# Exhibit 18

<u>Dhananjay Khaitan</u>
Name of Offeree

<u>38</u>
Circular No.

# ELGIN ASSISTED LIVING EB-5 FUND, LLC
## CHICAGOLAND FOREIGN INVESTMENT GROUP, LLC
### USCIS REGIONAL CENTER
### ELGIN MEMORY CARE, LLC
### IMMIGRANT INVESTOR FUND



## <u>PRIVATE PLACEMENT MEMORANDUM</u>

## AUGUST 2011

Confidential

This confidential Private Placement Memorandum (the "Memorandum") is being distributed on a limited basis to selected individuals and entities in connection with a private offering (the "Offering") of membership interests (the "Units") in ELGIN ASSISTED LIVING EB-5 FUND, LLC, an Illinois limited liability company (the "Company"). The Offering is made only to accredited investors who, upon admission to the Company, will become limited members of the Company (the "Members"). Each Member must make a capital contribution to the Company in an amount not less than $500,000.00 (the "Capital Contribution") per Unit. The manager of the Company (the "Manager") reserves the right to raise the requirement as to the minimum capital contribution at its sole discretion. The Manager is seeking commitments in the amount of $12,000,000.00 or less. The Manager may accept or reject subscriptions for Units at the Manager's sole discretion. The Offering will terminate on or before November 30, 2011 (the "Offering Deadline"), but may be extended at the sole discretion of the Manager.

The Company's investment objective is to provide investment funding to Elgin Memory Care, LLC ("EMC"), a to-be-constructed assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses, to enable EMC to create 10 direct or indirect fulltime jobs for U.S. workers for each $500,000.00 investment distributed to EMC.

To subscribe to Units in the Company, a prospective investor (an "Investor") must deliver to the Manager a signed Subscription Agreement and a **$500,000.00** Capital Contribution payment for each Unit to be purchased, to an escrow account at either FirstMerit Bank, N.A. or JP Morgan Chase, N.A. (the "Escrow Agent") in the method described herein. In addition to the $500,000.00 Capital Contribution, the Investor will also be responsible for an administrative fee (the "Administrative Fee"), payable to Chicagoland Foreign Investment Group, LLC ("CFIG"), the United States Citizenship and Immigration Services ("USCIS")-approved Immigrant Investor Pilot Program Regional Center, or CFIG's subsidiaries. The Administrative Fee paid to CFIG or CFIG's subsidiaries will be used, in part, to cover services in connection with the organization, documentation and filing fees associates with the limited liability company, escrow services, general administrative and marketing expenses, and the filing and prosecution of Investor's Form I-526 Petition for Alien Entrepreneur (the "Petition") with USCIS.

With respect to an Investor applying for approval of a Petition through the Immigrant Investor Pilot Program (the "Program"), before an Investor's Petition is approved by USCIS and the Investor obtains conditional lawful permanent residence in the U.S., the capital contribution subscription amount of $500,000.00 per Unit will be held in the Escrow Account. If USCIS approves the Investor's Petition, the Company will close on the Subscription Agreement, and the Investor will become a Member of the Company. The subscription payment of $500,000.00 will then be applied as the Investor's Capital Contribution to the Company, and the Capital Contribution will be released from the Escrow Account to the Company for the Company's use. If USCIS denies the Investor's Petition, then the capital contribution subscription payment of $500,000.00 per Unit will be released from the Escrow Account and returned to the Investor without interest as per the Escrow Agreement, one-half (1/2) of the Administrative Fee will be refunded from CFIG or CFIG's subsidiaries to Investor without interest within 90 days of the denial notice if there is no intent to appeal, and the Investor will be released from his or her obligation to purchase the Unit(s) from the Company.

**The Company does not expect to receive any distribution during the life of the investment, but expects to receive a 3% APR return on the investment monies distributed to EMC – with absolutely no guarantee on actual return.**

2

CFIG0407654

The Manager, in its sole discretion, will make investment decisions for the Company. The Manager is offering Membership Interests exclusively to "accredited investors" within the meaning of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"). There is no existing market for Units in the Company.

AN INVESTMENT IN THE COMPANY INVOLVES SUBSTANTIAL RISKS AND SHOULD BE CONSIDERED ONLY BY PERSONS WHO CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. SEE "RISK FACTORS." THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY THE UNITS IN ANY JURISDICTION WHERE THE OFFER AND SALE OF SUCH UNITS IS UNLAWFUL.

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS CONCERNING THE COMPANY OTHER THAN AS CONTAINED IN THIS MEMORANDUM, AND IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON. THE DELIVERY OF THIS MEMORANDUM DOES NOT IMPLY THAT THE INFORMATION SET FORTH IN IT IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

PRIOR TO THE SALE OF ANY UNITS OFFERED HEREBY, THE COMPANY WILL MAKE AVAILABLE TO EACH INVESTOR THE OPPORTUNITY TO ASK QUESTIONS OF AND RECEIVE ANSWERS FROM THE MANAGER CONCERNING THE TERMS AND CONDITIONS OF THIS OFFERING AND TO OBTAIN ADDITIONAL INFORMATION NECESSARY TO VERIFY THE ACCURACY OF THE INFORMATION CONTAINED WITHIN THIS MEMORANDUM, TO THE EXTENT THE COMPANY POSSESSES SUCH INFORMATION OR CAN ACQUIRE IT WITHOUT UNREASONABLE EFFORT OR EXPENSE.

INVESTORS SHOULD READ THE COMPANY'S LIMITED LIABILITY COMPANY OPERATING AGREEMENT AND THE SUBSCRIPTION AGREEMENT INCLUDED WITHIN THE EXHIBIT VOLUME FOR COMPLETE INFORMATION CONCERNING THE RIGHTS AND OBLIGATIONS OF INVESTORS WHO PURCHASE THE UNITS OFFERED HEREBY.

THE SECURITIES OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING CIRCULAR. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

The delivery of this Memorandum at any time does not imply that the information herein contained is correct as of any time subsequent to the date hereof.

**AUGUST 2011**

Confidential

CFIG0407655

## TABLE OF CONTENTS

Summary .................................................................................................................. 5-7

Company and Manager ..................................................................................................8

The Elgin Memory Care, LLC Business............................................................... 8-11

Conflicts of Interest.....................................................................................................11

Terms of the Offering ............................................................................................ 11-14

USCIS EB-5 Immigration Visa Program.............................................................. 14-17

Admissible to the United States............................................................................ 17-18

Key Provisions of the Limited Liability Operating Agreement............................ 19-20

Risk Factors .......................................................................................................... 21-27

Exhibit A – USCIS Regional Center Approval Letters

Exhibit B – The Elgin Memory Care, LLC Business Plan

Exhibit C – Operating Agreement
   -   Schedule A- Register of Members

Exhibit D – Subscription Agreement

Exhibit E – Escrow Agreement

Confidential

CFIG0407656

## SUMMARY

The following summary is intended to give prospective investors a brief overview of certain aspects of this Memorandum, the Units, and the Company. This summary is not a substitute for the more comprehensive and detailed information contained in the full Memorandum, along with all accompanying documents, exhibits, and schedules.

| | |
|---|---|
| **The Company** | The Elgin Assisted Living EB-5 Fund, LLC (the "Company") is an Illinois limited liability company formed on December 8, 2009. The address of the Company is 111 E. Wacker Drive, Suite 555, Chicago, Illinois, 60601, U.S.A. The Company's business purpose is to extend a $12,000,000.00, or less, investment loan to Elgin Memory Care, LLC ("EMC"), an Illinois limited liability company formed to develop, construct and operate a building in the City of Elgin, Illinois as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses. |
| **The Manager** | The Manager of the Company (the "Manager") is Chicagoland Foreign Investment Group, LLC ("CFIG"), an Illinois limited liability company. The address of CFIG is 111 E. Wacker Drive, Suite 555, Chicago, Illinois, 60601, U.S.A. CFIG is member-managed; as of this Memorandum CFIG's members are Dr. Henry Sharfaei and Mr. Taher Kameli. Mrs. Kamelia Winrow shall represent CFIG's management of the Company. |
| **The Offering** | The Company is offering to sell units of limited liability company interest (the "Units") to investors who meet suitability requirements described herein. The purchase price is $500,000.00 per Unit. Investors may purchase more than one Unit. Investors who purchase Units and have their Petition approved by USCIS will become members (the "Members") in the Company along with the Manager. The Units will be offered and sold on behalf of the Company by the Manager, although the Manager may retain the assistance of third parties to assist with the Offering. Investor will have the option of either depositing the entire $500,000.00 at once or in installments of $100,000.00 at the time of subscription and $400,000.00 within 30 days of the (1) approval of the Form I-526 or (2) the issuance of a request for evidence from USCIS, whichever is earlier. |
| | In addition to the $500,000.00 per Unit capital contribution investment, each Investor must pay an administrative fee (the "Administrative Fee") to CFIG or CFIG's subsidiaries. CFIG is approved as an Immigrant Investor Pilot Program Regional Center by USCIS. |
| | Upon funding, the Company will be granted a first priority security interest in all of the general business assets, real estate, buildings, and working capital of EMC. |
| | The Company shall receive an annual amount from EMC equal to 7% APR interest on the $12,000,000.00, or less, business loan for the life of the investment in quarterly payments. The Company shall immediately |

5

CFIG0407657

transfer 1% of the 7% APR interest received from the loan to its Manager for management and business expenses of the Company. 3% of the 7% APR interest shall remain with the Company to be retained and/or distributed according to the terms of the Company's Operating Agreement. The Company shall immediately transfer 3% of the 7% APR interest received from the loan to CFIG as a payment to monitor the Company's and EMC's compliance with the EB-5 Program requirements.

**Suitability**

In light of the long-term nature of an investment in the Units, their lack of liquidity, the various risk factors involved, and in order to ensure compliance with Federal, state, and non-U.S. securities laws, the Company will sell the Units exclusively to persons who are "Accredited Investors" as defined under Regulation D of the Securities Act of 1933, as amended (the "Act"). In order to purchase Units, a potential Investor must complete and execute the Subscription Agreement.

**Risk Factors**

An investment in the Units offered herein is subject to various risks which an Investor should carefully consider prior to making an investment. An Investor should carefully review those risks as set forth below in more detail in "Risk Factors."

**Transfer Restrictions**

There are substantial restrictions on transferring Units and no market for the Units exists or can be expected to develop.

**Use of Proceeds**

The Company intends to use the proceeds from the Offering to extend a $12,000,000.00, or less, investment loan to EMC to develop, construct and operate a building in the City of Elgin, Illinois as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate ten (10) or more direct or indirect fulltime jobs for each $500,000.00 capital contribution distributed to EMC.

The Administrative Fee will be used, in part, to cover services in connection with the organization, documentation and filing fees associated with the limited liability company, escrow services, general administrative and marketing expenses, and the filing and prosecution of Investor's Petition with USCIS.

**Allocation of Profits and Losses**

Except as otherwise provided by the Internal Revenue Code and in the Company's Operating Agreement, the Company's profits and losses shall be allocated to the Members in the same manner as their proportionate share of Units.

**Distributions**

Distributions will be made in accordance with the provisions set forth in the Operating Agreement. Any distributions will generally be distributed pro rata to the Members, but each Member should consult the complete terms of the Operating Agreement prior to entering into the Subscription Agreement. The Company expects to receive no return on the investment loan from EMC at the end of the five-year loan period, beginning on the date the full disbursement amount is transferred to

6

CFIG0407658

EMC, other than the amount of the original investment loan. The Company expects to receive from EMC the annual amount of 4% APR interest. 1% will be transferred immediately to the Manager and the remaining 3% will be retained and/or distributed by the Company as set forth in the Operating Agreement. An additional 3% will be received and immediately transferred to CFIG.

**Expenses and Management Fees**

The Manager will receive a management fee equal to 1% APR interest on the $12,000,000.00, or less, investment loan, to be paid quarterly, by the Company from quarterly interest payments received by EMC for the estimated five-year duration of the loan. CFIG will receive an annual 3% fee directly from the Company for the estimated five-year duration of the investment loan. This fee shall be to ensure that the Company and EMC comply with the EB-5 Program requirements.

**Exit Strategy**

The Company will continue its existence until the $12,000,000.00, or less, investment loan becomes due five years from the date the full disbursement amount is transferred to EMC and all I-829 adjudications are complete. Should EMC fail to repay the $12,000,000.00, or less, investment loan in full at the end of the five year term to the Company, the Company reserves the right to extend the terms of the loan or enforce the terms of the loan and foreclose on the secured assets to recoup the investment funds.

**Legal Counsel for Manager**

Kameli Law Group, LLC, and/or the Law Offices of Kameli & Associates, P.C., both located at 111 E. Wacker Drive, Suite 555, Chicago, Illinois, 60601, U.S.A. Kameli Law Group, LLC does not represent any Investors or Members in this Offering, and all Investors and Members are urged to consult their own legal, tax, immigration, and other advisors with respect to the Company, the Immigrant Investor Pilot Program and the Offering.

Confidential

CFIG0407659

## COMPANY AND MANAGER

Elgin Assisted Living EB-5 Fund, LLC (the "Company") is an Illinois limited liability company formed on December 8, 2009. The address of the Company is 111 E. Wacker Drive, Suite 555, Chicago, Illinois, 60601, U.S.A. The Company's business purpose is to extend a $12,000,000.00, or less, investment loan to Elgin Memory Care, LLC ("EMC") to develop, construct and operate a building in the City of Elgin, Illinois as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses. The term of the loan is to be five years from the date the full disbursement amount has been transferred to EMC. The Company does not plan on undertaking any other investment projects and plans to dissolve itself on the completion of the loan repayment and the conclusion of the Investors' immigration proceedings.

The Manager of the Company is Chicagoland Foreign Investment Group, LLC ("CFIG"), an Illinois limited liability company formed in order to manage, own and operate projects of the Chicagoland Foreign Investment Group, LLC USCIS-approved Regional Center. The current members of CFIG are Dr. Henry Sharfaei and Mr. Taher Kameli. Mrs. Kamelia Winrow shall represent CFIG's management of the Company.

Mrs. Kamelia Winrow is a highly accomplished visionary executive, with 17 years of expertise in supporting healthcare facilities and management companies (hospitals, outpatient clinics, nursing homes, long term care pharmacy and healthcare staffing companies) through critical start-up, or turnaround situations, and coordinating rapid-growth market expansions. Areas of expertise include, but are not limited to census development, strategic marketing, tactical planning, physician relations, physician recruitment, fundraising, customer service training, sales and presentation training, program integration, organizational development, executive recruitment, fiscal and program management, strategic partnership and alliances, business expansion and competitive market analysis.

## THE ELGIN MEMORY CARE BUSINESS

### Introduction

Elgin Memory Care, LLC is an Illinois-based limited liability company that has been formed for the purpose of developing and operating an assisted living facility for elderly patients, with a focus on providing care for patients with Alzheimer's and other memory-related illnesses. The company has targeted a site in the city of Elgin, Illinois for the location of its facility which will have a minimum of 80 Assisted Living and Memory Care units with a total initial capital investment of $12,000,000.00.

### Services

Assisted Living facilities provide services for residents that require assistance with Activities of Daily Living (ADL) on a frequent basis, but do not have a high enough level of infirmity to require residence at a nursing facility. These amenities and services range from housing, meals, laundry, housekeeping, transportation, social-recreational activities, maintenance, and security, to other similar services that are not medical or skilled nursing services. Customers that need assistance with Instrumental Activities of Daily Living (IADL) are not as predictive as the need for ADLs in terms of requiring a residential care facility. These services are offered by Assisted Living facilities and generally include management of medications, finances, shopping, preparing snacks, meals, and housework.

The Elgin Memory Care facility will have a minimum of 80 units available for occupancy, which estimated to be comprised of 56 Assisted Living units and 24 Memory Care units. The type of units and level of care that each client will require is segmented out, allowing clients to choose from the amenities

8

Confidential
CFIG0407660

and services that will best accommodate their specific healthcare needs. Elgin Memory Care will offer Studio, One-Bedroom, Two-Bedroom, and Memory Care units for its clientele to choose from based on their specific needs.

In conjunction with choosing the rights size of unit for clients, Assistance with Daily Living (SDL) services will be offered in a five tiered pricing structure that is designed to address the individual needs of each client. ADL service fees at Elgin Memory Care will cover three daily meals, utilities, regular housekeeping services, laundry-linen services, scheduled transportation, social activities, lounge area/community rooms, and a public dining room. In conjunction with basic services, Elgin Memory Care Center will offer specialized services based upon the level of assistance that clients need with Activities of Daily Living (ADL). These services most commonly will involve daily medication reminders, mobility assistance, meal monitoring, dressing/grooming assistance, and personal laundry service.

## Marketing and Sales Strategy

As the proposed management team for Elgin Memory Care's Assisted Living facility, Randall Residence will be tasked with marketing and sales for the facility. The company's experience and strategies applied in successfully operating Assisted Living facilities in Michigan and Ohio will carry over to Elgin Memory Care's Assisted Living facility. Randall Residence markets its facilities by utilizing three primary differentiation strategies; Pricing-to-Service, Direct Customer Marketing, and by an established reputation for providing high quality of life for clients at its facilities.

In developing a pricing strategy, Elgin Memory Care aims to provide high level services and amenities at competitive prices. Elgin Memory Care's unit pricing generally falls under or within the market price average for units in the Primary Market Area. By positioning the prices for Assisted Living units, Memory Care units, and Assistance with Daily Living (ADL) services at competitive prices compared to the Primary Market Area (PMA) average rates, while providing exceptional services, Elgin Memory Care believes that it has the strategies in place that will enable the facility to capture and retain market share when it enters the PMA and operations begin.

## Operations

Elgin Memory Care's Assisted Living facility is projected to commence operations in 2012. Is has been estimated that it will take two years for the facility to achieve occupancy rates that exceed the Primary Market Area average of 92.25%. Occupancy is projected to be 62.50% after the first twelve months of Operation Year 1 and rises to 93.80% at the end of Operation Year 2. The ability to hire and retain sound management to manage the initial Lease-Up phase of the facility is critical to the long-term success of Elgin Memory Care.

Payroll coverage at the facility will provide for visible nursing and care giver assistance throughout the facility. Properly trained therapy givers, and properly trained attendees on each floor, food service locations and customer service locations will provide help as required. With expected attendance from family with the patients on a seven days a week basis, proper visible customer service is essential to the success of the facility. The organizational plan addresses this by covering key support functions with adequate and well trained staff to assist the experience of patients and attendees.

9

CFIG0407661

**Financial Capitalization**

The financing requirement for capitalizing and developing Elgin Memory Care's facility in Elgin is estimated to cost $12,000,000.00. The minimum funding requirement to acquire land for the facility and begin construction is estimated to total $4,000,000.00. In the event that the entire $12,000,000 funding requirement is not met through the initial round of funding but the $4,000,000 threshold is crossed, Elgin Memory Care will explore multiple funding sources including bringing in additional equity partners, mezzanine financing, construction financing, and letters of credit as additional funding facilities to complete the construction and development of the project.

**Site Overview**

Elgin Memory Care will be located at 3251 U.S. Highway 20 in Elgin, IL. Elgin Memory Care's Assisted Living facility is projected to commence operations in 2012. The site is located in a Targeted Employment Area ("TEA") as designated by the Illinois Department of Commerce and Economic Development. Extensive research was done on the properties and buildings available, and after careful consideration and evaluation, it was decided that construction of a new building would result in a strong asset, predictable costs, and modern efficiencies.

**Management Summary**

Randall Residences, LLC will act as the manager of EMC. Randall Residence Group is a Lawton, Michigan based company that specializes in providing management services for senior living facilities. Randall has extensive experience and specializes in providing high-level senior assisted living services with a specific emphasis on memory care services for clients suffering from diseases such as Alzheimer's and dementia. Randall Residence was founded in 1975 when Charles Randall opened the company's first facility, White Oaks, in Lawton Michigan. Randall currently owns and operates six facilities in both Michigan and Ohio with four facilities offering specialty memory care services. The company is managed by Charles Randall and his son Christopher Randall who oversees the day-to-day operations of the company.

Randall Residence is the leading innovator in memory care and dementia care senior assisted living in the United States. Its care facilities located throughout the Midwest have been recognized for their care, compassion, and commitment to residents since 1948. Randall Residence is a three generation family managed business with both Chuck Randall as Chairman and son Chris Randall, President, as the visionary leaders for this unique and highly successful business. The Randalls welcome residents as family. They take great satisfaction in their years of service to seniors and see their occupation as a fulfilling mission.

Randall Residences' corporate office is located at 300 White Oak Road, Lawton, Michigan, 49065.

While the Company is currently offering Randall Residence, LLC as the manager of EMC, there is no guarantee that Randall Residence, LLC will remain in a position to operate the facility once constructed. The Company reserves the right to use another management group should Randall Residence, LLC be unavailable.

Confidential

CFIG0407662

## CONFLICTS OF INTEREST

As of now, Dr. Henry Sharfaei, DDS, and Mr. Taher Kameli are the two members of CFIG, which owns and operates the USICS-approved Immigrant Investor Pilot Program Regional Center.

Taher Kameli is the principal of the Kameli Law Group, LLC ("Kameli") and the Law Offices of Kameli & Associates, P.C. Mr. Kameli is also a member of CFIG. As of the date of this PPM, Mr. Kameli is also the sole member of Elgin Real Estate and Property Investments, LLC ("EREPI"); EREPI will receive a 70% equity interest in EMC upon distribution of the investment loan to EMC by the Company.

CFIG and or CFIG's subsidiaries may be reimbursed by EMC for start-up expenses and services rendered prior to funding.

Kameli serves as counsel to the Company and the Manager in connection with the formation of the Company and the offering of interests in the Company as well as other matters which the Company may engage Kameli from time to time pursuant to a written engagement letter. Kameli does not and will not, however, represent any individual Member concerning this Memorandum. Kameli also does not purport to represent the separate interests of the Members and have assumed no obligation to do so. Accordingly, potential investors and Members have not had the benefit of independent counsel in the structuring of the Company or determination of the relative interests, rights, and obligations of the Manager and the Members. Kameli may be contracted by CFIG to file and prosecute an Investor's Form I-526 with USCIS, but each Investor is free to locate and retain his or her own independent immigration attorneys including the Law Offices of Kameli & Associates, P.C.

Certain transactions and agreements included herein and entered into by the individuals listed above, as well as the companies affiliated with those individuals, will not be made in an arm's length and may not be as good as those obtained in an arm's length transaction.

## TERMS OF THE OFFERING

### The Offering

The Company is offering up to $12,000,000.00 in Units sold in $500,000.00 increments in reliance upon Rule 506 of Regulation D promulgated under the Securities Act of 1933 (the "Act") through the Manager. The Offering will terminate on the earlier of the date all of the Units are sold or November 30, 2011 (the "Offering Deadline"). The Manager, in its sole discretion, may extend the Offering or terminate the Offering at any time. An amount of approximately $12,000,000.00 will be sought but the Manager may close the Offering at a lower amount at the Manager's discretion.

Subscriptions will be accepted on a first come, first serve basis, subject to acceptance or rejection by the Company and the Manager in their discretion. Any rejected subscription funds will be returned promptly, without interest. The Company reserves the right to terminate the Offering for any reason at any time.

All subscriptions will be held in an escrow account, either interest bearing or non-interest bearing, at CFIG's discretion, at either FirstMerit Bank, N.A. or JP Morgan Chase Bank, N.A. maintained by the Company. When the Investors' Form I-526s have been adjudicated and the approval notices sent to the Escrow Agent, the subscriptions will be released from escrow account to the Company. The Company expects to receive no additional return on the original $12,000,000.00, or as otherwise applicable,

11

CFIG0407663

investment except for the return of the original investment amount itself. The Company expects to receive an interest amount from EMC as provided below.

In addition, to the $500,000.00 per Unit capital contribution investment, each Investor must pay an administrative fee (the "Administrative Fee") to CFIG or CFIG's subsidiaries The Administrative Fee will be used, in part, to cover services in connection with the organization, documentation and filing fees associated with the limited liability company, escrow services, general administrative and marketing expenses, and the filing and prosecution of Investor's Petition with USCIS. If USCIS denies the Investor's Petition, then one-half (1/2) of the Administrative Fee will be returned to the Investor by CFIG or CFIG's subsidiaries without interest within ninety (90) days.

## Manner of Offering; Compensation; Expenses

The Company intends to offer the Units through its Manager; CFIG. CFIG may retain third party companies to obtain funding and/or to administer relations for CFIG projects. Upon disbursement of the $12,000,000.00, or less, investment loan to EMC, the Company will be granted a first, priority security interest in all of the general business assets, real estate, buildings, and working capital of EMC.

Upon disbursement of the $12,000,000.00, or less, investment loan, or any portion thereof, EMC will pay to the Company an amount equal to 7% APR interest on the $12,000,000.00 investment or any outstanding portion thereof. This interest will accrue from the time the investment loan funds are distributed to EMC until operational revenues or other means are available for payment. Of the 7% APR interest, 1% APR interest shall be immediately transferred to its Manager. This will represent the Manager's sole compensation for the Manager's duties during the term of the loan.

The Company shall pay 3% APR interest in quarterly installments to CFIG as a fee for CFIG's supervision of EMC and the Company's compliance with EB-5 requirements, including proper auditing of the Company.

The remaining 3% APR interest shall remain with the Company and will be retained and/or distributed according to the terms of the Company's Operating Agreement.

The Company does not expect any commissions or any other form of remuneration.

## Security

The Company shall obtain a first, priority security interest in all of the general business assets, real estate, buildings, and working capital of EMC and the project. Should EMC fail to repay the investment amount provided by the Company upon termination of the five-year repayment plan, and should EMC's assets decrease in value, **it is possible that the Company may not recoup its full investment or any part thereof.**

## Restrictions on Transferability

The Partnership has not registered the Company Units under the Act or applicable state securities laws. Pursuant to Rule 506 of Regulation D, the Units will not be transferable. Accordingly, investors must still be able to bear the economic risk of purchasing the Units for an indefinite period of time.

12

CFIG0407664

## Who May Invest; Suitability

The Company's Units are a suitable investment only for those investors who are "accredited investors" as defined in Rule 501(a) under Regulation D, which include:

(i) Those with an individual net worth, or joint net worth including that person's spouse, at the time of the purchase of the securities that exceeds $1,000,000, **excluding the value of the primary residence of such person(s), and the related amount of indebtedness secured by the primary residence up to its fair value;**

(ii) Those with an individual income that exceeded $200,000 in each of the two most recent years and who expects to reach that income level in the current year; or

(iii) Those with joint income including that person's spouse that exceeded $300,000 in each of the two most recent years and who expects to reach that income level in the current year.

Investors in this Offering must also be persons who can afford to bear the economic risk of their investment for an indefinite period of time, whose business and investment experience either alone or together with an experienced advisor (who must be neither affiliated with nor compensated by the Company), makes them capable of evaluating the merits and risks of a prospective investment in the Company, have no need for liquidity in this investment, and could withstand a loss of all or substantially all of this investment.

Prior to being accepted for a purchase of Units, subscribers may be required to satisfy, and represent in writing that they have satisfied, certain investment suitability standards. These standards and representations include the following: (1) that the subscriber's overall commitment to investments which are not readily marketable is reasonable in relation to his or her net worth; (2) he or she is willing and able to bear the economic risk of his or her investment in the Company, has no need for liquidity in his or her investment, and is able to sustain a loss of substantially all his or her investment in the Company; (3) he or she has read the documents provided for the purpose of evaluating the risks of investing in the Company and has been afforded the opportunity to ask questions of and obtain additional information from the Company regarding the risks and merits of this investment; (4) he or she has substantial experience in making investment decisions of this type or is relying on his or her own qualified advisors in making the investment decision; and (5) he or she is purchasing the Units for his or her own account, for investment, and not with a view to resale or other distribution.

These suitability standards represent minimum suitability requirements for prospective investors and the satisfaction of such standards does not necessarily mean that the Units are a suitable investment for a prospective investor. In addition, the transfer of the Units by an investor will be subject to compliance with the transfer requirements imposed by federal and state securities laws.

## Subscription Procedure

Included in this Memorandum are subscription documents containing certain information which the Company will use to assist in determining whether a prospective investor meets specified criteria for purchase of the Units and various forms and signature pages including the Subscription Agreement which will be used, if the subscription is accepted, to issue Unit(s) to the Investor. Execution of the signature page to the Subscription Agreement evidences an agreement to be bound by all the terms and provisions of the Subscription Agreement. In addition, execution of the signature page to the Subscription Agreement constitutes a representation by the prospective investor that he or she has read all the documents included in this Memorandum.

13

CFIG0407665

Execution and delivery of the Subscription Documents constitutes an irrevocable subscription for Units by a prospective investor, but does not obligate the Company to accept the subscription. Executed subscription documents, including the appropriate signature pages, should be delivered to the Company together with funds in the appropriate amount of a $500,000.00 (or $100,000.00 as described below) capital contribution as provided in the following instructions and in the Escrow Agreement.

Notwithstanding the representations of investors made in the subscription documents, the Company retains the right to determine the suitability of the investment for a particular investor and to accept or reject any subscription in whole or in part.

Investors wishing to subscribe for a Unit in the Company are required to deliver to the Company:

(1)     $500,000.00 (or $100,000.00 now, and $400,000.00 within 30 days of the (1) approval of the Form I-526 or (2) issuance of a request for evidence from USCIS, whichever is earlier) to the Company via the Escrow Agent by wire transfer of funds, representing the capital contribution for the Unit;

(2)     An Executed Subscription Agreement; and

(3)     An Executed Escrow Agreement.

14

CFIG0407666

# USCIS EB-5 IMMIGRATION VISA PROGRAM

## Generally

Under section 203(b)(5) of the 1990 Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5) immigrant visas are available to qualified individuals seeking permanent resident status on the basis of their engagement in a new commercial enterprise.

The immigrant seeking permanent resident status must demonstrate that this investment will benefit the U.S. economy and preserve and/or create the requisite number of full time jobs for qualified persons within the U.S. Specifically, eligible individuals include those who (1) establish a new commercial enterprise, (2) have invested or who are actively in the process of investing at least $1,000,000.00 or $500,000.00 where the investment is being made in a "targeted employment area" which is an area that has experienced unemployment of at least 150% of the national average rate or a rural area as designated by OMB, (3) whose engagement in the enterprise will benefit the United States economy creating full time employment, directly or indirectly, for not fewer than 10 qualified individuals, and (4) those that can prove that their investment comes from a lawful source of funds.

## Government Regulation

Regulations, regulatory actions, and court decisions in the future could have both a positive and/or negative impact on CFIG's and the Company's ability to compete. CFIG and the Company will be under substantial scrutiny by the agency responsible for oversight of the USCIS EB-5 program. CFIG and the Company understand the future scrutiny and have put in place a system of checks and balances designed to monitor and report on a timely basis every requirement of the EB-5 program.

## The Immigrant Investor Pilot Program

The Immigrant Investor Pilot Program is ideal for the retiree or inactive investor due in large part to the "indirect employment creation" requirement and possible limited partner features of this program. The Immigrant Investor Pilot Program advantageously removes the 10 employee requirement of the regular program and substitutes the less-restrictive "indirect employment creation," which allows the investor to qualify for an EB-5 Visa without hiring 10 people in the company that the investor has invested in. So, in a nutshell, under a Immigrant Investor Pilot Program, the investor can qualify by presenting evidence that 10 jobs will be created throughout the Regional Center economy, supported by an economist's report obtained by the Regional Center.

Also, the EB-5 policy management requirement is minimal in that the investor can be a limited partner with only a policy-making role and still qualify. Thus, for those who are not interested in day-to-day management or running an active business, Immigrant Investor Pilot Programs offer a more acceptable form of investment for the inactive investor.

Another advantage of the Immigrant Investor Pilot Program is the ability of the investor to live wherever he or she wishes in the U.S. The investor is not required to live in the same geographic area that the investment is made. For example, the investor may invest in CFIG, but choose to live in California.

Under mandate by Congress, Regional Center EB-5 petitions are given priority which often results in a quicker path to approval.

15

Confidential
CFIG0407667

## EB-5 Visa: Case Processing Procedures

For applicants outside the United States:

- The applicant first makes a qualifying investment.
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- The U.S. Department of State's National Visa Center processes the EB-5 immigrant visa through the local U.S. consular post with jurisdiction over the place of residence.
- The applicant uses the EB-5 immigrant visa to enter the United States, which commences the two-year conditional lawful permanent resident status.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

For applicants having lawful non-immigrant status within the United States and staying in the United States:

- The applicant first makes a qualifying investment.
- The applicant files a Form I-526 petition (and supporting documents) with USCIS.
- On approval of Form I-526, the applicant files a Form I-485 (Application to Register Permanent Residence or Adjust Status).
- Upon approval of the Form I-485, the applicant is granted a conditional lawful permanent resident status, which is valid for two (2) years.
- Approximately 21 months later, the applicant must file a Form I-829 to remove the conditional status.
- The applicant must provide supporting documents to establish that they have satisfied all EB-5 qualifying conditions.
- Upon approval, a new ten-year unconditional green card is issued.

### Active Investment

The EB-5 program is expected to create proven employment that is generated through a viable and registered commercial enterprise. The EB-5 regulations require only minimal involvement in management or policy making.

### Timing of investment

The EB-5 program procedures requires an investor to first make a qualifying investment, and then file a Form I-526 petition (and supporting documents) with USCIS. The applicant must thus be prepared for situations where - if the application is denied – he or she would have incurred irrecoverable expenses on foreign exchange transfer and then getting the investment returned. The investor might also have disposed of some valuable asset to arrange liquid funds in the first place and would be required to look for new investment assets. The investor should factor in expenses as well as costs and losses that he or she might incur while going through sale and purchase of assets. From the time that the investor makes the investments and time he or she receives the money back, the investor will need to factor in the lost interest in the process.

16

CFIG0407668

**Conditional Lawful Permanent Residence (Green Card)**

Upon approval, the investor will only be granted the status of a conditional lawful permanent resident for two years. During the interim period he or she should be able to prove that the commercial enterprise in which his or her funds were invested met the conditions for removing the conditional residence status, particularly related to the creation of 10 direct or indirect jobs on an ongoing basis. Should the investor not be able to demonstrate that he or she has met the conditions for removing the conditional residence status, the investor will be asked to leave the U.S.

**Troubled Business**

In the case of a capital investment in a troubled business, employment creation may meet the criteria set forth in 8 CFR 204.6(j)(4)(ii). This section states that in order to show that a new commercial enterprise which has been established through a capital investment in a troubled business meets the statutory employment creation requirement, the petition must be accompanied by evidence that the number of existing employees is being or will be maintained at no less than the pre-investment level for a period of at least two years. Photocopies of tax records, Forms I-9, or other relevant documents for the qualifying employees and a comprehensive business plan shall be submitted in support of the petition. An investment entity's qualification or non-qualification as a Troubled Business may have some effect on the Company's ability to demonstrate sufficient job generation for purposes of approving Form I-526s.

**Dependent definition**

U.S. law permits a spouse or a dependent less than 21 years old at the time of Consulate interview or at the time of adjustment of status interview, with certain exceptions such as the Child Status Protection Act, to be considered as part of the application under EB-5.

## ADMISSIBLE TO THE UNITED STATES

Immigrant Investors applying for U.S. lawful permanent residence must demonstrate that they are admissible to the U.S. Section 212 of the Immigration and Nationality Act sets forth various grounds of inadmissibility, which may prevent an otherwise eligible Investor from receiving lawful permanent residence or entering the U.S. Immigrant Investors who are ineligible to receive conditional lawful permanent residence or be admitted to the U.S. include but are not limited to an individual who:

(1) Is determined to have a communicable disease of public health significance, which shall include infection with the etiologic agent for acquired immune deficiency syndrome;

(2) Is determined to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the individual or others;

(3) Is determined to have a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the individual or others and which behavior is likely to recur or to lead to other harmful behavior;

(4) Is determined to be a drug abuser or addict;

(5) Has been convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political

17

CFIG0407669

offense), or a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance;

(6) Has been convicted of 2 or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial or whether the offense involved moral turpitude, for which the aggregate sentences to confinement were 5 years or more;

(7) Is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 102 of the Controlled Substances Act (21 U.S.C. § 802)), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking in any such controlled or listed substance or chemical, or endeavored to do so;

(8) Is the spouse, son, or daughter of an alien inadmissible under clause (7) and has, within the previous 5 years, obtained any financial or other benefit from the illicit activity of that alien, and knew or reasonably should have known that the financial or other benefit was the product of such illicit activity;

(9) Is coming to the U.S. solely, principally, or incidentally to engage in prostitution, or has engaged in prostitution within 10 years of the date of application for a visa, admission, or adjustment of status;

(10) Directly or indirectly procure or attempts to procure, or (within 10 years of the date of application for a visa, admission, or adjustment of status) procured or attempted to procure or to import, prostitutes, or persons for the purpose of prostitution, or receives or (within such 10 year period) received, in whole or in part, the proceeds of prostitution;

(11) Is coming to the U.S. to engage in any other unlawful commercialized vice, whether or not to prostitution;

(12) Has committed in the U.S. a serious criminal offense, regardless of whether such offense was prosecuted as a result of diplomatic immunity;

(13) Is excludable from the U.S. on grounds relating to national security, related grounds or terrorist activities;

(14) Is excludable from the U.S. on grounds relating to foreign policy;

(15) Is or has been a member of or affiliated with the Communist or any other totalitarian party or who has participated in Nazi prosecutions or genocide;

(16) Is likely to become a public charge at any time after entry;

(17) By fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission to the U.S.;

(18) Illegally entered into the U.S.; or

(19) Has at any time knowingly encouraged, induced, assisted, abetted, or aided any other alien to enter or to try to enter the U.S. in violation of law.

18

Confidential

CFIG0407670

# KEY PROVISIONS OF THE LIMITED LIABILITY COMPANY OPERATING AGREEMENT

## General

The Company's Operating Agreement governs the operations of the Company and the rights and duties of the Manager and the Members.

Any prospective Investor should review the entire Operating Agreement before subscribing for Units. The following is merely a summary of some of the significant provisions of the Operating Agreement and is qualified in its entirety by the full text of the Operating Agreement. Capitalized terms in this section not otherwise defined shall have the same meaning as set forth in the Operating Agreement.

Elgin Assisted Living EB-5 Fund, LLC (the "Company") is an Illinois limited liability company formed on December 8, 2009. The address of the Company is 111 E. Wacker Drive, Suite 555, Chicago, Illinois, 60601, U.S.A. The Company's purpose is to (i) provide investment funding to Elgin Memory Care, LLC ("EMC"), to develop, construct and operate a building in the City of Elgin, Illinois as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to enable EMC to create 10 direct or indirect fulltime jobs for U.S. workers for each $500,000.00 investment distributed to EMC, (ii) to develop and monitor the Company investment strategy, and (iii) to determine an orderly dissolution strategy of the Company proceeds. The investment loan is to have an estimated duration of five years from the date the full disbursement amount is transferred to EMC. The Company does not plan on undertaking any other investment projects and plans to dissolve itself upon the completion of the loan repayment and the conclusion of the Investors' immigration proceedings.

## Authority of Members

All Members are authorized and required to participate in the business of the Company to the extent illustrated for members pursuant to the Act and therefore are entitled to vote on any matter submitted to a vote for the consent of the Members as provided under this Agreement. No Member, in his or her capacity as a Member shall: (a) execute any document that binds, or purports to bind, the Company or any Member; (b) hold itself out as having the power or authority to bind the Company or any Member; (c) undertake any obligation or responsibility on behalf of the Company; or (d) bring any action for partition or sale in respect to any or all of the assets or property of Company or record or permit any encumbrance in respect to any such property.

## Limitations on Management Authority

The Manager, or any officer, employee, or agent of the Company shall not be able to take any of the following actions without obtaining the consent of approval of Members owning or holding a majority of then outstanding Units entitled to vote: (a) Do any act which is in contravention of or inconsistent with this Agreement or any other agreement to which the Company is a party; (b) Do any act which would make it impossible to carry on the ordinary business of the Company; (c) Materially change the nature of the business or purpose of the Company; (d) Take any action that would cause the termination of the Company for federal income tax purposes under Section 708 of the Code; or (e) Confess any judgment against the Company.

19

CFIG0407671

## Liabilities of Investors

All Investor's capital is subject to the risks of the Company's business; including total loss of investment. However, the Investors will have no obligation to contribute additional capital to the Company after the initial contribution.

## Interest on Capital

A Member will not be entitled to receive interest on any portion of its Capital Contributions or Capital Account in excess of the anticipated three percent (3%) APR return on the Capital Contribution, unless otherwise provided for herein.

## Buyback

After the fifth anniversary of the full distribution of the investment loan to EMC, or the final adjudication of each Member's Form I-829 Petition to Remove Conditions on Residence of Alien Entrepreneur, whichever is later, the Investor has the option to sell the Member's Unit(s) or exchange the Unit(s) for the Member's pro rata share of EMC's repayment of the investment loan.

## Restrictions on Transfer of Units in Company

Generally an Investor may not transfer his or her Unit(s) in the Company before the fifth anniversary of the full investment loan disbursement to EMC. After such fifth anniversary, an Investor's transfer of his or her Unit(s) will be subject to certain limitations.

## Tax Elections

The Manager is authorized to cause the Company to make or revoke such elections for federal income tax purposes as they, in their sole discretion, deem necessary or advisable. The Manager's authority with respect to the making of tax elections specifically includes, but is not limited to, the authority to elect, pursuant to Section 754 of the Code (or corresponding provisions of succeeding law), to adjust the basis of Company assets if there has been a transfer of a Member's interest in the Company. Each Member agrees to furnish the Company, upon request, all information necessary to give effect to any such election.

## Special and Limited Power of Attorney

The Manager will at all times during the existence of the Company have a special and limited power of attorney as the attorney-in-fact for each Member, with power and authority to act in the name and on behalf of each Member to make, execute, acknowledge and file certain documents the Manager deems necessary for Company business, with certain exclusions listed in the Operating Agreement.

## Term and Termination

The Company will continue in existence until terminated. The Company will be dissolved and its affairs will be wound up upon the happening of the first to occur of the following: (a) The unanimous agreement of the Members after all I-829s are fully adjudicated; (b) The sale or other disposition of all or substantially all of the assets of the Company; (c) The entry of a decree of judicial dissolution; (d) Upon the expiration of two years after the effective date of administrative dissolution; or (e) Any other event or act causing dissolution of the Company pursuant to the Act or this Agreement.

20

Confidential

CFIG0407672

**Independent Legal Advice**

EACH MEMBER IS INSTRUCTED TO SEEK INDEPENDENT LEGAL ADVICE CONCERNING THEIR RESPECTIVE RIGHTS AND RESPONSIBILITIES CONCERNING THIS AGREEMENT.

# RISK FACTORS

An investment in Membership Interests involves a degree of risk and is suitable only as an investment for persons of substantial means that have no need for liquidity with respect to such investment. Prospective investors should carefully consider the risk factors set forth below as well as other risks specified in this Memorandum before making a decision to invest in the Company.

**Nature of Investment**

An investment in the Company requires a long-term commitment, with no certainty of return. All of the Company's investments will be relatively illiquid, and there can be no assurance that the Company will be able to realize on such investments in a timely manner. The Company's investment strategy may involve a high degree of financial risk, and there can be no assurance that the Company's rate of return objectives will be realized or that there will be any return of capital. There is no assurance that there will be a ready market for resale of the Company's investments because investments in real estate generally are not liquid. The possibility of partial or total loss of capital will exist and investors should not subscribe unless they can readily bear the consequences of such loss. No assurances can be given that the targeted investment returns discussed elsewhere in this Memorandum will be realized.

**No Prior History**

The Company is a newly-formed entity with no prior operating history by which investors can gauge potential future results. The Company's proposed operations are subject to all of the risks inherent in the establishment of a new business enterprise. There can be no assurance that any of the Company's investments will meet the Company's desired target returns. Additionally, the Company, the Manager, and none of their principals have any prior history with operating a venture capital firm, or the underlying investment assisted living facility.

**Unproven Business Model**

The Company expects that EMC will generate sufficient operating cash flow that it will be able to generate sufficient proceeds. In the event the Company's assumptions about the revenues or operating expenses of EMC are inaccurate, EMC may not be able to obtain sufficient proceeds to repay the Members' Capital Contributions in full or at all.

**General Real Estate Risks**

The Company's investment in EMC will be subject to the risks incident to the ownership and operation of real estate, including risks associated with both the domestic and international general economic climate, local real estate conditions, changes in supply of, or demand for, competing properties in an area (as a result, for instance, of over-building), energy and supply shortages, various uninsured or uninsurable risks, natural disasters, the ability of the Company or third-parties to manage the properties, government

21

CFIG0407673

regulations (such as rent control), potential environmental and other legal liabilities. Certain of these risks cannot be predicted with certainty or controlled by the Manager.

## Lack of Diversity in Company Business

A lack of diversity in Company investments may increase the risk associated with the Company. The Company intends on investing in EMC, located in Elgin, Illinois for the purpose of generating ten (10) direct or indirect jobs for each $500,000.00 loan increment distributed. The investment in EMC by the Company will have an expected term of five years, beginning once the last of the investment funds are distributed to EMC. The Company's focus on one type of industry may increase the risks associated with the Member's investments.

## Environmental Risks

Under various federal, state and local environmental laws, ordinances and regulations, a current or previous owner or operator of real property may be held liable for the cost of removal or remediation of certain hazardous or toxic substances that could be located on, in or under such property. Such laws and regulations often impose liability whether or not the owner or operator knew of, or was responsible for, the presence of the hazardous or toxic substances. In addition, EMC's facilities will be subject to laws relating to the disposal of biohazardous waste. The costs of any required remediation or removal of these substances could be substantial, and the liability of an owner or operator as to any affected property is generally not limited under such laws and regulations and could exceed the property's value and the aggregate assets of the owner or operator. In connection with the ownership or operation of its facilities, EMC could be liable for these remediation costs or fines. As a result, the presence, with or without the Company's knowledge, of hazardous or toxic substances at any property held or operated by EMC, or acquired or operated by EMC in the future, could have a material adverse effect on the Company's business, financial condition, and results of operations.

## Reliance on Key Personnel

The success of the Company is substantially dependent on the principals of the Manager, which control the Company, and the principals of EMC. Should one or more of these individuals become incapacitated or in some other way cease to participate in the Company or EMC, the Company's performance could be adversely affected. Failure to replace such personnel could have a material adverse effect on the Company.

While the Company is currently offering Randall Residence, LLC as the manager of EMC, there is no guarantee that Randall Residence, LLC will remain in a position to operate the facility once constructed. The Company reserves the right to use another management group should Randall Residence, LLC be unavailable.

## Lack of Management Rights

Members will have no opportunity to control the day-to-day operation, including investment and disposition decisions, of the Company. These decisions shall be vested in the Manager.

## Restrictions on Transfer and Withdrawal

Except for certain estate planning transfers, the Units are not transferable except with the consent of the Manager and otherwise in accordance with the terms of the Operating Agreement. Members may not withdraw capital from the Company. The Units will not be registered under the Securities Act and the

22

CFIG0407674

Units may not be resold unless such sale is registered thereunder or an exemption from registration is available. The Manager does not intend to register the Units and the Members have no right to require such registration. In addition, there is no existing public or other market for the Units and it is not anticipated that any such market will develop. The Company will not be registered as an investment company under the Investment Company Act of 1940. Each Member will be required to represent that it is an "accredited investor" and is acquiring its Unit for investment and not with a view of resale or distribution. Each Member must be prepared to bear the economic risk of an investment for an indefinite period.

### Conflicts of Interest

The principals of the Manager are investors in, and may devote significant time in the future to the management of other investment entities sponsored by the Manager or its affiliates. It is possible that such investment entities may own properties in the same general area as the Company's investment businesses, and that such businesses may be in competition with those of the Company.

### Tax Considerations

An investment in the Company involves complex federal, state, and local income tax considerations, which will differ for each Member. Although the Manager will make reasonable efforts to avoid generating income taxable to a tax exempt investor, a significant portion of a tax-exempt Member's allocable share of Company income may constitute "unrelated business taxable income" in the hands of such Member, and a foreign Member's allocable share of such income (as well as gain from the sale or disposition of an interest in the Company) generally will be treated as effectively connected with a U.S. trade or business. Furthermore, all Members may become subject to state and local income or franchise taxes and withholding thereof in jurisdictions where the Company acquires real estate or otherwise conducts activities or is deemed to be engaged in business.

**Note that all U.S. citizens and lawful permanent residents, regardless of where they live or where their monies are earned, remain subject to U.S. taxation.**

### No Internal Revenue Service Rulings

The Company will not seek rulings from the IRS with respect to any of the federal income tax considerations noted in this Memorandum. Thus, positions taken by the IRS as to tax consequences could differ from positions taken by the Company. For example, if the IRS determined that the Company's allocations of taxable income, gain, loss, and deduction were not in accordance with the Members' interests in the Company, then such items could be reallocated among the Members in accordance with the determination of the IRS or a court as to the Members' respective interests in the Company.

IN VIEW OF THE COMPLEXITY OF THE TAX ASPECTS OF THIS OFFERING, PARTICULARY IN LIGHT OF THE FACT THAT CERTAIN TAX ASPECTS OF THE OFFERING MAY NOT BE THE SAME FOR ALL INVESTORS, PROSPECTIVE PURCHASERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATIONS PRIOR TO INVESTING IN THE COMPANY.

### ERISA Considerations

If the Company is required to qualify as a "real estate operating company" and/or a "venture capital operating company" in order to avoid holding "plan assets" within the meaning of ERISA, the Company may be restricted or precluded from making certain investments. In addition, such avoidance could

Confidential

CFIG0407675

require the Manager to liquidate Company investments at a disadvantageous time, resulting in lower proceeds to the Company than might have been the case without the need for such compliance. If the Company fails to qualify as an "operating company," the Manager will be free to take any reasonable effort to preclude the assets of the Company from being "plan assets," including redemption of Members which are ERISA-covered plans.

## Possible Legislative or Other Developments

All statements contained herein concerning the federal income tax consequences of an investment in the Company are based upon existing law and the interpretations thereof. Therefore, no assurance can be given that the currently anticipated income tax treatment of an investment in the Company will not be modified by legislative, judicial, or administrative changes, possibly with retroactive effect, to the detriment of the Members. There can be no assurance that there will not be changes in a variety of other applicable laws which may adversely affect the Company's investments.

## Undistributed Income

The Company in its sole discretion may, but is not required to, make distributions to Members. Taxable income realized in any year by the Company will be taxable to the Members in that year regardless of whether they have received any distributions from the Company. Accordingly, Members may obtain taxable income for federal, state, and local income tax purposes without receiving any or a sufficient distribution from the Company with which to pay the taxes thereon. The Company will consider such possible tax liability of the Members when determining whether to make distributions, but no assurance is given that distributions, if made, will equal the amount of any Member's tax liability.

## Importance of General Economic Conditions

Overall market, industry or economic conditions, which the Company cannot predict or control, will have a material effect on performance.

## Absence of Securities Registration

The Limited Liability Company Interests have not been registered for sale under federal law or any state law and is being offered pursuant to an exemption from the registration provisions of Section 4(2) of the Securities Act of 1933, and Rule 506 promulgated thereunder. Therefore, no governmental agency has reviewed this Memorandum and no state or federal agency has passed upon either the adequacy of the disclosure contained in this Memorandum or the fairness of the terms of the Offering. The exemptions relied upon in this Offering are significantly dependent upon the accuracy of the representations of the purchasers to be made in their respective Subscription Agreements. In the event that any such representations prove to be untrue, the registration exemptions relied upon by the Company in selling the securities might not be available and substantial liability to the Company would result under applicable securities laws for rescission or damages.

## Indemnification

The Company will be required to indemnify the Manager and certain persons affiliated therewith for losses, costs, liabilities, and expenses incurred by such parties in connection with the business of the Company and decisions made on its behalf, except for such actions taken in bad faith or which constitute gross negligence or willful misconduct. Such liabilities may be material and may have an adverse impact on the Member's investments. The indemnification obligation of the Company will be payable from the assets of the Company.

24

CFIG0407676

## Projections: Forward Looking Information

EMC has prepared projections regarding its anticipated financial performance. These projections are hypothetical and based upon no historical financial performance of EMC, simply the sophisticated and well funded marketing plan, and other factors influencing the business of EMC. The projections are based on EMC's best estimate of the probable results of operations of EMC, based on present circumstances, and have not been reviewed by independent accountants. These projections are based on several assumptions, set forth therein, which EMC believes are reasonable. Some assumptions upon which the projections are based, however, invariably will not materialize due to the inevitable occurrence of unanticipated events and circumstances beyond EMC's control. Therefore, actual results of operations will vary from the projections, and such variances may be material. Assumptions regarding future changes in sales and revenues are necessarily speculative in nature. In addition, projections do not and cannot take into account such factors as general economic conditions, unforeseen regulatory changes, the entry into EMC's market of additional competitors, the terms and conditions of future capitalization, and other risks inherent to EMC's business. While the Company believes that the projections accurately reflect possible future results of EMC's operations, those results cannot be guaranteed.

## Immigration Risks

The Company makes no representation or warranty of any kind concerning whether an investment in the Company will meet the requirements of the Immigrant Investor Pilot Program or other U.S. immigration requirements. No assurances can be given that an investment in the Company will result in an immigrant investor receiving an EB-5 Visa or conditional or permanent resident status in the U.S.

Investors in this Offering who have subscribed for Units with the intention of applying for U.S. conditional permanent residence through investment in the Company should be aware of certain risk factors relating to immigration to the U.S. and the Immigrant Investor Pilot Program and its administration. An immigrant investor who purchases Units with the intention of obtaining U.S. conditional permanent residence is encouraged, along with his or her advisors, to make his or her own independent review of the Immigrant Investor Pilot Program and the various immigration risk factors relating to the process in obtaining conditional and permanent residency status to determine if an investment in the Units is a suitable approach for such immigrant investor.

General Immigration Risks. Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an immigrant investor or the Company. Immigrant investors who obtain conditional or permanent residence status must intend to make the U.S. his or her primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining permanent resident status involves numerous factors or circumstances which are not within the control of the Company. These include an immigration investor's past history and quotas established by the U.S. Government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Immigrant Investor Pilot Program.

Regional Center Designation. CFIG was designated as a regional center by USCIS on March 5, 2009 to participate in the Immigrant Investor Pilot Program. Accordingly, the personnel within CFIG have limited experience administering the Immigrant Investor Pilot Program, which could lead to delays for immigrant investors in the process of obtaining conditional or permanent resident status.

Immigrant Investor Pilot Program Expiration. The expiration date for the Immigrant Investor Pilot Program is September 30, 2012.

25

CFIG0407677

Use of Immigration Attorney and Processing Time. The filing of the Form I-526 Petition for Alien Entrepreneur with USCIS should be done with a qualified U.S. immigration attorney. As of this Memorandum, the processing time for USCIS to approve a Petition is up to eighteen (18) months, although the processing times may take longer depending upon an individual investor. Once approved by USCIS, the case will either be forwarded to the U.S. Department of State National Visa Center and then to a U.S. Consulate selected by the immigrant investor for processing or, if the immigrant investor is already in the U.S., the immigrant investor may adjust his or her status to that of conditional permanent resident. It may, however, take an additional four to six months or longer for a U.S. Consulate to process the Petition, or for the USCIS to adjust an immigrant investor's status, and issue conditional permanent residency.

Proving Lawful Source of Funds. As part of the Form I-526 Petition, an immigrant investor must present to the USCIS clear documentary evidence of the source of funds invested, the path of the funds to the Company, and that the funds belong to the immigrant investor. Generally, the immigrant investor can satisfy the source of funds requirements by submitting documents showing that he or she has a level of income from legal sources that would yield sufficient funds for the investment. The USCIS generally requires copies of income tax returns to satisfy the source of funds requirement. For immigrant investors who do not have such records, there may be other records that can be provided to the USCIS by an immigrant investor to demonstrate that the investment funds came from legal sources. All such matters regarding the immigrant investor's Petition should be discussed with his or her immigration counsel.

Policymaking Position. The Immigrant Investor Pilot Program requires an immigrant investor to hold a policymaking or management position within the Company. The Company believes that each investor, as a limited liability company member, is provided with the powers and duties under the Operating Agreement sufficient to meet the USCIS requirement than an immigrant investor be actively participating in policymaking or management of a new commercial enterprise.

At-risk Investment. An immigrant investor's investment must be at risk to qualify for the Immigrant Investor Pilot Program. As part of the conditional permanent residency application, an immigrant investor must show evidence that he or she has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk. The Company believes that an investor who invests in the Company has placed his or her capital contribution to the Company at risk because there is no assurance that the businesses to which the Company lends money will be able to repay the loan when due or at any time.

**Risks Associated With Investment in Installments. AN IMMIGRANT INVESTOR MUST BE AWARE THAT SHOULD HE OR SHE CHOOSE TO INVEST HIS OR HER CAPITAL CONTRIBUTION IN INSTALLMENTS, I.E. $100,000.00 AT TIME OF SUBSCRIPTION AND $400,000.00 WITHIN 30 DAYS OF APPROVAL OF THE FORM I-526 OR UPON ISSUANCE OF A REQUEST FOR EVIDENCE BY USCIS, WHICHEVER IS EARLIER, THAT INVESTOR RISKS THAT USCIS MAY NOT APPROVE HIS OR HER FORM I-526 FOR NOT HAVING MET THE MINIMUM INVESTMENT AMOUNTS. FEDERAL REGULATIONS, NOTABLY 8 C.F.R. § 204.6(J)(2), PROVIDE THAT AN INVESTOR MUST ONLY BE "IN THE PROCESS" OF INVESTING THE MINIMUM $500,000.00 AMOUNT IN ORDER FOR A FORM I-526 TO BE APPROVED. HOWEVER, USCIS HAS SOMETIMES ACTED IN CONTRADICTION TO THIS REGULATION AND THUS THE INVESTOR'S FORM I-526 MAY BE SUBJECT TO FURTHER ADJUDICATION SUCH AS AN APPEAL IF HE OR SHE INVESTS IN INSTALLMENTS.**

Confidential

CFIG0407678

**Further Investment Risks**

The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Company. Prospective Investors should read this entire Memorandum and consult with their own advisers before deciding whether to invest in the Companies. In addition, as the Company's investment program develops and changes over time, an investment in the Company may be subject to additional and different risk factors.

THE INVESTMENT OBJECTIVES AND METHODS SUMMARIZED ABOVE REPRESENT EMC'S AND THE MANAGER'S CURRENT INTENTIONS. THE FOREGOING DISCUSSION INCLUDES AND IS BASED UPON NUMEROUS ASSUMPTIONS AND OPINIONS OF EMC AND THE MANAGER CONCERNING FINANCIAL MARKETS AND OTHER MATTERS, THE ACCURACY OF WHICH CANNOT BE ASSURED. THERE CAN BE NO ASSURANCE THAT THE COMPANY'S INVESTMENT STRATEGY WILL ACHIEVE PROFITABLE RESULTS.

AN INVESTMENT IN THE COMPANY IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. NO SUBSCRIBER SHOULD HAVE ANY NEED FOR ANY MONIES INVESTED IN THE COMPANIES TO MEET CURRENT NEEDS OR ONGOING FINANCIAL REQUIREMENTS. EACH PROSPECTIVE INVESTOR MUST CAREFULLY ASSESS THE RISKS OF INVESTING BEFORE DETERMINING WHETHER TO SUBSCRIBE FOR ANY UNITS.

Each prospective investor should further understand that these forward-looking statements are necessarily based on the limited knowledge currently available to everyone concerned. Given the fact that many of the assumptions in this Memorandum will vary from what will actually occur, the prospective investor should treat the forward looking statements only as illustrations based upon the assumptions made, and not as the operating results of the Company as they will probably occur.

**THIS PRIVATE PLACEMENT MEMORANDUM IS APPLICABLE TO DISTRIBUTIONS MADE ON OR IMMEDIATELY AFTER THE DATE SET FORTH ON THE TITLE PAGE ABOVE. THE COMPANY RESERVES THE RIGHT TO AMEND THIS PRIVATE PLACEMENT MEMORANDUM FOR ANY OFFERING SUBSEQUENT TO SAID DATE.**

## NOTICE REGARDING NATIVE LANGUAGE TRANSLATION

Investor hereby agrees that it is the sole responsibility of Investor to ensure proper translation of this Agreement into their native language if necessary for Investor's understanding of the rights and obligations contained herein. Any language translation of this Agreement provided by any of the parties hereto is not a binding legal document, and is being provided solely for the Investor's convenience, and shall not in any way be construed as a contract or any part of this Agreement as set forth in English. None of the parties hereto are liable for any inaccuracies in any language translation or for any misunderstandings due to differences in language usage or dialect. In the event of any inconsistencies between this Agreement as set forth in English and any language translation, this Agreement as set forth in English and as executed shall govern. The Investor assumes the responsibility for fully understanding the nature and terms of the rights and obligations under this Agreement as set forth in English. None of the parties shall sign any translation of this Agreement.

27

CFIG0407679