**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| _____ ) | |
| **U.S. SECURITIES AND EXCHANGE** ) | |
| **COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civil Action No.: 1:17-cv-4686** |
| ) | **Judge Joan Gottschall** |
| **SEYED TAHER KAMELI,** *et al,* ) | |
| ) | |
| **Defendants,** ) | |
| ) | |
| **and** ) | |
| ) | |
| **AURORA MEMORY CARE, LLC,** *et al,* ) | |
| ) | |
| **Relief Defendants.** ) | |
| ) | |
| _____) | |

**DEFENDANTS SEYED TAHER KAMELI,**
**CHICAGOLAND FOREIGN INVESTMENT GROUP, LLC AND AMERICAN**
**ENTERPRISE PIONEER'S**
**POST-HEARING BRIEF IN OPPOSITION OF PLAINTIFF'S**
**MOTION FOR PRELIMINARY INJUNCTION**

Taher Kameli
1319 South State Street,
Chicago, IL  60605
(312)233-1000
One of Defendants attorneys

Defendants Seyed Taher Kameli ("Kameli"), Chicagoland Foreign Investment Group, LLC, ("CFIG"), and American Enterprise Pioneers ("AEP") (collectively, "Defendants") respectfully submit their post hearing statement of facts and brief in opposition of Plaintiff's Motion for Preliminary Injunction.

The purpose of a preliminary injunction is to preserve the status quo pending an ultimate decision on the merits. *E.g. EEOC v. City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980). Sections 20(b) and 21(d) of the Securities Act authorize the SEC to pursue injunctive relief to prevent further violations of Sections 10(b) and 17(a). 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d); *see SEC v. Hollnagel*, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007)(SEC may obtain injunction against further violations). To obtain a preliminary injunction, the SEC must show a likelihood of success as to (a) current violations and (b) a risk of repetition.[1] *Hollnagel*, 503 F. Supp 2d at 1058. The trial court, in turn, must fashion a remedy that satisfies the regulatory scheme while also serving

---

[1] The SEC is requesting two types of injunctive relief: (1) a statutory injunction prohibiting future violations; and (2) a conduct-based injunction against Mr. Kameli prohibiting him from participating in any EB-5 offering. (*See* SEC's Memo in Support of TRO, 28, Doc. No. 14-1.) However, statutory injunctive relief differs from traditional equitable injunctive relief. *CFTC v. Oystacher*, 2016 U.S. Dist. LEXIS 89934 at *15 (N.D. Ill.). To obtain a conduct-based injunction, the SEC, like a traditional litigant, must show: (1) a likelihood of success on the merits; (2) an inadequate remedy at law; (3) a threat of irreparable harm; and (4) the impact on public interest. *See SEC v. Cherif*, 933 F.2d 403, 407-08 (7th Cir. 1991). Despite requesting equitable relief, the SEC never addresses its requirements, instead maintaining that it is not required to prove irreparable harm or inadequate remedy. (SEC's Memo in Support of TRO, 22-23, Doc. No. 14-1)(citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990). This is a non sequitur. If the SEC is not required to prove irreparable harm and inadequate remedy, then, implicitly, it must still show the remaining elements: likelihood of success and the impact on public interest. It did not do so. (*See id.* at 22) (SEC must show a current violation and risk of repetition).

Instead, the SEC requested a conduct-based injunction while advancing a statutory argument. It cannot have it both ways. A statutory injunction may only be afforded a lesser burden to the extent that it enforces its legislative purpose. *See Oystacher*, 2016 U.S. Dist. LEXIS 89934 at *15-16; *see also SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53-54 (7th Cir. 1972). Once the relief exceeds that object, it is bound by traditional equity jurisprudence. *See id.* Otherwise, the statute becomes a mere license to avoid equitable requirements. This cannot be the intent. Therefore, while the SEC may seek to enjoin Mr. Kameli from violating the Securities Act, they cannot prohibit him from participating in the EB-5 program entirely without also showing how his continued participation would violate the Act. Because the SEC has neglected to carry this burden, Defendants request that this Court deny the SEC's request for a conduct-based injunction.

the particular needs of the case. *SEC v. Advance Growth Capital Corp.*, 470 F.2d 40, 53 (7th Cir. 1972); *see also* 15 U.S.C. 78j(b) (as necessary for protection of investors).

To show a current violation §§ 10(b) and 17(a)(1), the SEC must establish that Mr. Kameli: (1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the offer or sale of securities. *SEC v. Bauer*, 723 F.3d 758, 768-69 (7th Cir. 2013). Under §§ 17(a)(2) and (a)(3), the elements are identical except the SEC must show negligence instead of scienter. *Id.* at 769.

## I.    General Background

1.      EB5 applicant's money in the investment holding account was property of the applicant. The money was not an investment in the EB-5 Fund while it was being held in the Investment Holding Account. The EB5 Fund had no control or access to the money until the EB5 applicant's I-526 application was approved and the money was transferred to the Fund Account as capital contribution to EB5 Fund, and such Capital Contribution was accepted by EB5 Fund. Defendants' Ex. D.8. P. 3, ¶ 7; P. 4, ¶ (c). Decl. of Kameli, ECF No. 61, P. 3. Tr. 690, ll. 2-5.

2.      The EB5 applicant's money that is held in the Holding Account is not an investment. Only after money is transferred to the EB5 Fund from Investment Holding Account and the I- 526 petition is approved by USCIS will become members in the EB-5 Fund. Please see PPM, Defendants Exhibit D.2, P. 3. EB-5 Applicants were not members of the EB-5 Fund as their money was being held in the Holding Account. Decl. of Kameli, ECF No. 61, P. 2. Also, ECF No. 61, ¶ 28. Tr. 690, ll. 6-13.

3.      All Private Placement Memorandums ("PPMs") were issued for purchase of a membership unit in an EB-5 Fund, LLC ("EB-5 Fund"). Four PPMs were issued for four separate Illinois EB-5 Funds. Decl. of Kameli, ECF Doc. No. 61.2, P. 2, ¶ 1 (Aurora Fund); 61.9, P. 2, ¶ 1 (Elgin Fund); 61.33, P. 2, ¶ 1(Golden Fund); 61.54, P. 2, ¶ 1 (Silver Fund).

4.      PPMs were presented to prospective investors for investment in an EB-5 Fund. They became investors in a Fund that was to provide loan to a separate business that would use the money to create jobs that the investors needed in order to allow them to obtain their green card.

The relationship between the EB-5 Fund and the Project that it has loaned money to is governed by a funding agreement, and is not subject to any PPM. Each EB-5 Fund's objective was to provide a loan to a specific Assisted Living and Memory Care business (Project).

  i.  Aurora Assisted Living EB-5 Fund, LLC's (Aurora Fund) objective was to provide a loan of upto $8,500,000 to Aurora Memory Care (Aurora Project). Decl. of Kameli, ECF Doc. No. 61.2, P. 5, ¶ 2; Decl. of Aguilar, ECF Doc. No. 9.9 and 9.10, P. 5.

  ii.  Elgin Assisted living EB-5 Fund, LLC's (Elgin Fund) objective was to provide a loan of upto $12,000,000 to Elgin Memory Care, LLC (Elgin Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Kameli, ECF Doc. No. 61.9, P. 5, ¶ 2 and P. 6.

  iii.  Golden Assisted living EB-5 Fund, LLC's (Golden Fund) objective was to provide a loan to Golden Memory Care, LLC (Golden Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Kameli, ECF Doc. No. 61.33, P. 5, ¶ 2 and P. 6.

  iv.  Silver Assisted living EB-5 Fund, LLC's (Silver Fund) objective was to provide a loan to Silver Memory Care, LLC (Silver Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Kameli, ECF Doc. No. 61.54, P. 5, ¶ 2, P. 6.

  5.  Four other Private Placement Memorandums ("PPMs") were issued for purchase of a membership unit in four different EB-5 Fund, LLC ("EB-5 Fund") each to provide a loan to one of the four Florida projects.

  i.  First American Assisted Living EB-5 Fund, LLC's (First American Fund) objective was to provide a loan to First American Assisted Living, Inc (First American Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia,

and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Aguilar, ECF Doc. No.9.15, PP. 5 and 6

    ii.    Naples Memory Care EB-5 Fund, LLC's (Naples Fund) objective was to provide a loan to Naples ALF, Inc. (Naples Project) in order to develop, construct, and operate a building a memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Aguilar, ECF Doc. No.11.8, PP. 5 and 6.

    iii.    Ft. Myers EB-5 Fund, LLC's (Ft. Myers Fund) objective was to provide a loan to Ft. Myers ALF, Inc. (Ft. Myers Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Aguilar, ECF Doc. No.11.4, PP. 5 and 6.

    iv.    Juniper Assisted Living EB-5 Fund, LLC's (Juniper Fund) objective was to provide a loan to Juniper ALF, Inc (Juniper Project) in order to develop, construct, and operate a building as an assisted living and memory care facility for senior citizens who may be suffering from Alzheimer's, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000. Decl. of Aguilar, ECF Doc. No.11.7, PP. 5 and 6.

    6.    The EB-5 investment of $500,000 was to purchase a membership unit in the EB-5 Fund and NOT for a purchase of a membership unit or share of a Project. *Id*.

    7.    No PPM was issued or presented to any EB-5 applicants or investor for investment in Projects. *Id*. Decl. of Kameli, ECF. Doc. No. 61, P. 6, ¶ 39.

    8.    Projects have been owned by Taher Kameli through one of his wholly owned entities. Decl. of Kameli, ECF Doc. No 61.4, P. 2, ¶ G; No. 61.9, P. 12; No. 61.10 P. 2; No. 61.33, P. 11; No. 61.54, P. 11. Decl. of Aguilar, ECF Doc. No. 9.15, P. 12, Decl. of Aguilar, ECF Doc. No.11.8, P. 12, Decl. of Aguilar, ECF Doc. No.11.4, P. 12, Decl. of Aguilar, ECF Doc. No.11.7, P. 17.

    9.    The relationship between the EB-5 Fund and Project is a contractual relationship based on a loan agreement. Decl. Aguilar, ECF No. 24, P. 6, subsection "Use of Proceeds". Please see a loan agreement in Defendants' Ex. F.20. Decl. Kameli, ECF 61.82. Tr. 696-697.

10.     The EB-5 applicants are not members of the EB-5 Fund, until their I-526 immigration application is approved by the USCIS and $500,000 as a capital contribution has been paid to the EB-5 Fund.  See Decl. Aguilar, ECF. No 8.24, P. 5, ¶ 4. Also, Decl. Kameli, ECF, No. 61.62, P.3, S. 1.4; also, P. 6, S. 5.

11.     The investors in the EB-5 Funds have never had any ownership position in the Projects.

12.     There are no allegations of securities violation in regards to Juniper Fund or Juniper project, yet SEC has decided to name them as Relief Defendants.

13.     Ms. Aguilar, spent 2500 hours to review bank records and some of the documents Defendants supplied and some spreadsheets. Tr. P. 315, ll. 9-16.

14.     Ms. Aguilar looked at the business plans just to make sure that they were the ones attached to her declaration, and she did not review the sources and uses of the business plans in detail. Tr. 316, ll. 1-5.

15.     Ms. Aguilar prepared her report of movement of money between defendants and relief defendants without seeking to establish cause for those transfers through analysis of the general ledgers, and all agreements provided by all Defendants and relief Defendants even though the complete set of general ledgers and all agreements were provided to her for a period of 2009 to 2016/17. Tr. 333 ll. 8-16.

16.     Ms. Aguilar prepared Exhibit 2 of her declaration to demonstrate that the movement of Investor Funds to and from Individuals and entities associated with Defendant Kameli. Aguilar Exhibit 2. Ms. Aguilar prepared her report without having any knowledge of which transaction was a loan or income. Tr. 333, ll. 21-23.

17.     SEC has failed to show any money being transferred or diverted by Defendants between Projects or between EB-5 Funds. For Example, Defendants did not transfer money from Golden Project to Silver Project; or Juniper Fund to Naples Fund, and others. Aguilar Exhibit 2.

18.     Ms. Aguilar calculated all payments made to Kameli's law firm from EB-5 applicants/ EB -5 investors related to EB-5 Funds, non EB-5 clients, family law, immigration law clients, or other clients. She did not determine if the deposits were attorney's fees, loans, or income and has not established the source of the deposits. She does not know the reason of 9.8 million deposit in Kameli Law Firm and has not established if there is anything that would give rise to

SEC's case. Tr. 349-351; 352 ll. 17-20. No portion of the 9.8 million dollars have been paid by EB-5 Funds, or Projects related to this case. Tr., P. 352, ll. 24-25, P. 353 l. 1.

19.     Contrary to SEC's belief that the facilities need to be open and operational with direct employees working at the facility; under the EB-5 rules and regulations 10 jobs per EB-5 investor can be crated "directly or indirectly" and such evidence may be demonstrated by reasonable methodologies. 8 CFR 204.6(j)(4)(iii). Tr. 388-389. Such "reasonable methodology" may be based on the "expenditure" model, where indirect jobs are calculated based on the amount of money the Project spends in development and construction of the Project. Tr. 388-389; 404-406. So, as long as enough money has been spent on the project in activities that have economic impact to the region, that satisfies the USCIS requirement, completion of the development and construction of the building is not required, yet CFIG always encourages EB-5 Funds and Projects to complete the projects in order for more jobs be created as well as to increase the chance for return of the investment of the EB-5 investors.

20.     The economic impact analysis for all Illinois Projects have been filed with court. See Defendants' Exhibit F13, ECF. Doc. No. 61.75. The total amount spent in each project which includes all money borrowed from EB-5 Funds, has been noted in Section 4.1 of each Project's economic impact report in ECF. Doc. No. 61.75. Section 4.2 of each Project's economic impact report shows how many direct/indirect jobs have been created for Illinois Projects. The Aurora Project has created 362 jobs; Elgin Project has created 200 jobs which is more than sufficient for the investors that have remained in the project; Golden Project has created 189 which is more than sufficient for the investors that have remained in the project; Silver Project has created 14 jobs. Defendants Ex. 13, ECF Doc. No. 61.75.

        a.      According to EB-5 Fund Aurora's PPM, direct or indirect jobs could be counted towards job creation for each EB-5 investor. SEC's Ex. 35, ECF, Doc. No. 9.9, P. 2, ¶ 2; P. 7, ¶ 1; P. 19, ¶ 3.

        b.      According to EB-5 Fund Elgin's PPM, direct or indirect jobs could be counted towards job creation for each EB-5 investor. SEC's Ex. 18, ECF, Doc. No. 8.18, P. 6, ¶ 5; P. 15, ¶ 2; P. 19, ¶ 3.

        c.      According to EB-5 Fund Golden's PPM, direct or indirect jobs could be counted towards job creation for each EB-5 investor. SEC's Ex. 30, ECF, Doc. No. 9.3, P. 2, ¶ 2; P. 6, ¶ 5; P. 19, ¶ 2.

       d.      According to EB-5 Fund Silver's PPM, direct or indirect jobs could be counted towards job creation for each EB-5 investor. SEC's Ex. 22, ECF, Doc. No. 8.24, P. 2, ¶ 2; P. 6, ¶ 5; P. 21, ¶ 3.

      21.      Budgets for the Projects fall within an anticipated range for similar developments. IVI Report, Defendants Ex. F.21, ECF Doc. No. 61.83 at 25.

      22.      In preparation of her report, Ms. Aguilar did not know the purpose of any transfer of money between entities. Trans. 345, lines 8-11. She only made a report based on what money has entered certain bank account and what money has left the bank account. Her job was to figure out where the money came from and how the money was used; not the purpose of the money or not the purpose of the payment. Tr. 336, ll. 8-13. She does not know the purpose of any transfer or movement of the money between accounts. Tr. 358, ll. 15-24.

      23.      Ms. Aguilar's admitted that based on analysis and exhibits attached to her declaration, one cannot make any conclusion regarding whether the transfers between EB-5 Funds or Projects with Kameli entities, were legit or illegitimate. Tr. 359, ll. 7-10.

      24.      SEC has shown movement of funds between accounts associated with projects and entities that have contractual relationship with them. Though Ms. Aguilar has provided a summary statement, SEC has failed to establish a causal relationship in the movements that gives them the basis for forming their accusations against Defendants. It is clear from the presentation of material that there is ample confusion in SEC's mind that comes from lack of understanding of the structure of the businesses, their relationship with each other, and the appreciation of the impact of USCIS regulations on business execution and business relationship management.

## II.   <u>Brokerage Accounts</u>

      25.      The SEC has not made a "substantial showing of likelihood of success as to a current violation" of securities law relating to the placement of EB-5 funds into securities. See <u>SEC v. Hollnagel</u>, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007). To establish a violation of §§ 10 and 17(a)(1), the SEC must prove the following: (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. <u>SEC v. Bauer</u>, 723 F.3d 758, 768-69 (7th Cir. 2013). The SEC has not demonstrated that Defendants made a material misrepresentation or a material omission as to which exists a duty to speak in relation to the placement of EB-5 funds into securities.

26.     The testimony and documentation submitted to the Court establishes the following;

i.      In 2011 and 2012, multiple banks informed Defendants that they would be closing the accounts of CFIG, the Investment Holding Accounts, the EB-5 Funds, and the Projects because of the banks' concerns over foreign transactions, particularly the funds for Iranian EB-5 applicants.  Decl. of Kameli, ECF 61, ¶ 105.  These accounts apparently tripped their safety flags.  Id.  At one point Chase Bank informed Taher Kameli that they intended to send the money it had received back to the foreign money exchanger through whom the investor sent his EB-5 money to the escrow account.  Id.  Honorable Gottschall granted Defendants a declaratory judgment prohibiting Chase from returning $500,000 of the EB-5 applicant's money to a money exchanger over whom it may have been difficult or impossible to obtain jurisdiction.  See *Elgin Assisted Living EB-5 Fund, etc. v. JPMorgan Chase*, case number 12-cv-02193 in the Northern District of Illinois.  Also, at the end of 2012, the FDIC was placing a $250,000.00 limit on FDIC insurance.  Id.  This meant that Defendants needed to limit the funds exposure to smaller banks that could go out of business, as the FDIC would not protect the majority of the money if the bank failed.  Id.  Defendants were able to get Morgan Stanley and later UBS to hold the monies of the EB-5 applicants, the EB-5 Funds, and the Projects, but the banks required the funds to be kept in brokerage accounts.  Id.  These accounts were managed by professional financial advisors to safeguard the principal amount in each account by placing the principal in low risk securities.  Id.

ii.     This placement of the funds was authorized by the offering documents related to each of the Projects.  A "cash account" includes a brokerage account (Defendants' Exhibit F. 40), and CFIG could hold EB-5 applicants' money in a brokerage account where securities were being traded.  "The Escrow Agent shall not be subject to liability with respect to losses suffered from the investment of funds in the Escrow Fund, except for the safekeeping of *the securities in which said funds are invested* and collection of interest or other income thereon."  Defendants' Exhibit A7, ECF 7, page 6, ¶ 10 (Aurora); Defendants' Exhibit B6., ECF 61.13 page 5, ¶ 9 (Elgin); Defendants' Exhibit C13, ECF 61.44, page 4, ¶ 9 (Golden); Defendants' Exhibit D8, ECF 61.60, page 4, ¶ 9 (Silver).

   iii. CFIG, as the Manager of the EB-5 Funds, could make all investment decisions on behalf of the EB-5 Funds.  Decl. of Kameli, ECF 61, ¶ 110.  "The Manager, in its sole discretion, will make investment decisions for the Company."  Defendants' Exhibit A2, ECF 61.2, page 3, ¶ 1 (Aurora Fund); Defendants' Exhibit B2, ECF 61.9, page 3, ¶ 1 (Elgin Fund); Defendants' Exhibit C.2, ECF 61.33, page 3, ¶ 1 (Golden Fund); Defendants' Exhibit D.2, ECF 61.54, page 3, ¶ 1 (Silver Fund).

   iv. Also, according to the Operating Agreement of the EB-5 Funds, the Manager makes all day-to-day business and affairs decisions of the Company, and all operational decisions made by the Manager have the express consent, approval, and affirmative vote of the Members.  The Manager also has the unrestricted power and exclusive authority to carry on the activities of the company and to do and to perform any and all things necessary for, incidental to, or connected with carrying on the activities of the company.  Defendants' Exhibit A1, ECF 61.1 page 11, ¶ 5.1 (Aurora Fund); Defendants' Exhibit B1, ECF 61.8, page 11, ¶ 5.1 (Elgin Fund); Defendants' Exhibit C1, ECF 61.32, page 11, ¶ 5.1 (Golden Fund); Defendants' Exhibit D1, ECF 61.53, page 11, ¶ 5.1 (Silver Fund).

   v. The Operating Agreements further authorized the Manager, on the respective EB-5 Funds' behalf, to make all decisions as to (a) the sale, development, lease, or other disposition of the Company's assets; (b) the management of all or any part of the Company's assets; (c) the borrowing of money and the granting of security interests in the Company's assets; . . . . . In the exercise of their management powers, the Manager is authorized to execute and deliver (a) all contracts, conveyances, assignments leases, sub-leases, franchise agreements, licensing agreements, management contracts and maintenance contracts covering or affecting the Company's assets; . . . (b) all checks, drafts and other orders for the payment of the Company's funds; (c) all promissory notes, loans, security agreements and other similar documents; and, (d) all other instruments of any other kind relating to the Company's affairs, whether like or unlike the foregoing.  Defendants' Exhibit A3, ECF 61.3, page 7, ¶ I (Aurora Fund); Defendants' Exhibit B3, ECF 61.10, page 5, ¶ H (Elgin Fund); Defendants' Exhibit C3, ECF 61.34, page 4, ¶ H (Golden Fund); Defendants' Exhibit D1, ECF 61.53, page 12, ¶ 2 (Silver Fund).

vi.     The money held in the operating account of each respective Project was always available to that Project.  Dec. of Kameli, ECF 61, page 18, ¶ 111.  Trans. 507-508, 523. However, while the money was sitting dormant in the account, it was sometimes kept in securities due to reasons mentioned above.  Id.  In addition, all of the monies borrowed from EB-5 Funds were utilized by the Projects based upon the Sources and Uses schedule of each respective Project in order to create direct and indirect jobs.  The economic impact analyses for all four Illinois projects have been filed with the Court.  See Defendants' Exhibit F13, ECF 61.75.  The total amount spent in each Project, which includes all the money borrowed from the respective EB-5 Fund, has been noted in Section 4.1 of each Project's economic impact report.  See ECF 61.75. Section 4.2 of each Project's economic impact report shows how many direct and/or indirect jobs have been created.  Id.

vii.     The Aurora Project has created **362** jobs; Elgin Project has created **200** jobs; Golden Project has created **189**; Silver Project has created **14** jobs. Defendants Exhibit 13, ECF Doc. No. 61.75.

a.  According to EB-5 Fund Aurora's PPM, direct and indirect jobs could be counted towards job creation for each EB-5 investor. SEC's exhibit 35, ECF, Doc. No. 9.9, page 2, Paragraph 2; page 7, paragraph 1; page 19, para. 3.

b.  According to EB-5 Fund Elgin's PPM, direct and indirect jobs could be counted towards job creation for each EB-5 investor. SEC's exhibit 18, ECF, Doc. No. 8.18, page 6, Paragraph 5; page 15, paragraph 2; page 19, para. 3.

c.  According to EB-5 Fund Golden's PPM, direct and indirect jobs could be counted towards job creation for each EB-5 investor. SEC's exhibit 30, ECF, Doc. No. 9.3, page 2, Paragraph 2; page 6, paragraph 5; page 19, para. 2.

d.  According to EB-5 Fund Silver's PPM, direct and indirect jobs could be counted towards job creation for each EB-5 investor. SEC's exhibit 22, ECF, Doc. No. 8.24, page 2, Paragraph 2; page 6, paragraph 5; page 21, para. 3.

viii.     Ms. Aguilar indicates that Elgin Project and Aurora Project's accounts have lost value due to trading. Decl. of Luz, ECF, Doc. No. 7, paragraph 34. Ms. Aguilar fails to add the dividend and interest income in those accounts, where only in Elgin Project account, the total Dividend and Interest Income of $113,451.42 covers and significantly

exceeds the Cumulative decrease in Market Value of $26,189.42 (2013-2016). This amount stayed in Elgin account to be used for the Elgin Project's expenses.

  ix. In addition, the EB-5 applicants were apprised of the Fund Manager's control over the EB-5 Fund's assets, which included the possible use of brokerage accounts:

  a. Before I sent my money to the Investment Holding Account, I understood that once my money was released from the Investor Holding Account and went in the [EB-5 Fund] operating account, the control of my money was with CFIG and that EB-5 Fund's Operating Agreement gave CFIG freedom to make all investment decisions for [EB-5 Fund], including holding my money in a bank or brokerage accounts. Holding my money in brokerage accounts for purchasing or selling different securities while my money was in Investment Holding Account, [EB-5 Fund's] operating account, or [Silver Project's] account, would not have been an important factor in deciding whether to invest in [EB-5 Fund]. Decl. of Silver Investor #2, Defendants' Exhibit F.36, ¶ 11.

  b. I understood that control of my money was with [Elgin Fund's] fund manager, and that [Elgin Fund's] Operating Agreement gave the Fund Manager freedom to make all investment decisions for [Elgin Fund], including holding my money in bank or brokerage accounts. Holding my money in brokerage account for purchase or selling different securities would not have been an important factor in deciding whether to invest in [Elgin Fund]. Decl. of Elgin Investor #2, Defendants' Exhibit 32, ¶ 12.

  c. Before I sent my money to the Investment Holding Account, I understood that control of my money was with CFIG, and that [Golden Fund's] operating agreement gave the Fund Manager freedom to make all investment decisions for [Golden Fund's], including holding my money in a bank or brokerage accounts. Holding my money in brokerage accounts for purchasing or selling different securities would not have been an important factor to invest in [Golden Fund]. Dec. of Golden Investor #1, Defendants' Exhibit 33, ¶10.

  27. Before sending $500,000 to the Investment Holding Agreement, had EB-5 applicants known that their money would be held in brokerage accounts to purchase securities,

bonds, stocks, they would have invested in the EB-5 Funds. Arbabshirani, Trans. Page 694, Lines 18-25; page 695, lines 1-19.

28.     Investors knew that Kameli and/or his partners have a broad decision power in the Projects. Defendants' Exhibit B.7, ECF Doc. No. 61.14, page 2, paragraph #7 (Elgin Fund); ECF Doc. No. 61.45, page 2, paragraph #7 (Golden Fund); ECF Doc. No. 61.90, page 3, #7 (Aurora Fund).

29.     Investors knew that Kameli holds an interest in CFIG, and he and his associates may also have financial interest or otherwise in CFIG and Projects.  Defendants' Exhibit B.7, ECF Doc. No. 61.14, page 2, paragraph #8-9 (Elgin Fund); ECF Doc. No. 61.45, page 2, paragraph #8-9 (Golden Fund); ECF Doc. No. 61.90, page 3, #8-9 (Aurora Fund); ECF Doc. No. 61.91, page 3, #11-12 (Silver Fund).

30.     Investors knew the interests of Kameli and/or any of his associates interest in CFIG, related entities, and/or related projects, and they acknowledged and understood such disclosures. Defendants Exhibit B7, Page 2. Paragraph 10 (Elgin Fund); ECF Doc. No. 61.45, page 2, paragraph #10 (Golden Fund); ECF Doc. No. 61.90, page 3, #10 (Aurora Fund); ECF Doc. No. 61.91, page 3, #13 (Silver Fund).

31.     The SEC has alleged the Defendants misrepresented or impermissibly omitted the potential use of EB-5 money to be held in securities.  However, there are several problems with this allegation.  First, the PPM documents specifically state that funds may be held in cash and brokerage accounts.  Thus, there is no misrepresentation or impermissible omission.  Second, the Escrow Agreements and Investment Holding Account Agreements specifically discuss and note the potential placement of the funds in securities.   Thus, there is no misrepresentation or impermissible omission.  Third, the Operating Agreements specifically provide the Fund Manager (CFIG) with sole authority and discretion over the company, including management of its assets. Fourth, although permitted by the offering documents, there was no original plan to place the EB-5 funds into securities.  As well-demonstrated by the record, Defendants were having serious problems maintaining bank accounts at various financial institutions due to the large transfers of funds incoming from multiple parties across many countries, some which ultimately originated from Iranian nationals triggering OFAC issues.  In order to safeguard the funds from additional bank closures and possible expatriation, Defendants placed the funds in brokerage accounts.  The SEC has not made any demonstration of the alleged misrepresentation made by Defendants.  As

the offering documents note the possible holding of the funds in a cash account, which includes brokerage accounts and in securities, there is no demonstration of an impermissible omission either.

32.     In addition, the SEC has not and will not be able to demonstrate the requisite scienter.  See Bauer, 723 F.3d at 768-69.  As noted, scienter is the intent to deceive, manipulate, or defraud.  City of Philadelphia, 264 F.2d at 1258.  Here, the offering documentation informed the investor of the possibility of cash and brokerage accounts.  Defendants Kameli and CFIG opted to hold the funds in securities in response to the closure of accounts from multiple banks.  The funds were placed into these accounts to protect the ability of the funds to be used for their purpose as an EB-5 loan to develop the facilities.  Had the banks continually closed the accounts and the funds were then returned to the EB-5 applicants, by the SEC's logic Defendants would then also apparently have committed a violation of securities law, as the funds would not have been used for their original purpose.  As there was no intent to deceive, manipulate, or defraud the EB-5 applicants, there is no requisite scienter, and no demonstration of a securities violation.

## III.   Silver Line of Credit

33.     The SEC has not made a "substantial showing of likelihood of success as to a current violation" of securities law relating to the Silver line of credit.  See SEC v. Hollnagel, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007).  To establish a violation of §§ 10 and 17(a)(1), the SEC must prove the following: (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.  SEC v. Bauer, 723 F.3d 758, 768-69 (7th Cir. 2013).  The SEC has not demonstrated that Defendants made a material misrepresentation or a material omission as to which exists a duty to speak in relation to the Silver line of credit.

34.     The testimony and documentation submitted to the Court establishes the following.

i.     An EB-5 applicant's money held in the Investment Holding Account (such as that for the Silver project) remained the property of the petitioner and was not yet considered an investment.  Defendants' Ex. D.8., P. 3, ¶ 7; P. 4, ¶ (c). Decl. of Kameli, ECF 61, P. 3.

ii.     The EB-5 Fund had no control or access to the money until the EB-5 applicant's I-526 petition was approved by USCIS and the funds were transferred to the

EB-5 Fund's account as a capital contribution and such capital contribution was accepted by the EB-5 Fund.  Id.

iii.     Only after an I-526 petition is approved by USCIS, and that EB-5 applicant's money is transferred to the EB-5 Fund from the Investment Holding Account and accepted by the EB-5 Fund, will that EB-5 applicant become a member in the EB-5 Fund.  See PPM, Defendants' Ex. D.2, P. 3; Decl. of Kameli, ECF 61, P. 2; see also ECF 61, ¶28.

iv.     Turning to the Investment Holding Account Agreement, paragraph 11(d) expressly provides an *option* to EB-5 applicants to authorize CFIG to use their funds as collateral to secure a line of credit and use the proceeds of the line of credit for any expenses that CFIG deems proper.  Defendants Ex. D.8, P. 5, ¶11(d); Decl. of Kameli, ECF 61, P. 3; Tr. 416-417.

v.     Contrary to the SEC's representation that Mr. Kameli "slipped into" the Investment Holding Account Agreement a box to check, the box that investors could check to permit the use of their funds to secure a line of credit for CFIG was very explicit in the agreement and it was in bold typeface.  Tr. 813, l. 17; see also Defendants' Ex. D.8, P. 5, ¶ 11(d).

vi.     The authorization to use the money was not a hidden part of the Agreement to be missed. There were two boxes given to the investor, one to approve the use, and the other rejecting the permission, and EB-5 applicants had to explicitly select one of the two boxes, in addition to signing the overall agreement. There is no requirement that the EB-5 applicants authorize the use of their funds to secure a line of credit.  Many EB-5 applicants checked or signed the box that authorized CFIG to use their funds as collateral to secure a line of credit to allow CFIG to use the proceeds for any expense CFIG deemed proper. Nine of such agreements, allowing CFIG to secure a line of credit up to $4,500,000, are filed as Defendants' Ex. F.25.  See also Decl. of Kameli, ECF 61.87; Tran. 417, ll. 11-22.

vii.     The EB-5 applicants were aware of the use of the proceeds of the line of credit and it did not matter to them as how Mr. Kameli and CFIG used the proceeds of the line of credit and for what purpose.  Decl. of Silver Investor No. 2, Defendants' Ex. F.36, ECF 62.7, ¶ 14.

viii.     Based upon the authorization given by the EB-5 applicants, CFIG established a line of credit in its name.  Decl. of Kameli, ¶ 23.

ix.     CFIG used $3.9 million of the proceeds of the line of credit backed by money in the Investment Holding account, authorized to be used as collateral by their rightful owner, EB-5 applicants.  CFIG used the proceeds of the line of credit for expenses CFIG deemed proper such as CFIG's expenses, CFIG-related businesses' expenses, and furtherance of the business of CFIG.  Decl. of Kameli, ¶ 29. ECF 61, ¶ 29.

x.     All of the transactions Ms. Aguilar discusses in her Declaration paragraphs 21 to 26, as well as exhibits 8 through 12, are related to the use of proceeds of the line of credit which CFIG was authorized to use for any expense CFIG deemed proper.  ECF Doc. 7, ¶¶ 21-26; ECF 8.8- 8.12.

xi.     Contrary to the SEC's representation, none of the EB-5 applicants' money in the Investment Holding Account for the Silver project was transferred to any other project.  Tr. 814, ll. 6-9; Decl. of Kameli, ECF 61, P. 5, ¶ 28.  No portion of the EB-5 applicants' funds was transferred from the Investment Holding Account to CFIG or other entities.  Tr., P. 290, ll. 1-10; Decl. of Kameli, ECF 61, P. 1-6; Tr. P. 426, ll. 21-23.

xii.     No portion of the EB-5 applicants' funds held in the Investment Holding Account used as collateral has been forfeited or lost, and currently $1M is being used as collateral for the line of credit to CFIG.  Tr. 298, ll. 5-7.

35.     There has not been any misrepresentation to the EB-5 applicants regarding the line of credit issue, or any impermissible omission.  The PPM documents provided to the EB-5 applicant expressly and conspicuously state that, should the individual check the box in the Investment Holding Account Agreement, it would permit CFIG to use that individual's money held in the Investment Holding Account for any expenses CFIG deems proper.  The EB-5 applicant was under no obligation to authorize this use, but some chose to do so.  The money of the EB-5 applicants that chose to allow such action by CFIG remained in the account, in full, at all times. Those funds were not transferred or spent on other projects, but, again, remained in the Holding Account at all times.  Thus, the SEC's contention that Defendants' actions to use the line of credit contradicted the Silver PPM is incorrect, as the full amount of EB-5 money committed to the Silver EB-5 Fund remained and remains fully available to the Silver EB-5 Fund.

36.     An argument that this was an impermissible omission would also lack merit.  A company is entitled to keep silent unless positive law creates a duty to disclose, even if it is information a reasonable investor would like to know.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997).  As noted, the EB-5 applicants were under no duty to permit CFIG's use of a line of credit.  All of the EB-5 monies remained in the Investment Holding Account at all times, even for those that affirmatively chose to allow CFIG to take out a line of credit against the funds.  The actions by Defendants did not contradict the documentation provided to the EB-5 applicants.  Thus, there was no omission as to which Defendants were required to speak.

37.     In addition, assuming, *arguendo*, that the SEC has made a demonstration of a material misrepresentation or improper omission, which Defendants deny, the SEC has not demonstrated that any such material misrepresentation or omission was performed with the necessary scienter required to establish a securities violation.  The Supreme Court has defined scienter as a mental state embracing intent to deceive, manipulate, or defraud.  City of Philadelphia v. Fleming Companies, Inc., 264 F.2d 1245, 1258 (10th Cir. 2001).  Here, the provision permitting the use of funds for a line of credit is conspicuous and explicit, and is designed to indicate its importance to the reader.  The EB-5 applicant did not need to permit such authorization, and had every opportunity to ask questions related to this language and its meaning prior to investing.  The EB-5 money at all times remained in their account, and were not transferred to CFIG or any other project.  There is no evidence to suggest that there was an intent to deceive, manipulate, or defraud the EB-5 applicants.  Thus, the SEC has not demonstrated an aspect necessary to establish a violation of §§ 10 and 17(a)(1).  Bauer, 723 F.3d at 768-69.

38.     Finally, there certainly is no risk of repetition of alleged violations here, as the SEC is in possession of all banking records related to Defendants and has had these materials for years, with the full cooperation of Defendants.  Hollnagel, 503 F. Supp. 2d at 1058.  Defendants have no intent to seek additional lines of credit, and given the public nature of these proceedings, even if Defendants did intend to seek a line of credit (which they do not), any financial institution would immediately become fully aware of the pending litigation upon application for a line of credit, likely dooming any such application.  Thus, there is no risk of repetition, which further demonstrates that injunctive relief is not appropriate.

## IV.     Payments to Bright Oaks

39.     The SEC has not made a "substantial showing of likelihood of success as to a current violation" of securities law relating to the placement of EB-5 funds into securities.  See SEC v. Hollnagel, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007).  To establish a violation of §§ 10 and 17(a)(1), the SEC must prove the following: (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.  SEC v. Bauer, 723 F.3d 758, 768-69 (7th Cir. 2013).  The SEC has not demonstrated that Defendants made a material misrepresentation or a material omission as to which exists a duty to speak in relation to the placement of EB-5 funds into securities.

40.     The testimony and documentation submitted to the Court establishes the following;

i.     The objective (business plan) of each EB-5 Fund was to provide a loan to an Project in order for the Project to "develop, construct, and operate" an assisted living facility.  The Business Plans of the Projects were designed for illustrative purposes and were issued by the Projects, not the EB-5 Funds.  The projections provided in the Business Plans were based on the knowledge of the shareholders and management of the Projects at the date the respective Business Plan was issued.  There were no assurances or guarantees provided by any party that the actual results would be consistent with the projections provided in each Business Plan.  The performance of each Project will depend on the time it takes to secure investment, the economic outlook of the country and region, the competitive landscape, and market conditions.  Significant delays in the process may cause the Project to adjust and change plans to adapt.  See Dec. of Aguilar, ECF 8.21, PP. 1 and 2 (Elgin Project); ECF 9.6 and 9.7, CP and TOC Pages. (Golden Project); Decl. of Kameli, ECF 61.57, CS and 2nd page (Silver Project); Decl. of Kameli, ECF 61.3, every page (Aurora Project); Decl. of Aguilar, ECF 11.2 and 11.3, TOC page (First American Project); ECF 11.6, TOC page (Ft. Myers Project); ECF 11.8, TOC page (Naples Project).

ii.     Each Project Business Plan contained a Source and Uses schedule, and the line items in each such schedule were general and not specific.  All line items in the Sources and Uses of each Business Plan were in relation to the development, construction, and operation of that specific Project.  Decl. of Kameli, ECF 61, ¶¶ 41 and 43-44.  The EB-5 applicants did not care about all of the specific details of the Project's Business Plan and it was not an important factor in their decision whether to invest in the EB-5 Fund.  Tr. 697.

iii.　　Bright Oaks Development and Bright Oaks Group were established in 2013, located in Chicago and Oak Brook, with employees working for both companies and performing work on all eight of the relief defendant in this lawsuit. Tr. 745-746.

iv.　　Bright Oaks Development, Bright Oaks Group, and CFIG were not set up to divert funds from Projects to Mr. Kameli, and contrary to assertions, none of these companies were shell companies. Decl. of Kameli, ECF 61, ¶ 47.

v.　　Mr. Kameli was the owner and only shareholder of the Projects, and the owner of the service companies: Bright Oaks Development, Bright Oaks Group, and CFIG. Mr. Kameli was eventually responsible for returning the money borrowed from the EB-5 Funds. It would be irrational for Mr. Kameli to divert money from one of his companies to another company he owns. Mr. Kameli was trying to manage costs and ensure quality of work by keeping many of the services under one roof. Mr. Kameli accomplished this, with the help of Nader Kameli who was the COO of the CFIG and in charge of operations. Id.

vi.　　Bright Oaks Development and Bright Oaks Group were not in existence when the PPMs of Aurora EB-5 Fund, Elgin EB-5 Fund, Golden EB-5 Fund, Silver EB-5 Fund, and First American EB-5 Fund were created and issued. Defendant's Exhibits F38 and F39.

vii.　　Bright Oaks Development, Bright Oaks Group, and CFIG performed services for the Projects in relation to the development, construction, and operation of the assisted living and memory care facilities. These services were based upon written agreements and the fees paid in relation to these agreements represent legitimate expenses of each Project. Decl. of Kameli, ECF 61, ¶¶ 45-55. Sample agreements are found as SEC's Ex. 56-64, Decl. of Aguilar, ECF 12.6 -12.14.

viii.　　In addition, Bright Oaks Development borrowed money from the Golden and Silver Projects against its already in place agreement in order to allow Bright Oaks Development to pay expenses and obligations created due to the unexpected increase in the duration of the Projects (in part due to an ever-increasing USCIS adjudication timeframe). Decl. of Kameli, ECF 61, ¶¶ 96-101; see also Tr. 745. These payments to Bright Oaks Development constituted an advance, which is common in the construction industry. Id.

Bright Oaks Development's line of credit agreements with the Golden and Silver Project, respectively, are located at Defendants' Ex. F.22 and F.23, ECF 61.84 and 61.85.

ix.     The EB-5 applicants were aware that fees would need to be paid to developers in order to develop and construct each Project, and they did not expect that all the fees and expenses with the name of the recipients would be mentioned in the Business Plan.  Tr. 696; see also Tr. 501.

x.     Mr. Kameli's ownership of the development company was not a factor in the EB-5 applicants' decision on whether to invest in the EB-5 Funds.  Tr. 695, ll. 20-25.

xi.     The payment of fees to Bright Oaks Development and Bright Oaks Group for services or a loan toward future services for the Golden Project would not have been an important factor in regard to investing in the Golden EB-5 Fund.  Decl. of Golden Investor No.1, Defendants' Ex. 33, ¶ 20; Decl. of Golden Investor No.2, Ex. 34, ¶¶ 22-23.

xii.     The payment of fees to Bright Oaks Development and Bright Oaks Group for services or a loan toward future services for the Silver Project would not have been an important factor in regard to investing in the Silver EB-5 Fund.  Decl. of Silver Investor No. 2, Defendants' Ex. 36, ¶ 28.

xiii.     In the latter part of 2014, when the Aurora Project could not afford to pay its subcontractors, Bright Oaks Development entered into a line of credit agreement with the company in order to provide a loan to the Aurora Project to pay the subcontractors so that Bright Oaks Development, as a general contractor, so Bright Oaks Development would not be subject to potential lawsuits by the subcontractors.  Decl. of Kameli. ECF 61, ¶ 102. Many of the subcontractors were used in multiple Projects including Golden and Silver and therefore it is possible that all of the Projects would have suffered if the subcontractors were not paid.  Id.  Usually in the construction industry, the general contractor is responsible for paying the subcontractors, regardless of the ability of the project to pay the subcontractors.  Id.  Bright Oaks Development, the general contractor of the Aurora Project, could have made payments to the subcontractors directly from its own account without first depositing the loan into the Aurora Project's account.  Id.  However, due to EB-5 rules and regulations regarding the demonstration of job creation, Bright Oaks Development decided to transfer the amount to the Aurora Project first, so the Aurora Project could pay its subcontractors and vendors directly.  Id.  These expenditures could

then be used to demonstrate the Aurora Project's job creation. Some of the money loaned to the Aurora Project by Bright Oaks Development consisted of funds that had been received by Bright Oaks Development into its bank account pursuant other agreements in place with another entity. Thus, the allegation that funds loaned to the Aurora Project by Bright Oaks Development represented the funds of the Golden and Silver Projects is not factually accurate, and the allegation is thus incorrect. In essence, the assertion that the first money deposited into Bright Oaks Development account was also the first money out of the account is nothing more than an unsupported assumption. Decl of Kameli. ECF 61, ¶ 102; see also Tr. 723-724 and 747-748.

xiv.    Moreover, it must not be overlooked that Bright Oaks Development was both the general contractor and developer of the Aurora Project. Tr. P. 723; Decl of Kameli. ECF 61, ¶ 102; see also Tr. 723-724.

xv.    A developer oversees all of the activities of the site, the entitlements for property, the zoning, the preliminary and final approvals of plats and plans, the permits, and then the construction, either through managing a general contractor or taking on the general contracting responsibilities themselves. Tr. 721, 11-17; Decl. of Kameli, ECF 61, ¶ 84.

xvi.    Bright Oaks Development guaranteed all payments to subcontractors for the Aurora Project. Defendants' Ex. F.24; ECF 61.86.

xvii.    Ms. Aguilar's Declaration, stated that "Kameli paid the Bright Oaks Entities a collective amount of approximately $7.5 million, which the Bright Oaks Entities used to pay for project expenses and for its own expenses." Decl. of Aguilar, ECF 7, ¶ 18. However, the Declaration fails to mention that $3.5 million of the $7.5 million was transferred to Bright Oaks Development in order for it to spend this amount on the expenses of the Elgin Project, and Bright Oaks did in fact spend the $3.5 million on the Elgin Project's expenses. Tr. 356, ll. 4-19. The $3.5 million represents almost 47% of the total amount of $7.5 million mentioned within the Declaration.

xviii.    Ms. Aguilar's Declaration also referred to a $1.32 million transfer to Bright Oaks Development from the Golden Project and the Silver Project. Decl. of Aguilar, ECF 7, ¶ 18. The Declaration does not specify the nature of the relationship between Bright Oaks Development with the Golden Project and Silver Project (Tr. 358, ll. 3-6), or if the

transfer of $1.32 million was for services provided by Bright Oaks Development. Tr. 358, ll. 10-14. All financial transfers were made based upon existing agreements between Bright Oaks Development with the Golden Project and Silver Project, respectively.

41. There has not been any misrepresentation to the EB-5 applicants regarding payments made to Bright Oaks Development, or any impermissible omission at the time of the EB-5 applicants' decision to invest. At the time of the creation of the offering documents, the Sources and Uses for each Project contemplated the payment of development fees. Thus, the EB-5 applicants were at all times aware that a portion of their funds may be used to pay a developer for its services. At the time of the offering documents, Bright Oaks Development did not exist and Defendants had no present intention to create the company. Defendants thus did not know at the time of offering that Bright Oaks Development would end up providing development services, and therefore there was neither a misrepresentation nor impressible omission at the time of the offering documents, or any time thereafter.

42. Both the Golden and Silver Projects executed separate agreements with Bright Oaks Development for its development services. The Projects then made payments to Bright Oaks Development for its services on their respective behalves. These represent legitimate expenses of the Projects, and the payment of such development expenses was included in the offering documents. Therefore, the funds of the Golden and Silver Projects were in fact used for the payment of their respective developer fees, fees that were reasonable and within an anticipated range for projects of this nature, and were not "transferred" to the Aurora Project. Please see IVI (a CBRE company) report. Defendants' Ex. F.21, ECF 61.83 at 27. Thus, the SEC has not demonstrated that there was a misrepresentation or impermissible omission in relation to Bright Oaks Development's receipt of development fees from the Projects.

43. Furthermore, the SEC has not demonstrated that any material misrepresentation or omission was executed with the required scienter to establish a securities violation as there has been no intent to embracing intent to deceive, manipulate, or defraud. City of Philadelphia, 264 F.2d at 1258. Here, the SEC's only argument that Defendant acted with scienter is a general accusation and not targeted to a specific misrepresentation; to wit, "Kameli … acted with a high degree of scienter. Kameli controlled both the representations made to investors and the uses of investor funds, and cannot possibly claim ignorance of the many discrepancies between the two." (Memo at 25) (citing T. Kameli Test. at 454:23-455:17, Aguilar Decl. Ex. 50). This statement is

without merit, as the SEC has not shown that Defendant withheld this information with the intent to defraud or deceive investors, only that Defendant controlled the means to do so. Further, paragraphs 45-50 of Mr. Kameli's Declaration show that in 2009 to 2012, when the PPMs were created, Defendants were unaware that Bright Oaks Development would ultimately provide development services. Decl. of Kameli, ECF 61, ¶¶ 45-55. The original plan called for other companies to assume the development and advisory role, but eventually these companies were replaced because of the logistical nightmare created by the EB-5 Program. There is no evidence of any preconceived intent to deceive, manipulate, or defraud the EB-5 applicants, and the payment of development expenses that were disclosed to the investor in the original filing and a bridge loan from the general contractor to one of its projects in order to pay necessary expenses does not run afoul of securities law or EB-5 policy. Therefore, the SEC has not fulfilled the necessary element of scienter to establish a securities violation of §§ 10 and 17(a)(1).

44.     Finally, the third element "in connection with" is satisfied if the device employed, whatever it may be, is of a sort that would cause a reasonable investor to rely thereon and so relying causes them to purchase or sell a security. SEC v. C. Jones & Co., 2009 U.S. Dist. LEXIS 9832 (D. Colo. Feb. 10, 2009). The PPMs and exhibits to PPMs for the EB-5 Funds are clearly relied upon by EB-5 applicants in purchasing a membership unit; however, supplements to the PPMs would arguably not affect the EB-5 applicant's decision, unless additional investors became involved or the supplements to the PPMs were purposely misleading to prevent investors from backing out of their investment. Here, the PPMs could not mislead investors in their decision to make an investment because all of the loan amount from the Golden and Silver EB-5 went towards originally disclosed expenditures of their own respective Projects. Thus, the SEC has not fulfilled the necessary third element to establish a securities violation of §§ 10 and 17(a)(1).

## V.     Florida Lands Transactions

45.     The SEC has not made a "substantial showing of likelihood of success as to a current violation" of securities law relating to the purchase and sale of lands for the Florida projects. See SEC v. Hollnagel, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007). To establish a violation of §§ 10 and 17(a)(1), the SEC must prove the following: (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. SEC v. Bauer, 723 F.3d 758, 768-69 (7th Cir. 2013). The SEC has not demonstrated that Defendants made a material

misrepresentation or a material omission as to which exists a duty to speak in relation to the purchase of lands in Florida and transfer of such lands to the Projects.

46.     The testimony and documentation submitted to the Court establishes the following.

i.      Mr. Kameli signed agreements to purchase the lands in Florida and subsequently purchased the lands because of USCIS challenges that he had faced with projects in Illinois when lands were not purchased and later on the project was forced to move to a new location. Kameli had learned from experience that USCIS may require projects to have a set geographical location that was in the project's control and the location of the project could not change in any regard during the years it would take USCIS to adjudicate the EB-5 petitions.  The land would thus need to be under contract or ownership while the EB-5 Funds were seeking funding from lenders so that the Projects would not face a "material change" challenge from USCIS, which could invalidate the EB-5 petitions. Decl. of Kameli, ECF 61, ¶ 135.

ii.     For all of the Florida-based Projects Kameli disclosed: (a) that he is the owner of AEP; (b) that AEP is the Fund Manager of the EB-5 Funds; (c) that AEP or AEP's subsidiaries may be reimbursed by the Projects for expenses, fees, and services rendered prior to funding, as well a certain amount per year from the EB-5 Funds; (d) that he is the sole member of Platinum Real Estate and Property Investments, Inc. (PREPI); (e) that PREPI owns the Projects; and (f) that "certain transactions and agreements included herein and entered into by the individuals listed above, as well as the companies affiliated with those individuals, will not be made in an arm's length and may not be as good as those obtained in an arm's length transaction.  SEC's Exhibit 39, ECF 9.15, page 12 (First American PPM); SEC's Exhibit 43, ECF 11.4, page 12 (Ft. Myers PPM); SEC's Exhibit 47, ECF 11.8, page 12 (Naples PPM).

iii.    First American EB-5 Fund's PPM indicated that; "Platinum Real Estate & Property Investment, Inc. ("PREPI") will sign an option to purchase property within the City of Wildwood, Florida.  First American will gain access to the property once adequate funds are released to First American."  SEC Exhibit 39, ECF 9.15, p. 14.

iv.     The Project's business plan stated that the First American Project shall purchase the land for $1,000,000.  SEC Exhibit 41, ECF 9.17, p. 4.

| First American AL-Wildwood Sources and Uses | |
|---|---|
| **Sources** | **Total** |
| Debt Funding | $18,000,000 |
| Equity Funding | $0 |
| **Total Sources** | **$18,000,000** |
| | |
| **Uses** | **Total** |
| Total Land Costs | $1,000,000 |
| Total Building Construction | $10,080,000 |
| Total FFE | $1,000,000 |
| Total Permits and Fees Costs | $200,000 |
| Total Pre-Development Expenses | $150,000 |
| Total Design Expenses | $300,000 |
| Total Taxes and Insurance Expenses | $30,000 |
| Total Financing/Legal Expenses | $10,000 |
| Fees | $469,200 |
| Contingencies | $588,500 |
| Other Expenses | $0 |
| Development Scvs/Advisory Scvs Fees | $910,000 |
| Operating Deficit Reserve | $2,000,000 |
| Working Capital | $262,300 |
| Management Fee | $1,000,000 |
| **Total Uses** | **$18,000,000** |

a.   PREPI purchased the lands for the First American Project in February 2014 and April 2015, for the total amount of $664,850.00.  Decl. of Aguilar, ECF 7, at 30-31.

b.   PREPI ordered an appraisal of the combined lands in 2014.  The appraised value was estimated to be $1,040,000.00.  Defendants' Exhibit F.26; ECF 61.88.

c.   PREPI subsequently ordered another appraisal of the lands in August of 2016.  The appraised value was estimated to be $1,450,000. Defendants' Exhibit F.43.

d.   The two parcels of lands were sold in September 2016 for the amount of $1 million, as specified in the Business Plan of the Project.  PREPI sold the lands to the First American Project for $450,000 less than the appraised value.  Decl. of Aguilar, ECF 7, at 32.

47.     The Naples EB-5 Fund's PPM indicated that; "Platinum Real Estate & Property Investment, Inc. ("PREPI") will sign an option to purchase property within the City of Naples, Florida.  [Naples Project] will gain access to the property once adequate funds are released to

[Naples Project].” SEC Exhibit 47, ECF 11.8, at 14.  The Project's Business Plan showed the Naples shall purchase the land for $1,000,000.  SEC Exhibit 49, ECF 11.10, p. 4.

| Naples Memory Care Sources and Uses | |
|---|---|
| **Sources** | **Total** |
| Debt Financing | $14,000,000 |
| Equity Funding | $0 |
| Total Sources | $14,000,000 |
| | |
| **Uses** | **Total** |
| Total Land Costs | $1,000,000 |
| Total Building Construction | $6,719,988 |
| Total FF&E | $1,000,000 |
| Total Permits and Fees Costs | $500,000 |
| Total Pre-Development Expenses | $250,000 |
| Total Design Expenses | $300,000 |
| Total Taxes and Insurance Expenses | $75,000 |
| Total Financing/Legal Expenses | $100,000 |
| Developer Fee | $231,600 |
| Contingencies | $447,249 |
| Other Expenses | $0 |
| Development Svcs./Advisory Fees | $980,000 |
| Operating Deficit Reserve | $1,500,000 |
| Working Capital | $396,163 |
| Management Fee | $500,000 |
| Total Uses | $14,000,000 |

  a. PREPI purchased the land for the Naples Project in December 2013 for a total amount of $725,000.  Decl. of Aguilar, ECF 7, ¶ 29.

  b. PREPI ordered an appraisal of the land in December 2014.  The appraised value was estimated to be $1,160,000.00.  Defendants' Exhibit F.26; ECF 61.88.

  c. In December 2014, PREPI sold the land to the Naples Project for an amount of $1 million as specified in the Business Plan of the Project (see above).  Decl. of Aguilar, ECF 7, ¶ 29.  PREPI sold the land to the Naples Project for $160,000 less than the appraised value.

  48. The Ft. Myers' EB-5 Fund's PPM indicated that "Currently Platinum Real Estate & Property Investment, Inc. ("PREPI") owns the property located within the City of Fort Myers, Florida that FMALF [Ft. Myers Project] intends to build the project upon (the "Property").  Once adequate funds are obtained, FMALF [Ft. Myers Project] will purchase the Property, and any improvements made thereon, from PREPI, according to the sources and uses section of the

business plan." SEC Exhibit 43; ECF 11.4, at 14. The Project's Business Plan showed that the Ft. Myers Project shall purchase the land for $1,015,000. SEC Exhibit 45, ECF 11.6, at 4.

| Fort Myers Memory Care Sources and Uses | |
| --- | --- |
| **Sources** | **Total** |
| Debt Financing | $28,000,000 |
| Equity Funding | $0 |
| Total Sources | $28,000,000 |
| | |
| **Uses** | **Total** |
| Total Land Costs | $1,015,000 |
| Total Building Construction | $17,830,000 |
| Total FF&E | $1,592,000 |
| Total Permits and Fees Costs | $522,586 |
| Total Pre-Development Expenses | $250,000 |
| Total Design Expenses | $394,600 |
| Total Taxes and Insurance Expenses | $70,000 |
| Total Financing/Legal Expenses | $100,000 |
| Developer Fee | $675,726 |
| Contingencies | $750,000 |
| Other Expenses | $0 |
| Development Svcs./Advisory Fees | $1,820,000 |
| Operating Deficit Reserve | $1,500,000 |
| Working Capital | $780,088 |
| Management Fee | $500,000 |
| Regional Center Placement Fee | $200,000 |
| Total Uses | $28,000,000 |

49. PREPI purchased the land for the Ft. Myers Project in December 2013 for the total amount of $550,000. Decl. of Aguilar, ECF 7, ¶ 28. PREPI ordered an appraisal of the land in December 2014. The appraised value was estimated to be $1,750,000.00. Defendants' Exhibit F.26; ECF 61.88. In December 2014, PREPI sold the land to the Ft. Myers Project for an amount of $1 million as specified in the Business Plan of the Project (see above). Decl. of Aguilar, ECF 7, ¶ 28. PREPI sold the land to the Ft. Myers Project for $750,000 less than the appraised value.

50. To establish a violation of §§ 10 and 17(a)(1), the SEC must prove that Defendants made (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. SEC v. Bauer, 723 F.3d 758, 768-69 (7th Cir. 2013). A company is entitled to keep silent unless positive law creates a duty to disclose, even if it is information a reasonable investor would like to know. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997).

51. Here the SEC cannot demonstrate that Defendants made a material misrepresentation or an impermissible omission. In all instances, Defendants, through PREPI, sold the land to the Projects at the price clearly set forth in the PPMs provided to the EB-5

applicants. In all instances PREPI sold the land to the Projects at well below market value. In all instances the PPM documents expressly stated, warned, and disclosed to the EB-5 applicants that "certain transactions and agreements included herein and entered into by the individuals listed above, as well as the companies affiliated with those individuals, will not be made in an arm's length and may not be as good as those obtained in an arm's length transaction." Thus, there was no misrepresentation made to the EB-5 applicants regarding the land and no representation that would mandate a disclosure to correct misleading statements. Thus, the SEC cannot establish a violation of §§ 10 and 17(a)(1) as to this issue.

52. Assuming the SEC has made a demonstration of a material misrepresentation or improper omission, which Defendants deny, the SEC has not demonstrated that any such material misrepresentation or omission was performed with the necessary scienter required to establish a securities violation. In order to demonstrate a violation of §§ 10 and 17(a)(1) the SEC must prove that Defendants had an intent to deceive, manipulate, or defraud investors. City of Philadelphia v. Fleming Companies, Inc., 264 F.2d 1245, 1258 (10th Cir 2001). However, the SEC has failed to establish in testimony and documentation submitted to the Court that Mr. Kameli and Defendants acted with intent to deceive investors by their allegation of a "marking up" of the land, which Kameli denies. Again, the PPM expressly stated the price that the Projects would pay for the land. The PPM clearly stated that there are transactions that are not at arm's length and may not be as good as those made in an arm's length transaction. There is no evidence that Defendants misrepresented the price that PREPI paid for the lands. Defendants sold the land to the Project at the disclosed and agreed-upon price at substantially discounted rates. In short, there is absolutely no evidence of scienter and this claim of a securities violation must fail.

53. Lastly, the third, required element "in connection with" to establish a violation of §§ 10 and 17(a)(1), is satisfied if the device employed, whatever it may be, is of a sort that would cause a reasonable investor to rely thereon and so relying causes them to purchase or sell a security. SEC v. C. Jones & Co., 2009 U.S. Dist. LEXIS 9832 (D. Colo. Feb. 10, 2009). Here, the SEC has not provided evidence that proves EB-5 applicants relied upon the alleged land sale markup when making the decision to invest, which Defendant denies, and would not have otherwise invested even if the Projects were paying the much higher, true value of the land at the time of the Projects' purchase. Thus, this allegation of a securities violation must fail.

## VI.    PAYMENTS TO CFIG AND AEP

54.    The SEC has not made a "substantial showing of likelihood of success as to a current violation" of securities law relating to CFIG's receipt of fees.  See <u>SEC v. Hollnagel</u>, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007).  To establish a violation of §§ 10 and 17(a)(1), the SEC must prove the following: (1) a material misrepresentation or a material omission as to which exists a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.  <u>SEC v. Bauer</u>, 723 F.3d 758, 768-69 (7th Cir. 2013).  The SEC has not demonstrated that Defendants made a material misrepresentation or a material omission as to which exists a duty to speak in relation to CFIG's receipt of fees.

55.    The testimony and documentation submitted to the Court establishes the following. The PPMs of the EB-5 Funds show payments will be made to CFIG and AEP.  Contrary to the SEC's statements that CFIG was entitled to a mere 1% fee for its managerial compensation (Trans., page 520), the PPMs disclose other fees and compensation to CFIG.

56.    First, there was an administrative fee for CFIG. Decl. of Aguilar, ECF 8.17, page 2, ¶ 3, page 5, ¶ 4, page 12, ¶ 2 (Elgin EB-5 Fund); Decl. of Aguilar, ECF 9.3, page 2, ¶ 3, page 5, ¶ 4, page 12, ¶ 3 (Golden EB-5 Fund); Decl. of Aguilar, ECF 9.9, page 2, ¶ 3, page 5, ¶ 4, page 12, ¶ 3 (Aurora EB-5 Fund).  For the Silver EB-5 petitioners and all Florida projects EB-5 petitioners, a Service Agreement applied, with the fee for such Service Agreements varying case-by-case.  Decl. Kameli, ECF 61, ¶ 62.

57.    At the time of drafting the PPMs, CFIG was the Fund Manager of the EB-5 Funds, and there was a possibility that Fund Manager could change in future based upon the vote of the EB-5 Fund members.  Regardless of who or what entity was Fund Manager, the Fund Manager is entitled to 1% of the 6% or 7% interest paid from the EB-5 Projects to the EB-5 Funds based on the loan agreements.  Decl. of Aguilar, ECF 8.24, page 6, ¶ 1, page 7, ¶ 4, page 12, ¶ 4 (Silver EB-5 Fund); Decl. of Aguilar, ECF 8.17, page 6, ¶ 2, page 7, ¶ 3, page 12, ¶ 3 (Elgin EB-5 Fund); Decl. of Aguilar, ECF 9.3, page 6, ¶ 8, page 7, ¶ 1, page 12, ¶ 3 (Golden EB-5 Fund); Decl. of Aguilar, ECF 9.9, page 6, ¶ 2, page 7, ¶ 4, page 12, ¶ 4 (Aurora EB-5 Fund); and Decl. of Aguilar, ECF 9.15, page 6, ¶ 2, page 7, ¶ 2, page 12, ¶ 1, page 13, ¶ 3 (First American EB-5 Fund).  The securities that were offered were for the EB-5 Funds, and not the EB-5 Projects.  The interest paid

from the EB-5 Projects to the EB-5 Funds, and then parsed out from the EB-5 Funds by the Fund Manager (CFIG) affected the amount of interest income that would potentially be received by the EB-5 petitioners and was thus expressly stated.

58.     Other fees payable to CFIG included:  an annual fee CFIG is entitled to of $20,000.00 per Member., Decl. of Aguilar, ECF 8.24, page 6, ¶ 1, page 12, ¶ 5 (Silver EB-5 Fund); CFIG and CFIG subsidiaries may be reimbursed by SMC for startup expenses and services rendered prior to funding as well as various fees as outlined in the Sources and Uses of Funds table on Page 8 of the Business Plan, as well as up to 4% of the annual interest from SMC. Decl. of Aguilar, ECF 8.24, page 11, ¶ 4 (Silver EB-5 Fund); CFIG's entitlement to an annual fee of 3%., Decl. of Aguilar, ECF 8.17, page 6, ¶ 2; CFIG and/or CFIG's subsidiaries may be reimbursed by EMC for startup expenses and services rendered prior to funding, Decl. of Aguilar, ECF 8.18, page 11, ¶ 3 (Elgin EB-5 Fund); an annual fee to which CFIG is entitled of $15,000.00 per Member, Decl. of Aguilar, ECF 9.3, page 6, ¶ 8, page 12, ¶ 3 (Golden EB-5 Fund); an annual fee of 2% to which CFIG is entitled, Decl. of Aguilar, ECF 9.9, page 6, ¶ 2, page 12, ¶ 4 (Aurora EB-5 Fund); and CFIG's entitlement to an annual fee of $8,250.00 per Member.  Decl. of Aguilar, ECF 9.15, page 6, ¶ 2, page 12, ¶ 4, page 13, ¶ 4 (First American EB-5 Fund).

59.     There has not been any misrepresentation to the EB-5 petitioners regarding this issue, or any impermissible omission.  Based on the PPM disclosures, CFIG may enter into service for fee contracts with EB-5 Projects.  "Certain transactions and agreements included herein and entered into by the individuals listed above, as well as the companies affiliated with those individuals, will not be made in an arm's length and may not be as good as those obtained in an arm's length transaction."  Decl. of Aguilar, ECF 8.24, page 11, ¶ 7 (Silver EB-5 Fund); Decl. of Aguilar, ECF 8.17, page 11, ¶ 5 (Elgin EB-5 Fund); Decl. of Aguilar, ECF 9.3, page 11, ¶ 5 (Golden EB-5 Fund); and Decl. of Aguilar, ECF 9.9, page 11, ¶ 7 (Aurora EB-5 Fund).  Moreover, EB-5 petitioners knew that Mr. Kameli and/or his partners have broad decision-making power in the EB-5 Projects and EB-5 Funds.  Defendants' Exhibit B.7, ECF 61.14, page 2, ¶ 7 (Elgin EB-5 Fund); ECF 61.45, page 2, ¶ 7 (Golden Fund); ECF 61.90, page 3, ¶ 7 (Aurora EB-5 Fund).  Also, EB-5 petitioners knew that Kameli holds an interest in CFIG, and that he and his associates may also have financial interest or otherwise in CFIG and the EB-5 Projects.  Defendants' Exhibit B.7, ECF Doc. No. 61.14, page 2, ¶ 8-9 (Elgin EB-5 Fund); ECF 61.45, page 2, ¶ 8-9 (Golden EB-5 Fund); ECF 61.90, page 3, ¶ 8-9 (Aurora EB-5 Fund); ECF 61.91, page 3, ¶ 11-12 (Silver EB-5

Fund). Finally, EB-5 petitioners knew about the interests of Kameli and/or any of his associates in CFIG, related entities, and/or related projects, and they acknowledged and understood such disclosures. Defendants' Exhibit B7, page 2, ¶ 10 (Elgin EB-5 Fund); ECF 61.45, page 2, ¶ 10 (Golden EB-5 Fund); ECF 61.90, page 3, ¶ 10 (Aurora EB-5 Fund); ECF 61.91, page 3, ¶ 13 (Silver EB-5 Fund). Some payments made by the Aurora EB-5 Project to CFIG was for reimbursement of expenses paid by CFIG. Decl. of Kameli, ¶ 56. The remaining payments were based on service agreements between CFIG or AEP and the EB-5 Projects. Decl. of Kameli, ¶ 57-61. The agreements may be found in the SEC's Exhibits 56, 58-60, and 62; ECF 12.6, 12.8-12.10, and 12.12.

60.     In her Declaration, Ms. Aguilar refers to payments to CFIG and AEP from five EB-5 Projects for total of $4.1 million. Decl. of Aguilar, ¶ 33; Exhibit 14; ECF 7, ¶ 33; ECF 8.24. However, Ms. Aguilar does not know if those payments were based on services provided or for reimbursement. *Supra*, paragraphs 23-24. Even though the Silver EB-5 Fund disclosed that CFIG was entitled to receive fees, see, *supra*, the Silver EB-5 Project's payment of $1,155,000 to CFIG for services provided or to be provided was not an important factor to EB-5 petitioners in relation to their investment in the Silver EB-5 Fund and it would not have affected their investment decision in the Silver EB-5 Fund. Decl. of Investor #2 for Silver, Defendants' Exhibit F.36, ECF 62.7, ¶ 13. Moreover, the EB-5 petitioners knew that CFIG has different roles, and receive payments for each role. (Tr. 691-693.) Decl. of Investor #2 of Elgin, ECF 62.3, Defendants' Exhibit F.32; Decl. of Investor #1 of Elgin, ECF 62.2, Defendants' Exhibit F31, ¶¶ 10 and 11; Decl. of Investor #2 for Silver, Defendants' Exhibit F.36, ECF 62.7, ¶¶ 9-10; Decl. of Golden Investor #1, Defendants' Exhibit F.33, ECF 62.4, ¶ 8; Decl. of Golden Investor #2, Defendants' Exhibit F. 32, ECF 62.3, ¶¶ 13 and 15. Similarly, the Elgin EB-5 Project's payment of $840,000 to CFIG for services provided or to be provided was not an important factor to in relation with the EB-5 petitioners' investment in EALEF and it would not have affected an investment decision in EALEF. Decl. of Investor #2 of Elgin, ECF 62.3, Defendants' Exhibit F.32; Decl. of Investor #1 of Elgin, ECF 62.2, Defendants' Exhibit F31, ¶ 14. Finally, the Aurora EB-5 Project's Business Plan disclosed the fees for development and costs in line items for organizational costs and land improvements. (Tr. 502-503.) The EB-5 petitioners investing in the Aurora and Golden EB-5 Funds knew the several different roles of both CFIG and Mr. Kameli as it related to the EB-5 Funds and EB-5 Projects. (Tr. 527-529; Tr. 221.)

31

61.     The SEC has not demonstrated that Defendants made a material misrepresentation or a material, impermissible omission as to CFIG's fees, as the testimony and documentation submitted to the Court establishes that investors knew of CFIGs several roles, that CFIG had agreements with EB-5 Projects and could be paid for services, and the Business Plans disclosed the payment of the fees.  As noted, the PPM offered to the EB-5 Petitioners was an offer to purchase a security interest in the EB-5 Fund, not the EB-5 Project.  The PPMs noted that there were transactions that were not at an arm's-length, and the Sources and Uses set forth fees that would be paid by the EB-5 Projects, not by the EB-5 Funds.  The PPMs accurately stated the compensation that CFIG would receive from the interest returning to the EB-5 Fund, and there was no misrepresentation in that regard.  The Sources and Uses for the EB-5 Projects, of which the EB-5 petitioners are not members, accurately stated the fees that would be paid for each EB-5 Project and there was no misrepresentation in that regard.  In addition, a person is entitled to keep silent, even if he has information that a reasonable investor would like to know.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1432 (3d Cir. 1997).  Here, the PPM materials noted the amounts of the loan interest returning to the EB-5 Fund that would be paid to different entities, including those remaining with the EB-5 Fund.  The Business Plans accompanying the PPMs disclosed the amounts and categorization of the payments to be made by the EB-5 Project. Accordingly, there was no impermissible material omission. Thus, the SEC has not demonstrated that Defendants have violated securities laws as to CFIG's receipt of fees.

62.     Additionally, in order to establish a violation of §§ 10 and 17(a)(1), the SEC must prove Defendants had a demonstrated intent to deceive, manipulate, or defraud investors. City of Philadelphia v. Fleming Companies, Inc., 264 F.2d 1245, 1258 (10th Cir 2001).  However, there has been no showing of scienter regarding CFIG's receipt of fees.  Defendants have put enormous amounts of sweat equity into the development of the EB-5 Projects over a sustained period of years.  The PPM materials at all times set forth and noted the payment of development, advisory, and service fees.  The PPMs expressly noted that there were transactions that were not at arm's length, that Defendants had many roles, and that there existed conflicts of interest.  As the amounts of the fees that the EB-5 Projects were paying were set forth at all times, it cannot be said that there was an intent to deceive, manipulate, or defraud the EB-5 petitioners.  As there has been no demonstration of such intent, there is no scienter, and this charge of a securities violation must also fail.

63.     Finally, the third, required element to establish a violation of §§ 10 and 17(a)(1), "in connection with", is satisfied if the device employed, whatever it may be, is of a sort that would cause a reasonable investor to rely thereon and so relying causes them to purchase or sell a security. SEC v. C. Jones & Co., 2009 U.S. Dist. LEXIS 9832 (D. Colo. Feb. 10, 2009).  Here, the SEC has not provided any evidence that demonstrates the EB-5 petitioners' reliance on CFIG's allegedly undisclosed fees, which caused these EB-5 petitioners to purchase a security.  As noted, the PPMs set forth the amounts of fees to be paid for development, advisory, and other services.  Thus, the EB-5 petitioners that chose to invest had no issue with the payment of the fees as set forth, and the SEC has not demonstrated that the EB-5 petitioners relied upon the belief that such fees would not be paid to CFIG, as opposed to any other company.  Thus, there was no material misrepresentation or impermissible omission made with scienter in connection with the sale of securities by Defendants.

**The SEC Has Not Demonstrated a Reasonable Likelihood of Future Violations Between Now and the Trial Date**

64.     As mentioned above, the SEC must not only demonstrate that Mr. Kameli violated the Securities Act, but also show a reasonable likelihood of future violations. *Advance Growth Capital, Corp.*, 470 F.2d at 54. Indeed, the purpose of injunctive relief is not to punish a defendant for prior conduct but to deter future harm. *Id*. Accordingly, the SEC must show the Court that absent judicial intervention Mr. Kameli will violate the Securities Act between now and the trial date. *Oystacher*, 2016 U.S. Dist. LEXIS 89934 at *129. Critically, evidence of past misconduct does not lead to the conclusion that future misconduct is likely; instead, the Court must consider the totality of the circumstances.[2] *Id.* (citing *CFTC v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)).

---

[2] In evaluating the totality of the circumstances, courts traditionally consider a number of factors including: (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction as well as the likelihood that defendant's business activities might again involve him in such transactions; (4) the defendant's recognition of his culpability; and (5) the sincerity of his assurances against future violations. *E.g. SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir. 1984).

In this context, the SEC has not demonstrated a reasonable likelihood that Mr. Kameli will violate the Securities Act.

65.     First, the SEC acknowledges that Mr. Kameli is no longer offering or selling securities in any of his companies' funds. (SEC TRO Memo, 3, Doc. No. 14-1.) Despite this acknowledgement, the Commission contends that a preliminary injunction is warranted because Mr. Kameli "is in a *position* to continue to violate the federal securities laws." *Id*. (emphasis added). While capacity to violate the Securities Act is certainly a factor this Court should consider, it is grossly outweighed by the fact that Mr. Kameli stopped offering and selling securities in 2015. (Decl. Taher Kameli ¶ 148, Doc. No. 61). Significantly, the SEC is alleging that Defendants violated Sections 10(b) and 17(a) by making material misrepresentations to investors in connection with the offer and sale of securities. (SEC TRO Memo, 23-24, Doc. No. 61.) If the last alleged misrepresentation occurred in 2015, the SEC needs to establish that, absent judicial intervention, Defendants will change course and start offering securities again after a two-year hiatus. They have not.

66.     Instead, the SEC contends that Mr. Kameli will violate the Securities Act by providing legal services to potential-immigrants interested in the EB-5 program. (*Id*. at 2-3.) However, unless the Securities and Exchange Act prohibits immigration attorneys from advising their clients about the program, it is unclear how Mr. Kameli's legal practice would violate the Act. Defendant no longer offers security interests in his projects. (Decl. Taher Kameli,¶ 149.) Nor does he offer financial advice to his clients. (*Id*. at ¶ 156.) His role is strictly that of an attorney – advising clients and preparing legal documents. (*Id*. at ¶¶ 149, 152, 155). None of which implicates the securities laws.

67.     Second, Defendants have continually demonstrated their ability to self-regulate and cooperate with the SEC and this Court. On July 20, 2017, Defendants agreed to entry of a joint-

order to preserve documents, freeze assets, and maintain the status quo. (Order, Doc. No. 31.) Prior to its entry, Defendants were already in substantial compliance, having already preserved documents, provided status updates, and halted promotion of their projects.

## Conclusion

Ms. Aguilar's admitted that based on analysis and exhibits attached to her declaration, one cannot make any conclusion regarding whether the transfers between EB-5 Funds or Projects with Kameli entities, were legit or illegitimate. SEC has shown movement of funds between accounts associated with projects and entities based on legitimate contracts for services and other agreements. After three years of investigation by SEC over the Defendants' businesses and Projects with the assistance of Ms. Aguilar who worked over 2500 hours to review bank statements of the Defendants and Relief Defendants, still SEC has failed to establish a causal relationship in transactions that gives them the basis for forming their accusations against Defendants. It is clear from the presentation of material that there is ample confusion in SEC's mind that comes from lack of understanding of the structure of the businesses, their relationship with each other, and the appreciation of the impact of USCIS regulations on business execution and business relationship management.

Defendants, respectfully requests that the court to deny the Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted

 /s/ Taher Kameli_____
Taher Kameli
1319 South State Street,
Chicago, IL  60605
(312)233-1000

August 21, 2017