IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | Case No. 17 C 4686 |
| | ) | Judge Joan B. Gottschall |
| SEYED TAHER KAMELI, et al., | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| AURORA MEMORY CARE, LLC, et al., | ) ) | |
| Relief Defendants. | ) ) ) | |

**MEMORANDUM OPINION AND ORDER**

In April 2017, the U.S. Securities and Exchange Commission ("SEC" or "Commission")

filed this enforcement action against Sayed Taher Kameli ("Kameli") alleging that he violated

Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and section

10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule

10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The SEC's allegations are based on

investments that Kameli offered through the U.S. Citizenship and Immigration Service's

(USCIS's) EB-5 Program, which extends U.S. citizenship to immigrants who invest money in

designated businesses in the U.S. that create a certain number of jobs. Before the court is the

SEC's motion for a preliminary injunction. The Commission seeks to enjoin Kameli from further

violations of the securities laws and from any further involvement with EB-5 investments. The

Commission also seeks ancillary relief, including appointment of a Receiver to manage several

businesses that Kameli has created with investor funds. For the reasons discussed below, the motion is denied.

**BACKGROUND**

**A.     The EB-5 Program**

Congress created the EB-5 Program with the passage of the Immigration Act of 1990. *See* Pub. L. No. 101–649, 104 Stat 4978 (codified at 8 U.S.C. § 1153(b)(5)). In 1991, the Immigration and Naturalization Service (INS) promulgated regulations for the EB-5 Program's administration. Today, the program is administered by USCIS. The program's chief purpose is to stimulate the economy by encouraging infusions of new capital and creating jobs. *See, e.g.*, *Kenkhuis v. I.N.S.*, No. CIV.A. 301CV2224N, 2003 WL 22124059, at *3 & n.2 (N.D. Tex. Mar. 7, 2003) (citing the EB-5 Program's legislative history).

The application process begins with the filing of a "Form I-526, Immigrant Petition by Alien Entrepreneur" with USCIS. 8 C.F.R. § 204.6. The application must be "accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees." 8 C.F.R. § 204.6(j). In support of their petitions, applicants may submit "[a] copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." 8 C.F.R. § 204.6(j)(4)(i)(B).

If the I-526 petition is approved, the investor is granted a conditional green card giving him permanent resident status on a conditional basis. 8 U.S.C. § 1186b(a)(1). To have the conditions removed, the investor must file (within a specified time period) a "Form I-829,

Petition by Entrepreneur to Remove Conditions." 8 C.F.R. § 216.6. At this stage, the investor must show that his investment of capital was sustained during his or her period of conditional residence and that the investment "created or can be expected to create with a reasonable period of time ten full-time jobs to qualifying employees." 8 C.F.R. § 216.6(a)(4)(iv). If USCIS grants the I-829 petition, the conditions are removed from the investor's green card and he becomes a lawful permanent resident. If not, the investor loses his conditional permanent residency. 8 C.F.R. § 216.6(d)(1)-(2).

**B.      Kameli's Investment Offerings**

Kameli is an attorney who specializes in immigration matters. Beginning in 2008-2009, he began searching for businesses that could be used for EB-5 investments. Eventually, he decided to offer investments in funds that lent money for the development and construction of facilities that provided memory care and/or assisted living services to senior citizens. Kameli initially planned four such projects in Illinois: Aurora Memory Care, LLC d/b/a Bright Oaks of Aurora, LLC (the "Aurora Project"); Elgin Memory Care, LLC d/b/a Bright Oaks of Elgin, LLC (the "Elgin Project"); Golden Memory Care, Inc. d/b/a Bright Oaks of Fox Lake, Inc. (the "Golden Project"); and Silver Memory Care, Inc. d/b/a Bright Oaks of West Dundee, Inc. (the "Silver Project").[1] A separate fund was created as an investment vehicle for each project: Aurora Assisted Living EB-5 Fund, LLC (the "Aurora Fund"); Elgin Assisted Living EB-5 Fund, LLC (the "Elgin Fund"); Golden Assisted Living EB-5 Fund, LLC (the "Golden Fund"); and Silver Assisted Living EB-5 Fund, LLC (the "Silver Fund"), respectively.[2] Each Fund used investors' money to make a loan to its associated Project for the development and construction of a particular senior living facility.

---

[1] These Projects are referred to collectively as the "Illinois Projects."
[2] These Funds are referred to collectively as the "Illinois Funds."

In 2013, Kameli began to offer similar investments in connection with senior living facilities in Florida. Kameli created four Funds: First American Assisted Living EB-5 Fund, LLC (the "First American Fund"); Naples Memory Care EB-5 Fund, LLC (the "Naples Fund"); Ft. Myers EB-5 Fund, LLC (the "Ft. Myers Fund"); and Juniper Assisted Living EB-5 Fund, LLC (the "Juniper Fund").[3] Each Fund loaned money to a Project for the development of a senior living center: First American Assisted Living, Inc. (the "First American Project") for a facility to be located in Wildwood, Florida; Naples ALF, Inc. (the "Naples Project") for a facility to be located in Naples, Florida; Ft. Myers ALF, Inc. (the "Ft. Myers Project"), for a facility to be located in Ft. Myers, Florida; and Juniper ALF, Inc. (the "Juniper Project") for a facility to be located in Sun City, Florida.[4]

The Illinois Funds were managed by Chicagoland Foreign Investment Group (CFIG), an entity created and owned by Kameli. The Florida Funds are managed by American Enterprise Pioneers (AEP), a subsidiary of CFIG. As detailed more fully below, in addition to managing the Illinois Funds, CFIG provided development services for the various Projects. In 2013, Kameli created Bright Oaks Group, Inc. and Bright Oaks Development, Inc. (together, "Bright Oaks") to provide business and development services to the Projects. Nader Kameli ("Nader"), Kameli's brother, served as the president of CFIG and later as the CEO of Bright Oaks. In addition to Kameli personally, CFIG and AEP are named as defendants in the suit. The individual Funds and Projects, along with Bright Oaks, are named as relief defendants.[5]

---

[3] These Funds are referred to collectively as the "Florida Funds."

[4] These Projects are referred to collectively as the "Florida Projects."

[5] In the Complaint, the second Bright Oaks entity is identified as "Bright Oaks Group, Inc." *See* Compl. ¶ 7. However, the caption makes no reference to Bright Oaks Group and instead refers to "Bright Oaks Platinum Portfolio, LLC." In addition to the other entities listed above, the complaint also names Platinum Real Estate and Property Investments, Inc. ("PREPI") as a relief defendant. PREPI is described more fully below.

Kameli offered investors, the vast majority of whom are Iranian or Chinese nationals, an ownership interest in a particular Illinois or Florida Fund. Each of the Funds issued Private Placement Memorandums ("PPMs") to prospective investors. These included a Business Plan containing information about the ways in which the Project would spend the money borrowed from the Fund. The Business Plan also provided an estimate of the time necessary for the Project's completion. The PPMs stated that the Projects would begin repaying the loan once the senior living facility had become operational. CFIG and AEP were to be compensated for their management services by a portion of the interest paid by the Projects on these loans.

To invest, individuals executed subscription agreements, which they returned to defendants along with $500,000. In addition, investors were charged an administrative fee of between $35,000 and $75,000. Investors' funds were held in escrow until their I-526 petitions were adjudicated. Once the petition was granted, the investor's money was deposited into the specific Fund for which the investor had applied. If the petition was denied, the money was returned to the investor. Eventually, each investor would hopefully earn back his or her principal plus interest. More importantly, each Project was to create enough jobs to support investors' I-829 petitions.

It would be an understatement to say that things did not go as planned. Each of the Projects is over budget and behind schedule. To date, only the Aurora Project has actually been completed. However, only 12 of the facility's 60 units are occupied. The property is also the subject of a foreclosure suit in Kane County in which a receiver has been appointed. *West Suburban Bank v. Aurora Memory Care LLC et al.*, No. 17-CH-000662 (Kane Cty. Cir. Ct. filed July 27, 2017).

The other Illinois Projects remain in various stages of development. The foundations have been poured and structures partially erected for the Elgin and Golden Projects. However, the general contractor for both Projects has stopped working and has sued the respective Funds for unpaid amounts of $2.197 million and $1.549 million, respectively. *See Global Builders v. Elgin Memory Care LLC*, No. 16 CH 964 (Kane Cty. Cir. Ct. filed Sept. 23, 2016); *Global Builders v. Golden Memory Care Inc.*, No. 16 CH 1472 (Kane Cty. Cir. Ct. filed Sept. 28, 2016). In addition, in December 2016, the City of Elgin sent Kameli a Notice of Unsafe Condition and Demolition Order for the Elgin Project. *See* Ex. 69, Elgin Community Development Dept. Notice of Unsafe Condition & Demolition Order, Dec. 22, 2016. Kameli appealed the demolition order, *see* Ex. 70, Letter from T. Kameli to Raoul Johnston, City of Elgin Community Development Department (Jan. 20, 2017), but the City of Elgin denied the appeal in March 2017, *see* Ex. 71, email from Christopher Beck, City of Elgin Assistant Corporation Counsel to Eric Phillips, U.S. Securities Exchange (Mar. 28, 2017). To date, there has been no construction on the Silver Project or on any of the Florida projects.

Defendants claim that the Projects faced numerous obstacles, including delays due to bureaucratic requirements of municipal governments; rising construction and labor costs; and new regulations imposed by the U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") on investments made by Iranian nationals.[6] *See, e.g.*, Kameli Decl. ¶¶ 73, 158. The

---

[6] As a result of these difficulties, Kameli previously filed a lawsuit in this court on behalf of two of his EB-5 Funds. *See Elgin Assisted Living EB-5 Fund, LLC et al v. JP Morgan Chase Bank, National Association*, 12-cv-02193 (filed Mar. 26, 2012). The suit arose because the OFAC licenses obtained for certain Iranian investors in the Funds were set to expire while their money was still in escrow. The Funds' escrow agent, JP Morgan Chase, believed that if the licenses were to expire, it would be required to return the funds to their source. The court issued an injunction preventing JP Morgan Chase from expatriating the money. Shortly thereafter, the suit was voluntarily dismissed.

SEC's investigation of Kameli, which has been underway since at least 2015, has made it difficult for the Funds to attract additional investments.

Defendants also state that, although the Projects are unfinished, they have in some cases created a sufficient number of jobs to support many investors' I-829 petitions. According to defendants, the Aurora Project has created 362 jobs; the Elgin Project has created 200 jobs; the Golden Project has created 189 jobs; and the Silver Project has created 14 jobs. *See* Defs.' Concl. Br. ¶ 20. Nevertheless, investors' green-card applications are in limbo. As of July 2014, USCIS had approved 12 of the 17 I-526 petitions filed by Aurora investors; 18 of the 24 I-526 petitions filed by Elgin and Golden Fund investors, respectively; 20 of the 29 I-526 petitions filed by Silver Fund investors; and approximately 14 I-526 petitions by investors in the First American Fund. USCIS has yet to act on any of the petitions submitted by investors in the other Florida Funds. To date, no I-829 petitions have been approved. *See* Tr. 472:24-473:10. It appears that, due to a backlog, few I-829 petitions, if any, have been adjudicated.

## C.     The SEC's Allegations

According to the SEC, defendants committed numerous violations of the securities laws in their handling of the EB-5 Funds and Projects. Specifically, the SEC alleges that defendants (1) charged several of the Funds and Projects over $4 million in undisclosed fees; (2) used approximately $16 million of investors' funds to engage in securities trading; (3) used money of Silver Fund investors as collateral for a line of credit, which they then used for their own benefit and the benefit of Funds and Projects other than the Silver Fund; and (4) made an undisclosed profit of roughly $1 million by acquiring parcels of land through a separate entity and selling them at a higher price to several of the Florida Projects. The SEC's complaint alleges that these constituted violations of section 17(a) of the Securities Act, and section 10(b) of the Exchange

Act. The Commission seeks disgorgement of ill-gotten gains and the imposition of civil penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d).

Contemporaneously with the filing of its complaint, the SEC moved for a temporary restraining order (TRO) and a preliminary injunction, seeking to enjoin defendants from further violations of the securities laws, and to enjoin Kameli from participating in any further EB-5 Program offerings. The motion also seeks ancillary relief, including: (1) an asset freeze; (2) appointment of a Receiver; (3) an accounting; and (4) a document preservation directive.

After a hearing on the TRO, the parties entered into an agreement pending the court's decision on the SEC's preliminary injunction motion. Order ¶ I.A, ECF No. 40. The agreement freezes all the defendants' and relief defendants' accounts, except for Kameli's personal accounts and those of the Aurora Fund (which must have funds available to pay for the Aurora facility's operation). The order also forbids Kameli, Nader, and other individuals from using the entities' assets. *Id.*

A preliminary injunction hearing was subsequently held over a period of five days, during which the court heard testimony from more than fifteen witnesses. The parties also submitted post-hearing briefs with proposed findings of fact and conclusions of law.

## **LEGAL STANDARD**

Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act both authorize the SEC, "upon a proper showing," to obtain a permanent or temporary injunction against violators of the securities. *See* 15 U.S.C. § 77t(b); 15 U.S.C. § 78u(d). Because the SEC seeks a preliminary injunction pursuant to these statutory provisions, the traditional preliminary injunction standard does not apply. *See, e.g.*, *United States v. Dove*, No. 1:10-CV-0060, 2010

WL 11426136, at *2 (N.D. Ill. Apr. 16, 2010) ("'When an injunction is expressly authorized by statute, the standard preliminary injunction test is not applied.'") (quoting *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)).

Although the Seventh Circuit has not addressed how the applicable standard is to be understood, there is general agreement that "[t]he SEC may obtain a temporary injunction against further violations of the securities laws upon a substantial showing of likelihood of success as to (a) current violations and (b) a risk of repetition." *U.S. S.E.C. v. Hollnagel*, 503 F. Supp. 2d 1054, 1058 (N.D. Ill. 2007); *see also S.E.C. v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998) ("A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition."); *S.E.C. v. Trabulse*, 526 F. Supp. 2d 1008, 1012 (N.D. Cal. 2007) ("A preliminary injunction enjoining violations of the securities laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition.").[7]

---

[7] In its briefing, the SEC recites this formulation of the standard along with various alternative formulations. In its opening brief, in addition to the "substantial showing" formulation, the SEC states that the standard for obtaining a preliminary injunction is "low," requiring "a 'justifiable basis for believing, derived from reasonable inquiry and other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved.'" SEC Opening Br. at 22 (citing *SEC. v. Householder*, No. 02 C 4128, 2002 WL 1466812 at *5 (N.D. Ill. July 8, 2002) (Brown, Mag. J). In its closing brief, after citing the "substantial showing" formulation, the SEC states that it is entitled to a preliminary injunction where it "presents a prima facie case that the defendant has violated the law." SEC Concl. Br. ¶ 84. The *Householder* articulation of the standard, which is based on what the SEC believes rather than what a court decides, has little case authority to support it. The only case cited by *Householder* is *SEC v. General Refractories Co.*, 400 F. Supp. 1248, 1254 (D.D.C. 1975). The "prima facie" formulation is often cited by courts, though it is rarely defined. *See, e.g.*, *S.E.C. v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) ("The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated."); *Sec. & Exch. Comm'n v. San Francisco Reg'l Ctr. LLC*, No. 17-CV-00223-RS, 2017 WL 1092315, at

There is also general agreement that, unlike a private litigant, the SEC may be granted a preliminary injunction without showing a risk of irreparable injury or the unavailability of alternative remedies. *See, e.g.*, *Smith v. S.E.C.*, 653 F.3d 121, 127–28 (2d Cir. 2011) ("In this jurisdiction, injunctions sought by the SEC do not require a showing of irreparable harm or the unavailability of remedies at law."); *Sec. & Exch. Comm'n v. San Francisco Reg'l Ctr. LLC*, No. 17-CV-00223-RS, 2017 WL 1092315, at *2 (N.D. Cal. Mar. 23, 2017); *Sec. & Exch. ComM'n v. Texas Int'l Co.*, 498 F. Supp. 1231, 1253 (N.D. Ill. 1980) ("Under this standard, the SEC need not show irreparable harm but need only show that the statutory conditions have been satisfied.").

The defendants argue that the SEC is seeking two types of injunctive relief: a statutory injunction prohibiting Kameli from committing future violations of the securities laws; and a conduct-based injunction prohibiting him from participating in any EB-5 offering. Defs.' Concl. Br. at 2 n.1. Defendants agree that the standard articulated above applies in the case of the former, but they argue that the traditional standard (requiring a showing of irreparable harm and a balancing of the hardships) applies where the SEC seeks a conduct-based injunction. The court has found no authority for this proposition.[8] Nevertheless, a preliminary injunction against future

---

*2 (N.D. Cal. Mar. 23, 2017) ("The SEC proposes that it is entitled to a preliminary injunction if it can establish (1) a prima facie case of previous violations of the securities laws (2) and a reasonable likelihood that the wrong will be repeated.") (citations omitted). The fact that the SEC cites both alternative formulations in tandem with the "substantial showing" language suggests that it believes these various characterizations are interchangeable. In any case, since the SEC cites the "substantial showing" formulation in both its opening and closing briefs, the court will use this characterization of the standard for the sake of consistency.

[8] The defendants cite *S.E.C. v. Cherif*, 933 F.2d 403 (7th Cir. 1991); but *Cherif* says nothing about a difference between conduct-based and other injunctions. On the contrary, the parties there agreed that the traditional preliminary injunction standard applied, and the court consequently stated that it would not address the question of whether a different standard applied to injunctions sought by the SEC. *Id.* at 408.

violations of securities laws is a grave remedy. *See, e.g.*, *S.E.C. v. Compania Internacional Financiera S.A.*, No. 11 CIV 4904 DLC, 2011 WL 3251813, at *10 (S.D.N.Y. July 29, 2011) ("An injunction against future securities violations has grave consequences, especially for individuals who are regularly involved in the securities industry, because the injunction places them in danger of contempt charges in all future securities transactions. The reputational and economic harm of suffering a preliminary injunction, especially on charges of fraud, can also be severe.") (citation, quotation marks, and alteration omitted). And courts have observed that, "[l]ike any litigant, the Commission should be obliged to make a more persuasive showing of its entitlement to a preliminary injunction the more onerous are the burdens of the injunction it seeks." *See, e.g.*, *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1039 (2d Cir. 1990).

## DISCUSSION

As noted above, the SEC alleges violations of 10(b) of the Exchange Act and 17(a) of the Securities Act. The elements of a claim under sections § 10(b) and § 17(a)(1) are essentially the same. "The principal difference is that § 10(b) and Rule 10b–5 apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995).[9] To prove a violation of either statute, the SEC must show that defendants "(1) made a material misrepresentation or a material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *S.E.C. v. Bauer*, 723 F.3d 758, 768–69 (7th Cir. 2013) (quotation marks and brackets omitted). The elements of claims under § 17(a)(2) and § 17(a)(3) are the same as those for § 17(a)(1),

_____

[9] Courts have specifically held that investments in EB-5 enterprises like those at issue here constitute "securities" within the meaning of the securities laws. *See, e.g.*, *Sec. & Exch. Comm'n v. Liu*, No. SACV1600974CJCAGRX, 2016 WL 9086941, at *3 (C.D. Cal. Aug. 17, 2016). Defendants do not contest this point.

except they require a showing of negligence instead of scienter. *Id.* at 768 n.2 ("§ 10(b), Rule 10b–5 and § 17(a)(1) have a scienter requirement, while § 17(a)(2) and (a)(3) … do not."). "An omission or misstatement is material if a substantial likelihood exists that a reasonable investor would find the omitted or misstated fact significant in deciding whether to buy or sell a security, and on what terms to buy or sell." *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988). Scienter is a mental state that "embraces an intent to deceive, manipulate, or defraud, as well as reckless disregard of the truth." *Bauer*, 723 F.3d at 775 (quotation marks and citations omitted).

## A.    Likelihood of Success in Showing Current or Past Violations of Securities Laws

As noted above, the SEC alleges that defendants have violated the securities laws in several different ways. The court examines each of these in turn.

### 1.    Compensation & Conflicts Relating to CFIG & Bright Oaks

The SEC alleges that between 2010 and 2016, CFIG and AEP received undisclosed compensation from various Projects totaling roughly $4 million. Specifically, the SEC points out that: (1) between October 2010 and October 2012, the Elgin Fund paid CFIG a total of $840,000; (2) between 2011 and 2016, the Aurora Project made three payments to CFIG amounting to $950,000; (3) in November 2012, the Golden Project paid CFIG $120,000; (4) in December 2013, the Silver Project paid CFIG $1.155 million; and (5) in 2016, the First American Project paid AEP $910,000. *See* Aguilar Decl. ¶ 33 & Ex. 14. The SEC makes a parallel argument regarding undisclosed payments by the Projects to Bright Oaks. *See* SEC Concl. Br. ¶ 43.[10]

_____

[10] Specifically, the SEC alleges that the Golden and Silver Projects made payments to Bright Oaks pursuant to undisclosed agreements. *See* SEC Concl. Br. ¶ 43. According to the SEC, these payments actually constituted loans because at the time they were made, Bright Oaks had not fully performed its duties under the agreements. *Id.* Additionally, the SEC alleges that Bright Oaks used some of the money from the Golden and Silver Projects to pay for the expenses of

According to the Commission, these payments show that the PPMs' representations regarding defendants' compensation were misleading. The SEC does not maintain that CFIG (or AEP or Bright Oaks) provided no actual services in exchange for the payments they received. Rather, the Commission contends that payment of these fees was contrary to statements in the PPMs indicating that CFIG's compensation would come from a portion of the loan interest paid by the Projects to the Funds once their senior living facilities became operational. *See*, *e.g.*, Ex. 18 Elgin Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 12 (Aug. 2011), ECF No. 8-18. The SEC correctly points out that the payments above did not come from loan interest and were paid before the facilities became operational.

Defendants argue that the PPM provisions cited by the SEC pertain only to CFIG's and AEP's compensation for *management* services. According to defendants, these provisions are inapplicable because the payments in question were for development services, not management services. The paper record at this point bears this out. The language in the PPMs regarding compensation via loan interest makes specific reference to CFIG's duties as manager of the Funds. *See, e.g.*, Ex. 36A, Aurora Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 12 (Aug. 2011) (stating that the loan interest "will represent the Manager's sole compensation *for the Manager's duties* during the term of the loan.") (emphasis added). Moreover, defendants cite specific agreements between CFIG/AEP and the Projects indicating that the payments identified by the SEC were for development services.[11] *See* Ex. 59, Elgin

_____

other Projects. *Id*. Ultimately, the court's analysis of the SEC's allegations vis-à-vis the undisclosed compensation to CFIG and AEP apply *mutatis mutandis* to its allegations vis-à-vis Bright Oaks. Accordingly, the court does not discuss the SEC's arguments regarding Bright Oaks in detail.

[11] Matters are slightly more complicated in the case of the payment from the Aurora Project. Although the SEC claims that the amount of the payment was $950,000, the amount listed in the

Development Services Agreement art. II (Sept. 29, 2011), ECF. No. 12-9 (agreement by the Elgin Project to pay CFIC a development services fee of $840,000); Ex. 58, Aurora Development Services Agreement art. II (Sept. 28, 2011), ECF No. 12-8 (agreement by the Aurora Project to pay CFIG $595,000 for development services); Ex. 60, Site Selection & Pre-Development Services Agreement § 5(a) (Nov. 2013), ECF No. 12-10 (agreement by the Golden Project to pay CFIG $250,000 for site selection and pre-development services, acknowledging that a payment of $120,000 already had been made); Ex. 56, Business Development & Advisory Services Agreement art. 2 (Apr. 2, 2012), ECF No. 12-6 (agreement by the Silver Project to pay CFIG $1.15 million for business development and advisory services); Ex. 62, Business Development and Advisory Services Agreement art. 2 (Jan. 7, 2013), ECF No. 12-12 (agreement by First American Assisted Living to pay AEP $910,000 for business development and advisory services).

The SEC responds that even if these payments are not regarded as compensation for management services, they still were not adequately disclosed in the offering documents. For at least two reasons, this argument is unpersuasive. First, at least in the case of the Elgin, Aurora, and First American Funds, the expenses *were* disclosed in the PPMs' Business Plans. *See* Ex. 21C, Elgin Memory Care Senior Living Facility Business Plan at 5 (Sept. 2015), ECF No. 8-23 (listing "Development Svcs/Advisory Fees" in the amount of $840,000); Ex. 38B, Aurora

---

Aurora Development Services Agreement is $595,000. Defendants claim that only $595,000 of the $950,000 represented payment for development services. They assert that the remainder constituted repayment of a loan from CFIG. *See* Kameli Decl. ¶ 56. Given that the $950,000 amount was comprised of several different payments over the period from 2011 to 2016, there is no reason to think that all of these were made for the same purpose. Some portion of the $950,000 could have been for development services while another portion could have been repayment of a loan. In any case, the SEC does not address this point. For present purposes, the precise amount in question is not critical; rather, the issue is whether the payment was disclosed and if not, whether it should have been.

Memory Care Senior Living Facility Business Plan at 4 (Oct. 2013), ECF No. 9-14 (listing "Development Svcs./Advisory Scvs. Fee" in the amount of $595,000); Ex. 41, First American Assisted Living-Wildwood Senior Living Facility Business Plan at 4 (Mar. 2013), ECF No. 11-2 (listing $910,000 for "Development Svcs/Advisory Svcs Fees").[12]

The more basic question, however, is why defendants should have been required to disclose these payments and agreements in the first place. The SEC has not presented any actual argument or evidence on this point. For example, the Commission has not suggested that the offering documents disclosed the Projects' agreements with other service providers and selectively omitted information about the services provided by CFIG, AEP, and Bright Oaks. On the contrary, it appears that few service providers, if any, were mentioned in the PPMs and Business Plans. Nor has the SEC offered any evidence to suggest that such information was customarily disclosed in offering documents for investments of this type.

The SEC also has not offered sufficient evidence to show that information regarding these payments was material to investors. The Commission cites the declaration of Chaohua Huang, an investor in the Elgin Fund, who avers: "I later learned that in late 2015, Kameli asserted for the first time in a supplement to the Fund's private placement memorandum that Kameli's companies 'have been entitled' to receive $840,000 in additional fees. It would have been important to my investment decision if I had learned that Kameli, or companies he controlled, were going to obtain additional compensation beyond what was disclosed to me in

_____

[12] In its opening brief, the SEC additionally argued that the offering documents' representations regarding development and management fees were misleading because they state that such fees are deferrable until the Projects become operational. *See* SEC Opening Br. at 18, 21. In point of fact, the Commission notes, the fees were paid before the Projects became operational. Since this argument was not mentioned in its concluding brief, the SEC appears to have abandoned it. In any case, the court does not find the argument convincing. The language cited by the SEC does not state definitively that the development fees will be deferred until the beginning of operations. It says only that the payments "may be" deferrable.

the documents I was provided before I invested." Ex. ECF. 83, Chaohua Huang Decl. ¶ 26, ECF

No. 13-13. At issue here, however, is whether the information would have been important to a

reasonable investor. The fact that the information may have been important to a particular

investor such as Mr. Huang may be relevant to that issue, but it does not settle the matter. *See,*

*e.g.*, *U.S. S.E.C. v. Trujillo*, No. 09-CV-00403-MSK-KMT, 2010 WL 3790817, at *4 (D. Colo.

Sept. 22, 2010) ("To demonstrate that the statements were material, the SEC provides

declarations from various investors attesting that they, in fact, relied on the Mr. Trujillo's

statements in making their decisions to invest in the Funds. However, whether or not these

particular investors relied on Mr. Trujillo's statements is not dispositive as the question is

whether a reasonable investor would find the statements material. However, the actual reliance is

relevant with regard to whether a reasonable investor would consider the statements material.").

Reliance on the SEC's declaration is particularly problematic in this instance because defendants

have submitted multiple declarations from investors who aver that information regarding such

payments was not important to them. *See, e.g*., Ex. F.32, Decl. of Elgin Investor #2 at ¶ 13

("Before sending my money to the escrow account of EALEF, I knew that Mr. Kameli or

companies associated with him were performing services for EMC and for that they would

receive payments from EMC. I also knew that there was a fee that EMC had to pay to CFIG for

start-up services. My investment was with the investment fund, and how EMC used the money

for its business purposes did not matter to me."), ECF 62-3; Ex. F.31, Decl. of Elgin Investor #1

¶, ECF 62-2; Defs.' Concl. Br. ¶ 60.

  In any case, Huang's declaration does not support the SEC's position. Huang states only

that it would have been important to his investment decision to know that "Kameli, or companies

he controlled, were going to obtain additional compensation." Ex. 83, Huang Decl. ¶ 26. This

indicates that what was important to Huang was not the payments themselves but the fact that they were being made to entities *owned by Kameli*. The fact that Kameli owned the entities being paid by the Projects is relevant to the materiality of the PPMs' conflict-of-interest disclosures, which is discussed below. However, investors' concern over Kameli's ownership of the entities does not suggest that information regarding the payments themselves was material to investors.

Finally, the SEC has not made a sufficient showing that defendants acted with scienter. Indeed, the SEC makes no argument at all that defendants acted with scienter in not disclosing the payments they received for development services. The Commission's argument for scienter is based on the defendants' failure to disclose Nader Kameli's role in the Funds and Projects. *See* SEC Concl. Br. ¶ 121 ("Defendants knew, or were reckless in not knowing, that their representations about their conflicts of interest and compensation were inaccurate, incomplete, and misleading. At the time the Defendants disseminated the PPMs to investors, Kameli already had caused his brother to become involved with the Funds and the Projects. At the time the Defendants disseminated the PPMs to investors, Kameli already had caused his brother to become involved with the Funds and the Projects."). Once again, defendants' disclosures regarding the involvement of Kameli and his relatives in the Projects is relevant to the adequacy of the PPMs' representations regarding conflicts of interest; but they do not support an inference of scienter with respect to defendants' failure to disclose the payments themselves.[13] As discussed above, the SEC has failed to establish satisfactorily at this juncture that the Projects' payments of development fees should have been disclosed to investors. On this record, no

---

[13] A separate question is whether the record evidence is sufficient to show that defendants were negligent in failing adequately to disclose the payments for purposes of § 17(a)(2) and § 17(a)(3). Because the SEC has not addressed this issue, the court likewise does not address it.

inference of an intent to deceive or defraud can readily be drawn from defendants' failure to disclose the payments.

For these reasons, the SEC has failed to make a substantial showing that it is likely to succeed on the merits of its claims insofar as they are based on defendants' alleged misrepresentations regarding their compensation.

**(b) Conflict of Interest Disclosures**

The court now considers whether defendants' disclosures regarding conflicts of interest were misleading. The PPMs include a "Conflicts of Interest" section that informs investors that "CFIG and or CFIG's subsidiaries may be reimbursed by [the Project] for start-up expenses and services rendered prior to funding." Ex. 18, Elgin Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 11 (Aug. 2011). It also notes that "Kameli serves as counsel to the [Fund] and [CFIG] in connection with the formation of the [Fund] and the offering of interests in the [Fund] as well as other matters which [sic] the Company may engage Kameli from time to time pursuant to a written engagement letter." *Id*. Finally, the Conflicts section contains a clause stating that "[c]ertain transactions and agreements included herein and entered into by the individuals listed above, as well as companies affiliated with those individuals, will not be made in an arm's length [sic] and may not be as good as those obtained in an arm's length transaction." *Id*.

The SEC argues that the "PPMs' discussion of conflicts of interest was inaccurate, incomplete, and misleading by discussing various purported conflicts of interest but omitting to disclose that … Kameli caused the Projects to hire CFIG, AEP, and Bright Oaks Development to serve as the Projects' developers and caused the Projects to pay these companies millions of dollars in undisclosed fees based on undisclosed agreements between the Projects and these

entities." SEC Concl. Br. ¶ 112. According to the Commission, defendants "did not have an affirmative duty to speak about" conflicts of interest, but "once they chose to speak about [the] topic[], Defendants had a duty to be accurate, complete, and not misleading." SEC Concl. Br. ¶ 111. Stated in the abstract, this proposition is unexceptionable; but it also begs the question of how much specificity is needed in any particular case to ensure that conflicts disclosures are "accurate, complete, and not misleading." The SEC has not addressed this question fully and squarely. Its treatment of the matter is limited to two case citations, *SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013), and *S.E.C. v. Gorsek*, 222 F. Supp. 2d 1099 (C.D. Ill. 2001). The Commission offers no discussion of either decision, much less any argument concerning how they apply under the circumstances of this case. Nor does the SEC develop this argument in its opening brief. Indeed, the Conflicts provision receives no mention at all in the Commission's opening brief. The SEC's argument regarding the PPMs' conflicts disclosures was raised for the first time only at the conclusion of the preliminary injunction hearing—and then only after the court asked the Commission to explain its basic legal theory. *See* Tr. at 811:21-24; 818:15-816:19.

The only other place in which the conflicts disclosures are mentioned is in the SEC's complaint. Specifically, the Commission states that the Conflicts section of the Golden Fund's July 2011 PPM "purported to describe all of Kameli's potential or actual conflicts of interest but omitted to state that Bright Oaks Development or his brother would be involved with the Project or would receive any payments from it." Compl. ¶ 158.[14] The court disagrees. This is not a case in which multiple conflicts of interest were identified with specificity and where the putative

_____

[14] Given that Bright Oaks had not been created until 2013, it would presumably have been impossible to disclose the company's involvement in a PPM issued in 2011. It is unclear whether this was an oversight, or whether the SEC has some theory according to which Bright Oaks's disclosure could have been made at that point.

conflict with Bright Oaks and Nader Kameli were selectively omitted. The Conflicts section informs investors that CFIG might be entitled to reimbursement for start-up and pre-funding expenses, and then goes on to note potential conflicts stemming from Kameli's role as an attorney. The section ends by expressly informing investors that there may be other conflicts that have not been or will not be disclosed in detail.

For these reasons, the court concludes that the SEC has not made a substantial showing that it is likely to prevail on its claims insofar as they allege that the PPMs' conflict-of-interest disclosures were misleading.[15]

## 2. Securities Trading

Next, the SEC argues that from April 2013 to September 2015, Kameli transferred into brokerage accounts a total of $15.8 million that had been invested in the Illinois Projects. According to the SEC, Kameli used the funds to invest in stocks, bonds, and other securities. Aguilar Decl. ¶ 34; Compl. ¶ 170. The SEC claims that the Aurora and Elgin Projects lost approximately $16,000 and $18,000, respectively; and that the Golden and Silver Projects had gains of approximately $464,000 and $27,000, respectively. The SEC further alleges that defendants transferred a portion of the gains from the Golden Project's brokerage account to Platinum Real Estate and Property Investments, Inc. ("PREPI"), a Kameli-owned company, which used the funds to purchase land that it later sold to the First American Project in Florida. SEC Concl. Br. ¶ 17; Aguilar Decl. ¶ 34. As a result, the Commission maintains, the PPMs for the Illinois Funds misled investors by telling them that their money would be used only for the

---

[15] For this reason, the court need not consider the elements of materiality or scienter in connection with the SEC's allegations regarding undisclosed compensation or conflicts of interest.

development and construction of particular senior living facilities, when in fact the money was also used to invest in securities.

Defendants do not dispute that investors' funds were transferred into securities brokerage accounts. *See* Kameli Decl. ¶ 104. However, they maintain that they were authorized to do so, and they have offered evidence that places the events described by the SEC in a very different light. According to the declaration submitted by Kameli, changes in banking practices and regulations occurring in 2011-2012 left defendants with little choice but to place investor funds in brokerage accounts. Specifically, Kameli states that in 2011, banks began to close the accounts in which investors' funds had been held because of OFAC regulations pertaining to investments from Iran. Kameli Decl. ¶ 105. In addition, Kameli claims that "at the end of 2012, the FDIC was placing a limit on FDIC insurance for $250,000.00," and that, as a result, "we had to limit the funds [sic] exposure to smaller banks who could go out of business since the FDIC would not protect the majority of the money if the bank failed." *Id*. According to Kameli, Morgan Stanley and UBS agreed to keep the funds, but they required that the money be placed in brokerage accounts. *Id*. Kameli states that the accounts were managed by professional financial advisors and invested in low-risk securities. *Id*. Further, Kameli insists that the funds were available to the Projects at all times. *Id*. ¶ 111 ("The money that was in the operating account of the Projects was always available to the project and it was used based on the Sources and Uses of the Projects to develop, construct, and operate an assisted living facility. While the money was sitting dormant in the account, it was kept in securities due to reasons mentioned before."). It is not entirely clear whether Kameli means to say that the money could have been used for the Projects even while in the brokerage accounts, or that the money was simply never needed for the Projects while it was being held in the brokerage accounts.

More importantly, defendants contend that transferring the funds to brokerage accounts was authorized by the Funds' Operating Agreements, which take effect once investors' money is transferred out of escrow. For example, the Operating Agreements state: "Subject to the terms of this Agreement and the terms of the Act, the Manager shall have the unrestricted power and exclusive authority to (a) carry on the activities of the Company and to do and to perform any and all things necessary for, incidental to, or connected with carrying on the activities of the Company and (b) represent and bind the Company." Ex. A.1, Elgin Assisted Living EB-5 Fund, LLC Limited Liability Company Operating Agreement ¶ 5.1. The Operating Agreements additionally state that "[a]ll operational decisions made by the Manager hereby have the express consent, approval, and affirmative vote of the Members." *Id*. On their face, these provisions appear broad enough to permit the transfer of investors' funds into brokerage accounts, particularly if, as defendants maintain, the investments were kept in low-risk portfolios. And if the Operating Agreements authorized defendants' actions, it is not clear that investors were misled regarding how their funds would be used.

The SEC has not addressed defendants' argument based on the Operating Agreements. Nor has the Commission addressed defendants' claims regarding why investors' funds were placed in brokerage accounts, how the accounts were managed, and the sorts of securities in which the funds were invested. Without argument or evidence from the SEC on these issues, it is difficult for the court, even at this preliminary stage, to address them meaningfully. Presumably, the Commission maintains that, regardless of the circumstances, placing the funds in a brokerage account was contrary to the PPMs' representation that investors' money would be used only for the purpose of constructing a senior living center. But the picture here is more complicated. Even putting aside the question of whether the Operating Agreements authorized defendants to place

the funds in brokerage accounts, it is unclear in light of Kameli's testimony to what extent

defendants' actions were contrary to the PPMs' representations. If it is true, as Kameli has

averred, that the money was available to the Projects at all times, then transfer of the funds to

brokerage accounts would not have conflicted with the purpose of constructing the senior living

facilities. Indeed, if Kameli's testimony is true, the ultimate purpose of transferring the funds to

brokerage accounts was not to trade securities for profit but to protect individuals' investments,

and their citizenship petitions, by preventing the expatriation of their funds.

Of course, at this stage, it is unclear whether Kameli's account will ultimately prove true

(though his account of his reasons for placing the funds in brokerage accounts appears to be

corroborated to some degree by his 2012 lawsuit against JP Morgan Chase. *See* n.6, *supra*).

There may also be sound reasons for rejecting defendants' contention that their investment of the

funds was authorized by the Operating Agreements. But given that the SEC has not addressed

these issues, the court cannot conclude that the Commission has sufficiently shown that the

PPMs' representations regarding the use of investors' funds were misleading.[16]

Nor has the SEC sufficiently shown a violation of § 10(b) or § 17(a) based on defendants'

transfer of the profit from the Golden Fund's brokerage account to PREPI. The PPM for the

Golden Fund states that investors' capital contributions would be used for the Golden Project. At

issue here, however, is not investors' capital contributions, but additional money derived from

their contributions. At this point, the SEC has not addressed defendants' fundamental contention

that their investment of investors' money was authorized by the Operating Agreements. Thus,

---

[16] Having failed to show that defendants made a misleading representation, it is unnecessary to
address the issues of materiality and scienter. However, the court notes that Kameli's testimony
regarding his reasons for transferring the funds to brokerage accounts militates significantly
against a finding of scienter.

the court is not prepared simply to assume that any proceeds from such investments should also be considered investors funds.

Similarly, the SEC has failed to show that the PPMs' disclosures were misleading based on the losses incurred by the brokerage accounts for the Aurora and Elgin Funds. Defendants initially challenge the SEC's allegation that the accounts sustained losses, claiming that the Commission's calculations failed to take account of dividend and interest income of $113,451.42 earned by the Elgin Fund. Since the combined losses of the Aurora and Elgin funds amounted to roughly $34,000, defendants claim that there was no actual loss to the accounts. *See* Defs.' Concl. Br. ¶ 26(viii). However, defendants cite no record evidence in support of their claims regarding the Elgin account's dividend and interest income; and even assuming that the Elgin account earned this additional amount, it would not address the separate losses incurred by the Aurora account. But whether the Funds suffered losses as a result of the securities trading is not relevant to whether the offering documents misled investors by informing them that their money would be used only for the construction of a senior living center. The fact that the accounts incurred losses might be helpful in establishing the magnitude of the harm resulting from defendants' violations of the securities laws. However, absent further explanation by the SEC, this evidence does not help establish that defendants violated the laws to begin with.

It may well be that, for many reasons, defendants should have informed investors that money had been transferred from the Projects' accounts to brokerage accounts, and should have informed investors of the profits and losses to those accounts. Based on the particular legal theory advanced by the SEC, however, the question here is whether the PPMs' statements regarding the use of investors' funds were misleading. Based on the argument and evidence presented by the SEC, the court is unable to answer that question affirmatively. Accordingly, the

court concludes that the SEC has failed to make a substantial showing that it is likely to prevail on its § 10(b) and § 17(a) claims insofar as they are based on defendants' investment of the Illinois Projects' funds in securities.

**3.      The Silver Line of Credit**

The SEC alleges that defendants violated the securities laws by using the money of certain investors in the Silver Fund to establish a Line of Credit, which they then used for a variety of purposes other than the benefit of Silver Fund investors. For example, CFIG used some of the money to purchase land for the First American Project. SEC Concl. Br. ¶ 27; Tr. 427:2-9. In addition, CFIG used about $2 million to open a brokerage account to trade securities. *See* Aguilar Decl. ¶ 21; Tr. at 428:5-14; Tr. at 25. Some of the money was used to pay for CFIG's expenses. Tr. at 428:15-17. In addition, the SEC has presented evidence indicating that CFIG's credit card was used to pay for Kameli's and others' personal expenses. *See* SEC Concl. Br. ¶¶ 28-29; Tr. at 429:16-17. For example, CFIG's American Express card was used to pay a $699.48 charge to Carnival Cruise Lines on August 10, 2014. *See* Tr. at 431:9-17. 28. It was also used to make college tuition payments. *See* SEC Ex. 3 (December 2014 charge of $10,406 for tuition at Loyola University). The SEC claims that defendants misled Silver Fund investors by representing that their money would be used only for the purpose of loaning money to the Silver Project and the construction of a senior living facility.

Defendants do not dispute that they took out the line of credit; and while they appear to dispute the SEC's allegations regarding certain expenses, they do not dispute that funds from the Silver Line of Credit were frequently used for expenses unrelated to the Silver Project. Defendants argue, however, that they were expressly permitted to establish the line of credit based on the Investor Holdings Account Agreement, which provides, in bold type: "The Parties

hereto consent to and agree that the Fund Manager [CFIG] has the right to use the funds held in the Investor Holdings Fund as collateral for the Fund Manager to secure a line of credit to be used for any expense the Fund Manager deems proper." Ex. D.8, Investor Holdings Account Agreement Between Silver Assisted Living EB-5 Fund LLC and Jiugang Yao ¶ 11(d) (Aug. 23, 2012), ECF No. 61-60. This provision is followed by two blank boxes. By placing a check mark in one of the boxes, investors indicated whether or not they consented to have their funds used for a line of credit. *Id*. Nine investors checked the box granting defendants authorization to use their funds for a line of credit. Since each investor had invested $500,000, this authorized a line of credit with a limit of $4.5 million.[17]

Although the Investor Holdings Account Agreement permits the line of credit "to be used for any expense [CFIG] deems proper," the Commission insists that it should be understood as requiring that the funds be used for the benefit of Silver Fund investors. According to the SEC, this is because "investors made this authorization in the context of an Investor Holdings Account Agreement that required CFIG to hold investor funds 'for the benefit of the [Silver Fund] and [the] Investor' and in the context of a Silver Fund PPM that represented that the Fund would use investor assets to loan money to develop and construct the Silver Fund [sic]." SEC Concl. Br. ¶ 104 (quoting the Silver Fund PPM). The court is not persuaded that the provision authorizing the line of credit can be construed in such a limited fashion. The SEC's argument simply cannot be squared with section 11(d)'s plain language. Moreover, some payments, while nominally for expenses incurred by other Projects, can nonetheless be regarded as having benefitted the Silver Fund indirectly. For example, defendants note that in some instances, the subcontractors they

_____

[17] The SEC does not allege that this amount was ever exceeded. At its highest, the Silver Line of Credit reached $3.9 million ($4.1 million when finance charges were included). *See* Tr. at 295:2-4.

hired worked on multiple Projects; and that, as a result, a subcontractor who was not paid by one Project might refuse to work on the other Projects as well. *See* Kameli Decl. ¶ 102. Hence, using funds from the Silver Line of Credit to enable CFIG to pay the subcontractors for their work on another Project may ultimately have redounded to the benefit of the Silver Fund investors.

But this line of reasoning can be taken only so far. The court is unable to accept that section 11(d) authorizes all of the expenses for which funds from the Silver Line of Credit were used. Even assuming that this section may have given defendants authority to spend funds from the line of credit on some expenses not directly related to the Silver Fund, there are at least some expenses that appear to lie beyond the pale. The payments for personal expenses such as cruises and tuition fall into this category. During the hearing, Kameli testified that he used his personal credit card to pay for business expenses. *See* Tr. at 429:16-29 ("Q. You also put some of your personal charges on these cards, right? A. The same way that some of the business charges for CFIG projects are being placed on my personal American Express."). Kameli's response seems to suggest that the personal expenses paid for with CFIG's credit card may ultimately be balanced with the CFIG expenses paid for with his personal credit card. It is not clear whether Kameli will be able to demonstrate this, or whether, even if he were to succeed, it would make any difference. At this stage, the SEC has made an adequate showing that, to the extent that funds from the Silver Line of Credit were used for personal expenses, those funds were misapplied. To the same extent, therefore, the Commission has made a sufficient showing that defendants' disclosures regarding the Silver Line of Credit were misleading.

The SEC has also made a sufficient showing with respect to materiality. In deciding whether to authorize CFIG to take out a line of credit collateralized by investors' funds, a reasonable investor would have considered it important to know that defendants might draw on

the line of credit to pay personal expenses. Defendants cite a declaration from one Silver Fund investor who stated: "Before sending my money to the Investment Holding Account, I understood about the collateral paragraph 11(d) in the Investment Holding Account. I did authorize CFIG to use the money in Investment Holding Account as collateral and obtain a line of credit. CFIG was allowed to use the proceeds of the line of credit in any way it deemed proper. It did not matter to me as how Mr. Kameli and CFIG used the proceeds of the line of credit and for what use. It was not important to me whether the proceeds of the line of credit may or may not be used for [Project-]related expenses." Ex. F.36, Decl. of Silver Investor #2 at ¶ 14, ECF No. 62-7. As explained previously, investor declarations alone are not sufficient to establish materiality; and in any event, while the declaration indicates that it did not matter to the investor whether funds from the line of credit were used for expenses unrelated to the Silver Project, it does not clearly indicate that it did not matter to him whether his funds would be used to pay for individuals' personal expenses. The court finds this representation material.

With respect to scienter, the SEC contends that the defendants "knew that their purpose in asking Silver Fund investors to authorize a line of credit was to benefit themselves, not the investors," and that defendants "knew, or were reckless in not knowing, that a reasonable investor would view their authorization of a line of credit as an authorization to use the line of credit for the benefit of the investor and the Silver Fund, not for the benefit of CFIG or for the benefit of other Projects in which Silver Fund investors had no interest." SEC Concl. Br. ¶ 108. This puts too fine a point on the matter. To the extent that the SEC suggests that defendants' chief purpose in taking out the line of credit was to engage in self-dealing, the record developed so far does not support this contention. Given the broad language of section 11(d), it was not unreasonable for defendants to believe that they were authorized to use the Silver Line of Credit

for expenses that did not benefit investors in the Silver Fund. Moreover, as already discussed, the line separating what benefits CFIG from what benefits the Silver Fund or the Silver Project is a porous one. Nevertheless, the court agrees that defendants knew (or were reckless in not knowing) that investors who consented to have their funds used for a line of credit would not have viewed this as authorizing CFIG's expenditures on purely personal expenses. The SEC has therefore made an adequate showing of scienter to this extent.

Therefore, the court concludes that the SEC has shown a substantial likelihood of succeeding on the merits insofar as it is claiming that the defendants' representations regarding the Silver Line of Credit were misleading.

## 4.    Land Transactions

Finally, the SEC claims that defendants violated the securities laws based on the sale of land by Platinum Real Estate and Property Investments ("PREPI") to three of the Florida Projects. The Florida PPMs stated that Kameli was the sole owner of PREPI; that PREPI owned the Projects; and that PREPI would provide real estate for the Projects. *See*, *e.g.*, Ex. 39, First American Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 12, 14 (Mar. 2013). According to the Commission, PREPI acquired the land to be used for the First American, Ft. Myers, and Naples Projects for between roughly $665,000 and $750,000 each; and that it sold the land a short time later to each of the Projects for approximately $1 million.[18] In all, the SEC contends, Kameli reaped a profit of $1.06 million from these transactions. Compl. ¶ 104. The

---

[18] Specifically, in December 2012 and October 2014, PREPI bought two parcels of land for a total of $664,850, which it sold to the First American Project in September 2016 for $1 million. *See* Aguilar Decl. ¶¶ 31-32. In January 2013, PREPI purchased a parcel of land for $550,000, which it sold to the Ft. Myers Project in December 2014 for $1 million. *Id*. ¶ 28. And in December 2013, PREPI purchased a parcel of land for $750,000, which it sold to the Naples Project in December 2014 for $1 million. *Id*. ¶ 29.

SEC maintains that the proceeds from these sales were not used for the benefit of the Project that purchased the land. *See* Compl. ¶¶ 119, 124, 129. As in the case of the development fees discussed above, the Commission argues that because these proceeds were not disclosed to investors, the PPMs' representations regarding compensation and conflicts of interest were misleading. *See* SEC Concl. Br. ¶¶ 112(iii), 116.

In response, defendants once again present testimony that, if true, provides a fuller picture of the events in question. Defendants state that PREPI purchased the land before any of the Florida EB-5 Funds had even been established. In his declaration, Kameli avers that he purchased the land when the market was down, and that when he later had it appraised, the land for each Project was valued at above $1 million.[19] Kameli Decl. ¶ 137. Thus, Kameli states, by selling the land to the Projects for $1 million, he sold the land for less than its market price. *Id*. According to Kameli, he sold the land for $1 million because that was the amount that had been listed for land costs in the Projects' Business Plans. *Id*. The SEC has not responded to Kameli's testimony on this point.

The court concludes that the SEC has failed to make a sufficient showing that defendants' non-disclosure of the proceeds from these sales renders the PPMs' representations regarding compensation misleading. As an initial matter, the Commission has not explained its basis for characterizing the proceeds as "compensation" within the meaning of the PPMs. Ordinarily,

---

[19] The appraisals were performed in 2014. *See* Ex. F.26, Integra Realty Resources Appraisal Report Of: Bright Oaks of Wildwood ALF Real Property (Dec. 8, 2014), ECF No. 61-88. The First American Project's land was appraised at a value of $1.04 million. *See* Defs.' Concl. Br. ¶ 46(iv)(b); Ex. F.26 at 3. The Naples land was appraised at a value of $1,160,000.00. *Id*. ¶ 47(b); Ex. F.26 at 225. The land for the Fort Myers Project was appraised at a value of $1,750,000.00. *Id*. ¶ 49; Ex. F.26 at 111. Defendants later obtained a second appraisal that valued the First American Project's land at $1,450,000. *Id*. ¶ 46(iv)(c); Ex. F.43, Integra Realty Resources Appraisal of Real Property: Bright Oaks of Wildwood--ALF Site at 5, ECF No. 66-8.

"compensation" is defined as "[r]emuneration and other benefits received in return for services rendered; esp., salary or wages." Black's Law Dictionary (10th ed. 2014). The profit earned by PREPI does not represent remuneration for services. If the funds in question cannot properly be regarded as "compensation," defendants' failure to disclose the funds cannot be used to establish that the PPMs' disclosures regarding compensation were misleading. Further, even if the proceeds could be considered compensation, the SEC has not established that it was misleading for defendants not to have disclosed it. As discussed above in connection with the SEC's claims regarding undisclosed development fees, the Commission has offered virtually no argument addressing why defendants should have been required to make specific disclosures regarding specific forms of compensation. The PPMs' representations regarding CFIG's and AEP's compensation for management services do not suggest that these entities (or affiliated entities such as PREPI) will not receive compensation for any other services they may provide to the Projects.

The SEC also has failed to provide a sufficient basis for concluding that the PPMs' disclosures regarding conflicts of interest were misleading by virtue of defendants' failure to disclose the profits from the land sales. As noted above, the Florida PPMs informed investors that Kameli was the sole member of PREPI and that PREPI owned the Projects. The PPMs also informed investors in at least two places that Kameli was the sole member of AEP and that AEP managed the Projects. *See*, *e.g.*, Ex. 39, First American Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 12, 14 (Mar. 2013). In addition, as with the Illinois PPMs, the Florida PPMs contained the general disclosure that "certain transactions and agreements included herein and entered into by the individuals listed above, as well as the companies affiliated with those individuals, will not be made in an arm's length and may not be as good as

those obtained in an arm's length transaction. *See* Ex. 39, First American Assisted Living EB-5 Fund, LLC Private Placement Memorandum at 12 (Mar. 2013), ECF No. 9-15; Ex. 43, Ft. Myers EB-5 Fund, LLC Private Placement Memorandum at 12 (May 2014), ECF No. 11-4; Ex. 47, Naples Memory Care EB-5 Fund, LLC Private Placement Memorandum at 12 (July 2013), ECF No. 11-8. As explained above in connection with the Projects' payment of development fees, the SEC has presented no argument or evidence to show why, given these representations and the factual context of this case, defendants were required to provide more specific disclosures regarding the land sales.[20]

Because the SEC has failed to make a substantial showing that it is likely to succeed in demonstrating that the PPMs' disclosures are misleading on this score, it is unnecessary to consider the elements of materiality or scienter. Nevertheless, the court notes that Kameli's testimony presents a serious challenge to the SEC's evidence of scienter. The Commission's argument is based on the fact that, as noted above, the land costs were listed at $1 million in each of the Projects' Business Plans even before the land had been appraised. As a result, the SEC says, defendants "appeared to pre-determine these sales prices based on their own profit motive and well before they obtained these appraisals." SEC Concl. Br. ¶ 122. However, if it is true that at the time PREPI purchased the land, defendants did not know when it would be sold to the Projects, the $1 million figure can reasonably be viewed as merely an estimate of the land's

---

[20] The SEC separately asserts that "[i]n addition to making false and misleading statements about their conflicts of interest and compensation, the Defendants also are liable for deceptive conduct – sometime referred to as "scheme liability" – for, among other things, using [PREPI] as an intermediary to receive undisclosed compensation." Concl. Br. ¶ 117. This argument has not been adequately developed. In support of this assertion, the SEC cites a single case, *SEC v. Familant*, 910 F. Supp. 2d 83, 93-94 (D.D.C. 2012), for the proposition that "deceptive conduct can be actionable under 'scheme liability' provisions." Concl. Br. ¶ 117. The Commission provides no further elaboration regarding the requirements for scheme liability, nor any discussion regarding how those requirements are supposedly met here.

future value. (As it happens, defendants' estimate of the value turned out to be conservative). The SEC has not challenged the accuracy of the appraisals and does not dispute that PREPI sold the land to the Projects at a price below its fair market value. Nor does there appear to be any reason why, if defendants had wanted to sell the land for a higher price in light of the appraisals, the Business Plans' land-cost projections could not have been amended. Given that defendants nevertheless sold the land to the Projects at a discount, it is difficult to infer that they acted with an intent to deceive or defraud investors.

In short, the court concludes that the SEC has not made a substantial showing that it is likely to succeed on the merits of its claims that defendants violated § 10(b) and § 17(a) by failing to disclose to investors information about the land purchases.

## B.      Risk of Repetition

In addition to making the necessary showing that defendants have violated the securities laws, the SEC must show a risk that defendants will violate the laws in the future without a preliminary injunction. *See, e.g.*, *S.E.C. v. Yang*, 795 F.3d 674, 681 (7th Cir. 2015) ("Once the SEC has demonstrated a past violation, it 'need only show that there is a reasonable likelihood of future violations in order to obtain [injunctive] relief.'") (quoting *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982)). That showing has not been made here.

First, the SEC has shown a likelihood of success with respect only to the Silver Line of Credit. Moreover, the Commission's showing on this point is limited to defendants' use of funds from the line of credit for personal expenses; it does not extend, as the SEC maintains, to defendants' use of the funds for any purpose other than the Silver Fund. The SEC has not established a sufficient risk that defendants will commit any future violations of the securities laws based on their use of funds from the Silver Line of Credit. For one thing, the record

indicates that the Silver Line of Credit was substantially paid off by March 2016. *See* Trans. at 295:5-6. The SEC's accountant testified that at some point, funds from the Silver Line of Credit were used to establish a separate $1 million line of credit at MB Financial. *See* Tr. at 297:21-298:7; Aguilar Decl. ¶ 17. Although the record is not entirely clear on this point, it appears that this MB Financial Line of Credit was used to pay off a separate line of credit, and not for Kameli's or others' personal expenses. See Ex. 11, ECF No. 8-11. In any case, the line of credit's maturity date is October 2017 (the exact date is unclear), Aguilar Decl. ¶ 17, after which point defendants presumably will no longer be able to draw upon it. More importantly, whatever defendants may have believed previously about their authority to use the funds from the Silver Line of Credit, they are now on notice that any use of the funds for personal expenses is verboten.

The court notes that defendants have established a track record of cooperation with the SEC. Defendants state (and the SEC does not dispute) that they have cooperated fully with the SEC during its investigation for the past two years. In addition, defendants agreed to freeze their assets pending resolution of this motion. Defendants have also stated that they have no intention of seeking additional lines of credit (and they point out that, in light of these proceedings, they would be unlikely to obtain any additional lines in any event). *See* Defs.' Concl. Br. ¶ 38. Under these circumstances, the court does not believe that an injunction is necessary to prevent defendants from any further unjustified expenditures using funds from the Silver Line of Credit.

The SEC expresses concern about the potential for future securities violations based on the fact that Kameli continues to solicit investors for other EB-5 projects. *See* SEC Concl. Br. ¶ 134. However, Kameli states (and the SEC does not dispute) that while he continues to advise clients regarding EB-5 investments and related immigration issues, he no longer accepts

subscriptions for investment in his own Funds. Indeed, Kameli says that he has not accepted new investors in his Funds for approximately the past two years. *See* Kameli Decl. ¶¶ 145-57; Defs.' Concl. Br. ¶¶ 65-66. Moreover, while it is true that Kameli is still the manager of the Funds, he informed investors in April 2017 that, in light of the SEC's investigation, he intended to resign his position and to transfer his shares to the investors. *See, e.g*., SEC Opening Br. at 12; *see also* Tr. at 44:9-23; Tr. at 48:16-20. It appears that this process has been delayed at least in part due to difficulties in reaching agreement among investors regarding who should replace Kameli as the Funds' manager. *See, e.g*., Tr. at 88:14-89:15 (describing disputes among investors in the Elgin Fund regarding, *inter alia*, Kameli's proposal that Omid Amjadi become manager of the Fund).

This court is not empowered to order relief because it or the SEC's proposed Receiver believes that it is necessary to save the Projects in which defendants' clients have invested. It is empowered to do so only if the SEC has satisfied both prongs of the preliminary injunction test. This standard, while not onerous, has not been met here. Although the SEC has presented a great deal of evidence, much of it relates to matters not in dispute (e.g., the fact that the Projects made undisclosed payments to CFIG and Bright Oaks; that funds of investors in the Illinois Funds were placed in brokerage accounts; that funds from the Silver Line of Credit were used for purposes that did not benefit Silver Fund investors; and that PREPI made a profit when it sold land to the First American, Ft. Myers, and Naples Projects). The Commission in numerous instances has not presented fully developed arguments to show why defendants' actions violated securities laws. Nor has it addressed the evidence presented by defendants. Accordingly, the SEC's motion for a preliminary injunction is denied.

**Conclusion**

For the reasons discussed above, the court denies the SEC's motion for a preliminary injunction. Accordingly, the SEC's request for ancillary relief, including appointment of a Receiver, is likewise denied.


Date:   Sept. 5, 2017

_____/s/_____
Joan B. Gottschall
United States District Judge