**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SEYED TAHER KAMELI, CHICAGOLAND FOREIGN INVESTMENT GROUP, LLC, and AMERICAN ENTERPRISE PIONEERS, INC. | ) Civil Action No.: 1:17-cv-4686 ) ) Honorable Joan B. Gottschall ) |
| Defendants, | ) Jury Trial Demanded ) |
| and | ) ) |
| AURORA MEMORY CARE, LLC, AURORA ASSISTED LIVING EB-5 FUND, LLC, BRIGHT OAKS PLATINUM PORTFOLIO, LLC, ELGIN MEMORY CARE, LLC, ELGIN ASSISTED LIVING EB-5 FUND, LLC, GOLDEN MEMORY CARE, INC., GOLDEN ASSISTED LIVING EB-5 FUND, LLC, SILVER MEMORY CARE, INC., SILVER ASSISTED LIVING EB-5 FUND, LLC, FIRST AMERICAN ASSISTED LIVING, INC., FIRST AMERICAN ASSISTED LIVING EB-5 FUND, LLC, NAPLES ALF, INC., NAPLES MEMORY CARE EB-5 FUND, LLC, FT. MYERS ALF, INC., FT. MYERS EB-5 FUND, LLC, JUNIPER ALF, INC., JUNIPER ASSISTED LIVING EB-5 FUND, LLC, PLATINUM REAL ESTATE AND PROPERTY INVESTMENTS, INC., and BRIGHT OAKS DEVELOPMENT, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Relief Defendants. | ) ) ) |

**FIRST AMENDED COMPLAINT**

Plaintiff United States Securities and Exchange Commission ("SEC") alleges as follows:

**NATURE OF THE ACTION**

1.     This case involves the misuse by Defendant Seyed Taher Kameli, commonly known as Taher Kameli ("Kameli"), of investment fund ("Fund") proceeds intended for the development and construction of assisted living and/or memory care projects for care of the elderly ("Projects"), and the continuing harm being suffered by immigrant investors as a result of Kameli's misconduct.

2.     Between 2009 and 2016, Kameli, a Chicago immigration attorney, raised approximately $88.7 million in investment proceeds from at least 226 immigrant investors, most of whom are citizens of China or Iran. He obtained several millions more from these investors directly in administrative, service, and/or legal fees. The investors made their investments through the EB-5 immigrant investor program ("EB-5 Program" or "Program"), which is a U.S. government immigration program for foreign nationals seeking permanent U.S. residency.

3.     The EB-5 Program provides a path to permanent U.S. residency for immigrant investors who invest in a commercial enterprise that creates at least 10 permanent full-time jobs within a certain period of time in the U.S. for qualified U.S. workers, either through direct employment or indirect job stimulation. The United States Citizenship and Immigration Services ("USCIS"), which is part of the Department of Homeland Security, administers the EB-5 Program.

4.     Kameli held himself out to investors as an expert in the EB-5 Program and told investors that his expertise would help investors obtain permanent U.S. residency through the Program. Among other things, Kameli conducted detailed video presentations about the EB-5 Program and its requirements, and he broadcast the video presentations on YouTube and other outlets so that prospective EB-5 investors could see them.

5.      Kameli formed an Illinois company, Defendant Chicagoland Foreign Investment Group, LLC ("CFIG"), to manage Funds (the "CFIG Funds") that each would loan money to a specific Project located in Illinois (the "Illinois Projects").

6.      He also formed another Illinois company, Defendant American Enterprise Pioneers, Inc. ("AEP") (which, together with Kameli and CFIG, will be collectively referred to herein as "Defendants"), to manage Funds (the "AEP Funds") that each would loan money to a specific Project located in Florida (the "Florida Projects").

7.      Kameli told EB-5 investors that in return for their $500,000 capital contribution to the Funds, they could purchase one unit of a particular Fund and become a member of that Fund. He told investors that the Fund would then use their investments to loan money to a particular Project, eventually resulting in an operational, revenue-producing, and job-creating senior living facility that would support the investors' application for permanent U.S. residency. He told investors that in managing the operation of the Funds for EB-5 investors, his companies adhered "to the integrity and goals" of the EB-5 Program and that the Funds would comply strictly with the Program's requirements. He told investors that the return of their capital contribution, an investment profit on that contribution (generally ranging from 0.35 % to 3% annually), and the creation of the requisite number of jobs per investor to qualify them for permanent residency under the EB-5 Program all depended on the successful development and construction of a specific Project.

8.      Kameli formed his own company, Bright Oaks Group, Inc. (the "Bright Oaks Group"), to manage the Projects. He also used CFIG, and, later, another entity, Bright Oaks Development, Inc. ("Bright Oaks Development") (together, with the Bright Oaks Group, "Bright Oaks"), to develop the Projects. Kameli installed his brother as the CEO and President of Bright

Oaks and caused the Projects to pay Bright Oaks millions in fees.

9.    Contrary to Kameli's representations to investors that they would each invest in one specific Project, and that Kameli would use an investor's funds to develop and construct a specific Project, from at least 2010 to the present, Kameli improperly commingled and otherwise improperly used portions of the $88.7 million in investment proceeds that he raised. Among other things, Kameli failed to make the full amount of each investor's capital contribution to a Fund available to the business most closely responsible for creating the employment upon which the investor's immigration petition was based. His failure jeopardized the investor's chances of obtaining permanent U.S. residency through the EB-5 Program. At the time he raised money from investors, Kameli knew, or was reckless in not knowing, that a well-known and established requirement of the EB-5 Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. He knowingly or recklessly violated this requirement. He assured investors that the Funds and Projects would comply with the EB-5 Program's requirements even though he knew, or was reckless in not knowing, that they did not.

10.   Not satisfied with having collected million dollars from investors directly – apparently for administrative, service, and/or legal fees paid to Kameli and his companies, partly for their purported compliance with the EB-5 Program's requirements – Kameli has diverted investor funds from one Project to another and has spent a significant portion of investment proceeds for his own benefit, for the benefit of his brother, and for the benefit of companies he owns. His misconduct has left most of the Projects without money to complete construction and has jeopardized investors' ability to obtain permanent U.S. residency though the EB-5 Program. His misconduct has included: (i) causing one Fund to draw down $3.8 million on a line of credit,

with Kameli using the bulk of the draw-down to benefit Projects unaffiliated with investors in

that Fund, and to benefit Kameli's companies and Kameli personally; (ii) withdrawing a total of

over $4 million in undisclosed fees from five different Projects and using part of those purported

fees to benefit investors unaffiliated with those Projects; (iii) generating over $1 million in

undisclosed profits for his company through three Projects' land transactions; (iv) diverting a

total of $475,000 from two Projects to a different Project in an effort to complete construction on

that different Project; (v) funneling a total of $745,000 from two Projects to Bright Oaks

Development to pay for its expenses; and (vi) trading securities with money lent by the Funds to

the Projects, including using $250,000 in trading profits for the benefit of a company Kameli

owned, not for the benefit of the Funds or Projects.

      11.    Additionally, Kameli has caused the Funds to repurchase some investors'

membership interests – effectively redeeming these individuals' investments. The Funds and

Projects are in poor financial condition, and all but one of the Projects have failed to complete

construction of senior living facilities. Because the Funds do not have enough money to

repurchase all membership interests of all investors, Kameli has given some investors unfair

preferences through investor redemptions, causing harm to investors who remain invested in the

Funds.

      12.    During nearly all of the relevant time period, Kameli has remained in total control

of the Funds and held control and ownership of the Projects. Recently, however, after the SEC

staff advised Kameli that the staff intended to recommend a lawsuit against him, Kameli told

investors he intended to resign as the Funds' manager and pressured Fund investors to replace

him as manager with one of his associates.

      13.    Kameli's misconduct has put investors' contributions to the Funds, and the

promised investment returns on those investment amounts, at risk. His misconduct also has jeopardized investors' chances at obtaining permanent U.S. residency through the EB-5 visa program.

14. Through the activities alleged in this Complaint, Defendants, directly or indirectly, have engaged in transactions, acts, practices or courses of business which constitute violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] promulgated thereunder.

15. The SEC brings this action and seeks relief to protect and preserve whatever assets remain in the Funds and Projects, to ensure an orderly process for the conduct of the Funds' and Projects' business activities, to prevent future unjust enrichment of Kameli and companies he controls, and to provide for the equitable distribution of Fund and Project assets.

16. The SEC seeks relief including, among other things: (a) preliminary injunctive relief; (b) the appointment of a receiver over the Funds and Projects; and (c) the entry of an asset freeze to remain in place while a receiver can be appointed and can gain control over the assets of the Funds and Projects.

## JURISDICTION AND VENUE

17. The SEC brings this action pursuant to the authority conferred by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] seeking to restrain and enjoin Defendants from engaging in the acts, practices, transactions and courses of business alleged herein, and for such other equitable relief as may be appropriate or necessary for the benefit of investors.

18. The SEC also seeks a final judgment ordering Defendants and certain Relief

Defendants to disgorge their ill-gotten gains and pay prejudgment interest thereon, and ordering Defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

19.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Sections 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§78u(d) and 78aa]. Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein. These transactions, acts, practices and courses of business occurred in the Northern District of Illinois, which is where CFIG and AEP are located, where Kameli resides and does business on CFIG's and AEP's behalf, and where all of the Funds are incorporated as limited liability companies.

20.     Defendants have, directly and indirectly, made, and are making, use of the mails, and of the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

21.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this Complaint, and transactions, acts, practices and courses of business of similar purport and object.

## **DEFENDANTS**

22.     **Seyed Taher Kameli**, age 44, resides in Chicago, Illinois. He is an attorney licensed in the State of Illinois.

23.     **Chicagoland Foreign Investment Group, LLC** is an Illinois limited liability company with its principal place of business in Chicago, Illinois. It has served as the manager of

several Funds that loaned money to the Illinois Projects. Kameli is the sole member of CFIG.

24. **American Enterprise Pioneers, Inc.** is an Illinois corporation with its principal place of business in Chicago, Illinois. It has served as the manager of several Funds that loaned money to the Florida Projects. It is owned and controlled by Kameli, who serves as AEP's President.

## RELIEF DEFENDANTS

25. **Aurora Memory Care, LLC d/b/a Bright Oaks of Aurora, LLC** (the "Aurora Project") is an Illinois limited liability company formed to develop and construct a senior living facility in Aurora, Illinois.

26. **Aurora Assisted Living EB-5 Fund, LLC** (the "Aurora Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Aurora Project. Its manager is CFIG, and its members are Fund investors.

27. **Bright Oaks Platinum Portfolio, LLC** ("BOPP") is an Illinois limited liability company that Kameli owns. This company owns Platinum Real Estate Property Investments, Inc. ("Platinum").

28. **Elgin Memory Care, LLC d/b/a Bright Oaks of Elgin, LLC** (the "Elgin Project") is an Illinois limited liability company formed to develop and construct a senior living facility in Elgin, Illinois (the "City of Elgin").

29. **Elgin Assisted Living EB-5 Fund, LLC** (the "Elgin Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Elgin Project. Its manager is CFIG, and its members are Fund investors.

30. **Golden Memory Care, Inc. d/b/a Bright Oaks of Fox Lake, Inc.** (the "Golden Project") is an Illinois corporation formed to develop and construct a senior living facility in Fox

Lake, Illinois.

31.    **Golden Assisted Living EB-5 Fund, LLC** (the "Golden Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Golden Project. Its manager is CFIG, and its members are Fund investors.

32.    **Silver Memory Care, Inc. d/b/a Bright Oaks of West Dundee, Inc.** (the "Silver Project") is an Illinois corporation formed to develop and construct a senior care facility in West Dundee, Illinois.

33.    **Silver Assisted Living EB-5 Fund, LLC** (the "Silver Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Silver Project. Its manager is CFIG, and its members are Fund investors.

34.    **First American Assisted Living, Inc.** (the "First American Project") is a Florida corporation formed to develop and construct a senior living facility in Wildwood, Florida.

35.    **First American Assisted Living EB-5 Fund, LLC** (the "First American Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the First American Project. Its manager is AEP, and its members are Fund investors.

36.    **Naples ALF, Inc.** (the "Naples Project") is a Florida corporation formed to develop and construct a senior living facility in Naples, Florida.

37.    **Naples Memory Care EB-5 Fund, LLC** (the "Naples Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Naples Project. Its manager is AEP, and its members are Fund investors.

38.    **Ft. Myers ALF, Inc.** (the "Ft. Myers Project") is a Florida corporation formed to develop and construct a senior living facility in Ft. Myers, Florida.

39.    **Ft. Myers EB-5 Fund, LLC** (the "Ft. Myers Fund") is an Illinois limited liability

company formed for the purpose of raising money from investors to loan to the Ft. Myers Project. Its manager is AEP, and its members are Fund investors.

40. **Juniper ALF, Inc.** (the "Juniper Project") is a Florida corporation formed to develop and construct a senior living facility in Sun City, Florida.

41. **Juniper Assisted Living EB-5 Fund, LLC** (the "Juniper Fund") is an Illinois limited liability company formed for the purpose of raising money from investors to loan to the Juniper Project. Its manager is AEP, and its members are Fund investors.

42. **Platinum Real Estate and Property Investments, Inc.** is an Illinois corporation. This corporation owns the Golden, Silver, First American, Naples, Ft. Myers, and Juniper Projects, and it is solely owned by Kameli.

43. **Bright Oaks Development, Inc.** is an Illinois corporation which Kameli owns.

## FACTS

### The EB-5 Program

44. Congress created the EB-5 immigrant investor program in 1990 in an effort to boost the U.S. economy through job creation and capital investment by immigrant investors. The Program provides an immigrant investor with the opportunity to become a permanent resident by investing in the United States.

45. In conjunction with making an investment in an EB-5 fund, an immigrant investor may submit a petition to USCIS to establish his or her eligibility for the EB-5 Program through what is known as an "I-526" Petition. If USCIS approves the I-526 Petition, the immigrant investor may apply for a conditional green card, which provides temporary U.S. residency. A conditional green card is valid for two years.

46. If the EB-5 investment created or preserved at least ten permanent full-time jobs

for qualified U.S. workers at the end of the two-year conditional period, the immigrant investor may petition USCIS through what is known as an "I-829" Petition to have the conditions removed from his or her green card, resulting in legal permanent U.S. residency.

47.     To be eligible for permanent U.S. residency under the Program, one of the fundamental requirements of the Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based, and not for other purposes. For example, in 1998 – well before Kameli launched the Funds – the Administrative Appeals Office of USCIS' predecessor agency issued an EB-5 precedent decision, *Matter of Izummi*, 22 I. & N. Dec. 169, 179 (Assoc. Comm. 1998). The *Izummi* decision is one of four precedent decisions that USCIS has issued to provide public guidance about the eligibility requirements for the EB-5 Program. As stated in *Izummi*, to qualify for permanent U.S. residency under the Program, an investor must show, among other things, that the "full amount" of the investor's money has been "made available to the business(es) most closely responsible for creating the employment upon which the [immigration] petition is based." *Id.*

48.     As of the date on which Kameli launched the Funds, he knew, or was reckless in not knowing, about the *Izummi* precedent decision and the EB-5 Program's requirement that the full amount of an investor's money must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. In fact, when Kameli and/or his law firm filed I-526 and I-829 Petitions with USCIS on behalf of Fund investors, they cited to the *Izummi* precedent decision in support of the Petitions, confirming that they knew the decision.

49.     An additional confirmation of Kameli's awareness of the *Izummi* precedent

11

decision occurred when Kameli received a string of August 2014 emails, in which an attorney at Kameli's law firm and an attorney representing a prospective First American Fund investor communicated about the decision. In the emails, the attorney for the prospective investor wrote to Kameli's law firm with a question about how the Fund complied with the *Izummi* precedent decision, stating in pertinent part:

> "Investors' fund (sic) needs to be used mainly for job creation. According to USCIS Memo issued in May 2013, it states 'It is also important to note that the full amount of the immigrant's investment must be made available to the business(es) most closely responsible for creating the employment upon which EB-5 eligibility is based. *Matter of Izummi*, 22 I&N Dec. at 179.' Can you explain?"

The attorney at Kameli's law firm responded, copying Kameli and others and stating in pertinent part:

> "This is a tenant (sic) of the EB-5 Program. This statement reminds the investor that his or her *full* investment will be released to the First American Assisted Living EB-5 Fund, LLC (new commercial entity) upon approval of the I-526, which will then be released in whole to First American Assisted Living, Inc. (the job creating entity). Thus the full amount of the investor's $500,000.00 will be provided to the project."

(emphasis in original).

### Kameli Investigates EB-5 Investment Opportunities

50.     In approximately 2008 or 2009, Kameli formed CFIG to investigate possible businesses suitable for EB-5 investment. At around the time Kameli formed CFIG, Kameli's brother began working with CFIG, eventually becoming the company's Chief Operating Officer.

51.     In approximately 2009, Kameli and his brother began to investigate EB-5 investments in senior living projects, consisting of assisted living and/or memory care facilities.

52.     An assisted living facility typically caters to individuals who need assistance with

daily activities, but do not require the 24-hour medical care provided by a nursing home. A memory care facility is a facility that provides specialized care and programming for individuals with Alzheimer's or a dementia-related disease.

53.     Kameli determined that senior living projects would be suitable for EB-5 investments, and Kameli began forming the Funds as vehicles for those investments.

**Kameli Forms The CFIG And AEP Funds**

54.     In approximately August 2009, Kameli and CFIG began offering and selling investments in the Aurora Fund, the investment vehicle for the development and construction of the Aurora Project, a senior living facility in Aurora, Illinois. Subsequently, Kameli and CFIG raised money from EB-5 investors for the Elgin, Golden, and Silver Funds, similar investment Funds for senior living Projects in Elgin, Fox Lake, and West Dundee, Illinois, respectively.

55.     In approximately March 2013, Kameli and AEP began offering and selling investments in the First American Fund, which loaned its proceeds to the First American Project to develop and construct a senior living facility in Wildwood, Florida. Subsequently, Kameli and AEP raised money from EB-5 investors for the Naples, Ft. Myers, and Juniper Funds, which loaned money to the senior living Projects in Naples, Ft. Myers, and Sun City, Florida, respectively.

56.     Defendants solicited and obtained investments in the CFIG and AEP Funds for an investment of $500,000 per investor, plus an administrative or service fee typically ranging from $35,000 to $75,000 for each investor. Some investors made their investments in installments over time and have not yet invested the full $500,000 amount that they committed to invest.

57.     According to the Funds' offering documents, when an investor sent money for the purpose of a Fund investment, Kameli initially would hold the investment proceeds in an escrow

or investor holdings account. Then, after USCIS approved the investor's I-526 Petition, Kameli would cause the investment proceeds to be invested in the Fund for the purpose of loaning money to the particular Project affiliated with that Fund.

58.     Additionally, many investors hired Kameli as an attorney to represent them in their efforts to obtain a conditional and permanent green card based on their investments in the CFIG and AEP Funds. These investors paid Kameli and his law firm additional fees for legal services, such as filing the investors' I-526 and I-829 Petitions and supporting materials with USCIS on the investors' behalf.

59.     When Kameli and/or his law firm filed I-526 Petitions with USCIS on behalf of Fund investors, they represented that all proceeds raised by a particular Fund would be used for the development and construction of a particular Project. For example, when Kameli and/or his law firm filed I-526 Petitions on behalf of investors in the Elgin Fund, they represented to USCIS that the Elgin Fund would take all of the proceeds it raised and use those proceeds to loan money to the Elgin Project for the development and construction of that project.

60.     Bank records indicate that in addition to raising $88.7 million in investment proceeds from investors in the CFIG and AEP Funds, Kameli: (a) through CFIG, obtained approximately $5.92 million directly from investors (and later returned approximately $4.47 million to investors); (b) through AEP, obtained approximately $4.3 million directly from investors (and later returned $570,000 to investors); and (c) through his law firm, obtained approximately $9.9 million directly from investors (and later returned approximately $1.9 million to investors). These additional amounts obtained by CFIG, AEP, and Kameli's law firm appear to represent administrative, service, and/or legal fees that investors paid directly, although some portion of these amounts appear to have been paid by investors in funds that are not the

subject of this lawsuit.

61.     Investors, some of whom were inside the United States and some of whom were outside the United States, made investments in the CFIG and AEP Funds which were finalized in the United States. Investors executed a subscription agreement and returned the executed subscription agreement to Kameli at the time they sent him their money for investment in the CFIG and AEP Funds. Some investors were already in the United States at the time they executed the subscription agreement. Regardless of whether the investor was inside or outside the United States at the time he or she executed the subscription agreement, the investor then sent an executed subscription agreement to Defendants in the United States. After USCIS approved the investor's I-526 Petition, Defendants, while in the United States, accepted the subscription agreement.

62.      Investors, some of whom were inside the United States and some of whom were outside the United States, caused money to be sent to Defendants, and Defendants received these proceeds at financial institutions located in the United States. Investors received membership interests in the CFIG and AEP Funds, which are entities formed in, and with principal places of business in, the United States. The managing members of the Funds – CFIG for the CFIG Funds and AEP for the AEP Funds – are entities formed in, and with principal places of business in, the United States. The CFIG and AEP Funds' assets consist of funds located in United States bank accounts. The CFIG and AEP Funds used investor proceeds to develop and construct senior living projects located in the United States.

63.     Additionally, Defendants solicited investments while Defendants were located in the United States.

64.     The CFIG and AEP Funds have marketed their EB-5 limited partnership interests

15

and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States.

65. The CFIG and AEP Funds' offering materials identify the membership interests in the Funds as "securities." In addition, each investment in the CFIG and AEP Funds involved the pooling of investor funds and the investment of those funds in a common enterprise (the Funds), with profits to come from the efforts of others (Kameli, CFIG, and/or AEP). The membership interests are therefore securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78a(10).

**The Funds' Offering Documents**

66. Defendants solicited investors through similar, though not identical, offering documents for each Fund.

67. The Funds' core offering document was a Private Placement Memorandum ("PPM") for each Fund. Defendants issued supplements to some of the Funds' PPMs in 2013 (the "2013 PPM Supplements"), 2014 (the "2014 PPM Supplements"), and 2015. In the 2013 and 2014 PPM Supplements, Defendants asked existing investors in the Funds for which these supplements were issued to sign an acknowledgement that they had read and examined the changes to the PPM and understood the changes. Defendants also asked these investors to acknowledge that they were still committed to investing in the Fund in which they had invested. Some investors in these Funds returned signed acknowledgments to Defendants.

68. The Defendants used, among other offering documents, the following PPMs to

raise money from investors:

    (a)    Aurora Fund PPMs dated August 2009 and August 2011, and an Aurora Fund PPM Supplement dated September 2015; Defendants used these Aurora Fund PPMs and PPM Supplement to raise money from investors from at least October 2009 through August 2014;

    (b)    Elgin Fund PPMs dated February 2010 and August 2011, and Elgin Fund PPM Supplements dated August 2013 and September 2015; Defendants used these Elgin Fund PPMs and PPM Supplements to raise money from investors from at least March 2010 through December 2014;

    (c)    a Golden Fund PPM dated July 2011, and Golden Fund PPM Supplements dated November 2013 and September 2015; Defendants used this Golden Fund PPM and PPM Supplements to raise money from investors from at least June 2011 through June 2014;

    (d)    a Silver Fund PPM dated July 2012, and Silver Fund PPM Supplements dated August 2013, October 2014, and September 2015; Defendants used this Silver Fund PPM and PPM Supplements to raise money from investors from at least May 2012 through February 2015;

    (e)    a First American Fund PPM dated March 2013 and a First American Fund PPM Supplement dated December 2013; Defendants used this First American Fund PPM and PPM Supplement to raise money from investors from at least March 2013 through September 2016;

    (f)    a Naples Fund PPM dated July 2013 and a Naples Fund PPM Supplement dated September 2015; Defendants used this Naples Fund PPM and PPM Supplement to

raise money from investors from at least November 2013 through July 2016;

(g)    a Ft. Myers Fund PPM dated May 2014 and a Ft. Myers Fund PPM Supplement dated April 2015; Defendants used this Ft. Myers Fund PPM and PPM Supplement to raise money from investors from at least April 2014 through June 2015; and

(h)    a Juniper Fund PPM dated January 2015; Defendants used this Juniper Fund PPM to raise money from investors from December 2014 through November 2016.

69.    Other offering documents for each Fund included, among other things, a Business Plan, a Subscription Agreement, and various brochures.

70.    Kameli, as the principal of the Funds' managers (either CFIG or AEP), was responsible for, and had authority over the contents of the Funds' PPMs and other offering documents. The PPMs themselves identified Kameli, in among other roles, as the principal of the manager of the Funds. The PPMs also stated that Kameli owned and controlled the Projects indirectly through limited liability companies of which he was the sole member.

**Kameli Represents That The Funds Would Use Money
In A Manner Compliant With The EB-5 Program's Requirements**

71.    Through the PPMs and other offering documents, Kameli represented that the investment objective of the Funds was to loan money for development and construction of a specific senior living facility so that an investor's capital contribution could create jobs through that specific facility and lead to the investor's successful petitions for permanent U.S. residency through the EB-5 Program. Thus, for example, Kameli represented that an investor in the Elgin Fund could file I-526 and I-829 Petitions with USCIS based on job creation resulting from the development and construction of the Elgin Project, an investor in the Silver Fund could file I-526

and I-829 Petitions with USCIS based on job creation resulting from the development and construction of the Silver Project, and so on.

72. Kameli represented in offering documents that his companies organized and operated the Funds to comply with the EB-5 Program's requirements. For example, a CFIG brochure that the firm distributed in 2012 stated in pertinent part: "As a designated EB-5 regional center, CFIG has the responsibility of matching investors with EB-5 authorized businesses. We take this responsibility seriously as we understand the risk that foreign nationals take when immigrating to a new country. This is why we strictly follow the guidelines set by the United States Citizenship and Immigration Services (USCIS) to be sure that each business has the capability to create jobs, and thrive within the United States economy. CFIG's mission is to offer USCIS authorized EB-5 investment opportunities to foreign investors interested in obtaining permanent residency within the United States."

73. Indeed, Kameli structured the Funds so that each Fund would pay CFIG or AEP a fee to ensure that the Funds and the Projects would comply with the EB-5 Program's requirements. For instance, a Silver Fund July 2012 PPM stated that the Fund would pay CFIG a $20,000.00 annual fee per investor "to ensure that the [Fund] and [the Silver Project] comply with the EB-5 Program requirements" and that this fee would be for "CFIG's supervision" of the Silver Fund's and the Silver Project's compliance with these requirements. Likewise, a First American Fund March 2013 PPM stated that the Fund would pay AEP an annual fee of $8,250.00 per investor "to ensure that the [Fund] and First American comply with the EB-5 Program requirements" and for AEP's "supervision" of the First American Fund's and First American Project's compliance with these requirements. Through this language, Kameli assured investors that the Funds and the Projects would comply with the EB-5 Program's requirements.

74.     The Fund PPMs represented that the Funds would use an investor's capital contribution to loan money to a specific Project for job creation to enable the investor to obtain permanent U.S. residency through the EB-5 Program. For example, an Elgin Fund PPM dated February 2010 stated that the Fund "intended to use the proceeds from the Offering to extend an $12,000,000.00, or less, business loan to [the Elgin Project], to develop an 80-120 unit facility in the City of Elgin, Illinois and implement memory care assisted living units for senior citizens with Alzheimer, dementia, and related illnesses in order to generate 10 or more direct or indirect fulltime jobs for each $500,000.00 capital contribution distributed to [the Elgin Project]." The Elgin Fund PPM added that the "project should be completed in 16 to 18 months."

75.     The February 2010 Elgin Fund PPM went on to state that "CFIG and the [Fund] will be under substantial scrutiny by the agency responsible for oversight of the USCIS EB5 program. CFIG and the [Fund] understand the future scrutiny and have put in place a system of checks and balances designed to monitor and report on a timely basis every requirement of the EB-5 Program."

76.     Other Fund PPMs, such as an Aurora Fund PPM dated August 2009 and a Silver Fund PPM dated July 2012, contained nearly identical language representing that Kameli would operate the Funds to comply with the EB-5 Program's requirements.

77.     Although the PPMs identified the possibility that USCIS ultimately would not approve an investor's petition for U.S. permanent residency under the EB-5 Program, the PPMs did not disclose any risk that an investor's chances at U.S permanent residency would be jeopardized by Defendants' failure to comply with the fundamental EB-5 Program requirement that Defendants use the full amount of an investor's capital contribution for the specific job-creating senior living Project upon which the investor's permanent residency petition would be

based.

78.     The Funds' Business Plans provided additional information on how each Project would spend the money it borrowed from each Fund. Each Fund Business Plan included a sources and uses table that identified how the Project intended to spend all borrowed funds (the "Sources and Uses Table"). These Sources and Uses Tables stated that the Projects would use the majority of borrowed money on hard construction costs – such as excavation, paving, landscaping, concrete, mechanical systems, masonry, steel, carpentry, and finishes – with other funds being spent on categories such as land acquisition, working capital, and fees.

79.     For instance, a July 2013 Business Plan for the Silver Fund contained a Sources and Uses Table that showed the Silver Fund raising $16.5 million from EB-5 investors to pay for the Silver Project, plus an additional $1.5 million in other third-party financing. The Sources and Uses Table then broke down the costs for the Silver Project, including $11 million for "Hard Construction." Thus, the July 2013 Silver Fund Business Plan's Sources and Uses Table showed that approximately 61% of the Silver Project's costs (approximately $11 million out of $18 million) would be spent on "Hard Construction."

80.     Kameli told investors that the Projects were low risk. For instance, the CFIG brochure proclaimed that CFIG practiced its "commitment to our clients" by developing "low-risk, small investment projects," adding: "This is in comparison to many regional centers that commit themselves to high-risk, large-scale business projects, but then are unable to secure the needed investment capital or create the USCIS required jobs." The brochure went on to state that CFIG offered a "low-risk investment to our clients," and it included a quote from Kameli in which he stated: "CFIG strives to ensure that our projects are as safe as possible for investors."

**Kameli Appoints His Brother To Oversee The Projects**

81.     When Kameli first formed CFIG in approximately 2009 and began investigating various types of projects for EB-5 investment, Kameli retained his brother to assist him in evaluating possible projects. As of 2009, neither Kameli nor his brother had any experience or expertise in the development, construction, or management of those types of projects. Indeed, prior to deciding to pursue senior living projects for EB-5 investments, Kameli investigated a number of other types of projects unrelated to senior living, such as a sports complex.

82.     Rather than bring in developers with senior living development experience, Kameli initially used CFIG to develop the Projects. Later, in June 2013, Kameli formed Bright Oaks Development to develop the Projects.  Kameli installed his brother as the Chief Operating Officer of CFIG, and, later, as CEO and President of Bright Oaks Development.

83.     From 2009 through 2014, Kameli issued numerous PPMs for the Funds that failed to disclose Kameli's brother's involvement with Bright Oaks Development, even though Kameli's brother was involved with the Projects during this entire time period.

84.     Kameli has caused the Projects to pay Bright Oaks a collective amount of approximately $7.5 million, which Bright Oaks used to pay for Project expenses and for its own expenses. Kameli's brother has told the SEC staff that Bright Oaks paid him an annual salary of $450,000 beginning in November 2014.

85.     Also, PPMs dated in 2010 and 2011 for the Elgin and Aurora Funds identified a woman who would represent CFIG's management of the Fund. That woman, described as a "highly accomplished visionary executive," was Kameli's sister. Kameli has told the SEC staff that his sister had some experience relevant to senior living. But Kameli, aware that potential investors might disfavor the involvement of his family members, never disclosed to investors in these Elgin and Aurora Fund PPMs that she had any familial relationship to Kameli. Although

Kameli later supplemented these PPMs, he never changed the language in which he described his sister's background but failed to disclose her relationship to Kameli.

**Kameli Represents That The Funds' Expenses And Management**
**Fees Would Be Paid Upon The Start Of Projects' Operations**

86.     The Funds' PPMs contained detailed sections explaining how the Funds would earn interest on money loaned to the Projects and how the Funds would pay the Funds' investors and managers from that interest income.

87.     The Funds' PPMs explained that the Fund would loan money to a specific Project, which would owe the Fund annual interest on the amount loaned. The PPMs explained that the Fund would then pay expenses and management fees to Fund managers CFIG or AEP by taking a portion of the interest earned by the Fund.

88.     The Fund PPMs generally stated that the Project that received the loan would not be required to pay the Fund interest until after the start of the Project's business operations, which the PPMs generally defined as the date of entry of the Project's first resident. Because the PPMs stated that the Fund would pay expenses and management fees out of the interest it received, and that the Project would not begin paying interest until the start of a Project's operations, the PPMs linked the timing of payment of expenses and management fees to CFIG or AEP to the start of a Project's operations.

89.     For instance, the First American Fund March 2013 PPM stated that the First American Project would owe the First American Fund a 5% annual interest rate on the loan and make quarterly payments of interest "upon the start of First American's business operations, which will occur upon the entry of the first resident."

90.     The First American PPM went on to state that AEP would receive a 1% management fee out of the 5% annual interest paid to the Fund by the First American Project and

that the Fund would pay AEP an additional amount equal to an additional 1.65% out of the 5% annual interest paid "to ensure that the [Fund] and First American comply with the EB-5 Program requirements."

91.     In Aurora Fund PPMs dated in 2009 and 2011, Elgin Fund PPMs dated in 2010 and 2011, and a Golden Fund PPM dated in 2011, Kameli, through these Funds, specifically stated that CFIG's receipt of a portion of the interest "will represent [CFIG's] sole compensation" for its management duties. Kameli later issued supplements to these PPMs in mid-to-late 2013 and in September 2015. These supplements did not change this language about the receipt of a portion of the interest paid by the Projects representing CFIG's "sole compensation" – meaning that this language remained in effect for the life of the Aurora, Elgin, and Golden Funds during these Funds' entire existence – although the September 2015 PPM supplements asserted, for the first time, that CFIG had been entitled to additional fees.

**USCIS Approves The Conditional Green Card Petitions Of A Majority
Of The CFIG Funds' Investors And A Minority Of The AEP Funds' Investors**

92.     USCIS granted approvals of the majority of the I-526 Petitions filed by CFIG Fund investors.

93.     For example, according to a CFIG brochure available on a Kameli-sponsored public website, www.ChicagoEB5.com, as of July 2014, 24 investors had invested in each of the Elgin and Golden Funds, representing an investment amount of $12 million in each of those Funds.

94.     According to the CFIG brochure, as of July 2014, for each of the Elgin and Golden Funds, USCIS had approved 18 out of the 24 I-526 Petitions filed by investors.

95.     Similarly, according to the CFIG brochure, as of July 2014, 29 investors had invested in the Silver Fund, representing an investment amount of $14.5 million in the Silver

Fund.

96.     According to the CFIG brochure, as of July 2014, USCIS had approved 20 out the 29 I-526 Petitions filed by investors in the Silver Fund.

97.     While USCIS approved the majority of I-526 Petitions filed by investors in the CFIG Funds, USCIS did not approve the majority of such applications submitted by investors in the AEP Funds. Instead, for the most part, USCIS has not acted on those petitions to date.

98.     However, in 2016, USCIS did act on a number of I-526 Petitions filed by investors in the First American Fund. In 2016, USCIS approved the I-526 Petitions filed by approximately 14 investors in the First American Fund.

**Kameli Tells Investors That Development And**
**Construction Of The Projects Is Proceeding**

99.     Kameli issued quarterly updates to investors purporting to update the investors on the Projects' status. In these updates, he told investors that development and completed construction of the Projects was within reach.

100.     For example, a quarterly update for the Naples Project for the fourth quarter of 2014 stated: "We expect to receive a building permit by mid February 2015 and to commence construction immediately." The update added: "We expect construction to be complete by March 2016."

101.     As another example, a seasonal update for the Elgin Project for the winter of 2014 reported that "[l]ocal residents are watching all of the land grading activity on our site that will become a beautiful Community" and encouraged the reader to "[k]eep watching while the Community is being built."

102.     About a year later, a quarterly update for the Elgin Project for the first quarter of 2015 listed over twenty-five bullet points discussing purported accomplishments on the Project,

including that "[t]he completion of the construction and certificate of occupancy from the City of Elgin is scheduled for 2016."

103.     Kameli's sunny projections about the development and completion of construction on the Projects, however, have been inaccurate. In fact, Kameli misused investor funds in several different ways.

**Kameli Diverts Money To The Aurora**
**Project From The Golden And Silver Projects**

104.     Among other improper uses, Kameli transferred money to the Aurora Project from other Funds and Projects in an effort to complete construction on the Aurora Project.

105.     An Aurora Fund PPM dated August 2009 estimated that the Aurora Project would be completed in approximately 16 to 18 months, meaning sometime around early 2011.

106.     But by late 2014, construction of the Aurora Project was only partially complete, and the Project lacked money needed for completion.

107.     Faced with these problems, in November 2014, Kameli improperly diverted $475,000 in total from the Golden and Silver Projects to the Aurora Project to pay for the Aurora Project's construction costs.

108.     Specifically, in November 2014, Kameli caused the Golden Project and the Silver Project to wire $400,000 and $175,000, respectively, to Bright Oaks.

109.     As Kameli knew, at the time he caused the Golden Project and Silver Project to pay Bright Oaks these amounts, Bright Oaks had not achieved any of the milestones it was required to achieve in order to earn these amounts.

110.     Because Bright Oaks had not earned these amounts, Kameli did not make the payments of these amounts to Bright Oaks to compensate Bright Oaks for services performed for the Golden or Silver Projects. Rather, Kameli's purpose in making these payments was to use

Bright Oaks merely as a conduit for his diversion of money.

111.    After Bright Oaks' receipt of these amounts, Kameli caused Bright Oaks to wire all but $100,000 of these amounts to the Aurora Project.

112.    The Aurora Project spent this money almost immediately to pay construction expenses, including the Aurora Project's electrical, carpentry, landscaping, and HVAC vendors.

113.    Through the Golden and Silver Funds' PPMs and Business Plans, Kameli and CFIG made materially false and/or misleading statements about how these Funds would use investor money and how these Funds would comply with the EB-5 Program's requirements. They also engaged in a fraudulent scheme to misuse investor proceeds, which placed investors' immigration efforts through the Program into jeopardy. The Funds' offering documents falsely and/or misleadingly represented that each Fund would use investor proceeds to loan money for a specific Project and that Defendants would operate the Funds to comply with the EB-5 Program's requirements. In other words, the Golden Fund's offering documents represented that investor proceeds would be used to loan money to the Golden Project, and the Silver Fund's offering documents represented that investor proceeds would be used to loan money to the Silver Project. These representations were consistent with the offering documents' other representations that Defendants would operate the Funds to comply with the EB-5 Program's requirements. Contrary to these representations, Kameli and CFIG used investor proceeds in these Funds to benefit the Aurora Project, which was unaffiliated with investors in these Funds.

114.    Through the Aurora Fund's PPM and Business Plan, Kameli and CFIG made materially false and/or misleading statements about how the Aurora Project would obtain proceeds for the Project's development and construction. They engaged in a fraudulent scheme to misuse investor proceeds. The Aurora Fund's offering documents represented that the Aurora

Project would obtain proceeds derived from EB-5 investors through the Aurora Fund. Contrary to these representations, Kameli and CFIG caused the Aurora Project to obtain proceeds from Golden and Silver Fund investors, all of whom were unaffiliated with the Aurora Fund.

**Kameli Diverts Money From The Silver Fund Through A Line Of Credit**

115.    Kameli also improperly caused the proceeds from a line of credit (the "Line of Credit") to benefit Funds, Projects, and entities under Kameli's control other than the Silver Fund and the Silver Project. Certain Silver Fund investors had authorized Kameli and CFIG to use certain assets in an investor holdings account as collateral for the Line of Credit until USCIS approved these investors' I-526 Petitions. Based on the Silver Fund's offering documents, as well as the EB-5 Program's requirements that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based, Kameli was supposed to use the proceeds from the Line of Credit only to benefit the Silver Fund or the Silver Project. Instead, Kameli misused these proceeds for purposes unrelated to the Silver Fund or Silver Project, thereby violating the terms of the offering documents and violating the EB-5 Program's requirements that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. Through his misuse of the proceeds from the Silver Line of Credit, Kameli jeopardized these investors' ability to obtain U.S. residency through the Program.

116.    Because Kameli had pledged Silver Fund's investor assets as collateral for the Line of Credit, the Silver Fund could not use these assets to benefit the Silver Fund or the Silver Project during the period of time in which these assets were pledged.

117.    Between late 2012 and late 2014, Kameli drew on the Line of Credit, causing the

balance on the Line of Credit to balloon to $3.9 million by late 2014.

118.    Kameli used approximately $2.6 million of the amounts drawn on the Line of Credit to trade securities in a CFIG brokerage account.

119.    This securities trading resulted in approximately $161,000 in trading profits for CFIG. CFIG did not use these profits for the benefit of the Silver Fund or Silver Project.

120.    Kameli used the securities in CFIG's brokerage account as collateral for a second line of credit in CFIG's name. Kameli used approximately $863,000 from the Silver Line of Credit to pay for the second line of credit that was issued in CFIG's name. Kameli then drew over $1 million from this other line of credit to pay CFIG's expenses.

121.    Kameli also used approximately $730,000 from the Silver Line of Credit to pay for various expenses of other Projects, including approximately $446,000 to the Aurora Project and other amounts to the Elgin, Golden, and First American Projects.

122.    Kameli used approximately $358,000, $100,000, and another $100,000 from the Silver Line of Credit to pay for the acquisition of land for the First American, Naples, and Ft. Myers Projects, respectively.

123.    Kameli also used an additional $601,000 from the Silver Line of Credit to pay entities he owned or controlled, including his company Platinum. Platinum did not use these amounts to benefit either the Silver Fund or Silver Project.

124.    Kameli also used approximately $164,000 from the Silver Line of Credit to pay real estate costs associated with a transaction for land in North Dakota on behalf of another company that Kameli owned. This North Dakota land was unrelated to the Projects.

125.    Kameli, directly or indirectly, drew at least $126,000 from the Silver Line of Credit to deposit in his personal bank accounts.

126.     Through the Silver Fund's offering documents, Kameli and CFIG made materially false and/or misleading statements about how these Funds would use investor money and how these Funds would operate to comply with the EB-5 Program's requirements. They also engaged in a fraudulent scheme to misuse investor proceeds, which placed investors' immigration efforts through the Program into jeopardy. The Silver Fund's offering documents represented that the Silver Fund would use investor proceeds to loan money for the development and construction of the Silver Project and that Defendants would operate the Silver Fund to comply with the EB-5 Program's requirements. Contrary to these representations, Kameli and CFIG used Silver Fund investor assets to benefit other Funds, Projects, persons, and entities, including Kameli and his companies, not to benefit the Silver Fund or the Silver Project. Because Kameli did not make the full amount of investors' capital contributions in the Silver Fund available to the business most closely responsible for creating the employment upon which the investors' immigration petitions were based, *i.e.*, the Silver Project, and instead used a portion of the investors' contributions for other purposes, Kameli misused investor funds and jeopardized investors' immigration petitions through the Program.

127.     Through the Aurora, Elgin, Golden, First American, Ft. Myers, and Naples Funds' offering documents, Kameli and CFIG or AEP made materially false and/or misleading statements about how the Projects affiliated with these Funds would obtain money for development and construction. They also engaged in a fraudulent scheme to misuse investor proceeds. These Funds' offering documents represented that the Projects affiliated with these Funds would obtain proceeds derived from EB-5 investors through specific Funds. For example, the Golden Fund's offering documents represented that the Golden Project would obtain proceeds derived from EB-5 investors through the Golden Fund, the Ft. Myers Fund's offering

documents represented that the Ft. Myers Project would obtain proceeds derived from EB-5 investors through the Ft. Myers Fund, and so on. Contrary to these representations, Kameli and CFIG or AEP caused the Aurora, Elgin, Golden, First American, Ft. Myers, and Naples Projects to obtain proceeds derived from EB-5 investors in the Silver Fund, who were unaffiliated with these other Funds and Projects.

**Kameli Generates Over $1.06 Million In Undisclosed**
**Profits For Himself On Certain Projects' Acquisition Of Land**

128.    For three of the Projects, Kameli employed a scheme to use his company, Platinum, to generate a total of over $1.06 million in undisclosed profits for himself, to the detriment of Fund investors.

129.    First, for the First American Project, in approximately December 2012, Kameli caused Platinum to obtain a contract to purchase a parcel of land for $425,000.

130.    Knowing that Platinum already had secured land for the First American Project for $425,000, in February 2013, Kameli disseminated Business Plans for the First American Fund's offering documents in which Kameli stated that land costs for the First American Project would be $1 million.

131.    In April 2015, Kameli caused Platinum to acquire land for the First American Project for the previously-contracted price of $425,000.

132.    In October 2014, Kameli caused Platinum to acquire another parcel of land for the First American Project for $239,850. This amount, combined with the $425,000 that Platinum had already contracted to pay, and eventually did pay, for the other parcel of land, meant that the First American Project's actual land costs were $664,850.

133.    In September 2016, Kameli caused the First American Project to buy these two parcels from Platinum for a total of $1 million, with the Project paying $760,150 for the first

31

parcel (bought by Platinum for $425,000) and the second parcel for the same $239,850 amount that Platinum had paid for it. These transactions resulted in an undisclosed profit for Kameli and Platinum of over $335,000. Platinum did not use these profits to benefit either the First American Fund or First American Project.

134.    Second, for the Ft. Myers Project, in approximately January 2013, Kameli caused Platinum to contract to buy a parcel of land for $550,000.

135.    In December 2013, Kameli caused Platinum to acquire this land for the Ft. Myers Project for the previously-contracted price of $550,000.

136.    Knowing that Platinum already had acquired land for the Ft. Myers Project for $550,000, in 2014, Kameli disseminated Business Plans for the Ft. Myers Fund in which Kameli stated that land costs for the Ft. Myers Project would be $1.015 million.

137.    In December 2014, Kameli caused the Ft. Myers Project to buy this land from Platinum for $1 million, resulting in an undisclosed profit for Kameli and Platinum of $450,000.

138.    Platinum did not use these profits to benefit either the Ft. Myers Fund or Ft. Myers Project.

139.    Third, for the Naples Project, in approximately April 2013, Kameli caused Platinum to contract to buy a parcel of land for $725,000.

140.    In December 2013, Kameli caused Platinum to acquire this land for the Naples Project for the previously-contracted price of $725,000.

141.    Knowing that Platinum already had contracted to acquire, or had already acquired, land for the Naples Project for $725,000, in 2013, Kameli disseminated Business Plans for the Naples Fund's offering documents in which Kameli stated that land costs for the Naples Project would be $1 million.

142. In December 2014, Kameli caused the Naples Project to buy this land from Platinum for $1 million, resulting in an undisclosed profit for Kameli and Platinum of $275,000.

143. Platinum did not use these profits to benefit either the Naples Fund or Naples Project.

144. Kameli's decision to use the First American, Ft. Myers, and Naples Projects' real estate acquisitions to generate a profit for himself was part of a scheme, device, or artifice to defraud investors in the First American, Ft. Myers, and Naples Funds.

145. Through the First American, Ft. Myers, and Naples Funds' Business Plans, Kameli and AEP made false and/or materially misleading statements about the land acquisition costs for the Projects affiliated with these Funds, about how these Funds would use investor money and how these Funds would comply with the EB-5 Program's requirements. They also engaged in a fraudulent scheme to misuse investor proceeds, which placed investors' immigration efforts through the Program into jeopardy. At the time Kameli and AEP made these statements about these Projects' projected land acquisition costs, about how these Funds would use investor money and about how these Funds would operate to comply with the EB-5 Program's requirements, Kameli and AEP knew that the Projects, through Platinum, already had contracted to pay, or had actually paid, less for the land than Kameli projected in the Business Plans, with the difference serving as an undisclosed profit to Kameli, through Platinum. Kameli misused investor funds because he did not make the full amount of investors' capital contributions in the First American, Ft. Myers, and Naples Funds available to the businesses most closely responsible for creating the employment upon which investors' immigration petitions were based, and instead used a portion of the investors' contributions for undisclosed profits to Kameli. His misuse of investor funds jeopardized investors' immigration petitions

33

through the Program.

146.    As an illustration of how Kameli's misuse of investor funds jeopardized investors' immigration petitions through the Program, in 2015 USCIS denied an Elgin Fund investor's I-829 Petition, based in part on USCIS' doubt about the legitimacy of the Elgin Project's purchase of land. USCIS' doubt about the legitimacy of this transaction was fueled by its finding that an entity purchased the land on a date in approximately August 2011, and then, on that same date, sold the land to the Elgin Project for nearly double the price. Because of USCIS' concerns about this land transaction, USCIS concluded that the investor had not shown that the full amount of his capital contribution was truly made available to the Elgin Project, and USCIS denied the investor's I-829 Petition. Through Kameli's law firm, the investor has challenged USCIS' denial in federal court, but he has been unsuccessful to date.

147.    Similar to this land transaction involving the Elgin Project, the land transactions described above involving the First American, Ft. Myers, and Naples Projects may have jeopardized the ability of investors in the First American, Ft. Myers, and Naples Projects to obtain permanent U.S. residency through the EB-5 Program.

148.    Through the First American, Ft. Myers, and Naples Funds' PPMs, Kameli and AEP made materially false and/or misleading statements in their descriptions of how Kameli and AEP would be compensated through managing the Fund. The PPMs falsely and/or misleadingly stated that Kameli and AEP would be compensated through their receipt of a portion of the loan interest paid to the Funds by the Projects after commencement of the Projects' operations. In fact, Kameli received over $1.06 million in undisclosed profits from these Funds.

**Kameli Causes CFIG And AEP To Take**
**$4.1 Million In Undisclosed Fees From Several Projects**

149.    From 2010 to 2016, Kameli caused five Projects to pay CFIG or AEP a combined

34

amount of $4.1 million in fees that Kameli did not disclose would be paid to CFIG and/or AEP.

150.    In the summer of 2016, Kameli caused the First American Project to pay a total of $910,000 to AEP in "Business Development and Advisory Services" fees. Kameli then used $660,000 of this amount to redeem Fund investors whom were unaffiliated with the First American Fund.

151.    Kameli caused the First American Fund to issue a PPM in March 2013 and a supplement to this PPM in December 2013. Prior to issuing this PPM, Kameli already had agreed to pay AEP $910,000 in "Business Development and Advisory Services" fees.

152.    Similar to other Funds' PPMs, the First American Fund's March 2013 PPM stated in pertinent part that "AEP and the [Fund] will be under substantial scrutiny by the agency responsible for oversight of the USCIS EB5 program. AEP and the [Fund] understand the future scrutiny and have put in place a system of checks and balances designed to monitor and report on a timely basis every requirement of the EB-5 Program." This language constituted a representation by Kameli that he would operate the First American Fund to comply with the EB-5 Program's requirements.

153.    Neither the March 2013 First American Fund PPM nor the December 2013 PPM supplement disclosed that Kameli had caused the First American Project to agree to pay AEP $910,000 in "Business Development and Advisory Services" fees.

154.    To the contrary, the March 2013 PPM stated that Kameli and AEP would be compensated through their receipt of a portion of the loan interest paid to the First American Fund by the First American Project after commencement of the Project's operations. As Kameli knew, however, he already had caused the Project to agree to pay AEP $910,000 in additional compensation not disclosed in the PPM.

155.    In the "Conflicts of Interest" section of the March 2013 PPM, this PPM vaguely stated that "AEP and or AEP's subsidiaries may be reimbursed by First American for start-up expenses, fees and services rendered prior to funding . . ." In fact, just two months earlier, Kameli had already caused the First American project to agree to pay $910,000 to AEP.

156.    Although the Sources and Uses Table in the First American Business Plan contained a line item for $910,000 in "Development Svcs/Advisory Svcs Fees," the Business Plan did not mention Kameli or AEP at all, let alone disclose that they would receive fees from the Project that the PPM did not disclose.

157.    Further, the First American Business Plan stated in a narrative paragraph next to the Sources and Uses Table that "development and management fees may be deferrable until the start of operations" of the First American Project. However, as Kameli knew at the time he caused the Business Plan to be issued, he already had caused the First American Project to agree to pay these fees to AEP "upon funding, either wholly or partially of [the First American Project] from any source," meaning that the Project was contractually obligated to pay these fees to AEP regardless of whether the Project's operations ever started. Indeed, when Kameli caused the Project to pay these fees to AEP in the summer of 2016, no construction whatsoever on the Project had even occurred, and the start of operations of a senior living facility at the Project was at least years away, if it would ever occur.

158.    Moreover, for $660,000 out of the $910,000 to AEP that the First American Project paid in 2016, Kameli's purpose in making these payments was to use AEP merely as a conduit for Kameli's diversion of money. He did not make these payments to compensate AEP for services performed for the First American Project. The First American Fund's PPM contained materially false and/or misleading statements that the Fund would comply with the

EB-5 Program's requirements, when in fact Kameli caused at least $660,000 of investors' capital contributions to be diverted for redemption of investors in other funds. They also engaged in a fraudulent scheme to misuse investor proceeds, which placed investors' immigration efforts through the Program into jeopardy. Because Kameli did not make the full amount of investors' capital contributions in the First American Fund available to the business most closely responsible for creating the employment upon which the investors' immigration petitions were based, and instead used a portion of the investors' contributions to redeem investors in other Funds, Kameli misused investor funds and jeopardized investors' immigration petitions through the Program.

159.    Meanwhile, between 2010 and 2012, Kameli caused the Elgin Project to pay a total of $840,000 to CFIG in "Development Services" fees. CFIG then transferred approximately $225,000 of these amounts to Kameli's personal bank accounts.

160.    In September 2011, Kameli had caused the Elgin Project to agree to pay CFIG this $840,000 amount in "Development Services" fees.

161.    Kameli caused the Elgin Fund to issue a PPM in August 2011 and a supplement to this PPM in October 2013.

162.    Neither the August 2011 Elgin Fund PPM nor the October 2013 PPM supplement disclosed that Kameli had caused the Elgin Project to agree to pay CFIG $840,000 in "Development Services" fees.

163.    To the contrary, the August 2011 PPM stated that Kameli and CFIG would be compensated through their receipt of a portion of the loan interest paid to the Elgin Fund by the Elgin Project after "operational revenues or other means are available for payment." The PPM went to state that the portion of the loan interest "will represent [CFIG's] sole compensation for

[CFIG's] duties during the term of the loan."

164.    As Kameli knew, however, he already had either caused the Project to agree to pay, or had caused the Project to actually pay, CFIG $840,000 in additional compensation not disclosed in the PPM.

165.    In August 2011, Kameli also caused the Elgin Fund to issue a Business Plan, but neither the Sources and Uses Table nor any other portion of this Business Plan disclosed the $840,000 fee that Kameli already had caused the Elgin Project to pay, or agree to pay, to CFIG.

166.    In September 2015, Kameli caused the Elgin Fund to issue a second PPM supplement. Kameli issued this PPM supplement long after all investors had contributed to the Fund and long after the 2010 to 2012 period of time in which Kameli had caused the Elgin Project to pay CFIG $840,000 in fees.

167.    This September 2015 PPM supplement asserted, for the first time, that CFIG had "been entitled" to receive "Development Svcs./Advisory Fees," which "may be equivalent to $840,000.00." In fact, the payment of this amount was not a mere possibility which "may" occur, but rather was a certainty which already had occurred.

168.    In addition to the First American and Elgin Projects, Kameli caused undisclosed fees to be paid by:

(a)    the Silver Project, which in April 2012 agreed to pay, and in December 2013 actually did pay, $1.155 million to CFIG. Kameli used nearly $1 million of this amount to purchase land that was ultimately sold to the Ft. Myers and Naples Projects. Kameli's purpose in making these payments was to use CFIG merely as a conduit for Kameli's diversion of money to Projects not associated with Silver Fund investors. He did not make these payments to compensate CFIG for services

performed for the Silver Project;

(b)    the Aurora Project, which in September 2011 agreed to pay CFIG $595,000, and
which in March 2011, September 2012, and February 2016 paid CFIG a total of
$950,000 (about $74,000 of which CFIG then sent to Kameli's personal bank
accounts). Kameli also used the amounts that the Aurora Project paid to CFIG in
February 2016 to redeem investors in the Elgin Fund. Kameli's purpose in
making these payments was to use CFIG merely as a conduit for Kameli's
diversion of money to investors not associated with the Aurora Fund. He did not
make these payments to compensate CFIG for services performed for the Aurora
Project; and

(c)    the Golden Project, which in November 2013 agreed to pay CFIG $250,000, and
which in November 2012 and November 2013 paid CFIG a total of $245,000.
Kameli used over $60,000 of the amounts that the Golden Project paid to CFIG in
November 2013 to redeem an investor in the Elgin Fund and to be deposited in
the Naples Project's bank account. Kameli's purpose in making these payments
was to use CFIG merely as a conduit for his diversion of money for purposes not
associated with the Golden Fund. He did not make these payments to compensate
CFIG for services performed for the Golden Project.

169.    Through the First American, Elgin, Silver, Aurora, and Golden Funds' PPMs,
Kameli and CFIG or AEP made materially false and/or misleading statements about their
compensation, about how these Funds would use investor money and how these Funds would
comply with the EB-5 Program's requirements. They also engaged in a fraudulent scheme to
misuse investor proceeds, which placed investors' immigration efforts through the Program into

jeopardy. These Funds' PPMs falsely and/or misleadingly stated that Kameli and CFIG or AEP would be compensated through their receipt of a portion of the loan interest paid to the Funds by the Projects after commencement of the Projects' operations and that Kameli would operate these Funds to comply with the EB-5 Program's requirements. Contrary to these representations, Kameli caused CFIG and AEP to receive fees from these Projects that Kameli did not disclose would be paid to CFIG and/or AEP, that were not derived from a portion of the loan interest paid to the Funds by the Projects, and that were paid before these Projects commenced operations or were even fully built. He also used a substantial portion of these purported fee payments merely as vehicles to divert money to Funds, Fund investors, and Projects that were not the businesses most closely responsible for creating the employment upon which the investors' immigration petitions were based. Therefore, Kameli misused investor funds and jeopardized investors' immigration petitions because he violated the EB-5 Program's requirement that the full amount of investors' capital contributions must be made available to the businesses most closely responsible for creating the employment upon which the investors' immigration petitions were based.

170.    Further, through the Aurora, Elgin, and Golden Funds' PPMs, Kameli and CFIG made materially false and/or misleading statements that CFIG's receipt of a portion of the loan interest paid to these Funds by the Projects would constitute CFIG's "sole compensation" for its management duties. Contrary to these representations, Kameli caused the Aurora, Elgin, and Golden Projects to pay CFIG additional, undisclosed compensation in the form of purported development and advisory fees.

171.    In addition, for the First American and Silver Fund Business Plans, not only did the Business Plans fail to disclose that the Projects would pay development and advisory fees to

CFIG or AEP, but certain versions of the Business Plans also made materially false and/or misleading statements about whether these fees would be deferrable. These Business Plans stated that these fees "may be deferrable" until the start of the Projects' operations. Contrary to these representations, Kameli and CFIG or AEP had already caused the Projects to pay, or agree to pay, the fees regardless of the Projects' operational status.

**Kameli Funnels A Total Of $745,000 From The Golden And**
**Silver Projects To Bright Oaks Development To Pay For Its Expenses**

172.     In 2013, 2014, and 2015, Kameli improperly diverted money from the Golden and Silver Projects to Bright Oaks Development to pay for that company's expenses. As discussed above, Kameli owned Bright Oaks Development, and Kameli made his brother its President. Bright Oaks Development did not earn these payments and was not entitled to receive them.

173.     In June 2013, Kameli caused the Golden Project to pay $100,000 to Bright Oaks Development. In October 2014, December 2014, and June 2015, Kameli caused the Golden Project to make additional payments to Bright Oaks Development in the amounts of $200,000, $125,000, and $10,000, respectively. These 2013, 2014, and 2015 payments totaled $435,000.

174.     None of the Golden Fund offering documents that Kameli caused to be issued before or during this June 2013 to June 2015 time period disclosed any involvement of Bright Oaks Development, or Kameli's brother, with the Golden Project or disclosed that the Project would make any payments to Bright Oaks Development.

175.     Kameli issued a November 2013 PPM Supplement to the Golden Fund's PPM, but this PPM Supplement omitted to disclose the involvement of Bright Oaks Development or Kameli's brother in the Project.

176.     Further, the total amount of money that the Golden Project paid to Bright Oaks Development exceeded the amount that the Project was authorized to pay to Bright Oaks

Development.

177.    For the Silver Project, Kameli caused this Project to pay Bright Oaks Development a total of $310,000 through the following payments: (1) $50,000 in July 2014; (2) $100,000 in each of August 2014 and September 2014; (3) $25,000 in each of January 2015 and February 2015; and (4) $10,000 in May 2015. Bright Oaks Development paid the Silver Project $25,000 in February 2015.

178.    Bright Oaks had not earned the Silver Project's July 2014 $50,000 payment  or its August 2014 and September 2014 $100,000 payments as of the time these payments were made; indeed, these payments occurred before the Project even acquired any land.

179.    Further, the total amount of money that the Silver Project paid to Bright Oaks Development exceeded the amount that the Project was authorized to pay to Bright Oaks Development.

180.    None of the Silver Fund offering documents that Kameli caused to be issued up to August 2013 disclosed any involvement of Bright Oaks Development with the Silver Project.

181.    In August 2013, Kameli caused the Silver Fund to issue a First PPM Supplement, which asserted in pertinent part: "Mr. Kameli is the principal of Bright Oaks Development, Inc. which may assist in the development and construction" of the Silver Project. However, this August 2013 First PPM Supplement omitted to state that Kameli had installed his brother as the President of Bright Oaks Development or that his brother had any involvement with the development of the Silver Project.

182.    Through the Golden and Silver Funds' PPMs, Kameli and CFIG made materially false and/or misleading statements about their compensation and about Kameli's conflicts of interest. They also engaged in a fraudulent scheme to provide Kameli, his companies, and his

42

brother with undisclosed compensation. These Funds' PPMs falsely and/or misleadingly stated that Kameli and CFIG would be compensated through their receipt of a portion of the loan interest paid to the Funds by the Projects. These Funds' PPM also purported to describe all of Kameli's potential or actual conflicts of interest. Contrary to these representations, Kameli and his brother received payments from these Projects through Bright Oaks Development, and Bright Oaks Development's receipt of payments from the Project constituted an undisclosed conflict of interest. Moreover, as set forth above, Kameli fraudulently schemed to cause the Golden and Silver Projects to pay Bright Oaks Development money that it was not entitled to.

**Kameli Causes The Illinois Projects To Use Money They Borrowed From The CFIG Funds To Trade Securities**

183.    From approximately April 2013 to September 2015, Kameli caused the Illinois Projects to use money they borrowed from the CFIG Funds to trade in mutual funds, options, stocks, bonds, and other investments, contrary to Kameli's representations in the Funds' offering documents about how the Projects would use borrowed funds to develop, construct, and operate senior living facilities.

184.    This securities trading resulted in some profits and some losses.

185.    For the Golden Project, the securities trading generated net profits of approximately $464,000.

186.    Kameli then caused the Golden Project to transfer approximately $250,000 of these profits to Platinum, which then used the money for purposes unrelated to the Golden Project.

187.    Through the CFIG Funds' PPMs and Business Plans, Kameli and CFIG made materially false and/or misleading representations about how they would use investors' money and how they would comply with the EB-5 Program's requirements. They also engaged in a

fraudulent scheme to misuse investor proceeds, which jeopardized investors' immigration petitions. These Funds' offering documents represented that the Projects would use money borrowed from the Funds for the development and construction of the Projects. Contrary to these representations, Kameli and CFIG caused the Illinois Projects to use some money they borrowed from the CFIG Funds to trade securities, subjecting the Funds and the Projects to undisclosed market risks and jeopardizing investors' chances at permanent U.S. residency through the use of investors' money for purposes other than the purpose of loaning money to the job-creating project upon which their immigrant petitions were based.

188.    Further, through the Golden Fund's offering documents, Kameli and CFIG made materially false and/or misleading representations about the Golden Project's use of borrowed funds. Kameli and CFIG represented the Project would use these funds to develop and construct a senior living facility. Contrary to these representations, Kameli and CFIG caused the Project to trade securities and then transfer $250,000 in securities trading profits to Platinum for purposes unrelated to the development and construction of a senior living facility.

**The Poor Condition Of The Funds And Most Projects**

189.    After having been involved with the Funds and Projects since 2009, Kameli has not completed construction on any of the Projects save one, the Aurora Project.

190.    Indeed, no construction has occurred to date on any of the Florida Projects. As noted above, USCIS has not approved the conditional green card applications for investors in the AEP Funds, except as to some investors in the First American Fund.

191.    As to the Illinois Projects, the Aurora Project substantially completed construction in approximately early 2016.

192.    However, the construction of the Aurora Project has been severely delayed and

over budget. The Aurora Project's 2010 Business Plan stated that the Project would be completed and fully operational in 2011 with full occupancy by early 2012. Instead, Kameli did not substantially complete the Project until 2016, and the facility today remains mostly unoccupied. Only approximately 12 residents currently occupy the 60-unit facility, which Kameli has named "Bright Oaks of Aurora."

193.    Meanwhile, the 2010 Business Plan for the Aurora Project stated that the Project would cost $8.5 million and would be entirely funded by investors in the EB-5 program. Instead, the Project has cost nearly that amount, and, consequently, Kameli has caused the Project to borrow over $6.5 million from third-parties. This third-party debt remains outstanding.

194.    In July 2017, a lender initiated a foreclosure lawsuit in Illinois state court against, among others, Defendants the Aurora Fund, the Aurora Project, and Bright Oaks Development. That lawsuit remains pending.

195.    As to other three Illinois Projects, as of December 2016: (i) on the Elgin Project, the foundation has been poured, but only half of the building is up and under a roof, and the general contractor for the Project has stopped work and has sued the Project to collect approximately $2.197 million in unpaid amounts; (ii) for the Golden Project, only the foundation has been poured and only the elevator towers have been completed, and the general contractor for the Project has stopped work and has sued for the Project for $1.549 million in unpaid amounts; and (iii) for the Silver Project, no construction has occurred.

196.    The Projects lack money to complete construction, and the Funds' poor financial condition prevents them from making additional loans to the Projects.

197.    For example, for the Silver Project, only approximately $320,000 remained in the Project's bank accounts as of May 23, 2017. Further, as of April 28, 2017, only approximately

45

$500,000 remained in the Silver Fund's bank account.

198.    Similarly, for the Golden Project, as of May 23, 2017, only approximately $1,800 remained in the Project's bank accounts, and approximately $100,000 remained in the Golden Fund's bank accounts as of April 28, 2017.

199.    The development and construction of all of the Projects is well behind schedule.

200.    For example, the completion of construction of the Elgin Project has been delayed by more than five years beyond the "16 to 18 months" that the Elgin Fund PPM projected in February 2010, with no date for the completion of construction within sight.

201.    In December 2016, the City of Elgin sent Kameli a notice of unsafe condition and demolition order for the Elgin Project. Kameli appealed the demolition order, but the City of Elgin denied the appeal in March 2017. In the City of Elgin's notice of unsafe condition and demolition order, the City stated that the incomplete structure lacks structural integrity, and, accordingly, the Project constitutes a fire hazard and is dangerous to human life.

202.    Moreover, while Kameli has told investors at various points in time that they could withdraw from the Funds if they no longer wished to continue their investments, the Funds' poor financial condition has prevented Kameli from redeeming all Fund investors. Indeed, Kameli has declined some investors' redemption requests while allowing other investors to withdraw. Kameli's practice of allowing some, but not all, investors to withdraw their investments, even after they obtained their I-526 approvals from USCIS, has exacerbated the Funds' poor financial condition and harmed investors who remained invested in the funds.

203.    When Kameli redeemed these investors, he structured the redemptions as resales of investors' membership interests in the Funds, and the Funds' repurchases of these membership interests from the investors.

204.     Kameli's actions have had the effect of significantly depleting the amounts that otherwise would have been available for the development and construction of certain Projects and making the likelihood the Projects' completion impossible without additional outside funding.

205.     These preference payments to certain investors have significantly harmed the remaining investors in the Funds and reduced the probability that they will ever achieve permanent U.S. residency under the EB-5 Program.

### <u>COUNT I</u>

**Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder**

**[All Defendants]**

206.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 205 above.

207.     By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, by use of the means or instrumentalities of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

208.     In engaging in the conduct described herein, Defendants acted knowingly or with a reckless disregard for the truth.

209.     By reason of the foregoing, Defendants violated, and unless enjoined will likely again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule l0b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1), (2) and (3)
### of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)]

### [All Defendants]

210.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 205 above.

211.      By virtue of the conduct alleged herein, Defendants, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

212.     In engaging in the conduct described herein, Defendants acted knowingly and/or with a reckless disregard for the truth and/or negligently.

213.     By reason of the foregoing, Defendants have violated, and unless enjoined will likely again violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), § 77q(a)(2) and § 77q(a)(3)].

## COUNT III
### Control Person Liability
### Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)]

### [Defendant Kameli Only]

214.     The SEC realleges and incorporates by reference the allegations set forth in paragraphs 1 through 209 above.

215.     As set forth above, during the relevant period, Kameli directly or indirectly, has controlled CFIG and AEP.

216.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Kameli is liable as a control person for CFIG's and AEP's violations of Section 10(b) [15 U.S.C. §78j(b)] of the Exchange Act and Rule l0b-5 [17 C.F.R. § 240.10b-5] thereunder.

217.     Pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Kameli is liable jointly and severally with and to the same extent as CFIG and AEP for their violations.

### RELIEF REQUESTED

### I.

### (Injunctive Relief Against Future Securities Law Violations)

Enter an Order of Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and Section 17(a) of the Securities Act [15 U.S.C. § 77o(a)].

## II.

### (Other Injunctive and Interim Relief)

Grant other appropriate injunctive interim relief, consistent with Rule 65(d) of the Federal Rules of Civil Procedure, as well as permanent injunctive relief, to protect investors, including: (i) an Order of Preliminary Injunction against Defendants restraining and enjoining them as set forth in this Section and Section I of the Relief Requested; (ii) an Order restraining and enjoining Kameli and his officers, agents, servants, employees, attorneys, subsidiaries and affiliates, and those persons in active concert or participation with any of them, by personal service or otherwise, and each of them, from directly or indirectly participating in the offer or sale of any security which constitutes an investment in a "commercial enterprise" under the United States Government EB-5 visa program administered by USCIS, including engaging in activities with a broker, dealer, or issuer, or a Regional Center designated by the USCIS, for purposes of issuing, offering, trading, or inducing or attempting to induce the purchase or sale of any such EB-5 investment; (iii) appointment of a Court-appointed Receiver over Defendants CFIG and AEP and the Relief Defendants named herein (to the extent set forth in a receivership order)**;** (iv) an Order freezing the assets of Defendants CFIG and AEP and the Relief Defendants (to the extent set forth in an asset freeze order); (v) an accounting by Defendants; (vi) an order prohibiting the destruction, mutilation, concealment, alteration or disposition of books and records; and (vii) other ancillary relief.

## III.

### (Disgorgement of Ill-Gotten Gains)

Issue an Order requiring Defendants and Relief Defendants to disgorge, jointly and severally, the ill-gotten gains that they received, directly or indirectly, including prejudgment

interest.

## IV.

### (Civil Penalties)

Issue an Order imposing appropriate civil penalties upon Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

## V.

### (Retention of Equitable Jurisdiction)

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VI.

### (Other Relief)

Grant such orders for further relief the Court deems appropriate.

### JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, the SEC demands that this case be tried before a jury.

Dated: January 29, 2018          Respectfully submitted,

**UNITED STATES SECURITIES
AND EXCHANGE COMMISSION**


/s/ Eric M. Phillips
Eric M. Phillips
Alyssa A. Qualls
Tracy W. Lo
BeLinda I. Mathie
Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd., Suite 1450
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

*Attorneys for Plaintiff*
*U.S. Securities and Exchange Commission*