IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br>              Plaintiff,<br><br>     v.<br><br>SEYED TAHER KAMELI, et al.,<br><br>              Defendants. | Case No. 17 CV 4686<br><br>Honorable Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

The U.S. Securities and Exchange Commission ("SEC" or "Commission") brought this civil enforcement action against Seyed Taher Kameli ("Kameli") and several corporations, alleging violations of Section 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. The SEC's allegations are set against the backdrop of a program commonly called the EB-5 program. EB-5 visas may be issued to "qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise" provided that (i) the immigrant invests a set amount of capital in the enterprise, and (ii) the enterprise benefits the U.S. economy by "creat[ing] full-time employment for not fewer than 10 [qualified employees]." 8 U.S.C. § 1153(b)(5). The SEC's allegations concern investments in projects to build senior living facilities offered by Kameli to immigrants seeking to qualify for the EB-5 program.

Four motions to dismiss the SEC's First Amended Complaint ("FAC"), ECF No. 105, are before the court. The SEC also moves to strike one of the motions to dismiss. Defendants argue that the FAC fails to state a claim and does not meet the heightened pleading standard of Federal

1

Rule of Civil Procedure 9(b), which applies to claims sounding in fraud. The court concludes that the FAC fails to satisfy the requirements of Rule 9(b) and dismisses it.

**I. Background**

This case began with the SEC's filing of its original complaint, ECF No. 1, and motion for a temporary restraining order and preliminary injunction, ECF No. 6. The court held hearings[1] over five days on the motion for preliminary injunction and denied it by memorandum opinion and order entered September 5, 2017, ECF No. 82 (reported *SEC v. Kameli*, 276 F. Supp. 3d 852 (N.D. Ill. 2017)).

Defendants then filed motions to dismiss the original complaint. ECF Nos. 100–03. In lieu of responding to those motions, the SEC elected to amend the complaint "as a matter of course," Fed. R. Civ. P. 15(a)(1). In four separate motions, defendants again moved to dismiss the FAC. ECF Nos. 124, 126–28. The SEC has also filed a motion to strike one of the motions to dismiss. ECF No. 140.

**A. The EB-5 Program**

Congress created the EB-5 Program under the Immigration Act of 1990. *See* Pub. L. No. 101-649, 104 Stat 4978 (codified at 8 U.S.C. § 1153(b)(5)). In 1991, the Immigration and Naturalization Service (INS) promulgated regulations for the EB-5 Program's administration. Today, USCIS administers the program. The program's chief purpose is to stimulate the economy by encouraging infusions of new capital and creating jobs. *See, e.g., Doe v. U.S. Citizenship & Immigration Servs.*, 2016 WL 3640687, at *1 (N.D. Ill. June 29, 2016), *Kenkhuis v. I.N.S.*, 2003 WL 22124059, at *3 & n.2 (N.D. Tex. Mar. 7, 2003) (discussing the EB-5 Program's legislative history).

---

[1] After a hearing, the parties reached a stand-still agreement regarding the request for a temporary restraining order pending the court's decision on the motion for a preliminary injunction. *See* Order ¶ I.A, ECF No. 40.

The application process begins with the filing of a "Form I-526, Immigrant Petition by Alien Entrepreneur" with USCIS. 8 C.F.R. § 204.6. The application must be "accompanied by evidence that the alien has invested or is actively in the process of investing lawfully obtained capital in a new commercial enterprise in the United States which will create full-time positions for not fewer than 10 qualifying employees." 8 C.F.R. § 204.6(j). In support of their petitions, applicants may submit "[a] copy of a comprehensive business plan showing that, due to the nature and projected size of the new commercial enterprise, the need for not fewer than ten (10) qualifying employees will result, including approximate dates, within the next two years, and when such employees will be hired." 8 C.F.R. § 204.6(j)(4)(i)(B).

If the I-526 petition is approved, the investor is granted a conditional green card conferring permanent resident status on a conditional basis. 8 U.S.C. § 1186b(a)(1). To have the conditions removed, the investor must file (within a specified time period) a "Form I-829, Petition by Entrepreneur to Remove Conditions." 8 C.F.R. § 216.6. At this stage, the investor must show that his investment of capital was "sustained" during his or her period of conditional residence and that the investment "created or can be expected to create with a reasonable period of time ten full-time jobs to qualifying employees." 8 C.F.R. § 216.6(a)(4)(iii)-(iv). If USCIS grants the I-829 petition, the conditions are removed from the investor's green card and he becomes a lawful permanent resident. If not, the investor loses his conditional permanent residency. 8 C.F.R. § 216.6(d)(1)-(2).

The SEC emphasizes an EB-5 requirement enforced by the USCIS of which Kameli allegedly knew or should have known. *See* FAC ¶ 47–49. Since at least 1998, the agency administering the EB-5 program has required the applicant to demonstrate that, where a company is involved, the "full amount" of the investor's money has been "made available to the

business(es) most closely responsible for creating the employment upon which the [immigration] petition is based." *In re Izummi*, 22 I. & N. Dec. 169, 179 (Assoc. Comm. 1998); *see also* FAC ¶ 49 (quoting USCIS memorandum issued in May 2013 describing this requirement); *Doe v. Johnson*, 2017 WL 1151036, at *6 (N.D. Ill. Mar. 28, 2017), non-dispositive op. on appeal *sub nom*. *Doe v. Nielsen*, 883 F.3d 716 (7th Cir. 2018) (discussing rule in related litigation and noting that the plaintiff did not challenge the USCIS' reliance on the rule).

## B. The Parties, Projects, and Funds[2]

The SEC alleges that between 2009 and 2016, Kameli, a Chicago attorney specializing in immigration, raised more than $88 million from at least 226 immigrant investors (most were citizens of Iran or China) to fund the development and construction of assisted living and memory care facilities (sometimes called "supportive living facilities")[3] in Illinois and Florida. FAC ¶ 2–4. Kameli promoted the investments as vehicles for obtaining residency using the EB-5 program, touting his expertise in immigration law in person and in YouTube videos. FAC ¶¶ 4, 7, 64.

Each investor was offered one or more ownership interests, described in offering documents as "securities," FAC ¶ 65, in a particular Illinois or Florida fund. The fund would then, investors were told, loan money to a particular project. FAC ¶ 6. Each fund issued similar Private Placement Memorandums ("PPMs") to prospective investors some of which were supplemented in 2013, 2014, and 2015. FAC ¶ 67. The offering documents included brochures,

---

[2] The factual summary in the text draws on the allegations made in the FAC, which the court accepts as true when deciding defendants' motions to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 679 (2009).

[3] According to paragraph 52 of the FAC:

> An assisted living facility typically caters to individuals who need assistance with daily activities, but do not require the 24-hour medical care provided by a nursing home. A memory care facility is a facility that provides specialized care and programming for individuals with Alzheimer's or a dementia-related disease.

a subscription agreement, and a business plan containing information about the ways in which the project would spend the money borrowed from the fund. The business plans also provided an estimate of the time necessary for the project's completion. The PPMs stated that the projects would begin repaying the loan once the senior living facility had become operational. CFIG and AEP were to be compensated for their management services by a portion of the interest paid by the projects on these loans.

To invest, individuals executed subscription agreements and returned them to defendants along with $500,000. In addition, investors were charged an administrative fee of between $35,000 and $75,000. Investors' funds were held in escrow until their I-526 petitions were adjudicated. Once the petition was granted, the investor's money was deposited into the specific fund for which the investor had applied. If the petition was denied, the money was returned to the investor. Eventually, each investor would hopefully earn back his or her principal plus interest. More importantly, each project was to create enough jobs to support investors' I-829 petitions.

Kameli created two companies to manage the funds. Formed in 2008 or 2009, FAC ¶ 50, Chicagoland Foreign Investment Group, LLC ("CFIG"), owned by Kameli, managed the four Illinois funds. In 2013, Kameli began offering similar investments for projects in Florida. Defendant American Enterprise Pioneers, Inc. ("AEP"), a subsidiary of CFIG, manages the Florida funds. As detailed more fully below, in addition to managing the Illinois funds, CFIG provided development services for the various projects.

In 2013, Kameli also created Bright Oaks Group, Inc. and Bright Oaks Development, Inc. (together, "Bright Oaks") to provide business and development services to the projects. The projects, which Kameli controlled, paid Bright Oaks $7.5 million in fees. Kameli appointed his

brother as the President and CEO of Bright Oaks. FAC ¶ 8, 50, 81–84. PPM's for two projects (Aurora and Elgin) described the credentials of the woman who would manage the respective funds but neglected to disclose that the manager in question was Kameli's sister. FAC ¶¶ 84–85. In addition to Kameli personally and as a controlling person, CFIG and AEP are named as defendants. The individual funds and projects, along with Bright Oaks, are named as relief defendants.

As discussed above, Kameli established a corporation for each project and a corresponding "fund" as an investment vehicle for the project. Each fund would, according to the offering documents, loan money to the corresponding project.

Table 1. Illinois Projects and Funds

| Project Name | Project Corporation | Fund |
|---|---|---|
| Aurora Project | Aurora Memory Care, LLC d/b/a Bright Oaks of Aurora, LLC \| Aurora Assisted Living EB-5 Fund, LLC | Aurora |
| Elgin Project | Elgin Memory Care, LLC d/b/a Bright Oaks of Elgin \| Elgin Assisted Living EB-5 Fund, LLC | Elgin |
| Golden Project | Golden Memory Care, Inc. d/b/a Bright Oaks of Fox Lake \| Golden Assisted Living EB-5 Fund, LLC | Golden |
| Silver Project | Memory Care, Inc. d/b/a Bright Oaks of West Dundee \| Silver Assisted Living EB-5 Fund, LLC | Silver |

Table 2. Florida Projects and Funds[4]

| Project Name | Project Corporation | Fund |
|---|---|---|
| First American Project (Wildwood) | First American Assisted Living, Inc.; First American Assisted Living EB-5 Fund, LLC | First American |
| Naples Project (Naples) | Naples ALF, Inc \| Naples Memory Care EB-5 Fund, LLC | Naples |
| Ft. Myers Project (Ft. Myers) | Ft. Myers ALF, Inc. \| Ft. Myers EB-5 Fund, LLC | Ft. Myers |
| Juniper Project (Sun City) | Juniper ALF, Inc. \| Juniper Assisted Living EB-5 Fund, LLC | Juniper |

---

[4] These projects are referred to collectively as the "Florida Projects."

Each project is over budget and behind schedule. *See* FAC ¶¶ 189–201. To date, only the Aurora Project has been completed. However, only 12 of the facility's 60 units are occupied. The property was the subject of a foreclosure suit in Kane County. *W. Suburban Bank v. Aurora Memory Care LLC et al.,* No. 17-CH-000662 (Kane Cty. Cir. Ct. filed July 27, 2017). The Aurora Project subsequently found itself the subject of an involuntary bankruptcy petition, and the proceeding has been converted to a Chapter 7 petition. *In re Aurora Memory Care, LLC*, 589 B.R. 631 (Bankr. N.D. Ill. 2018).

The other Illinois projects remain in various stages of development. The foundations have been poured and structures partially erected for the Elgin and Golden Projects. However, the general contractor for both projects has stopped working and has sued the respective funds for unpaid amounts of $2.197 million and $1.549 million, respectively. *See Glob. Builders v. Elgin Memory Care LLC,* No. 16 CH 964 (Kane Cty. Cir. Ct. filed Sept. 23, 2016); *Glob. Builders v. Golden Memory Care Inc.,* No. 16 CH 1472 (Kane Cty. Cir. Ct. filed Sept. 28, 2016). In addition, in December 2016, the City of Elgin sent Kameli a Notice of Unsafe Condition and Demolition Order for the partially constructed Elgin Project. Kameli appealed the demolition order*,* but the City of Elgin denied the appeal in March 2017. To date, there has been no construction on the Silver Project or on any of the Florida projects.

"The Projects lack money to complete construction, and the Funds' poor financial condition prevents them from making additional loans to the Projects."[5] FAC ¶ 196. With the exception of some investors in the First American Fund, USCIS has not approved the conditional applications for adjustment of status filed by investors in the Florida funds. FAC ¶ 190.

---

[5] At the preliminary injunction hearing, defendants offered explanations for the delays that included the SEC's investigation and bureaucracy. *See slip op*. at 6–7, ECF No. 82. Those explanations do not appear in the FAC, so the court cannot consider them when deciding the instant motion.

Additionally, reports of litigation in this court show that USCIS has denied the I-526 petitions of at least two investors in the Illinois funds. *See Doe v. Johnson*, *supra*, 2017 WL 1151036, at *6 (Aurora Project); *Doe v. USCIS*, *supra*, 2016 WL 3640687, at *1–2 (Elgin Project).

### C. The SEC's Allegations

In its briefing, the SEC alleges that Kameli, CFIG, and EAP's solicitation and management of the EB-5 funds and projects violated the securities laws in six ways. Pl.'s Combined Resp. to Mot. to Dismiss 1–2 ("Combined Resp."), ECF No. 142. Specifically, according to the SEC, defendants (1) charged several of the funds and projects over $4 million in undisclosed fees; (2) used approximately $16 million of investors' funds to engage in securities trading; (3) used money of Silver Fund investors as collateral for a line of credit, which they then used for their own benefit and the benefit of funds and projects other than the Silver Fund; (4) made an undisclosed profit of roughly $1 million by acquiring parcels of land through a separate entity and selling them at a higher price to several of the Florida Projects; (5) diverted $475,000 of funds from other projects to fund the completion of construction of the Aurora Project; and (6) diverted $745,000 from funds to Bright Oaks to cover its expenses. *See id.* at 1–2, 3–4 (collecting citations to the FAC).

As alleged in the FAC's three counts, defendants violated Section 17(a)(1), (2), and (3) of the Securities Act and Section 10(b) of the Exchange Act. The Commission also seeks to hold Kameli liable as a "control person" under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). FAC ¶¶ 216–17.

## II. Legal Standard

A Rule 12(b)(6) motion "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012); *accord. Randle v.*

*Bentsen*, 19 F.3d 371, 373 (7th Cir. 1994). A complaint need only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). That is, the complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim satisfies this standard when its factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56; *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). For purposes of a motion to dismiss, the court takes all facts alleged by the plaintiff as true and draws all reasonable inferences from those facts in the plaintiff's favor, although conclusory allegations that merely recite the elements of a claim are not entitled to this presumption of truth. *Virnich v. Vorwald*, 664 F.3d 206, 212 (7th Cir. 2011).

### III. Discussion

Defendants challenge the sufficiency of the FAC as a whole, contending that it fails to satisfy the requirements of Rules 8(a)(2) and the heightened pleading standard of Rule 9(b). Despite its length, the court must agree.

A. **Rule 9(b) Standard**

Rule 9(b)'s heightened pleading requirements apply to allegations of securities fraud. *See Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990); *S.E.C. v. Ustian*, 229 F. Supp. 3d 739, 760–61 (N.D. Ill. 2017). To satisfy Rule 9(b), a complaint "must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Rule 9(b) generally requires the complaint to set out the who, what, when, where, and how of the alleged fraud, though "the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011). Rule 9(b) has three primary

9

purposes: (1) protecting a defendant's reputation from harm; (2) minimizing "strike suits" and "fishing expeditions;" and (3) providing notice of the claim to the adverse party. *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994) (citing *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992))(other citation omitted). To further this last purpose, Rule 9(b) also requires the plaintiff to provide a general outline of the fraud scheme, sufficient to notify the defendant of its alleged role. *AnchorBank,* 649 F.3d at 615; *In re Rust-Oleum Restore Mktg., Sales Practices and Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 812 (N.D. Ill. 2016).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") adds additional pleading requirements such as a requirement that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Many courts have concluded that the PSLRA's pleading requirements do not apply to the SEC's complaints in enforcement actions. *See S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 615–16 & n.12 (N.D. Ill. 2011) (discussing majority view and noting contrary district court decisions). Defendants confine their heightened pleading analysis to Rule 9(b), *see* Kameli Mem. Supp. Mot. to Dismiss[6] 8–16, ECF No. 126, so the question of whether the PSLRA applies need not be reached here. Rule 9(b) and 8(a)(2) standards will therefore be applied.

### B. The First Amended Complaint Does Not Satisfy Rule 9(b)

Defendants primarily fault the FAC for lumping all defendants and allegedly false or misleading statements together. A "complaint that attributes misrepresentations to all defendants, 'lumped' together for pleading purposes, generally is insufficient" to satisfy Rule

---

[6] Kameli filed his motion and memorandum in support of his motion to dismiss as a single electronic document, ECF No. 126.

9(b). *Sears*, 912 F.2d at 893 (quoting *Design Time, Inc. v. Synthetic Diamond Tech., Inc.*, 674 F. Supp. 1564, 1569 (N.D. Ind. 1987)).

As defendants observe, the FAC's allegations cover eight projects with over 225 investors and span complex events that occurred between 2008 and 2016. After identifying the parties, the SEC lays out the facts over approximately 150 paragraphs, *see* FAC ¶¶ 47–204, followed by the three counts, FAC ¶¶ 205–13. The counts themselves sketch the elements of the SEC's claims in skeletal fashion and incorporate all of the paragraphs that came before them. *See* FAC ¶¶ 206, 210. The counts attribute scienter and actions to the defendants generally. *See* FAC ¶¶ 205–13. For example, plaintiffs allege under Counts I and II that "[i]n engaging in the conduct described herein, defendants acted knowingly or with a reckless disregard for the truth [and/or negligently]." FAC ¶¶ 208, 212 (bracketed text in ¶ 212 only).

The SEC responds that defendants take a myopic view of the FAC. They overlook its allegations that Kameli controlled or owned the defendants. *See* FAC ¶¶ 22–40, 214–17. The Commission reminds the court that Rule 9(b) must be read in conjunction with Rule 8(a)(2)'s "short and plain statement" requirement. *SEC v. Feminella*, 947 F. Supp. 722, 733 (S.D.N.Y. 1996). The Commission submits that it is not required at the complaint stage to "delineate precisely, in exacting detail, the role each Defendant and Relief Defendant played in the fraud." Pl.'s Combined Resp. 9. The SEC then points to paragraphs of the FAC it contends identify the "*specific* written misrepresentations that Kameli made or to which Kameli contributed," the offering documents in which those statements appeared, and Kameli's "*specific* misuses of investor assets." *Id.* at 10–11 (emphasis added).

The emphasized language highlights a reason Rule 9(b) requires greater specificity: the need to give fair notice to each defendant of his or her alleged part in the scheme. In its response

11

brief, the SEC asserts that "allegations regarding Kameli's and the other Defendants' and Relief Defendants' role in the fraud are sufficient to give Kameli reasonable notice about the allegations against him and to enable him to prepare a defense." Combined Resp. 10. Even if that were so, what about the other defendants? Rule 9(b) and 8(a)(2) entitle each defendant to fair notice of the alleged "nature of his or her alleged participation in the fraud." *Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (affirming dismissal of complaint and denial of leave to file an amended complaint). Alleging that Kameli controlled or owned the defendants does not by itself suffice, for "absent a compelling reason, a plaintiff is normally not entitled to treat multiple corporate defendants as one entity" under Rule 9(b). *Jepson*, 34 F.3d at 1329 (citations omitted). Nor does saying that Kameli contributed to certain written statements because it leaves open the natural next question: How much did Kameli contribute to the allegedly fraudulent statements and how much did other defendants and third parties contribute?

The FAC does not adequately delineate the defendants' roles in making the allegedly fraudulent statements. Take paragraph 127, which alleges that "Kameli and CFIG or EA made materially false or misleading statements" without differentiating among defendants. *See also* ¶¶ 113, 114, 126. Elsewhere the FAC identifies other persons, not named as defendants, involved in the management of CFIG, EAP, and Bright Oaks. An associate at Kameli's law firm wrote emails to potential investors, for instance, carbon copying Kameli. FAC ¶ 49; *see also* FAC ¶ 59. Kameli's brother and sister may have been involved in project administration. Despite this, the FAC leaves to speculation the amount to which the SEC alleges Kameli and the other defendants contributed to the offering documents discussed in the Commission's response brief. *See* FAC ¶¶ 124–28.

The Commission's focus on the projects' offering documents in its response underscores another deficiency in the FAC. Rule 9(b) requires the complaint to specify "the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated. . . ." *Uni\*Quality*, 974 F.2d at 923. The FAC describes statements made by Kameli in YouTube videos but does not specify whether any specific statements made in them constituted fraud. FAC ¶ 4. The FAC further alleges that defendants "solicited investors in a variety of ways - through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States." FAC ¶ 64. The FAC sometimes quotes PPMs, *e.g.*, FAC ¶¶ 74, 75, and sometimes alleges what PPMs "generally stated" even as it acknowledges that the PPMs contained different language. *See* FAC ¶¶ 86–87, 91. These generalities by themselves may not be fatal for the PPMs can be readily found in this record.

Nevertheless, as a whole, the FAC does not give notice of which of the many communications it mentions were allegedly fraudulent and which defendant is allegedly responsible for those communications. By focusing on the offering documents in its response to the motions to dismiss the FAC, does the SEC mean to disclaim reliance on the other communications described or mentioned in the FAC? The FAC discusses quarterly updates, for example, that "Kameli issued" that might or might not contain allegedly misleading statements. FAC ¶¶ 99–102. Neither the court nor defendants can discern on exactly which communications the SEC's claims are based, and Rule 9(b) is properly invoked to dispel that sort of uncertainty. The SEC suggests that Kameli can glean any details he needs in discovery. Combined Resp. 12.

13

If the SEC means to narrow the statements on which its claims are based to the specific communications discussed in its response, the SEC cannot do so in a response. Rule 9(b) requires the complaint to do the winnowing. *See Webb v. Frawley*, 906 F.3d 569, 584 (7th Cir. 2018).

The SEC relies on cases relaxing the requirements of Rule 9(b). *See Power v. GMAC Mortg. Corp.*, 2007 WL 723509, at *3 (N.D. Ill. Mar. 7, 2007); *SEC v. Santos*, 355 F. Supp. 2d 917 (N.D. Ill. 2003). These cases apply the general principle that exactly how much detail Rules 9(b) and 8(a)(2) require depends on the needs of the case. *See Iqbal*, *supra*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."); *AnchorBank*, 649 F.3d at 615. The Seventh Circuit endorses the principle that Rule 9(b)'s requirements "may be relaxed, of course, when the details are within the defendant's exclusive knowledge." *Jepson*, 34 F.3d at 1328 (citing *Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1567 & n.7 (7th Cir. 1991)); *see also Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998); *but see Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011) (explaining that a plaintiff "does not have unlimited leeway" under Rule 9(b)). In *Power*, for instance, expecting the plaintiff to know the specifics of how two companies' names came to be on a voucher for a $20 gift card would have been unreasonable without discovery. *See Power*, 2007 WL 723509, at *1, 3.

In contrast, the SEC does not identify any information peculiarly within defendants' knowledge. *See* Combined Resp. 9–12. The SEC called investors as witnesses at the preliminary injunction hearing, and the FAC pleads the outcomes of several of their I-526 petitions. FAC ¶¶ 97, 146 (Elgin Fund investor). The court also learned that the SEC gathered a

14

large number of documents from defendants prior to filing this suit, suggesting that the Commission has what it needs to identify who contributed to the various statements described in the FAC. The court, therefore, has no reason to doubt that the SEC has at least as much access to the investors as defendants and so has, or can gather, the needed details. *See Jepson*, 34 F.3d at 1328 (concluding Rule 9(b) requirements should not have been relaxed because the plaintiffs had "as much access as the defendants to the customers who can flesh out the circumstances of the mailings and wire communications involved").

The court does not hold that the SEC necessarily has to plead the date, time, sender, recipient, and content of every securities transaction involved to give defendants the notice that Rules 8(a)(2) and 9(b) demand. *See Santos*, 355 F. Supp. 2d at 921. The SEC must, however, make clear exactly which of the eight years of communications form the basis of its fraud allegations and must differentiate among the defendants sufficiently to give each defendant fair notice of its alleged role. Because the FAC does neither, it must be dismissed.

C. **Other Arguments**

Defendants make a host of other arguments, most of them claim or issue specific. The court recognizes that the funds and investors' financial positions grow ever more precarious with the passage of time and that defendants desire to move this litigation forward, believing it to be a barrier to finding funding that could get the Projects on track.

That said, the FAC's failure to meet the requirements of Rule 9(b) hampers the court's ability effectively to analyze the other issues raised by the defendants. For instance, defendants single out a series of statements in the PPMs and offering documents to argue that they are forward looking statements that cannot form the basis of a securities law violation. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (citing *Higginbotham v. Baxter Int'l, Inc.*, 495

F.3d 753, 756 (7th Cir. 2007)) (rejecting "fraud by hindsight" claim); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (same). Without knowing to whom these statements were allegedly communicated, when, and how the SEC alleges they are fraudulent, deciding whether they are actionable proves nearly impossible. So does determining whether any relief defendant has ill-gotten funds, which after all depends on identifying the nature of the alleged securities law violations.

Defendants also discuss a series of transactions described in the FAC involving the Silver Fund. They point out some of the alleged diversions of those funds that occurred while investor funds were in escrow pending the USCIS' approval of the investors' I-526 petitions. The funds did not become "securities" as the Securities Act and the Exchange Act define the term until they passed out of escrow, according to defendants. This presupposes that the alleged securities violations occurred sometime before the escrowed funds were released, but the SEC has not specified when it believes the fraud occurred. If the SEC plausibly pegs the alleged violation after the release of escrowed funds, this issue would become academic, further underscoring the need for Rule 9(b) compliance. Deciding the issue now would run afoul of the prohibition on "giv[ing] [judicial] 'opinion[s]' advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990)).

The remaining issues, though voluminous, involve allegations about particular funds and projects, and the court does not need to reach defendants' motion to strike certain exhibits because the exhibits do not affect the court's analysis of the FAC. For similar reasons the FAC leaves the court unable to reach the parties' remaining arguments. *See Arazie v. Mullane*, 2 F.3d 1456, 1468 & n.7 (7th Cir. 1993).

D. **Leave to Amend**

The SEC does not explicitly request leave to file an amended complaint, and defendants ask the court to dismiss the FAC with prejudice. Federal Rule of Civil Procedure 15(a)(2) states that "Rule 15(a) declares that leave to amend shall be freely given 'when justice so requires.'" *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

Rule 15(a)(2) creates a presumption in favor of granting a plaintiff at least one opportunity to cure procedural defects in a complaint. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and Nw. Ind.*, 786 F.3d 510, 518 (7th Cir. 2015) (citing *Luevano v. Wal–Mart Stores, Inc.*, 722 F.3d 1014, 1024 (7th Cir. 2013)). While the SEC amended its original complaint, this court determines, based on its observations at the preliminary injunction hearings and the motion to dismiss stage, that the SEC should receive an opportunity to cure, if it can, the Rule 9(b) defects the court has identified. *See Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792–94 (7th Cir. 2004) (reversing denial of leave to file second amended complaint to correct Rule 9(b) defects in first amended complaint).

## IV. Conclusion

For the reasons stated, defendants' motions to dismiss the First Amended Complaint are granted insofar as they seek dismissal for failure to plead with the particularity required by Federal Rule of Civil Procedure 9(b). Plaintiff's motion to strike certain exhibits to one of the motions to dismiss is denied as moot. Plaintiff is granted leave to file an amended complaint on or before April 11, 2019.

Dated: March 14, 2019                        /s/
                                                       Joan B. Gottschall
                                                       United States District Court Judge