**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) ) | |
| **Plaintiff,** | ) ) ) | |
| **v.** | ) ) ) | |
| **SEYED TAHER KAMELI, CHICAGOLAND FOREIGN INVESTMENT GROUP, LLC, and AMERICAN ENTERPRISE PIONEERS, INC.** | ) ) ) ) | **Civil Action No. 1:17-cv-4686** |
| **Defendants,** | ) ) ) | **Hon. Joan B. Gottschall** |
| **and** | ) ) ) | |
| **BRIGHT OAKS PLATINUM PORTFOLIO, LLC, PLATINUM REAL ESTATE AND PROPERTY INVESTMENTS, INC., and BRIGHT OAKS DEVELOPMENT, INC.,** | ) ) ) ) ) | |
| **Relief Defendants.** | ) ) | |

**PLAINTIFF UNITED STATES SECURITIES AND EXCHANGE
COMMISSION'S RESPONSE IN OPPOSITION TO DEFENDANTS'
CONSOLIDATED MOTION TO DISMISS THE SECOND AMENDED COMPLAINT**

Eric M. Phillips
Alyssa A. Qualls
Tracy W. Lo
BeLinda I. Mathie
United States Securities and
Exchange Commission
175 West Jackson Boulevard, Suite 1450
Chicago, Illinois 60604

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

KEY FACTUAL ALLEGATIONS ...................................................................................... 4

ARGUMENT ........................................................................................................................ 9

I.     The Second Amended Complaint Satisfies Rule 9(b)'s Specificity Requirements.... 11

II.    The SEC Has Not Engaged in "Shotgun Pleading.".................................................. 20

III.   The SEC Has Adequately Pled That Defendants Are Makers.................................... 22

IV.   The SEC Has Adequately Pled That Defendants Disseminated
False or Misleading Statements and Engaged in Deceptive
Conduct Under Rule 10b-5(a) and (c). ..................................................................... 26

V.    The SEC Has Adequately Pled That Defendants Are Sellers.................................... 29

VI.   The SEC Adequately Pleads Defendants' Requisite State of Mind. ......................... 30

VII.  The Second Amended Complaint Satisfies the Statute of Limitations....................... 31

VIII. The SEC Does Not Allege Misconduct
Based On "Forward-Looking Statements." ................................................................ 32

IX.   The "Bespeaks Caution" Doctrine Is Inapplicable To This Case. ............................. 36

X.    The SEC Has Adequately Pled "Control Person" Liability against Kameli............... 37

XI.   Assets in the Silver Fund Investor Holdings Account Involve "Securities." ............. 39

XII.  Defendants' Misrepresented the Use of the Silver Line of Credit............................. 42

XIII. Defendants' Payments of Over $4 Million In Undisclosed Fees From
the Silver, Golden, Elgin, Aurora, and First American Projects Are Actionable. ...... 47

XIV. Kameli and CFIG Violated The Federal Securities
Laws Through Their Undisclosed Payments to Bright
Oaks from the Silver and Golden Projects.................................................................. 50

XV.  Kameli and CFIG Violated the Federal Securities Laws When They
Used Silver, Golden, Elgin, and Aurora Project Assets to Trade Securities. ............. 52

XVI.  The SEC Has Stated a Claim for Kameli's and CFIG's Diversion of
      Assets from the Silver and Golden Projects to the Aurora Project. ........................... 54

XVII.  Kameli and AEP Committed Securities Fraud By Funneling Money
      to Kameli and His Companies Through the First American, Naples,
      and Ft. Myers' Projects Land Transactions. ............................................................... 55

CONCLUSION ..................................................................................................................... 58

## **TABLE OF AUTHORITIES**

**CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ............................................................10

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................... 10

*Carpenters Pension Trust Fund v. Barclays PLC,*
    56 F. Supp. 3d 549 (S.D.N.Y. 2014).....................................23

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ......................................... 10, 30

*Doe v. Johnson,*
    2017 WL 1151036 (N.D. Ill. Mar. 28, 2017), *aff'd*, 929 F.3d 478 (7th Cir. 2019). ..........36, 57

*Doe v. Nielsen,*
    883 F.3d 716 (7th Cir. 2018) ...............................................2

*Dolphin and Bradbury, Inc. v. SEC,*
    512 F.3d 634 (D.C. Cir. 2008)...............................................37

*EEOC v. Concentra Health Services, Inc.,*
    496 F.3d 773 (7th Cir. 2007) ............................................. 10

*Firestone Financial Corp. v. Meyer,*
    796 F.3d 822 (7th Cir. 2015) ............................................. 10

*Frederiksen v. City of Lockport,*
    384 F.3d 437 (7th Cir. 2004) ...............................................22

*Glickenhaus & Co. v. Household Intern., Inc.,*
    787 F.3d 408 (7th Cir. 2015) ...............................................22

*Gogos v. AMS Mechanical Sysstems, Inc.,*
    737 F.3d 1170 (7th Cir. 2013) .............................................10

*Harden v. Raffensberger, Hughes, & Co., Inc.,*
    65 F.3d 1392 (7th Cir. 1995). ..............................................36

*Harrison v. Dean Witter Reynolds, Inc.,*
    974 F.2d 873 (7th Cir. 1992) ...............................................38

*Hawaii Ironworkers Annuity Trust v. Cole,*
    2011 WL 3862206 (N.D. Ohio Sept. 1, 2011).......................................26

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981), *rev'd on other grounds*, 459 U.S. 375 (1983)........................37

*In re Fannie Mae 2008 Sec. Litig.*,
    891 F. Supp. 2d 458 (S.D.N.Y. Aug. 30, 2012)................................................................23, 26

*In the Matter of Gregg C. Lorenzo, et al.*,
    AP File No. 3-15211, Exchange Act Release No. 33-9385 (Feb. 15, 2013) ..........................28

*In re Investment Technology Group, Inc. Securities Litigation*,
    251 F. Supp. 3d 596 (S.D.N.Y. 2017) ................................................................................ 53

*In re Merck & Co., Inc. Securities, Derivative, & ERISA Litigation*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) .......................................................................22, 26

*In re Pfizer Inc. Sec. Litig.*,
    2012 WL 983548 (S.D.N.Y. Mar. 22, 2012) ........................................................................23

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*,
    2017 WL 3058563 (N.D. Cal. July 19, 2017)........................................................................25

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)......................................................................................................22, 23, 27

*Kokesh v. SEC*,
    137 S. Ct. 1635 (2017)............................................................................................................31

*Malouf v. SEC*,
    955 F.3d 1248 (10th Cir. 2019) .............................................................................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................................................ 47

*Matter of Izummi*,
    22 I. & N. Dec. 169 (Assoc. Comm. 1998) ..................................................................... 4, 5

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
    547 U.S. 71 (2006) ................................................................................................................41

*Milnarik v. M-S Commodities, Inc.*,
    457 F.2d 274 (7th Cir.) ........................................................................................................ 40

*Nasrabadi v. Kameli*,
    2019 WL 2173791 (N.D. Ill. May 20, 2019)........................................................................12

*Power v. GMAC*,
    2007 WL 723509 (N.D. Ill. Mar. 7, 2007) ......................................................................... 12

*SEC v. A Chicago Convention Center*,
    961 F. Supp. 2d 905 (N.D. Ill. 2013) .................................................................... 42

*SEC v. Aequitas Management, LLC*,
    2017 WL 1206691 (D. Ore. Jan. 9, 2017),
    *adopted by* 2017 WL 1429190 (D. Ore. Apr. 20, 2017) ........................................ 44

*SEC v. Black*,
    2005 WL 1498893 (N.D. Ill. June 17, 2005) ........................................................ 11

*SEC v. Buntrock*,
    2004 WL 1179423 (N.D. Ill. May 25, 2004) ................................................. 11, 31

*SEC v. Carter*,
    2011 WL 5980966 (N.D. Ill. Nov. 28, 2011) ........................................................25

*SEC v. China Northeast Petroleum Holdings Ltd.*,
    27 F. Supp. 3d 379 (S.D.N.Y. 2014)......................................................................38

*SEC v. City of Miami*,
    988 F. Supp. 2d 1343 (S.D. Fla. 2013) ................................................................. 21

*SEC v. Conrad*,
    2017 WL 3485766 (N.D. Ga. Feb. 2, 2017) .........................................................25

*SEC v. Constantin*,
    939 F. Supp. 2d 288 (S.D.N.Y. 2013) .................................................................. 41

*SEC v. Das*,
    2010 WL 4615336 (D. Neb. Nov. 4, 2010) ......................................................... 21

*SEC v. Edwards*,
    540 U.S. 389 (2004) .............................................................................................. 39

*SEC v. e-Smart Technologies, Inc.*,
    31 F. Supp. 3d 69 (D.D.C. 2014) ......................................................................... 35

*SEC v. Falor*,
    2010 WL 3385510 (N.D. Ill. Aug. 19, 2010) ...................................................9, 11

*SEC v. Feminella*,
    947 F. Supp. 722 (S.D.N.Y. 1996) ....................................................................... 17

*SEC v. Feng*,
    935 F.3d 721 (9th Cir. 2019) ........................................................................ passim

*SEC v. Feng*, 2016 WL 7443222 (C.D. Cal. Aug. 4, 2016),
    *aff'd*, 935 F.3d 721 (9th Cir. 2019)............................................................13, 19, 42

v

*SEC v. Gentile*,
    2019 WL 4686251 (3d Cir. 2019) ............................................................................32

*SEC v. Geswein*,
    2 F. Supp. 3d 1074 (N.D. Ohio 2014) ....................................................................25

*SEC v. Gorsek*,
    222 F. Supp. 2d 1099 (C.D. Ill. 2001) .............................................................. 45, 48

*SEC v. Holschuh*,
    694 F.2d 130 (7th Cir. 1982) ..................................................................................29

*SEC v. Homa*,
    2000 WL 1100783 (N.D. Ill. Aug. 4, 2000) ......................................................... 13

*SEC v. Kameli*,
    373 F. Supp. 3d 1194 (N.D. Ill. 2019) ....................................................................11

*SEC v. Kelly*,
    545 F. Supp. 2d 808 (N.D. Ill. 2008) ................................................................... 11

*SEC v. Koenig*,
    557 F.3d 736 (7th Cir. 2009) ..................................................................................32

*SEC v. Liu*,
    2016 WL 9086941 (C.D. Cal. Aug. 17, 2016) ..................................................... 42

*SEC v. Lorenzo*,
    139 S. Ct. 1094 (2019) ...........................................................................21, 26, 27

*SEC v. Meltzer*,
    440 F. Supp. 2d 179 (S.D.N.Y. 2006) ....................................................................37

*SEC v. Mercury Interactive, LLC*,
    2011 WL 5871020 (N.D. Cal. Nov. 22, 2011) ......................................................26

*SEC v. Morgan Keegan & Co.*,
    678 F.3d 1233 (11th Cir. 2012) ............................................................................ 33

*SEC v. Mozilo*,
    2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ................................................. 44, 53

*SEC v. Pocklington*,
    2018 WL 6843665 (C.D. Cal. Nov. 29, 2018) ...................................................25, 31

*SEC v. Qi*,
    2018 WL 5263187 (C.D. Cal. Mar. 21, 2018) .......................................................13

*SEC v. Radius Capital Corp.*,
  2012 WL 695668 (M.D. Fla. Mar. 1, 2012) ................................................................26

*SEC v. Reys*,
  712 F. Supp. 2d 1170 (W.D. Wash. 2010)..............................................................37

*SEC v. Sandifur*,
  2006 WL 538210 (W.D. Wash. Mar. 2, 2006) ....................................................... 30

*SEC v. Santos*,
  355 F. Supp. 2d 917 (N.D. Ill. 2003) .............................................................. 13, 17

*SEC v. SeeThruEquity, LLC*,
  2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)................................................................27

*SEC v. Steffes*,
  805 F. Supp. 2d 601 (N.D. Ill. 2011) ........................................................ 10, 11, 35, 54

*SEC v. Syron*,
  934 F. Supp. 2d 609 (S.D.N.Y. 2013) ............................................................. 45, 48

*SEC v. System Software Associates, Inc.*,
  145 F. Supp. 2d 954 (N.D. Ill. 2001) ...................................................................... 11

*SEC v. Thompson*,
  238 F. Supp. 3d 575 (S.D.N.Y. 2017).................................................................37

*SEC v. Ustian*,
  229 F. Supp. 3d 739 (N.D. Ill. 2017) .................................................... 20, 38, 44, 53

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ....................................................................................... 34

*SEC v. Zandford*,
  535 U.S. 813 (2002) ....................................................................................... 41

*Shirley v. JED Capital, LLC*,
  724 F. Supp. 2d 904 (N.D. Ill. 2010) .................................................................. 40

*Touchtone Grp. v. Rink*,
  913 F. Supp. 2d 1061 (D. Colo. 2012)................................................................23

*Tuchman v. DSC Communications Corp.*,
  14 F.3d 1061 (5th Cir. 1994) ........................................................................... 31

*United States v. Naftalin*,
  441 U.S. 768 (1979) ................................................................................. 29, 41

*United States v. O'Hagan*,
   521 U.S. 642 (1997) ........................................................................ 41

*United States v. Sanford-Brown, Ltd.*,
   788 F.3d 696 (7th Cir. 2015) .................................................... 10, 16

*Wals v. Fox Hills Development Corp.*,
   24 F.3d 1016 (7th Cir. 1994) ........................................................ 40

*Weiland v. Palm Beach County Sheriff's Office*,
   792 F.3d 1313 (11th Cir. 2015) ....................................................22


**STATUTES**

Securities Exchange Act of 1934, Section 10(b), 15 U.S.C. § 78j(b)........................20, 21, 30, 41

Securities Act of 1933, Section 17(a), 15 U.S.C. § 77q(a)................................20, 29, 30

Securities Act of 1933, Section 17(a)(1), 15 U.S.C. § 77q(a)(1)............................................20, 29

Securities Act of 1933, Section 17(a)(2), 15 U.S.C. § 77q(a)(2)..................................................21

Securities Act of 1933, Section 17(a)(3), 15 U.S.C. § 77q(a)(3)............................................20, 29

Securities Act of 1933, Section 2(a)(1), 15 U.S.C. § 77b(a)(1)................................................39

Securities Act of 1933, Section 2(a)(3), 15 U.S.C. § 77b(a)(3)................................................29

Securities Act of 1933, Section 2(c)(1), 15 U.S.C. § 77b(c)(1)................................................39

Securities Act of 1933, Section 3(a)(3), 15 U.S.C. § 77c(a)(3)................................................39

Securities Exchange Act of 1934, Section 3(a)(10), 15 USC § 78c(a)(10) ................................39

Securities Exchange Act of 1934, Section 20(a), 15 U.S.C. § 78t(a) .....................................19, 20

Securities Exchange Act of 1934, Section 21(d)(1), 15 USC § 78u(d)(1) ..................................32

Securities Exchange Act of 1934, Section 21(d), 15 USC § 78u(d)..............................................32

28 U.S.C. § 2462...................................................................................................31, 32

**RULES**

Securities Exchange Act of 1934 Rule 10b-5, 17 C.F.R. 240.10b-5 .........................20, 21, 22, 41

Securities Exchange Act of 1934 Rule 10b-5(a), 17 C.F.R. 240.10b-5(a) ......................... passim

Securities Exchange Act of 1934 Rule 10b-5(b), 17 C.F.R. 240.10b-5(b)......................21, 22, 23

Securities Exchange Act of 1934 Rule 10b-5(c), 17 C.F.R. 240.10b-5(c) .......................... passim

Federal Rules of Civil Procedure 8(a) ...................................................................................9

Federal Rules of Civil Procedure 8(a)(2) .................................................................10, 11

Federal Rules of Civil Procedure 12(b)(6)................................................................2, 10

Federal Rules of Civil Procedure 9(b) ......................................................................... passim

Federal Rules of Civil Procedure 10(b) ...................................................................22

Plaintiff United States Securities and Exchange Commission ("SEC") respectfully submits this memorandum in opposition to Defendants Seyed Taher Kameli's ("Kameli"), Chicagoland Foreign Investment Group, LLC's ("CFIG"), and American Enterprise Pioneers, Inc.'s ("AEP") (collectively, "Defendants") consolidated motion to dismiss the SEC's Second Amended Complaint. The motion is meritless and should be denied.

## INTRODUCTION

Following the Court's grant of Defendants' motion to dismiss the SEC's First Amended Complaint pursuant to Rule 9(b) of the Federal Rule of Civil Procedure, the SEC prepared a Second Amended Complaint with a high degree of factual detail devoted to each of the investment funds ("Funds") and senior living projects ("Projects") involved in the Defendants' fraud. Indeed, the Second Amended Complaint is more than double the length of the First Amended Complaint at 114 pages and 424 paragraphs, and charges Defendants with 12 additional counts of securities fraud, for a total of 15 separate counts (two counts against Kameli and CFIG for fraud relating to each of the four Projects located in Illinois (the "Illinois Projects") and the Funds that loaned money to those Projects (the "Illinois Funds"), and two counts against Kameli and AEP for fraud relating to each of the three Projects located in Florida (the "Florida Projects") and the Funds that loaned money to those Projects (the "Florida Funds"), as well as one count against Kameli for control person liability).

The Second Amended Complaint chronicles Defendants' misuse of the proceeds of the seven Funds intended for the development and construction of seven Projects located in Illinois and Florida. The Second Amended Complaint also spells out in detail the continuing harm Defendants' misconduct has inflicted on immigrant investors, most of whom were Kameli's legal clients ("investor/clients") to whom he owed a fiduciary duty. Further, the Second Amended Complaint explains how Kameli and the companies he controlled obtained illicit,

undisclosed compensation from Defendants' scheme.

As the Ninth Circuit recently held, an immigration attorney representing EB-5 investors, as Kameli did here, violates his fiduciary duties to investor/clients and violates the federal securities laws when he obtains undisclosed compensation and engages in conflicts of interest in connection with EB-5 investments. *See SEC v. Feng*, 935 F.3d 721, 735-36 (9th Cir. 2019). In a different but related context, the Seventh Circuit has already concluded that Kameli and his law firms suffer from two non-waivable conflicts of interest with respect to investor/clients. *See Doe v. Nielsen*, 883 F.3d 716 (7th Cir. 2018) (disqualifying Kameli's law firm from representing an investor/client in light of the SEC's allegations in this lawsuit).

The Second Amended Complaint – which more than satisfies Rule 9(b) – alleges a multitude of specific facts detailing each Defendant's particular misconduct with respect to each of seven different Funds and their respective Projects. These detailed factual allegations demonstrate Defendants' scienter; describe Kameli's central role in his undisclosed and fraudulent scheme to divert, commingle, and otherwise improperly use investment proceeds for the benefit of himself, his brother, and different companies he owns; explain the fiduciary duties Kameli owed to his investor/clients and his breach of those duties; and establish in detail Defendants' material misrepresentations and omissions regarding his purported compliance with the requirements of the EB-5 immigrant investor program ("EB-5 Program" or "Program"), a U.S. government immigration program for foreign nationals seeking permanent U.S. residency.

Notwithstanding the high degree of factual detail in the Second Amended Complaint, Defendants have filed a consolidated motion to dismiss under Rules 12(b)(6) and 9(b). Defendants assert that the Second Amended Complaint lacks particularized allegations necessary to support a fraud claim.

Defendants are incorrect. The Second Amended Complaint alleges in detail that: (i) Kameli and CFIG caused one Fund to draw down $3.8 million on a line of credit, with Kameli (and CFIG or AEP, depending on the particular Fund or Project) using the bulk of the draw-down to benefit Projects unaffiliated with investors in that Fund, and to benefit Kameli's companies and Kameli personally; (ii) Kameli (and CFIG or AEP, depending on the particular Fund or Project) withdrew a total of over $4 million in undisclosed fees from five different Projects and used part of those purported fees to benefit investors unaffiliated with those Projects; (iii) Kameli and AEP generated over $1 million in undisclosed profits for his company Relief Defendant Platinum Real Estate And Property Investments, Inc. ("Platinum"), through three Projects' land transactions; (iv) Kameli and CFIG diverted a total of $475,000 from two Projects to a different Project in an effort to complete construction on that different Project; (v) Kameli and CFIG funneled a total of $745,000 from two Projects to Relief Defendant Bright Oaks Development, Inc. ("Bright Oaks"), a Kameli-owned company, to pay for its expenses; and (vi) Kameli and CFIG traded securities with some of the Projects' money, including using $250,000 in trading profits for the benefit of a company Kameli owned, not for the benefit of the Funds or Projects. Defendants' improper commingling of investment funds and substantial self-enrichment breached Kameli's duty of loyalty and duty to act in the best interest of his investors/clients, and has left all but one of the Projects without money to complete construction, while jeopardizing investors' ability to obtain permanent U.S. residency through the EB-5 Program.

The SEC has fully and properly pled violations of the securities laws, and the SEC's Second Amended Complaint provides more than adequate notice to Defendants. This Court should reject Defendants' motion.

## KEY FACTUAL ALLEGATIONS

Although the Second Amended Complaint contains far too much detail to include fully in this Memorandum, the SEC sets forth some of the key factual allegations below:

The United States Citizenship and Immigration Services ("USCIS"), which is part of the Department of Homeland Security, administers the EB-5 Program. (Second Am. Compl. ¶ 3.) To be eligible for permanent U.S. residency under the Program, one of the fundamental requirements of the Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based, and not for other purposes. For example, in 1998 – well before Kameli launched the Funds – the Administrative Appeals Office of USCIS' predecessor agency issued an EB-5 precedent decision, *Matter of Izummi*, 22 I. & N. Dec. 169, 179 (Assoc. Comm. 1998). As stated in *Izummi*, to qualify for permanent U.S. residency under the Program, an investor must show, among other things, that the "full amount" of the investor's money has been "made available to the business(es) most closely responsible for creating the employment upon which the [immigration] petition is based." (Second Am. Compl. ¶ 31.)

In approximately 2009, Kameli launched the Aurora Fund, which was formed to loan money to the Aurora Project. Subsequently, Kameli formed the Elgin, Golden, Silver, First American, Naples, and Ft. Myers Funds, and he formed corresponding Projects that borrowed money from these Funds. (*Id*. ¶¶ 5-6.) The Aurora, Elgin, Silver, and Golden Projects were based in Illinois and the First American, Naples, and Ft. Myers Projects were based in Florida. Two companies that Kameli owns and controls, Defendants CFIG and AEP, managed the Funds. CFIG managed the Aurora, Elgin, Silver, and Golden Funds, whereas AEP managed the First American, Naples, and Ft. Myers Funds. (*Id*. ¶¶ 5-7, 23-24.)

As of the date on which Kameli launched the Funds, he knew, or was reckless in not

4

knowing, about the *Izummi* precedent decision and the EB-5 Program's requirement that the full amount of an investor's money must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. In fact, when Kameli filed petitions with USCIS on behalf of Fund investors, he cited to *Izummi* in support of the petitions, confirming that he knew the decision. (*Id*. ¶¶ 32-33.)

Kameli (and CFIG or AEP, depending on the particular Fund and Project) represented in each of the Funds' offering documents that his companies organized and operated the Funds to comply with the EB-5 Program's requirements. For example, the Silver Fund's Private Placement Memorandum ("PPM") stated the Silver Fund would comply with the EB-5 Program's requirements: "CFIG and the [Fund] will be under substantial scrutiny by the agency responsible for the oversight of the USCIS EB-5 program. CFIG and the [Fund] understand the future scrutiny and have put in place a system of checks and balances designed to monitor and report on a timely basis every requirement of the EB-5 program." Additionally, the Silver Fund PPM stated that the Fund would pay an annual fee to CFIG "to ensure that the [Fund] and [the Project] comply with the EB-5 Program requirements." (Second Am. Compl. ¶ 94; *see also id.* ¶¶ 152, 197, 205, 238, 245, 277, 311, 341 (substantially similar disclosures in each of the Fund PPMs).)

Many investors in the Funds hired Kameli as an attorney to represent them in their efforts to obtain a conditional and permanent green card based on their investments in the CFIG and AEP Funds. These investor/clients paid Kameli and his law firm additional fees for legal services. As an attorney, Kameli owed fiduciary, legal, and ethical duties to his investor/clients without regard to the specific terms in the Funds' PPMs and other of the Funds' offering documents. Among the fiduciary duties imposed by law on Kameli to his investor/clients were

5

the duties of fidelity, loyalty, honesty, and good faith in both the discharge of his contractual obligations to, and professional dealings with, his investor/clients. As a fiduciary, Kameli had a duty, among others, to refrain from self-dealing at the expense of his investor/clients; to refrain from self-enrichment at the expense of his investor/clients; to refrain from taking secret compensation at the expense of his investor/clients; and to refrain from conflicts of interest with his investor/clients. When Kameli placed his personal interest above the interest of his investor/clients, Kameli breached his fiduciary duties by reason of the conflict. (Second Am. Compl. ¶¶ 41, 67-69.) Kameli and his law firm represented most of the investors in the Funds. (*Id.* ¶¶ 99-100 (Silver; most), 155-156 (Golden; nearly half); 208-209 (Elgin; most); 249-205 (Aurora; most); 282-283 (First American; most); 316-317 (Naples; most); 346-346 (Ft. Myers; most).)

Contrary to Defendants' representations, they engaged in various forms of misconduct that jeopardized investors' chances at U.S. permanent residency and put investors' principal investments and promised investment profits at risk. The Second Amended Complaint contains seven separate sections outlining Defendants' fraud involving each of the seven Funds and Projects. The Second Amended Complaint alleges Kameli's and CFIG's fraud involving the Silver, Golden, Elgin, and Aurora Funds and Projects, and alleges Kameli's and AEP's fraud involving the First American, Naples, and Ft. Myers Funds and Projects. This misconduct included the following allegations:

**Diversion and Commingling of Silver Line of Credit Proceeds**

Kameli and CFIG improperly caused the proceeds from a line of credit (the "Line of Credit") collateralized by certain Silver Fund investors' assets to benefit Funds, Projects, and entities under Kameli's control other than the Silver Fund and Project, including the Golden,

6

Elgin, Aurora, First American, Naples, and Ft. Myers Projects. Because Kameli and CFIG did not make the full amount of investors' capital contributions available to the Silver Project, and instead used a portion of the investors' contributions for other purposes, Kameli (and CFIG or AEP, depending on the particular Fund or Project) misused investor funds and jeopardized investors' immigration petitions through the Program. (Second Am. Compl. ¶¶ 101-118, 168-174, 215-224, 255-264, 284-290, 318-324, 348-356.)

**Diversion of Investor Funds as Undisclosed Fees to Kameli, CFIG, or AEP**

From 2010 to 2016, Kameli and CFIG (or AEP for the First American Project) caused Aurora, Elgin, Golden, Silver, and First American Projects to pay CFIG (or AEP for the First American Project) a combined amount of $4.1 million in fees that Kameli did not disclose would be paid to CFIG (or AEP, in the case of First American). Kameli and CFIG (or AEP for the First American Project) also used a substantial portion of these purported fee payments merely as vehicles to divert money to Funds, Fund investors, and Projects that were not the businesses most closely responsible for creating the employment upon which the investors' immigration petitions were based. (Second Am. Compl. ¶¶ 134-137, 157-160, 210-214, 251-254, 291-294.)

**Undisclosed Profits to Kameli from Land Transactions**

For three of the Projects – the First American, Ft. Myers, and Naples Projects – Kameli and AEP employed a scheme to use one of Kameli's companies, Relief Defendant Platinum, to generate a total of over $1.06 million in undisclosed profits for Kameli, to the detriment of Fund investors. Kameli and AEP misused investor money because they did not make the full amount of investors' capital contributions in the related Funds available to the businesses most closely responsible for creating the employment, and instead used a portion of the investors' contributions for undisclosed profits to Kameli. Kameli's and AEP's misuse of investor funds

7

jeopardized investors' immigration petitions through the Program. (Second Am. Compl. ¶¶ 295-303, 325-333, 357-364.)

**Diversion of Silver and Golden Investor Funds to the Aurora Project**

In November 2014, Kameli and CFIG improperly diverted $475,000 in total from the Golden and Silver Projects to the Aurora Project to pay for the Aurora Project's construction costs. Meanwhile, the Golden Fund's offering documents represented that investor proceeds would be used to loan money to the Golden Project, and the Silver Fund's offering documents represented that investor proceeds would be used to loan money to the Silver Project. These representations were consistent with the offering documents' other representations that Kameli and CFIG would operate the Funds to comply with the EB-5 Program's requirements. Contrary to these representations, Kameli and CFIG used investor proceeds in these Funds to benefit the Aurora Project, which was unaffiliated with investors in these Funds. (Second Am. Compl. ¶¶ 124-129, 177-183.)

**Diversion of Investor Funds to Bright Oaks**

From 2013 to 2015, Kameli and CFIG improperly diverted money from the Golden and Silver Projects to his company Bright Oaks to pay for that company's expenses. Bright Oaks did not earn these payments and was not entitled to them. Kameli and CFIG also fraudulently schemed to cause these Projects to pay Bright Oaks money to which it was not entitled. (Second Am. Compl. ¶¶ 119-133, 175-187.)

**Securities Trading with Borrowed Funds**

From approximately April 2013 to September 2015, Kameli and CFIG caused the Aurora, Elgin, Golden, and Silver Projects to use money they borrowed from the CFIG Funds to trade in mutual funds, options, stocks, bonds, and other investments, contrary to Kameli's and

CFIG's representations in the Funds' offering documents about how the Projects would use borrowed funds to develop, construct, and operate senior living facilities. Kameli's and CFIG's conduct subjected the Funds and the Projects to undisclosed market risks and jeopardized investors' chances at permanent U.S. residency through the use of investors' money for purposes other than loaning money to a specific job-creating Project. (Second Am. Compl. ¶¶ 138-142, 161-167, 225-229, 265-269.)

*   *   *

Through the aforementioned misconduct, Kameli, CFIG (for the Illinois Funds and Projects), and AEP (for the Florida Funds and Projects) knew, or were reckless in not knowing, that they were engaged in a scheme to defraud and acts, practices, and courses of business that operated as a fraud and deceit on investors, and in violation of Kameli's legal, ethical, and fiduciary duties as counsel to his investor/clients. In addition, Kameli, CFIG (for the Illinois Funds and Projects), and AEP (for the Florida Funds and Projects) knew, or were reckless in not knowing, that they made materially false and/or misleading statements in the Funds' PPMs. Finally, Kameli knowingly or recklessly failed to disclose their material misconduct to his investor/clients in violation of the securities laws.

These detailed allegations, among others, support the SEC's securities fraud claims against Defendants and demonstrate the SEC's compliance with the pleading standards applicable to the Second Amended Complaint.

## ARGUMENT

This SEC enforcement action is not governed by the heightened pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA"). *See*, *e.g.*, *SEC v. Falor*, No. 09-CV-5644, 2010 WL 3385510, at *3 n.4 (N.D. Ill. Aug. 19, 2010) (denying motion to dismiss and noting that "[a]s a government entity, the SEC is not subject to the more stringent

pleading standards imposed by PSLRA").

Instead, like other civil litigants, the SEC must comply with Rule 8(a), which requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *SEC v. Steffes*, 805 F. Supp. 2d 601, 607 (N.D. Ill. 2011). On a Rule 12(b)(6) motion to dismiss, the Court must accept as true all well-pleaded facts and all reasonable inferences that can be drawn therefrom. *Id.*

A Rule 12(b)(6) motion should be denied when the complaint alleges sufficient factual matter to state a claim for relief that is plausible on its face. *See Firestone Financial Corp. v. Meyer*, 796 F.3d 822, 826 (7th Cir. 2015) (citing *Gogos v. AMS Mech. Sys., Inc.*, 737 F.3d 1170, 1172 (7th Cir. 2013) (*per curiam*); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The factual allegations in a complaint should be sufficient to raise the possibility of relief above the speculative level, assuming the allegations in the complaint are true. *See Steffes*, 805 F. Supp. 2d at 607 (citing *EEOC v. Concentra Health Servs., Inc.* 496 F.3d 773, 776 (7th Cir. 2007)); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007). Applying the correct legal framework is critical to proper resolution of this motion.

Allegations of securities fraud are subject to the heightened pleading standards of Rule 9(b). *See Steffes*, 805 F. Supp. 2d at 607-608; Fed. R. Civ. P. 9(b). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," whereas "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "The reference to 'circumstances' in the rule requires the plaintiff to state the identity of the person who made the misrepresentations, the time, the place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *United States v. Sanford-Brown, Ltd.*, 788 F.3d 696, 705 (7th Cir. 2015); *see*

10

*also DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) (particularity means "the who, what, when, where, and how: the first paragraph of a newspaper story").

Courts in this District are seasoned at applying the applicable pleading standards to SEC enforcement actions in the context of a motion to dismiss. *See, e.g., Steffes*, 805 F. Supp. 2d at 618 (denying motion to dismiss); *Falor*, 2010 WL 3385510, at *5 (same); *SEC v. Kelly*, 545 F. Supp. 2d 808, 813 (N.D. Ill. 2008) (same); *SEC v. Black*, No. 04-CV-7377, 2005 WL 1498893, at *8 (N.D. Ill. June 17, 2005) (same); *SEC v. Buntrock*, No. 02-CV-2180, 2004 WL 1179423, at *14 (N.D. Ill. May 25, 2004) (same); *SEC v. Sys. Software Assocs.*, 145 F. Supp. 2d 954, 959 (N.D. Ill. 2001) (same).

This Court should look to this substantial body of SEC-specific caselaw for guidance in disposing of Defendants' motion to dismiss.

## I. The Second Amended Complaint Satisfies Rule 9(b)'s Specificity Requirements.

In granting Defendants' motion to dismiss the First Amended Complaint pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, this Court recognized that the SEC need not "plead the date, time, sender, recipient, and content of every securities transaction involved to give defendants notice that Rules 8(a)(2) and 9(b) demand." *SEC v. Kameli*, 373 F. Supp. 3d 1194, 1204 (N.D. Ill. 2019). This Court concluded that "[t]he SEC must, however, make clear exactly which of the eight years of communications form the basis of its fraud allegation and must differentiate among the defendants sufficiently to give each defendant fair notice of its alleged role." *Id*. The SEC has done just that in the Second Amended Complaint.

The Second Amended Complaint alleges fraud by Kameli, CFIG, and AEP with particularity and satisfies Rule 9(b). As shown above, the Second Amended Complaint provides a detailed account of Kameli's, CFIG's, and AEP's participation in a scheme to misuse Fund investors' assets for each of seven Funds and Projects. The Second Amended Complaint contains

11

seven separate sets of allegations for the fraud involving each of these seven Funds and Projects. And those Fund- and Project-specific allegations are incorporated by reference into the applicable securities fraud count relating to each of those seven Funds and Projects (two counts against Kameli and CFIG for each of the four Illinois Funds and Projects, two counts against Kameli and AEP for each of the three Florida Funds and Projects, and one count against Kameli for control person liability, for a total of 15 counts).

Faced with the Second Amended Complaint's detailed allegations regarding each Defendant's participation in multiple fraudulent schemes, Defendants' arguments that the Second Amended Complaint does not satisfy Rule 9(b) makes little sense. (Defs. Br., Section I, at 20-24.) Indeed, Defendants have admitted that they have notice of the claims against them, have a very clear understanding of exactly which statements are the basis of the claims, and understand their roles in the allegedly fraudulent schemes. Defendants stated: "After a full reading of the [Second Amended Complaint], one can be forgiven for thinking that it is the statements in the PPMs that provide for Plaintiff's claims." (*Id.* at 21-22.) Precisely.

The purpose of Rule 9(b) is to force a plaintiff alleging fraud to provide the defendant with enough information within the initial pleading to allow the defendant to prepare a defense. *See Power v. GMAC*, No. 06-CV-4983, 2007 WL 723509, at *3 (N.D. Ill. Mar. 7, 2007). In *Nasrabadi v. Kameli*, No. 18-CV-8514, 2019 WL 2173791 (N.D. Ill. May 20, 2019), an EB-5 investor/client in the Aurora Project sued Kameli for malpractice and breach of fiduciary duty, alleging that Kameli and the Fund never acquired a security interest for its loan to the Aurora Project, contrary to representations in the PPM, and that Kameli used money from the Fund for his personal benefit. *Id.* at *1. Kameli moved to dismiss the complaint on the ground that it did not satisfy Rule 9(b). The court disagreed:

> Nasrabadi has alleged that the Fund's private placement memorandum misrepresented whether the Fund would have a first priority security interest in the Facility's assets, and that Kameli was responsible for the contents of that document and convincing Nasrabadi to make that the investment. These allegations described the "who, what, when, where, and how" of the claim and satisfy Rule 9(b).

*Id*. at *3; *see also SEC v. Qi*, No. 17-CV-8856, 2018 WL 5263187, at *4-6 (C.D. Cal. Mar. 21, 2018) (denying Rule 9(b) motion to dismiss SEC's complaint alleging immigration attorney and his law firm committed securities fraud in connection with EB-5 Program where complaint was pled with sufficient particularity to give defendants notice of misconduct and defendants' arguments in the motion indicated that they understood the allegations against them); *SEC v. Feng*, No. 15-CV-9420, 2016 WL 7443222, at *2-3 (C.D. Cal. Aug. 4, 2016) (denying Rule 9(b) motion to dismiss SEC's complaint alleging immigration attorney and his law firm committed securities fraud in connection with EB-5 Program where complaint pled who, what, when, where, and how and defendants filed an answer and defended the action for four months before filing a motion to dismiss), *aff'd,* 935 F.3d 721 (9th Cir. 2019); *SEC v. Santos*, 355 F. Supp. 2d 917, 921 (N.D. Ill. 2003) (denying Rule 9(b) motion to dismiss SEC's complaint alleging fraud scheme of cash payments and campaign donations in exchange for the City of Chicago's investment business and stating that the precise nature of defendants' respective roles in the fraud "are not necessary to provide them with fair notice of this particular fraud, but are evidentiary matters appropriate for discovery and trial"); *SEC v. Homa*, No. 99-CV-6895, 2000 WL 1100783, at *4 (N.D. Ill. Aug. 4, 2000) (denying Rule 9(b) motion to dismiss SEC's complaint alleging Ponzi scheme and stating that "[t]he Amended Complaint gives reasonable notice to the defendants of their specific roles in the alleged fraud, and those detailed allegations assure the Court that the SEC has not made claims lightly that defendants have committed acts that involve a certain degree of moral turpitude").

So too here. The SEC's allegations regarding Kameli's, CFIG's, and AEP's roles in the fraud are sufficient to give them reasonable notice about the allegations against them and to enable them to prepare a defense. For example, the Second Amended Complaint alleges that Kameli and CFIG engaged in the following fraudulent activity with respect to the Silver Fund and Project:

- The Silver Fund issued a PPM dated July 2012 and Kameli and CFIG used that PPM to raise money from investors during the period from May 2012 through February 2015 (Second Am. Compl. ¶ 83);

- Kameli and CFIG directed the preparation of that Silver Fund July 2012 PPM and approved its distribution to investors (*id.* ¶ 84);

- The Silver Fund July 2012 PPM attributed the statements in the PPM to CFIG, the manager of the Fund, and Kameli, the sole member of CFIG and counsel to the Fund (*id*. ¶ 85);

- Because Kameli and CFIG directed the preparation and distribution of the Silver Fund July 2012 PPM, and because that PPM attributed the statements to Kameli and CFIG, they are considered the "makers" of those statements (*id*. ¶ 86);

- The Silver Fund July 2012 PPM stated that the principal purpose of the Silver Fund's formation was the creation of 10 or more direct or indirect full time jobs for each $500,000 investment to satisfy the EB-5 Program's requirements (*id*. ¶ 87);

- The Silver Fund July 2012 PPM and the Silver Fund's subscription agreement both stated that the Silver Fund would comply with the EB-5 Program's requirements (*id*. ¶¶ 88, 94);

- The Silver Fund's July 2012 PPM represented that the Silver Project would obtain proceeds derived from EB-5 investors through the Silver Fund (*id*. ¶ 89); the Silver Fund July 2012 PPM also represented to investors that the Silver Fund's sole business activity would be to invest in the Silver Project (*id*. ¶ 91);

- Neither the Silver Fund July 2012 PPM nor its supplements ever stated that Silver Project would obtain money from any other Funds or Projects in which Kameli was involved. Further, the Silver Fund July 2012 PPM did not disclose that the Silver Fund would invest in any other business than investing in the Silver Project (*id*. ¶¶ 90-91);

- The Silver Fund July 2012 PPM represented that all of the CFIG's compensation would be derived from the interest that the Silver Project paid to the Fund, that a substantial portion of the compensation would be for CFIG's purposed efforts to ensure the Silver Fund's and Silver Project's compliance with EB-5 Program requirements, and that none of CFIG's compensation would be paid until after the first resident entered into the Silver Project senior living facility (*id*. ¶¶ 95-97);

- Kameli and his law firms represented most of the Silver Fund investors, and, therefore, Kameli owed fiduciary, legal, and ethical duties to his investor/clients, including the duty to disclose material information to these investor/clients and the duty of loyalty and the duty to refrain from obtaining undisclosed financial interests adverse to these investor/clients (*id.* ¶¶ 99-100);

- Kameli and CFIG misused Silver Fund investor assets, including diverting money from the Silver Fund through a line of credit, commingling Silver line of credit proceeds among other Funds and Projects, using Silver line of credit proceeds to

pay for Kameli's and CFIG's expenses (*id.* ¶¶ 101-118), taking over $1.155 million in undisclosed fees from the Silver Project (*id.* ¶¶ 134-136), funneling money from the Silver Project to Bright Oaks to pay for its expenses (*id.* ¶¶ 119-133), improperly diverting money from the Silver Project to the Aurora Project (*id.* ¶¶ 127-133), and misusing money loaned to the Silver Project to trade securities (*id.* ¶¶ 138-142); and

• In light of the aforementioned misconduct by Kameli and CFIG, Kameli's and CFIG's statements and omissions in the Silver Fund July 2012 PPM about the use of Silver Fund investor money, compliance with EB-5 Program requirements, compensation, and conflicts of interest were materially false and misleading to investors and investor/clients (*id.* ¶¶ 115-118, 132-133, 136-138, 140-142).

These allegations identify the person who made the misrepresentations and omissions involving the Silver Fund and Project (Kameli and CFIG), the time (May 2012 through February 2015), the place and content of the misrepresentation and omissions (specific statements quoted from the Silver Fund July 2012 PPM), the method by which the misrepresentations were communicated (Kameli and CFIG approved distribution of the PPM to investors), and how the misrepresentations and omissions were material to investors (because they concerned undisclosed conflicts of interest and compensation and placed investors' immigration efforts through the EB-5 Program at risk through the failure to comply with Program requirements). *Sanford-Brown, Ltd.*, 788 F.3d at 705. The Second Amended Complaint also contains substantially similar detailed allegations identifying the who, what, when, where, and how of Defendants' misconduct involving the six other Funds and Projects. *See* Second Am. Compl. ¶¶ 143-187 (explaining the fraud as to the Golden Fund and Project); ¶¶ 188-229 (explaining the

16

fraud as to the Elgin Fund and Project); ¶¶ 230-269 (explaining the fraud as to the Aurora Fund and Project); ¶¶ 270-303 (explaining the fraud as to the First American Fund and Project); ¶¶ 304-333 (explaining the fraud as to the Naples Fund and Project); ¶¶ 334-364 (explaining the fraud as to the Ft. Myers Fund and Project).

The Second Amended Complaint's detailed allegations of fraud as to each Fund and Project involved in the fraud provides everything that Rule 9(b) requires. *SEC v. Feminella*, 947 F. Supp. 722, 733 (S.D.N.Y. 1996) (rejecting Rule 9(b) motion to dismiss SEC's complaint alleging alleged kickback scheme and stating that "[g]iven the long-term nature of the scheme alleged, requiring plaintiff to list each securities transaction or alleged kickback payment by date, amount and markup would contravene the requirements of Rule 8(a) while not furthering the purposes behind 9(b)."); *accord Santos*, 355 F. Supp. 2d at 921 (rejecting defendants' claims that SEC's complaint was deficient because "each security transaction has not separately identified and specific dates for each transaction have not been stated").

Defendants claim that this matter must be dismissed under Rule 9(b) because the Second Amended Complaint insufficiently describes various communications that the SEC describes towards the beginning of the Second Amended Complaint. (Defs. Br., Section I, at 20-22.) But the Defendants' argument ignores the entirety of the Second Amended Complaint, which the Court should read as a whole. The beginning portion of the Second Amended Complaint works with the remaining portions to describe, in detail, the who, what, where, why and how of the Defendants' fraud. For example:

- Paragraphs 9-16: These paragraphs are in the introduction to the Second Amended Complaint and summarize what is alleged with more particularity in the hundreds of other remaining paragraphs that follow. For example, the allegation

17

that Kameli "falsely represented to investors that the Funds and Projects would comply with the EB-5 Program's requirements even though he knew, or was reckless in not knowing, that they did not" (Second Am. Compl. ¶ 11), is alleged with specificity for each of the seven Funds and Projects. (*See, e.g., id.* ¶¶ 87-88, 94, 115-118, 141 (Silver), 147-148, 152 (Golden), 192-193, 197, 203, 205 (Elgin) 234-235, 238, 243, 245 (Aurora), 274-275, 277 (First American), 308-309, 311 (Naples), 338-339, 341 (Ft. Myers).).

- Paragraphs 32-33: The Second Amended Complaint alleges that Kameli was copied on an email referencing the *Izummi* precedent to show Kameli's knowledge of the decision, not to establish that the email itself contains Kameli's material misstatements to investors.

- Paragraph 38: The allegation that "Defendants solicited and obtained investments in the CFIG and AEP Funds" is alleged with particularity in the sections of the Second Amended Complaint that detail the fraud involving each of the seven Funds and Projects. (*See, e.g.,* Second Am. Compl. ¶¶ 46-47, 49 (as to all Funds and Projects), 84 (Silver), 144 (Golden), 189 (Elgin) 231 (Aurora), 271 (First American), 305 (Naples), 335 (Ft. Myers).)

- Paragraph 42: The SEC does not allege that what Kameli or this law firm might have represented to USCIS was an actionable misstatement or omission under the federal securities laws. The allegations demonstrate the knowledge and state of mind of Kameli and his law firm.

- Paragraphs 47 & 62-66: General allegations about how the Funds marketed their EB-5 limited partnership interests and solicited investors – through websites,

videos, meetings, seminars, and quarterly updates – are intended to show Defendants' course of conduct and means of interacting with investors and investor/clients. The Second Amended Complaint alleges that all of Defendants' material misstatements were contained in the Fund PPMs and their attachments. (*See, e.g., id.* ¶¶ 83-100 (Silver), 143-156 (Golden), 188-209 (Elgin), 230-250 (Aurora), 270-283 (First American), 304-317 (Naples), 334-347 (Ft. Myers).)

The fact that the various Funds issued the PPMs of no moment. (Defs. Br., Section I, at 22-23.) The Second Amended Complaint alleges that Kameli and CFIG (or AEP for Florida Funds) directed the preparation of the Fund PPMs and approved their distribution. CFIG and AEP managed the Funds and Kameli controlled those entitles. (*See, e.g.,* Second Am. Compl. ¶¶ 84-86 (Silver), 144-146 (Golden), 189-191 (Elgin), 231-233 (Aurora), 271-273 (First American), 305-307 (Naples), 335-337 (Ft. Myers).) The Funds were the entities through which Defendants conducted their fraud. Their existence does not defeat the claims against Defendants or somehow diminish the sufficiently particularized allegations against Defendants. *See Feng*, 2016 WL 7443222, at *2-3 (denying defendant immigration attorney's Rule 9(b) motion where fraud was conducted through PPMs, among other things), *aff'd*, 935 F.3d 721 (9th Cir. 2019).

Finally, contrary to Defendants' arguments (Defs. Br., Section I, at 23-24), the fact that the Second Amended Complaint alleges that Kameli orchestrated the fraud through various entities he owned, controlled, and/or managed is no basis to dismiss. Indeed, nothing in Rule 9(b) prohibits a plaintiff from alleging that a deceptive act was committed by more than one defendant. Similarly, the fact that the Second Amended Complaint contains allegations to support a claim of control person liability under Section 20(a) does not render other allegations insufficiently particular under Rule 9(b). The Second Amended Complaint alleges that CFIG or

19

AEP managed the Funds; Kameli was the sole member of and/or a stakeholder in CFIG and AEP; CFIG and AEP were owned and controlled by Kameli; and Kameli served as counsel to the Funds, CFIG, and AEP. (Second Am. Compl. ¶¶ 23-24, 85 (Silver), 145 (Golden), 190 (Elgin), 232 (Aurora), 272 (First American), 306 (Naples), 336 (Ft. Myers).) A claim of control person liability requires no more at the motion to dismiss stage. *See SEC v. Ustian*, 229 F. Supp. 3d 739, 777 (N.D. Ill. 2017) (denying motion to dismiss control person claim).

## II.    The SEC Has Not Engaged in "Shotgun Pleading."

Defendants falsely accuse the SEC of "shotgun pleading" with respect to the Section 10(b) claims (Counts I, III, V, VII, IX, XI & XIII), the Section 17(a) claims (Counts II, IV, VI, VIII, X, XII & XIV), and the control person claim (Count XV). (Defs. Br., Sections II-IV, at 24-32.) In a similar vein, Defendants complain that Plaintiff failed to "separate into a different count each cause of action or claim for relief" (*id*. at 24) or to "delineate the allegations" that give rise to Plaintiff's claims under the subsections of Sections 10(b) and 20(a) of the Exchange Act and Section 17(a) of the Securities Act (*id*. at 26, 28).

Defendants have pointed to no authority that requires plaintiffs to plead violations of each subsection of Rule 10b-5 and Section 17(a) as separate Counts. As an initial matter, such a requirement would be unworkable. It would add 28 additional counts to the Second Amended Complaint and needlessly confuse the jury. Moreover, such parsing is unnecessary where, as here, the Second Amended Complaint separates and articulates each of the three subsections for both Rule 10b-5 and Section 17(a) in each Count and contains detailed allegations in support of each of the three subsections for both Rule 10b-5 and Section 17(a), which are incorporated by reference into the relevant Count. For example, with respect to the alleged fraud on Silver Fund investors and investor/clients, the Second Amended Complaint contains detailed allegations that Kameli and CFIG engaged in a scheme to defraud and acts, practices, and courses of business

with operated as a fraud and decide on Silver Fund investors within the meaning of Sections 17(a)(1) and 17(a)(3) and Section 10(b) and Rules 10b-5(a) and 10b-5(c) thereunder. (Second Am. Compl. ¶¶ 114, 131, 135.) The Second Amended Complaint also contains detailed allegations that Kameli and CFIG made materially false and/or misleading statements and/or omissions to Silver Fund investors and investor/clients within the meaning of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b) thereunder. (*Id*. ¶¶ 115-118, 132-133, 136-137, 140-142.)[1] These allegations have been incorporated into the two counts related to fraud on Silver Fund investors and investor/clients – and only those counts. (*Id*. ¶¶ 366-368 (Count I), ¶¶ 369-371 (Count II).) The remaining six other areas of alleged fraud in connection with Golden, Elgin, Aurora, First American, Naples, and Ft. Myers Funds the follow the identical pattern. This is not "shotgun" pleading or otherwise objectionable under Rule 9(b). *See SEC v. Das*, No. 8:10-CV-102, 2010 WL 4615336, at *6 (D. Neb. Nov. 4, 2010) (rejecting "shotgun pleading" argument); *see also SEC v. City of Miami*, 988 F. Supp. 2d 1343, 1354-55 (S.D. Fla. 2013) (same).

Likewise, Defendants' suggestion that the Second Amended Complaint is somehow deficient because the SEC alleges that Defendants made more than one material misstatement or omission in connection with each count is meritless. (Defs. Br., Sections II-IV, at 24-32.) Again, Defendants have pointed to no authority, and the SEC knows of none, that requires each count alleging violations of Sections 17(a)(2) or 10(b) and Rule 10b-5(b) thereunder to incorporate by reference only one material misstatement or omission. Such an approach would mushroom the Second Amended Complaint by adding many additional counts, resulting in a needlessly bloated

[1] The SEC filed the Second Amended Complaint before the Supreme Court decided *SEC v. Lorenzo*, 139 S. Ct. 1094 (2019). As explained in Section III, *infra*, under *Lorenzo*, the SEC no longer needs to allege conduct separate and apart from misstatement to establish deceptive conduct under Rule 10b-5(a) and (c) against a "maker" of misstatements such as Defendants here. *Lorenzo* also held that the different provisions of Rule 10b-5 are not mutually exclusive and have "considerable overlap." *Id*. at 1101.

document. Accordingly, the Court should reject Defendants' "shotgun pleading" argument.[2]

## III.     The SEC Has Adequately Pled That Defendants Are Makers.

Defendants argue that the complaint does not adequately allege they "made" the

misrepresentations contained in the PPMs for purposes of Rule 10b-5(b). (Defs. Br., Section V,

at 32-35.) Specifically, Defendants contend that the Rule 10b-5(b) claims should be dismissed

because the Second Amended Complaint merely alleges in a conclusory fashion that Defendants

"directed the participation" and "approved the distribution" of the PPMs. (Defs. Br. at 33-34.)

This argument is based on a misreading of *Janus Capital Group, Inc. v. First Derivative*

*Traders*, 564 U.S. 135 (2011), and its progeny, and a misreading of the Second Amended

Complaint. In *Janus*, the Supreme Court held that only someone who "makes" a misleading

statement or omission, or who has "ultimate authority over" it, can be held liable under Rule

10b-5. *Id*. at 142; *see also Glickenhaus & Co. v. Household Intern., Inc*., 787 F.3d 408, 427 (7th

Cir. 2015) (noting whether company's CEO is considered the "maker" of press releases and

other company statements is "an inherently fact-bound inquiry;" "Absent either attribution or

actual delivery, the *Janus* inquiry turns on control.") *Janus* did not create some talismanic

formula for drafting Rule 10b-5 allegations and it did not "alter the well-established rule that [an

entity] can act only through its employees and agents." *See In re Merck & Co., Inc. Securities,*

*Derivative, & ERISA Litigation*, Nos. 05-CV-1151, 05-CV-2367, 2011 WL 3444199, at *25

(D.N.J. Aug. 8, 2011). In other words, despite *Janus*, a Rule 10b-5(b) claim is adequately pled if

it alleges that the defendant was involved in preparing, reviewing, and/or distributing the false

---

[2] Defendants' reliance on *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004) (noting *in dicta* that Rule 10(b) of the Federal Rules of Civil Procedure requires allegations to be separated into numbered paragraphs and distinct claims to be separated into counts), and *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1326 (11th Cir. 2015) (reversing district court's dismissal as "shotgun pleading" where counts were "informative enough to permit a court to readily determine if they sate a claim upon which relief can be granted"), are misplaced.

and misleading statements, and had ultimate authority over them. *In re Pfizer Inc. Sec. Litig.*, Nos. 04-CV-9866, 05-MD-1688, 2012 WL 983548, at *4 (S.D.N.Y. Mar. 22, 2012) ; *see also Carpenters Pension Trust Fund v. Barclays PLC*, 56 F. Supp. 3d 549, 559 (S.D.N.Y. 2014) (denying motion to dismiss 10b-5(b) claims where plaintiff alleged president instructed others to make statement); *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. Aug. 30, 2012) (corporate insider responsible for unsigned statements under his control); *Touchtone Grp. v. Rink*, 913 F. Supp. 2d 1061, 1079 (D. Colo. 2012) (General Counsel who "prepared or reviewed" allegedly false securities offerings "had ultimate authority over the statements [he] prepared," even in the absence of attribution, given his role as a senior officer of the company). Moreover, as *Janus* recognized, attribution of false and misleading statements can be implicit from surrounding circumstances. *Janus*, 564 U.S. at 142-43.

Defendants are also misreading the Second Amended Complaint. It goes well beyond allegations that Defendants "directed the preparation" and "approved the distribution" of the PPMs. To be sure, under the cases cited above, this would have been enough, but the Second Amended Complaint further alleges that:

- Kameli is the sole member of CFIG, the manager of the Funds that loaned money to the Illinois Projects; Kameli owns and controls AEP, the manager of the Funds that loaned money to the Florida Projects, and serves as its President (Second Am. Compl. ¶¶ 7, 23-24);

- "Kameli controlled all of the operations of CFIG, AEP, the Funds, and the Projects" (*id*. ¶ 8);

- "Kameli, as the principal of the Funds' managers (either CFIG or AEP), was responsible for, and had authority over, the content of the Funds' PPMs and other

offering documents;" "[t]he PPMs identified Kameli, among other roles, as the principal of the manager of the Funds; "[t]he PPMs also stated that Kameli owned and controlled the Projects indirectly through limited liability companies of which he was the sole member" (*id*. ¶ 52);

- Kameli and the Funds' managers (either CFIG or AEP) "directed the preparation" of each Fund's PPM and "approved the distribution" of each Fund's PPM to investors and potential investors (*id*. ¶¶ 84 (Silver), 144 (Golden), 189 (Elgin), 231 (Aurora), 271 (First American), 305 (Naples), 335 (Ft. Myers));

- The PPM for each Fund "attributed" the statements in that PPM to Kameli and the Fund manager (either CFIG or AEP) because each PPM stated (i) CFIG or AEP was the manager of the Fund; (ii) Kameli was the sole member of the manager; and (iii) Kameli served as counsel to the Fund and the manager in connection with the formation of the Fund and the offering of interests in the Fund (*id*. ¶¶ 85 (Silver), 145 (Golden), 190 (Elgin), 232 (Aurora), 272 (First American), 306 (Naples), 336 (Ft. Myers)); and

- Because Kameli and the Fund manager (either CFIG or AEP) "directed the preparation, and approved the distribution," of each Fund PPM, and because the Fund PPM "attributed the statements therein" to Kameli and the Fund manager (either CFIG or AEP), Kameli and the Fund manager (either CFIG or AEP) "are considered 'makers' of those statements for purposes of primarily liability under the antifraud provisions of the securities laws" (*id*. ¶¶ 86 (Silver), 146 (Golden), 191 (Elgin), 233 (Aurora), 273 (First American), 307 (Naples), 337 (Ft. Myers)). *See also id*. ¶ 51 ("Kameli directed employees of his law firm to prepare the

Funds' PPMs and the other offering documents attached to the PPMs . . . . He

approved the distribution of the PPMs and their attachments to prospective EB-5

Program investors").[3]

These allegations are more than sufficient to establish the Defendants are "makers" at the motion

to dismiss stage. *See SEC v. Geswein*, 2 F. Supp. 3d 1074, 1080 (N.D. Ohio 2014) (denying

motion to dismiss where determination of "ultimate authority" and "maker" status required fact-

intensive discovery); *see also SEC v. Conrad*, No. 1:16-CV-2572, 2017 WL 3485766, at *9-10

(N.D. Ga. Feb. 2, 2017) (denying motion to dismiss where complaint alleged that individual

defendant controlled the Funds through his control of other defendant entities and the court could

"reasonably infer" that defendants' control over the funds extended to their public statements in

the offering materials); *see In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod.*

*Liab. Litig.*, MDL No. 2672, 2017 WL 3058563, at *8 (N.D. Cal. July 19, 2017) (finding CEOs

of two Volkswagen subsidiaries to be "makers" of statements because the complaint alleged

facts that the two CEOs "actually participated in and had authority over" the filings containing

the false statements); *SEC v. Carter*, No. 10-CV-6145, No. 2011 WL 5980966, at *2 (N.D. Ill.

Nov. 28, 2011) (denying motion to dismiss where complaint alleged that CEO "approved" two

press releases, of which only one was "signed," before they were publicly available); *SEC v.*

*Pocklington*, No. 18-CV-701, 2018 WL 6843665, at *6-7 (C.D. Cal. Nov. 29, 2018) (denying

---

[3] Defendants contend that PPMs do not state that Kameli himself served as counsel to the Funds in the formation of the Funds and the offering of the Funds' securities. (Defs. Br. at 34 & Exs. 128-2, 128-6, 128-7, 128-8, 128-17, 128-31, 128-32, Docket Nos. 128.) The PPMs explicitly state that Taher Kameli is "***the principal***" of his two law firms and that his firm "serves as counsel to the Company and the Manager in connection with the formation of the Company and the offering of interests in the Company as well as other matters." (Docket Nos. 128, Exs. 128-2 at 11 (Silver), 128-6 at 11 (Golden), 128-7 at 11 (Aurora), 128-8 at 11 (Elgin), 128-17 at 12 (First American), 128-31 at 13 (Naples), 128-32 at 12 (Ft. Myers) (emphasis added).)

motion to dismiss complaint alleging defendant had "authority to approve" sections of the PPMs and approved that "each PPM was complete, final, and ready to be sent to investors").[4]

## IV. The SEC Has Adequately Pled That Defendants Disseminated False or Misleading Statements and Engaged in Deceptive Conduct Under Rule 10b-5(a) and (c).

Defendants contend that the securities fraud claims under Rule 10b-5(a) and (c) must be dismissed because the Second Amended Complaint does not sufficiently plead that Defendants disseminated false statements or allege deceptive conduct beyond the false statements and omissions themselves. (Defs. Br., Section VI, at 35-39.) This is false. Defendants misapprehend the Supreme Court's decision in *SEC v. Lorenzo*, 139 S. Ct. 1094 (2019), and the facts alleged in the Second Amended Complaint.

Under *Lorenzo*, the SEC does not have to prove conduct separate and apart from misstatements to establish deceptive conduct against defendants like Kameli, CFIG, and AEP, who allegedly made and disseminated false and/or misleading statements to investors. In *Lorenzo*, the Court held that a defendant could be liable for disseminating false or misleading statements under subsections (a) and (c) of Rule 10b-5 and that the SEC did not have to prove conduct separate and apart from misstatements against such a defendant. *Id.* at 1100-1101.

---

[4] All of the cases Defendants cite are easily distinguished and do not apply in this context. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 483-85 (S.D.N.Y. Aug. 30, 2012) (corporate insider responsible for unsigned statements under his control; underwriter not "maker" where no alleged facts showed that underwriter had "ultimate authority" over the content of offering materials and no "attribution" to underwriter); *SEC v. Mercury Interactive, LLC*, No. 5:07-CV-2822, 2011 WL 5871020, at *2 (N.D. Cal. Nov. 22, 2011) (declining to resolve whether the complaint adequately alleged that defendant was a "maker" where complaint also stated claims under Rule 10b-5(a), (c)); *In re Merck & Co. Sec. Deriv. & ERISA Litig.*, MDL No. 1658, 2011 WL 3444199, at *25-26 (D.N.J. Aug. 8, 2011) (finding EVP could be liable for misstatements in signed SEC filings and quotes in articles and reports)*; Hawaii Ironworkers Annuity Trust v. Cole*, No. 3:10-CV-371, 2011 WL 3862206, at *4-5 (N.D. Ohio Sept. 1, 2011) (granting motion to dismiss where complaint did not alleged defendants had "ultimate authority" over misstatements; rather complaint alleged defendants' misstatements were in response to "mandatory directives" issued by CEO and CFO)*; SEC v. Radius Capital Corp.*, No. 2:11-CV-116, 2012 WL 695668, at *7 (M.D. Fla. Mar. 1, 2012) (granting motion to dismiss where complaint did not identify who was ultimately responsible for the prospectuses).

26

In making its decision in *Lorenzo*, the Supreme Court addressed its earlier ruling in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011), and stated that "we can assume that *Janus* would remain relevant (and preclude liability) where an individual neither *makes* nor *disseminates* false information – provided, of course, that the individual is not involved in some other form of fraud." *Lorenzo*, 139 S. Ct. at 1103 (emphasis in original). Thus, *Lorenzo* plainly applies to individuals who either make or disseminate false information. Under *Lorenzo*, these individuals can be liable under Rule 10b-5(a) or (c) for either making or disseminating false information. A recent SEC enforcement case, *SEC v. SeeThruEquity, LLC*, 2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019), held that under *Lorenzo*, the defendants could be liable under Rule 10b-5(a) and (c) based on the SEC's allegations that "defendants repeatedly made false or misleading statements in their research reports, press releases, and website." *Id.* at *5. This conclusion follows directly from *Lorenzo*, which made clear that the different provisions of Rule 10b-5 are not mutually exclusive and have "considerable overlap." 139 S. Ct. at 1101.

As explained in Section III, *supra*, the Second Amended Complaint has adequately alleged that Defendants are "makers" of false or misleading statements. This is sufficient for liability under Rule 10b-5(a) and (c) under *Lorenzo*. Therefore, Defendants' suggestion that they cannot be liable for their deceptive conduct under Rule 10b-5(a) and (c) if they are, in fact, "makers" of false or misleading statements is not true. Moreover, contrary to Defendants' protestations, the Second Amended Complaint more than adequately alleges that Defendants disseminated false or misleading statements to investors. The Second Amended Complaint alleges that Kameli "approved the distribution of the PPMs and their attachments to prospective EB-5 Program investors." (Second Am. Compl. ¶ 51.) In addition, with respect to each of seven

27

Funds and Projects, the Second Amended Complaint alleges that Kameli (and either CFIG or AEP depending on the Fund) "approved the distribution" of a particular Fund PPM to investors and potential investors. (*Id*. ¶¶ 84 (Silver), 144 (Golden), 189 (Elgin), 231 (Aurora), 271 (First American), 305 (Naples), 335 (Ft. Myers).) "Distribution" is a synonym of "dissemination." *See* ROGET'S II, THE NEW THESAURUS 132 (3d Edition). There is nothing magic about the particular words used, so long as they convey the transmission of false and misleading information to investors. Indeed, the original order instituting proceedings against Lorenzo did not use the word "disseminate." *In the Matter of Gregg C. Lorenzo, et al.*, AP File No. 3-15211, Exchange Act Release No. 33-9385 (Feb. 15, 2013), https://www.sec.gov/litigation/admin/2013/33-9385.pdf.

If that were not enough to support the Rule 10b-5(a) and (c) charges, there is more. The Second Amended Complaint also alleges that Defendants engaged in other deceptive conduct, including a scheme to defraud and acts, practices, and courses of business which operated as a fraud and deceit on investors. For example, as alleged in the Second Amended Complaint, such deceptive conduct included: (i) the diversion and commingling of Fund and Project assets through the use of Silver Line of Credit proceeds to pay for the expenses of Kameli and the Fund manager (either CFIG or AEP) (Second Am. Compl. ¶¶ 114 (Silver), 172 (Golden), 221 (Elgin), 259 (Aurora), 287 (First American), 321 (Naples), 353 (Ft. Myers)); (ii) the diversion and commingling of Fund and Project assets to the Aurora Fund and Project, and to Bright Oaks Development for Kameli's and his brother's benefit (*id*. ¶¶ 131 (Silver), 185 (Golden)); (iii) funneling of improper payments and undisclosed compensation to Kameli and the Fund manager (*id*. ¶¶ 135 (Silver), 158 (Golden), 211 (Elgin), 252 (Aurora), 292 (First American)); and (iv) funneling of undisclosed profits to Kameli through various land transactions (*id*. ¶¶ 300 (First American), 330 (Naples), 361 (Ft. Myers)). In addition, Kameli also failed to disclose all of this

deceptive conduct, in violation of his legal, ethical, and fiduciary duties as counsel to his investor/clients. These are separate additional violations of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3). *See Malouf v. SEC*, 955 F.3d 1248, 1261-1262 (10th Cir. 2019) (affirming SEC's finding that fiduciary investment adviser failed to disclose conflict of interest in violation of Rule 10b-5(a) and (c) and Section 17(a)(1) and (3)).

## V. The SEC Has Adequately Pled That Defendants Are Sellers.

Defendants contend that the Second Amended Complaint does not sufficiently allege that Defendants are "sellers" of securities under Section 17(a). Specifically, Defendants argue that there is no allegation that they passed title or other interest in the security to the buyer or successfully solicit the purchase motivated by their own financial interests. (Defs. Br., Section VII, at 39-42.) Defendants' arguments are incorrect in all respects.

Section 17(a) prohibits fraud "in the offer *or* sale" of securities, using the mails or the instrumentalities of interstate commerce. 15 U.S.C. § 77q(a) (emphasis added). Section 2(a)(3) of the Securities Act provides the following definitions for terms used in that Act:

> The term "sale" or "sell" shall include every contract of sale or disposition of a security . . . for value. The term "offer to sell," "offer for sale," or "offer" shall include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.

15 U.S.C. § 77b. The Supreme Court has stated that the language of Section 17(a) "does not require that the fraud occur in any particular phase of the selling transaction," and that "[t]he statutory terms [offer and sale] . . . are expansive enough to encompass the entire selling process, including the seller/agent transaction." *United States v. Naftalin*, 441 U.S. 768, 773 (1979). Therefore, Defendants' argument that the SEC must specifically allege that Defendants are "sellers," as some additional requirement for only Section 17(a) claims, is false. *See SEC v. Holschuh*, 694 F.2d 130, 142 (7th Cir. 1982) ("[A]ctual first-hand contact with offerees or buyers

29

[is not] a condition precedent to primarily liability for antifraud violations."). Moreover, courts have concluded that, in the EB-5 context such as this, defendants have violated Section 17(a). *See Feng*, 935 F.3d at 734-737 (affirming that defendant immigration attorney was liable for violating Sections 10(b) and 17(a) where, among other things, he failed to disclose a fee reduction to investor/clients).

Even assuming that § 17(a) applies only to offerors or sellers, Defendants' argument still fails because the Second Amended Complaint adequately alleges that Defendants engaged in such conduct. The Second Amended Complaint alleges that: "Defendants solicited and obtained investments in the CFIG and AEP Funds;" "The CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigrations attorneys with interested clients, and overseas meetings and seminars with prospective investors;" and "Defendants solicited investors through similar, though not identical, offering documents for each Fund." (Second Am. Compl. ¶¶ 38, 47, 49.)

## VI.    The SEC Adequately Pleads Defendants' Requisite State of Mind.

The Second Amended Complaint more than adequately alleges Defendants' requisite state of mind. (Defs. Br., Section VIII & IX, at 42-50.) While the circumstances constituting fraud must be pled with particularity, scienter may be alleged generally. *DiLeo*, 901 F.2d at 629; *SEC v. Sandifur*, No. 05-CV-1631C, 2006 WL 538210, at *7 (W.D. Wash. Mar. 2, 2006) ("The SEC is correct that the more stringent pleading requirements set forth in the [PSLRA] do not apply to enforcement actions brought by the SEC. Thus, to satisfy Rule 9(b), the SEC need only state that scienter existed.") As the Seventh Circuit has stated, the allegations in the complaint need only "afford a basis for believing that the plaintiffs could prove scienter." *DiLeo*, 901 F.2d at 629. Alleged facts are sufficient to support such an inference if they either (1) show a

defendant's motive to commit securities fraud, or (2) identify circumstances that indicate "conscious behavior" on the part of the defendant. *See Tuchman v. DSC Communications Corp.,* 14 F.3d 1061, 1068 (5th Cir. 1994). With respect to negligence, allegations of conduct inconsistent with the standards of reasonable prudence is sufficient at the pleading stage. *See Pocklington*, 2018 WL 6843665, at \*7-8 (holding SEC need not allege defendant's duty to act).

Here, the Second Amended Complaint meets these standards. It describes negligent, reckless, and conscious behavior of Defendants, including making knowing misrepresentations to investors, in carrying out a fraudulent scheme. Further, the Second Amended Complaint clearly speaks to Defendants' motive, pleading that the fraudulent scheme was designed in part to enrich Kameli, his brother, and the entities Kameli owned and controlled. The Second Amended Complaint also describes how Defendants knowingly engaged in transactions contrary to USCIS's requirements for the EB-5 Program – requirements of which he was aware. (Second Am. Compl. ¶¶ 11, 31-33; *see also id.* ¶¶ 87-88, 94, 115-118, 141 (Silver), 147-148, 152 (Golden), 192-193, 197, 203, 205 (Elgin) 234-235, 238, 243, 245 (Aurora), 274-275, 277 (First American), 308-309, 311 (Naples), 338-339, 341 (Ft. Myers).) These are paradigmatic and sufficiently-pled allegations of Defendants' requisite state of mind. *Cf. Buntrock*, No. 02-CV-2180, 2004 WL 1179423, at \*6 ("The SEC has demonstrated Tobecksen's scienter by alleging that he personally engaged in numerous significant top-level adjustments which were later shown to be materially misleading.").

## VII.    The Second Amended Complaint Satisfies the Statute of Limitations.

A five-year statute of limitations applies to any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise." 28 U.S.C. § 2462. In *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), the Supreme Court held that "[d]isgorgement in the securities-enforcement context" is a "penalty" subject to that five-year limitations period of

Section 2462. *Id.* at 1639. Defendants contend that *Kokesh* also applies to the SEC's injunctive remedies to enjoin against further violations of the securities laws. (Defs. Br., Section X, at 50-54.) Defendants are wrong.

The statutory provision conferring the SEC's general authority to seek injunctions against ongoing or threatened violations, § 78u(d)(1), states:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, [or] the rules or regulations thereunder ... it may in its discretion bring an action in [district court] to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d). In *SEC v. Gentile*, — F.3d —, 2019 WL 4686251 (3d Cir. 2019), the court considered whether a properly issued and framed § 78u(d)(1) injunction constitutes a penalty subject to the statute of limitations. *Id.* at *4. Following careful evaluation of the equitable principles governing injunctions and the text and history of the SEC's authority to seek them, the court held that because § 78u(d) does not permit the issuance of punitive injunctions, SEC's injunctive remedies do not fall within the reach of the statute of limitations under § 2462. *Id.* at *4-9; *see also SEC v. Koenig*, 557 F.3d 736, 739 (7th Cir. 2009) (holding that SEC's fraud claims accrue "when it ***could have been*** discovered by a person exercising reasonably diligence") (emphasis in original). Accordingly, Defendants' statute of limitations argument is meritless.

## VIII. The SEC Does Not Allege Misconduct Based On "Forward-Looking Statements."

The SEC alleges that Kameli, CFIG and AEP knew, or were reckless in not knowing, that they were making false or misleading statements and engaging in a fraudulent scheme at the time of their misconduct. The SEC's Amended Complaint does *not* contend that Kameli, CFIG, and AEP engaged in mismanagement for inaccurately predicting that the Funds would be EB-5

compliant in "forward looking" statements. (Defs. Br., Section XI, at 54-58.)

Importantly, the Second Amended Complaint contains detailed allegations about the period of time during which Kameli, CFIG, and AEP used the Funds' offering documents to raise money and the period of time during which they operated the Funds in contravention of the EB-5 Program's requirements. Specifically, the SEC alleges that: (a) Kameli and CFIG used the Aurora Fund's offering documents to raise money from investors from October 2009 through August 2014 (Second Am. Compl. ¶ 230); (b) Kameli and CFIG used the Elgin Fund's offering documents to raise money from investors from March 2010 through December 2014 (*id*. ¶ 188); (c) Kameli and CFIG used the Golden Fund's offering documents to raise money from investors from June 2011 through June 2014 (*id*. ¶ 145); (d) Kameli and CFIG used the Silver Fund's offering documents to raise money from investors from May 2012 through February 2015 (*id*. ¶ 83); (e) Kameli and AEP used the First American Fund's offering documents to raise money from investors from March 2013 through September 2016 (*id*. ¶ 270); (f) Kameli and AEP used the Naples Fund's offering documents to raise money from investors from October 2009 through July 2016 (*id*. ¶ 304); and (g) Kameli and AEP used the Ft. Myers Fund's offering documents to raise money from investors from April 2014 through June 2015 (*id*. ¶ 334). If the SEC proves that Kameli, CFIG, and AEP made one actionable misstatement or engaged in one fraudulent scheme through any of these Funds' offering documents during the period of time they used these offering documents to raise money, the SEC can prevail on its securities fraud claims. *Cf. SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1248 (11th Cir. 2012) (one violation of federal securities laws is actionable in SEC enforcement case).

The Second Amended Complaint describes numerous instances, involving many different Funds, in which Kameli, CFIG, and AEP made misstatements or engaged in a fraudulent scheme

relating to misconduct that already had occurred when they continued to raise EB-5 investor funds, even though they knew the Funds' were violating the EB-5 Program's requirements. For example, the Second Amended Complaint alleges against Kameli, CFIG, and AEP that, among other things, they first engaged in fraud and violated the EB-5 Program's requirements, and then they raised money for ***each*** of the Funds involved in his scheme. For example:

(1)    **<u>Silver Fund</u>**: in November 2014, Kameli and CFIG improperly diverted $175,000 from the Silver Project to the Aurora Project (Second Am. Compl. ¶¶ 124-128); they ***later*** used the Silver Fund's offering documents to raise money from investors through l 2015 (*id*. ¶ 83);

(2)    **<u>Golden Fund</u>**: in June 2013, Kameli and CFIG caused the Golden Project to improperly divert $100,000 to Bright Oaks Development (*id*. ¶ 176); they ***later*** used the Golden Fund's offering documents to raise money from investors through June 2014 (*id*. ¶ 143);

(3)    **<u>Elgin Fund</u>:** beginning in April 2013, Kameli and CFIG improperly caused the Elgin Project to use money it borrowed from the Elgin Fund to trade in securities (*id*. ¶¶ 225-229); they ***later*** used the Elgin Fund's offering documents to raise money from investors through December 2014 (*id*. ¶ 188);

(4)    **<u>Aurora Fund</u>**: from April 2013 to July 2013, Kameli and CFIG improperly caused the Aurora Project to use money it borrowed from the Aurora Fund to trade in securities (*id*. ¶¶ 265-269); they ***later*** used the Aurora Fund's offering documents to raise money from investors through August 2014 (*id*. ¶ 230);

(5)    **<u>First American Fund</u>**: from December 2012 through September 2016, Kameli and AEP engaged in a scheme to funnel money to Kameli through the First

34

American Project's land transactions (*id*. ¶¶ 295-303); they used the First

American Fund's offering documents to raise money from investors through

September 2016 (*id*. ¶ 270);

(6) **Naples Fund**: from April 2013 through December 2014, Kameli and AEP

engaged in a scheme to funnel money to Kameli through the Naples Project's land

transactions (*id*. ¶¶ 325-333); they ***later*** used the Naples Fund's offering

documents to raise money from investors through July 2016 (*id*. ¶ 304); and

(7) **Ft. Myers Fund**: in January 2015, Kameli and CFIG caused portions of Ft. Myers

Fund investors' capital contributions to be diverted to CFIG to pay for CFIG's

and Kameli's expenses (*id*. ¶¶ 351-352); they ***later*** used the Ft. Myers Fund's

offering documents to raise money from investors through June 2015 (*id*. ¶ 334).

The SEC's Second Amended Complaint focuses on specific instances of Kameli's,

CFIG's, and AEP's knowing or reckless securities fraud, not their inability to predict the future.

Therefore, the Court should reject the Defendants' argument about "forward-looking"

statements. *SEC v. e-Smart Techs.*, 31 F. Supp. 3d 69, 83-84 (D.D.C. 2014) (denying motion to

dismiss based on allegedly "forward-looking" SEC allegations).

Kameli, CFIG, and AEP wrongly suggest that the SEC has failed to plead that they knew

about the EB-5 Program's requirements. (Defs. Br. at 54-55). In fact, the SEC has explicitly pled

that they knew about the Program's requirements (Second Am. Compl. ¶ 32), and the SEC has

cited to specific evidence to support this allegation. (*Id.* ¶¶ 32-33.) These allegations are more

than sufficient to establish Kameli's, CFIG's, and AEP's knowledge, which the SEC may plead

generally. *See Steffes*, 805 F. Supp. 2d at 607-608. Kameli's, CFIG's, and AEP's claimed

ignorance about the EB-5 Program's requirements seems especially misplaced in light of

Kameli's practice of law specializing in representation of clients seeking permanent residency under the EB-5 Program. (Second Am. Compl. ¶ 4). Indeed, Kameli had a fiduciary duty with respect to his investor/clients to know the EB-5 Program requirements when he was seeking permanent residency for these investor/clients based on their claimed compliance with the Program's requirements.

USCIS' approval of certain investors' I-526 Petitions (Defs. Br. at 57-58) lends no support to the notion that Kameli, CFIG, and AEP operated the Funds in an EB-5-compliant fashion. USCIS' approval of investors I-526 Petitions does not represent a USCIS ratification of Kameli's, CFIG's, and AEP's misconduct. There is no evidence that USCIS was aware of Kameli's, CFIG's, and AEP's misconduct at the time they approved these Petitions. Indeed, USCIS denied investors' I-829 Petitions, after first granting these investors' I-526 Petitions, once USCIS became aware of Kameli's misconduct. *See Doe v. Johnson*, No. 15-CV-1387, 2017 WL 1151036, at *4 (N.D. Ill. Mar. 28, 2017) (noting USCIS' determination that "the same-day land transaction and the doubling of the price cast doubt on the legitimacy of the transaction" involving the Elgin Fund), *aff'd*, 929 F.3d 478 (7th Cir. 2019).

IX.     **The "Bespeaks Caution" Doctrine Is Inapplicable To This Case.**

Kameli, CFIG, and AEP continue to mischaracterize the SEC's allegations when they rely on the "bespeaks caution" doctrine. (Defs. Br., Section XII, at 58-61.) The bespeaks caution doctrine provides that when forecasts, opinions, or projections in a disclosure statements are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading. *Harden v. Raffensberger, Hughes, & Co., Inc.*, 65 F.3d 1392, 1404 (7th Cir. 1995). The bespeaks caution doctrine is a "narrow fact-intensive defense." *Id.*

This doctrine is inapplicable here. Kameli's, CFIG's, and AEP's reliance on this doctrine is premised on the mistaken notion that the SEC is charging the Defendants based on their

predictions about how USCIS would interpret the EB-5 Program's requirements and whether USCIS would grant investors' immigration petitions. (Defs. Br. at 58-61.) That is not the SEC's theory. Rather, the SEC has charged the Defendants for operating the Funds in a manner that they knew violated the EB-Program's requirements and then holding out to investors that they would make every effort to ensure that the Funds would be EB-5-complaint. (*See* Second Am. Compl. ¶¶ 9, 11-12, 15, 31-33, 88, 94, 102, 115-117, 131, 141, 148, 152, 166, 173, 185, 193, 197, 205, 223, 228, 235, 238, 245, 261, 268, 275-276, 289, 309, 311, 323, 339, 341, 355.) Courts have rejected efforts by defendants in SEC enforcement cases to use the "bespeaks caution" doctrine to dismiss SEC enforcement lawsuits. *See, e.g., SEC v. Thompson,* 238 F. Supp. 3d 575, 602-603 (S.D.N.Y. 2017); *SEC v. Meltzer*, 440 F. Supp. 2d 179, 191-92 (S.D.N.Y. 2006); *SEC v. Reys*, 712 F. Supp. 2d 1170, 1176-77 (W.D. Wash. 2010); *Dolphin and Bradbury, Inc. v. SEC*, 512 F.3d 634, 640 (D.C. Cir. 2008) ("[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk" had already "transpired"); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *rev'd on other grounds*, 459 U.S. 375 (1983) ("[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

Based on this established caselaw, this Court should conclude that the "bespeaks caution" doctrine is inapplicable to Kameli's, CFIG's, and AEP's statements that they were operated the Funds in an EB-5-compliant fashion, when they knew that they were violating the Program's requirements.

## X.    The SEC Has Adequately Pled "Control Person" Liability against Kameli.

Kameli falsely accuses the SEC of making "conclusory" allegations about his control over CFIG and AEP. (Defs. Br., Section XIII, at 61-64.) Kameli ignores that for each Fund, the SEC has cited specific representations that the Defendants made in which they told investors that

Kameli controlled CFIG and AEP, and that CFIG or AEP controlled the Funds. Specifically, the Second Amended Complaint alleges that the Defendants represented that: (i) CFIG managed the Silver Fund, and Kameli was CFIG's sole member (Second Am. Compl. ¶ 85); (ii) CFIG managed the Golden Fund, and Kameli was one of two members of CFIG (*id.* ¶ 145); (iii) CFIG managed the Elgin Fund, and Kameli was a stakeholder in, and Executive Director of, CFIG (*id.* ¶ 190); (iv) CFIG managed the Aurora Fund, Kameli was a stakeholder of CFIG, and Kameli served as CFIG's counsel in connection with the sale of interests in the Aurora Fund (*id.* ¶ 232); (v) AEP managed the First American Fund, and Kameli was AEP's sole member (*id.* ¶ 272); (vi) AEP managed the Naples Fund, and Kameli was AEP's sole member (*id.* ¶ 306); and (vi) AEP managed the Ft. Myers Fund, and Kameli was AEP's sole member (*id.* ¶ 336). The Second Amended Complaint contains other allegations that Kameli controlled CFIG, AEP, the Funds, and the Projects. (*Id.* ¶¶ 8, 23-24, 40, 139, 162, 226, 266, 422.)

In the Seventh Circuit, control person liability is construed liberally. *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880 (7th Cir. 1992). To hold a defendant liable as a control person, a court must only find some indirect means of discipline or influence short of actual direction over an entity. *Id.* The Seventh Circuit has ordered reversal where a court decided prior to a trial that a defendant could not be liable as a control person. *Id.* The SEC's allegations against Kameli are sufficient to allege control person liability. *See Ustian*, 229 F. Supp. 3d at 777 (denying motion to dismiss control person claim); *SEC v. China Northeast Petroleum Holdings Ltd.*, 27 F. Supp. 3d 379, 396 (S.D.N.Y. 2014).

Kameli mistakenly asserts that the SEC's allegations about his brother's involvement with CFIG undermines the SEC's control person claims. (Defs. Br. at 63.) But two people can control an entity. *See China Northeast Petroleum Holdings*, 27 F. Supp. 3d at 396 (holding that

38

the SEC had adequately pled control person liability against two individuals). The SEC has not alleged that Kameli's brother controlled CFIG, but even if the SEC had done so, such an allegation would not negate an allegation that Kameli also controlled the entity.

## XI. Assets in the Silver Fund Investor Holdings Account Involve "Securities."

The SEC alleges the following in its Second Amended Complaint:

> The CFIG and AEP Funds' offering materials identify the membership interests in the Funds as "securities." In addition, each investment in the CFIG and AEP Funds involved the pooling of investor funds and the investment of those funds in a common enterprise (the Funds), with profits to come from the efforts of others (Kameli, CFIG, and/or AEP). The membership interests are therefore securities within the meaning of Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78a(10).

(Second Am. Compl. ¶ 48.) The SEC also alleges that "when an investor sent money for the purpose of a Fund investment, the Defendants initially would hold the investment proceeds in an escrow or investor holdings account. Then, after USCIS approved the investor's I-526 Petition, the Defendants would cause the investment proceeds to be invested in the Fund for the purpose of loaning money to the particular Project affiliated with that Fund." (*Id.* ¶ 39.)

Notwithstanding these and other SEC allegations, Kameli, CFIG, and AEP contend that the SEC fails to allege that his misconduct relating to his misuse of certain Silver Fund investor assets to collateralize a line of credit (*id.* ¶¶ 101-118) involved "securities." (Defs. Br., Section XIV, at 64-71.) Kameli's argument is based on a fundamental misunderstanding of the law.

Both the Securities Act and Exchange Act define the term "security" in broad terms, including among other things, "any . . . investment contract." *See* 15 U.S.C. §§ 77b(a)(1), 77c(a)(3), 78c(a)(10). An investment contract is (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profits to come solely from the efforts of others. *SEC v. Edwards*, 540 U.S. 389, 394 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

The immigrant investors' investments in the Funds satisfy these requirements. First, money was invested by the immigrant investors participating in the EB-5 Program. Between 2009 and 2016, at least 226 immigrant investors gave the Defendants $88.7 million for the purpose of investing that money into Funds that would loan money to construct and develop U.S. job-creating senior living Projects. (Second Am. Compl. ¶¶ 2-9.)

Second, investors' interests in the Funds involved a common enterprise under the "horizontal commonality" test set forth by the Seventh Circuit. *See, e.g., Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994); *Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276-78 (7th Cir. 1972). The Court in *Fox Hills* defined horizontal commonality to mean "a pooling of interests not only between the . . . promoter and each individual 'investor' but also among 'investors.'" *Fox Hills*, 457 F.2d at 1018. Kameli pooled investors' funds in each of the Funds' and Projects' financial accounts. (Second Am. Compl. ¶ 65.) Kameli told investors that the profits generated from the operation of the assisted living facilities would be used to, among other things, make interest payments to the investors in the Funds. (*Id.* ¶¶ 86-91.) Because the profits and losses of each investor were tied to the profits and losses of other investors, the requirements of horizontal commonality are satisfied.

Third, investors had an expectation of profits to be derived solely from the efforts of others. Kameli, CFIG, and AEP promised investors a return of up to 3% above their capital contributions. (*Id.* ¶ 9.) The expected profitability of the investments was to be derived solely from the efforts of Kameli, CFIG, and AEP. By design, the regional center model of the EB-5 Program that Kameli employed relieves foreign investors of the day-to-day troubles of running a business and responsibility for direct management of their investments. *See Shirley v. JED Capital, LLC*, 724 F. Supp. 2d 904, 910-911 (N.D. Ill. 2010) (interest in an LLC may be a

security when the members are dependent on a manager).

Further, the investments in the Funds and Projects satisfied the securities' laws requirements that the alleged fraud occur "in the offer or sale" or "in connection with" the purchase or sale of a security. The Supreme Court has held that the statutory phrase "in the offer or sale of any securities" was intended to be "defined broadly" and is "expansive enough to encompass the entire selling process." *See United States v. Naftalin*, 441 U.S. 768, 773 (1979). The Supreme Court also has "espoused a broad interpretation" of the phrase "in connection with" in the context of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006). Section 10(b) and Rule 10b-5 "should be construed not technically and restrictively, but flexibly to effectuate its remedial purposes." *SEC v. Zandford*, 535 U.S. 813, 819-20, 822 (2002). To satisfy the "in connection with" requirement, "it is enough that the fraud alleged 'coincide' with a securities transaction whether by the plaintiff or by someone else." *Merrill Lynch*, 547 U.S. at 85 (citing *United States v. O'Hagan*, 521 U.S. 642, 651, 659 (1997)).

These authorities undermine Kameli's, CFIG's, and AEP's myopic focus on the question of whether a Silver Fund investor's interests in assets temporarily held in an escrow or investor holdings account qualify as a "security." (Defs. Br., Section XIV, at 64-71.) The Court's "securities" analysis in this case should look at the questions of why did investors part with their money, based on what representations did they do so? Kameli's, CFIG's, and AEP's securities fraud involved making misrepresentations and engaging in a fraudulent scheme to induce immigrant investors to invest $500,000 into the Funds. These allegations are sufficient to state a claim that the Defendants committed fraud "in connection with" the offer or sale, or purchase or sale, of "securities." The Defendants' placement of investors' money in an escrow or investor

41

holdings account, after the investors sent in their money to invest in the Funds, does not affect the analysis. *Cf. SEC v. Constantin*, 939 F. Supp. 2d 288, 304-305 (S.D.N.Y. 2013) (concluding that conduct met the "in connection with" requirements and stating that the "fact that Windham's clients did not initially receive stock in exchange for their funds (though they did, long after they made their investments, receive some Leeward Group Holdings stock, apparently with little relation to the amounts each client had invested) is immaterial.").

Defendants in other SEC EB-5 cases have argued at the pleadings stage that investors' interests in EB-5 investment vehicles are not "securities," as the Defendants do here. Courts have rejected those arguments. *See, e.g.*, *SEC v. Liu*, No. 16-CV-974, 2016 WL 9086941, at *4 (C.D. Cal. Aug. 17, 2016) (denying motion to dismiss); *SEC v. Feng*, No. 15-CV-9420, 2016 WL 7443222, at *3 (C.D. Cal. Aug. 4, 2016) (denying motion for judgment on the pleadings), *aff'd*, 935 F.3d 721 (9th Cir. 2019). *Cf. SEC v. A Chicago Convention Center*, 961 F. Supp. 2d 905 (N.D. Ill. 2013) (holding that EB-5 investments qualified as domestic securities transactions under federal securities laws). This Court should likewise reject Defendants' arguments about the absence of "securities" where Kameli, CFIG, and AEP induced EB-5 investors to send them $500,000 based on the promise that the Defendants' efforts would generate an investment profit and would promote the investors' efforts to obtain permanent U.S. residency based on the investment. Instead of delivering on this promise, Kameli, CFIG, and AEP defrauded investors, causing them devastating harm.

## XII. Defendants Misrepresented the Use of the Silver Line of Credit.

Defendants Kameli and CFIG argue that, because the Investor Holdings Account Agreement permitted them to use the proceeds of the Silver Line of Credit "for any expense the Fund Manager deems proper," the SEC cannot state claim for securities fraud based on the allegation that Defendants misrepresented the use of the Silver Line of Credit. (Defs. Br., Section

XV, at 72-78.) Kameli's and CFIG's argument proves too much. The SEC does not dispute the terms of the Investor Holdings Account Agreement. But that agreement did not give Kameli and CFIG a license to do whatever they want with Silver Fund investor assets.

The SEC's allegations regarding the Silver Line of Credit focus on Kameli and CFIG's use of Silver Fund investors' assets as collateral for a Line of Credit while CFIG held those assets in a Silver investor holdings account. The SEC alleges that Kameli and CFIG misrepresented to Silver Fund investors that they would use investor funds for the development and construction of the Silver Project and that CFIG would hold investor funds in the investor holdings account only to benefit the Silver Fund and investors in the Silver Fund. (Second Am. Compl. ¶¶ 101-118.) While certain Silver Fund investors authorized CFIG to use their assets in the investor holdings account as collateral for a Line of Credit "for any expense the Fund Manager deems proper," these investors made this authorization in the context of (1) an agreement that required CFIG to hold investor funds "*for the benefit of the [Silver Fund] and [the] Investor*" (Ex. A to Docket Nos. 126-128 at 3, first sentence of paragraph number 4 titled "Creation of Investor Holdings Fund" (emphasis added); Second Am. Compl. ¶ 93); (2) a representation in the Silver Fund PPM that the Fund would only use investor assets to loan money to develop and construct the Silver Project (Ex. B to Docket Nos. 126-128 at 2, second paragraph, and at 5, first paragraph titled "The Company"; Second Am. Compl. ¶ 89, 91); and (3) a representation in the Silver Fund PPM and other documents that the Silver Fund would use the money in a manner compliant with the EB-5 Program's requirements (Ex. B to Docket Nos. 126-128 at 16, under Section of PPM titled "Government Regulation; Second Am. Compl. ¶ 94). The SEC alleges that Kameli and CFIG misled investors by representing that they would use Silver Fund investors' money to benefit the Silver Fund and Silver Fund investors, when in fact

they used Silver Fund investors' assets to collateralize a Line of Credit, which Kameli and CFIG used to benefit themselves, including for Kameli's personal expenses, and for other Projects and Funds, not to benefit the Silver Fund, Project, and investors. (Second Am. Compl. ¶¶ 101-118.)

The Court must evaluate the representations in the Investor Holdings Account Agreement, including the provision regarding the Line of Credit, by considering the circumstances under which those representations were made. *See SEC v. Ustian*, 229 F. Supp. 3d 739, 772 (N.D. Ill. 2017) (denying motion to dismiss and stating that "[t]he context in which these statements were made is significant . . ."); *SEC v. Mozilo*, No. 09-CV-3994, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009) ("[N]either Countrywide's disclosures nor a careful review of the context of the statements convince this Court that the alleged omissions or misstatements were immaterial or not misleading as a matter of law."); *SEC v. Aequitas Management, LLC*, No. 3:16-CV-438, 2017 WL 1206691, at *12 (D. Ore. Jan. 9, 2017) (recommending denial of motion to dismiss where "question whether the statement was actionably misleading in context is for a finder of fact to determine"), *adopted by* 2017 WL 1429190 (D. Ore. Apr. 20, 2017); *see also* 17 C.F.R. § 240.10b-5.

Here, the Investor Holdings Account Agreement provided for the creation of a non-interest bearing cash account to hold investors' funds "for the benefit of the [Silver Fund] and [Silver] Investor." (Ex. A to Docket Nos. 126-128 at 3, first sentence of paragraph number 4 titled "Creation of Investor Holdings Fund.") A separate provision of that agreement provided the investors with the option to authorize CFIG to use investor funds in this account as collateral for a line of credit "to be used for any expense [CFIG] deems proper." (*Id.* at 5.) But when read in conjunction with the Silver PPM and the EB-5 program requirements described therein, the SEC has sufficiently alleged that Kameli and CFIG created a misleading impression that the

Silver Line of Credit would be used to benefit the Silver Fund, Project, and investors and that Kameli's and CFIG's operation of the Silver Fund complied with the EB-5 Program's requirements. (Second Am. Compl. ¶¶ 115-117.)

Kameli had a duty to disclose the misuse of proceeds from the Silver Line of Credit due to Kameli's fiduciary status as an attorney for most Silver Fund investors. (Second Am. Compl. ¶¶ 2, 4, 67-69, 99-100, 114.) As the Ninth Circuit recently held in *Feng*, 935 F.3d 721, 734-36 (9th Cir. 2019), an immigration attorney representing investors in EB-5 Petitions, such as Kameli, owes a fiduciary duty to his clients, including the duty to disclose conflicts of interest. *Id.* at 735. Here, Kameli had a clear conflict of interest when he represented Silver Fund investors as their immigration attorney and then misused the proceeds from the Silver Line of Credit to benefit Kameli's other business and to benefit himself. Accordingly, Kameli and CFIG had a fiduciary duty to disclose this misuse to the Silver Fund investors who authorized their deposits in the Silver Fund Investor Holdings Accounts to be used as collateral for a Line of Credit.

Moreover, contrary to Defendants' assertions (Defs. Br., Section XV, at 75), once Kameli and CFIG decided to speak on the issue of the Silver Line of Credit, they had an obligation to be both accurate and complete to avoid rendering their statements false or misleading. *SEC v. Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013); *see also SEC v. Gorsek*, 222 F. Supp. 2d 1099, 1109 (C.D. Ill. 2001). The SEC is not arguing that Kameli and CFIG had to disclose every possible use of the proceeds of the Silver Line of Credit. However, reasonable minds could conclude that Kameli's and CFIG's statements concerning the use of funds and compliance with the EB-5 Program requirements were false or misleading in light of Kameli's and CIFG's use of investor money for the benefit of others, including using it to pay for Kameli's personal

expenses.

Kameli and CFIG's reliance on a general EB-5 Program disclaimer in the Silver Fund PPM is also unavailing. (Defs. Br. at 77.) The Silver Fund PPM states that the Silver Fund makes no representation or warranty concerning whether an investment in the Fund will meet the requirements of the EB-5 Program. (*Id.*) However, this general disclaimer must be read in the context of other statements in the Silver PPM, which specifically represented that Kameli and CFIG organized and operated the Silver Fund to comply with the EB-5 Program requirements (Ex. B to Docket Nos. 126-128 at 16, under Section of PPM titled "Government Regulation; Second Am. Compl. ¶ 94) and stated that CFIG would be paid a fee "to ensure" that the Silver Fund and Project "comply with the EB-5 Program requirements." (Ex. B to Docket Nos. 126-128 at 7, under Section of PPM titled "Expenses and Management Fees, last sentence of section; Second Am. Compl. ¶ 94.)

Moreover, this Court should disregard the USCIS 2013 Policy Memorandum, which Defendants improperly referenced in their motion to dismiss (Defs. Br. at 76-77; *see* SEC's 10/2/19 Mot. to Strike). Even if this Court were to consider this document, it does not help the Defendants' cause. While the memorandum permits Kameli and CFIG to hold investors' funds in escrow pending approval of the investor's Form I-526 (Ex. II to Docket Nos. 126-128 at 6), there is nothing in the memorandum that permits Fund Managers to use those escrowed funds for purposes unrelated to Fund and Project expenses. Indeed, the memorandum explains that USCIS will require evidence that all "escrowed funds were released and that the investment was sustained in the new commercial enterprise." (*Id.*)

The SEC has also sufficiently alleged materiality. There can hardly be any doubt that a reasonable investor would consider information about how the proceeds of an investment are to

46

be used important in deciding whether to buy a security. This is especially true because Defendants' use of Silver Fund investor assets as collateral for a line of credit placed these assets at risk. (Second Am. Compl. ¶ 104) By pledging these assets as collateral, Defendants gave CFIG's lenders the right to seize these assets if CFIG defaulted on the line of credit. In fact, CFIG enjoyed the benefit of the Silver Line of Credit while causing Silver Fund investors to assume all the risk. (*Id.* ¶¶ 101-118.) In light of these allegations, this Court should conclude that Defendants' misrepresentations and omissions about the Silver Line of Credit were material. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) ("[T]hese allegations suffice to 'raise a reasonable expectation that discovery will reveal evidence' satisfying the materiality requirement and to 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'") (internal citations omitted).

## XIII. Defendants' Payments of Over $4 Million In Undisclosed Fees From the Silver, Golden, Elgin, Aurora, and First American Projects Are Actionable.

The Defendants argue (Defs. Br., Section XVI, at 78-88) that the SEC cannot state securities fraud claims based on allegedly material misrepresentations about their compensation in connection with $4.1 million in undisclosed payments that the Silver Project, Golden Project, Elgin Project, and Aurora Project paid to CFIG, and that the First American Project paid to AEP. (Second Am. Compl. ¶¶ 134-137, 157-160, 210-213, 251-254, 291-294.) Defendants contend that these fees were authorized by the plain language of various Development Services Agreements and that Defendants made no false or misleading statement in the offering documents about compensation for development services. (*Id.*) Defendants' arguments are meritless.

The SEC alleges that Kameli had a duty to disclose his receipt of compensation due to his fiduciary status as an attorney for most Fund investors. (Second Am. Compl. ¶¶ 2, 4, 67-69, 99-

47

100, 114.) As the Ninth Circuit held in *Feng*, 935 F.3d 721, 734-36 (9th Cir. 2019), an immigration attorney representing investors in EB-5 Petitions, as a fiduciary, is required to disclose all compensation he obtains in connection with that representation. *Id*. at 735. Kameli breached this fiduciary duty in the offer or sale of securities, thereby violating the federal securities laws.

The SEC alleges that Defendants misrepresented their conflicts of interest and their compensation in the Funds' PPMs. The Funds' PPMs contained numerous provisions purporting to address their conflicts of interest and their compensation in sections entitled "Conflicts of Interest" and "Manner of Offering; Compensation; Expenses," among other provisions. (Second Am. Compl. ¶¶ 97, 132, 153, 186, 198, 206, 239, 246, 280; *see, e.g.*, Ex. H to Docket Nos. 126-128 at 11-12 (Elgin Aug. 2011 PPM).) While Defendants did not have an affirmative duty to speak about these topics, once they chose to speak they had a duty to be accurate, complete, and not misleading. *Syron*, 934 F. Supp. 2d at 629; *Gorsek*, 222 F. Supp. 2d at 1109.

The SEC alleges that the Funds PPMs' discussion of conflicts of interest was inaccurate, incomplete, and misleading by discussing various purported conflicts of interest but omitting to disclose that Kameli caused the Projects to hire CFIG, AEP, and Bright Oaks to serve as the Projects' developers and caused the Projects to pay these companies more than $4 million in undisclosed fees based on undisclosed agreements between the Projects and these entities. (Second Am. Compl. ¶¶ 97, 132, 153, 186, 198, 206, 239, 246, 280.) The SEC further alleges that the Funds PPMs' discussion of CFIG's and AEP's compensation was inaccurate, incomplete, and misleading. (*Id*.) The PPMs identified CFIG or AEP as fulfilling the role as the Funds' manager, and the PPMs stated that CFIG or AEP would be compensated through its receipt of a portion of the interest paid by the Projects on the Funds' loans to the Projects. (*Id*.)

48

Several of the Funds' PPMs stated explicitly that CFIG's receipt of this interest would constitute its sole compensation as manager (which was the only role identified for CFIG and AEP in the PPMs). (*Id*. ¶¶ 153, 198, 239.) The PPMs further stated that the Projects would only pay this interest to the Funds after operational revenues or other means were available for payment. (*Id*. ¶¶ 96-97, 279-280.) Because the Projects (except the Aurora Project) have not been completed, no operational revenues or other means for payment have been available to date. (*Id*. ¶¶ 98, 281.)

Contrary to these representations about compensation, Kameli caused several of the Projects to pay CFIG, AEP, and/or Bright Oaks millions of dollars in development fees (including some un-earned fees that the Golden and Silver Projects "loaned" to Bright Oaks, Second Am. Compl. ¶¶ 119-129, 175-183), even though at the time these payments were made, the PPMs did not disclose that these entities would develop the Projects, no interest had been paid by the Projects to the Funds, and no operational revenues or other means had been available for payment. (*Id*. ¶¶ 98, 281.) Taking these allegations as true and drawing all reasonable inferences in favor of the SEC, this Court cannot conclude that Defendants' statements in the Funds PPMs regarding conflicts of interest and compensation were accurate as a matter of law.

The Court should disregard the various Development Services Agreements on which Kameli, CFIG, and AEP rely. (Defs. Br. at 81-82, Exs. I-L, R-S, CC-DD to Docket Nos. 126-128; *see* SEC's 10/2/19 Mot. to Strike). However, even if the Court were to consider those agreements, they should not change the conclusion that the SEC has sufficiently alleged that the representations in the Funds' PPMs regarding conflicts of interest and compensation were false or misleading. The conflicts of interest disclosure made no mention that Kameli, CFIG, or AEP intended to serve as a developer of the Projects. (*See, e.g.*, Ex. H to Docket No. 127 at 11 (Elgin Aug. 2011 PPM).) Indeed, Kameli only highlighted his role as counsel and manager. (*Id*.) And

the Funds' PPMs only disclosed the compensation of their Manager, not the developer. (*Id.* at

12.) Investors had no way to know that Defendants intended to pay themselves millions of

dollars in development fees. While some of the Projects' Business Plans disclosed development

fees, investors were not informed that those fees were going to Kameli, CFIG, or AEP ***and*** that,

in some instances, Kameli was paying himself before the fees had been earned.[5] (*See, e.g.*, Ex. M

to Docket No. 127 at 4 (Elgin Dec. 2012 Business Plan; no development fee disclosed), Ex. T to

Docket No. 127 at 4 (First American Dec. 2013 Business Plan); Second Am. Compl. ¶¶ 291-294

(alleging that Kameli had already caused First American to pay AEP $910,000 in development

fees not disclosed in the PPM).)

Defendants' misrepresentations about their conflicts of interest and their compensation

were material. Obviously, the more money that Defendants paid themselves in development fees

the less money was available to the Projects for development and construction of senior living

facilities. This information would have affected investors' understanding of the terms,

conditions, and risks associated with their EB-5 investments. (Second Am. Compl. ¶¶ 137, 160,

214, 254, 294.)

## XIV.  Kameli and CFIG Violated the Federal Securities Laws Through Their Undisclosed Payments to Bright Oaks from the Silver and Golden Projects.

Contrary to Defendants' assertions (Defs. Br., Section XVII, at 88-91), the SEC has

stated a claim in the Second Amended Complaint based on the Silver and Golden Projects'

payments to Bright Oaks that Bright Oaks did not earn. (Second Am. Compl. ¶¶ 119-133; 175-

---

[5] This Court should disregard the USCIS 2013 Policy Memorandum cited by Kameli, CFIG, and AEP. (Defs. Br. at 86-88 & Ex. II to Docket Nos. 126-128; *see* SEC's 10/2/19 Mot. to Strike). However, even if this Court were to consider these documents, they do not make Defendants' statements accurate. Nowhere in these documents does it authorize fund and project managers to pay their own affiliates undisclosed fees. In addition, the general EB-5 disclaimer in the PPMs does not render other statements in the PPMs and other documents accurate as a matter of law.

187.)

The Defendants mistakenly rely on a July 2013 letter to Golden Fund investors to assert that the Defendants disclosed Bright Oaks' involvement with the Projects. (Defs. Br., Section XVII, at 89; Ex. E to Docket No. 199.) First, because the Second Amended Complaint does not attach or reference this document, the Court should not consider it. (*See* SEC's 10/2/19 Mot. To Strike). Second, the letter is only addressed to Silver Fund investors, not Golden Fund investors. Third, the letter does not address the SEC's allegation that Kameli and CFIG caused the Silver and Golden Projects to make payments to Bright Oaks that Bright Oaks did not earn. (Second Am. Compl. ¶¶ 119-133; 175-187.) Finally, because the letter mentions Bright Oaks' involvement but omits to state that Kameli's brother was Bright Oaks' President or was otherwise involved with Bright Oaks (Ex. E to Docket No. 199), the letter supports the SEC's allegations that Kameli and CFIG purposefully and misleadingly failed to tell investors about Kameli's brother's involvement with Bright Oaks.

The Defendants wrongly appear to defend the payments to Bright Oaks, stating that "any alleged payments to Bright Oaks, even if unearned, are not in themselves a violation of federal securities laws." (Defs. Br. at 90.) Defendants ignore the SEC's allegations that the payments to Bright Oaks are actionable because Kameli and CFIG commingled Silver and Golden investor assets with other investor assets in unrelated Funds and Projects and used Silver and Golden investor assets to benefit Kameli and his brother, rather than for the benefit of the Silver and Golden Projects. (Second Am. Compl. ¶¶ 131, 185.) Further, these payments are actionable because as a fiduciary to his investor/clients, Kameli was obligated to disclose these payments, which represented an undisclosed conflict of interest and undisclosed compensation to Kameli and his family. (*Id.* ¶¶ 132-133, 186-187.) As in *Feng*, Kameli's failure to disclose conflicts of

interest and compensation violated his fiduciary duties and violated the federal securities laws. *Feng*, 935 F.3d at 734-36.

**XV.    Kameli and CFIG Violated the Federal Securities Laws When They Used Silver, Golden, Elgin, and Aurora Project Assets to Trade Securities.**

Kameli and CFIG are wrong in contending that they complied with the federal securities laws when they used Silver, Golden, Elgin, and Aurora Project assets to trade securities. (Defs. Br., Section XVIII, at 91-96.) Defendants Kameli and CFIG argue that the SEC cannot state securities fraud claims based on their undisclosed trading in securities with investor funds because the Funds' respective operating agreements granted the Manager (CFIG) unrestricted power and authority to carry out the activities of the Funds. (Defs. Br. at 92-93.) Again, Kameli misses the mark and ignores the context in which various disclosures were made. Taking the allegations in the Second Amended Complaint as true, the SEC has sufficiently alleged securities fraud claims based on Kameli's and CFIG's undisclosed securities trading.

The SEC alleges in the Second Amended Complaint that Kameli and CFIG misrepresented in the Funds' PPMs that the Silver, Golden, Elgin, and Aurora Projects would use the money they borrowed from the CFIG Funds for the purpose of developing and constructing senior living facilities and comply with EB-5 Program requirements. (Second Am. Compl. ¶¶ 87, 89, 192, 194, 204, 234, 236, 243-244.) In fact, Kameli and CFIG caused the Silver, Golden, Elgin, and Aurora Projects to use a portion of the money they borrowed from the CFIG Funds to trade in mutual funds, options, stocks, bonds, and other investments. (*Id.* ¶¶ 104-105, 138-142, 161-167, 225-229, 265-269.) For example, the SEC alleges that after the Golden Fund loaned money to the Golden Project using capital contributions from investors, the Golden Project used some of this money to trade securities. This securities trading generated net profits of approximately $464,000. Kameli and CFIG then caused the Golden Project to transfer

approximately $250,000 of these profits to Platinum, a Kameli-owned company, which then used the money for purposes unrelated to the Golden Project. (*Id*. ¶¶ 163-164.)

The Court must evaluate the representations in offering documents by considering the circumstances under which those representations were made. *See Ustian*, 229 F. Supp. 3d at 772; *Mozilo*, 2009 WL 3807124, at *9. Here, when taken in context under the circumstances in which the statements were made, the SEC has adequately alleged that Kameli and CFIG's statements in the Funds' PPMs that the Silver, Golden, Elgin, and Aurora Projects would use the money they borrowed from the CFIG Funds for only the purpose of developing and constructing senior living facilities and would comply with EB-5 Program requirements were false or misleading. While the Funds' operating agreements may have given the Defendants latitude in operating the Funds, the operating agreements did not authorize the Defendants to misuse investor assets. *See In re Investment Tech.*, 251 F. Supp. 3d at 609. Similarly, the general EB-5 disclaimer in the PPMs does not make other statements in the PPMs and other documents about compliance with the EB-5 Program requirements accurate as a matter of law.[6]

The SEC has also sufficiently alleged materiality. (Defs. Br. at 93.) The Silver, Golden, Elgin, and Aurora Projects' use of the borrowed money to develop and construct senior living facilities was critical to investors' successful applications to obtain permanent U.S. residency and to the eventual returns of the investors' $500,000 capital contributions and generation of profit on their investments. (Second Am Compl. ¶¶ 9, 31.) By causing the Silver, Golden, Elgin, and

---

[6] As noted in Footnote 6 above, this Court should disregard the USCIS 2013 Policy Memorandum cited by Kameli and CFIG. (Defs. Br. at 94-95; Ex. II to Docket Nos. 126-128; *see* SEC's 10/2/19 Mot. to Strike). However, even if this Court were to consider this document, it does not make Kameli and CFIG's statements in the Funds PPMs that they would use the borrowed funds only to construct and develop senior living centers accurate. Nowhere in the Policy Memorandum does it permit securities trading or suggest that it was permissible to place investor funds held in escrow at risk of market fluctuation. This undermines the EB-5 Program requirement that the full amount of investor funds be made available to the job-creating business, and thus jeopardizes investors' eligibility for immigration benefits.

Aurora Projects to use a portion of the money they borrowed to trade securities, Defendants placed investments at risk. (*Id*. ¶¶ 140-141, 165-166, 225-226, 276-268.)

Moreover, the SEC alleges that Defendants caused the Golden Project to misuse the profits it made from this undisclosed securities trading. Rather than use these profits to benefit the Golden Project and the Golden Fund by developing and constructing a senior living facility, Defendants misappropriated these profits for themselves by diverting the profits to a Kameli-owned entity, Platinum. (*Id*. ¶ 164.)

Finally, the SEC has adequately pled that Defendants engaged in this misconduct with scienter. (Defs. Br. at 93-94.) Kameli controlled the Silver, Golden, Elgin, and Aurora Funds and Projects. He also controlled Platinum. Thus, he knew, or was reckless in not knowing, that the Funds misrepresented how the Projects would use the money they borrowed. Kameli's scienter is imputed to the companies he controls. The allegations in the Second Amended Complaint about Kameli's and CFIG's undisclosed securities trading with the assets of the Silver, Golden, Elgin, and Aurora Projects provide more than "some basis" for believing that the SEC could prove that Defendants acted with scienter. *Steffes*, 805 F. Supp. 2d at 618.

## XVI.  The SEC Has Stated a Claim for Kameli's and CFIG's Diversion of Assets from the Silver and Golden Projects to the Aurora Project.

The Defendants wrongly argue that they were permitted to divert money from the Silver and Golden Projects to the Aurora Project. (Defs. Br., Section XIX, at 97-104). Defendants contend that these payments were authorized by the plain language of various agreements and that neither Kameli nor CFIG made any false or misleading statement in the offering documents about payments to Bright Oaks or about compliance with EB-5 Program requirements. (*Id*.) These arguments are without merit.

The SEC alleges that the statement in the Golden and Silver Funds' PPMs regarding how

they would use investor money was inaccurate, incomplete, and misleading. The Golden and Silver Funds offering documents falsely or misleadingly represented that the Golden and Silver Funds would use investor proceeds to loan money for the Golden and Silver Projects, respectively. (Second Am. Compl. ¶ 87, 89, 147, 149.) Contrary to those representations, Kameli caused the assets of Silver and Golden Fund investors to benefit the Aurora Project. (*Id*. ¶¶ 109-124, 127-128, 131, 177, 181-182, 185.)

In support of their motion to dismiss the Second Amended Complaint, Kameli and CFIG point to Golden and Silver Funds' operating agreements and Development Services Agreements.[7] (Defs. Br., Section XIX, at 100, Exs. I-L, R-S, CC-DD to Docket Nos. 126-128.) These agreements are irrelevant. While the operating agreements generally grant CFIG (as Manager) discretion to carry out the activities of the Funds and the Development Services Agreements authorize one-time payments of fees to CFIG, they do not permit Kameli to take actions in contravention to representations made in the Golden and Silver Funds' PPMs regarding how they would use investor funds.[8]

## XVII. Kameli and AEP Committed Securities Fraud By Funneling Money to Kameli and His Companies Through the First American, Naples, and Ft. Myers' Projects Land Transactions.

The Defendants launch a misguided defense of their illicit land transactions involving the

---

[7] *See* SEC's 10/2/19 Mot. to Strike.

[8] As noted in Footnote 6 above, this Court should disregard the USCIS 2013 Policy Memorandum cited by Kameli. (Defs. Br. at 103 & Ex. II to Docket Nos. 126-128; *see* SEC's 10/2/19 Mot. to Strike.) However, even if this Court were to consider this document, it does not make Kameli and CFIG's statements in the Silver and Golden Funds' PPMs regarding compliance with EB-5 Program requirements accurate. There is nothing in the memorandum that permits the Silver or Golden Projects to use Silver or Golden Fund investor money to pay for another Project's construction costs. Indeed, using funds meant for one project to benefit another directly undermines the requirement that the full amount of EB-5 funds be made available to the job-creating business that the investor is actually investing in. In addition, the general EB-5 disclaimer in the PPMs does not make other statements in the PPMs and other documents about compliance with the EB-5 Program requirements accurate as a matter of law.

First American, Naples, and Ft. Myers Projects. (Defs. Br., Section XX, at 105-111.)

The SEC alleges that Kameli had a duty to disclose his receipt of compensation due to his fiduciary status as an attorney for most First American, Naples, and Ft. Myers Fund investors. (Second Am. Compl. ¶¶ 2, 4, 282-283, 316-317, 346-347.) The SEC also alleges that as a fiduciary, Kameli had a duty to refrain from self-dealing. (*Id.* ¶¶ 283, 317, 347.) As the Ninth Circuit held in *SEC v. Feng*, 935 F.3d 721, 734-36 (9th Cir. 2019), as a fiduciary an immigration attorney representing investors in EB-5 Petitions is required to disclose all compensation he obtains in connection with that representation. *Id*. at 735. Kameli breached this fiduciary duty in the offer or sale of securities in the First American, Naples, and Ft. Myers Funds, and he also engaged in self-dealing, thereby violating the federal securities laws.

The SEC also alleges that the statements in the First American, Naples, and Ft. Myers Funds' PPMs concerning AEP's compensation was inaccurate, incomplete, and misleading. (Second Am. Compl. ¶¶ 293, 301, 331, 362.) These Funds' PPMs identified AEP as fulfilling the role as the Funds' manager, and the PPMs stated that AEP would be compensated through its receipt of a portion of the interest paid by the Projects on the Funds' loans to the Projects. (*Id.* ¶¶ 280, 314, 344.) The PPMs further stated that the Projects would only pay this interest to the Funds after the first resident entered into the senior living facility located at the Project. (*Id.)* Because the First American, Naples, and Ft. Myers Projects have not been completed, no operational revenues or other means for payment have been available to date. (*Id*. ¶¶ 281, 315, 345.) Contrary to these representations, the SEC alleges in the Second Amended Complaint that Kameli caused Platinum to make undisclosed profits from its land purchases for the First American, Naples, and Ft. Myers Projects. (*Id*. ¶¶ 295-303; 325-333; 357-364.) The Second Amended Complaint alleged that when Kameli reaped undisclosed profits through the First

American, Naples, and Ft. Myers Projects' land transactions, he breached his legal, ethical, and fiduciary duties to his investor clients in the First American, Naples, and Ft. Myers Funds. (*Id.* ¶¶ 300, 330, 361.) As illustrated by the *Feng* case, the SEC has stated a valid claim for Kameli's securities laws violations through these breaches. *See Feng*, 935 F.3d at 734-36. Moreover, while the PPMs mentioned that Kameli owned Platinum and that Platinum would purchase land for these Projects, these disclosures were inadequate to inform investors that Platinum would mark up the land parcels and profit from flipping them to the Projects. (*Id.*) This Court, therefore, cannot conclude that Kameli and AEP's statements regarding conflicts of interest and compensation were accurate as a matter of law.

The Court should reject Kameli's and AEP's arguments that they complied with the EB-5 Program requirements when they structured the First American, Naples, and Ft. Myers Projects' land transactions to funnel undisclosed profits to Kameli and Platinum. (Defs. Br. at 108-109.) As discussed throughout, the general EB-5 disclaimer in the PPMs does not make other statements in the PPMs and other documents accurate as a matter of law.

In addition, this Court should disregard the USCIS June 4, 2015 Memorandum cited by Defendants. (Defs. Br. at 109-110 & Ex. KK to Docket Nos. 126-128; *see* SEC's 10/2/19 Mot. to Strike). However, even if this Court were to consider this document, it does not save Kameli. While the memorandum mentions that investor funds may be used to purchase land, it does not authorize offerors or fund managers to mark up the land parcels and take undisclosed profits. Indeed, USCIS already denied an Elgin Fund investor's I-829 Petition based in part on USCIS's doubt about the legitimacy of the Elgin Project's land purchase (which had been purchased by one entity and flipped to the Project for double the price on the same date). The investor challenged the denial in federal court, but was unsuccessful. *See Johnson*, 2017 WL 1151036, at

*4.

## **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court deny Defendants'

Motion to Dismiss the Second Amended Complaint. (Docket No. 199.).


Dated: October 2, 2019                    Respectfully submitted,

                                          **UNITED STATES SECURITIES
                                          AND EXCHANGE COMMISSION**

                                          /s/ Eric M. Phillips
                                          Eric M. Phillips
                                          Alyssa A. Qualls
                                          Tracy W. Lo
                                          BeLinda I. Mathie
                                          United States Securities and Exchange Commission
                                          175 W. Jackson Blvd., Suite 1450
                                          Chicago, IL 60604
                                          Telephone: (312) 353-7390
                                          Facsimile: (312) 353-7398

                                          Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on October 2, 2019, a copy of the foregoing Plaintiff United States Securities and Exchange Commission's Memorandum in Opposition to Defendants' Consolidated Motion to Dismiss the Second Amended Complaint was served upon the following counsel by the Court's CM/ECF system:

John Nicolas Albukerk
Albukerk & Associates
1450 W. Randolph Street, 2nd Floor
Chicago, IL 6060
Telephone: (773) 847-2600


Seyed Taher Kameli
Kameli & Associates
1319 S. State St., Suite C2
Chicago, IL 60605
Telephone: (312) 233-1000

Attorneys for Defendants

/s/ Eric M. Phillips
Eric M. Phillips