**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 17 C 4686 ) |
| | ) Judge Joan B. Gottschall |
| SEYED TAHER KAMELI, CHICAGOLAND FOREIGN INVESTMENT GROUP, LLC, and AMERICAN ENTERPRISE PIONEERS, INC., | ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| BRIGHT OAKS PLATINUM PORTFOLIO, LLC, PLATINUM REAL ESTATE AND PROPERTY INVESTMENTS, INC., and BRIGHT OAKS DEVELOPMENT, INC., | ) ) ) ) ) |
| Relief Defendants. | ) ) ) |

**MEMORANDUM OPINION AND ORDER**

The U.S. Securities and Exchange Commission ("SEC" or "Commission") filed this

enforcement action against Sayed Taher Kameli ("Kameli") alleging that he violated § 17(a) of

the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77q(a); and § 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. §

240.10b–5, promulgated thereunder.[1] Also named as defendants are two corporations owned by

---

[1] Because the scope of § 10(b) and Rule 10b-5 are coterminous, the court uses them
interchangeably. *S.E.C. v. Zandford*, 535 U.S. 813, 813 n.1 (2002) ("The scope of Rule 10b–5 is

Kameli: Chicagoland Foreign Investment Group, LLC ("CFIG") and American Enterprise Pioneers, Inc. ("AEP") (Kameli, CFIG, and AEP, "defendants"). Before the court is defendants' motion to dismiss the SEC's Second Amended Complaint ("SAC" or "the complaint"). For the reasons explained below, the motion is denied.

## I. Background

**A.     The EB-5 Program**

The securities fraud alleged by the SEC involved investments that Kameli offered pursuant to the U.S. Immigrant Investor Program, 8 U.S.C. § 1153(b)(5)(A). Created as part of the 1990 Immigration Reform Act, Pub. L. No. 101-649, 104 Stat 4978, the Program offers U.S. citizenship to foreign nationals who invest the requisite amount of capital in the U.S. (in this case, $500,000)[2] leading to the creation of ten full-time jobs. The program is commonly referred to as the "EB-5 Program" because it is included among employment-based visas, and is ranked fifth in the order according to which employment-based visas are to be allotted. *See U.S. Sec. & Exch. Comm'n v. Hui Feng*, 935 F.3d 721, 725 n.2 (9th Cir. 2019).

Applicants begin by filing a petition referred to as a "Form I-526," presenting evidence that the petitioner has invested or is in the process of investing in a commercial enterprise that will create full-time positions for at least ten employees. If approved, the investor is granted a

---

coextensive with the coverage of § 10(b), therefore, we use § 10(b) to refer to both the statutory provision and the Rule.").

[2] Prior to November 2019, EB-5 applicants were generally required to invest $ 1 million, 8 U.S.C. § 1153(b)(5)(C)(i), but were permitted to invest $500,000 if the investment was located in "targeted employment areas" (defined as an area that, "at the time of investment, is a rural area or an area which has experienced unemployment of at least 150 percent of the national average rate," 8 C.F.R. § 204.6). Following amendments in November 2019, the regulations now require an investment of $1.8 million and allow for an investment of $900,000 in targeted employment areas.

conditional green card conferring U.S. residency for a period of two years. The applicant then files a Form I-829, demonstrating that the investment has in fact created or preserved at least ten permanent full-time jobs for U.S. workers. If the Form I-829 is approved, the conditions on the investor's green card are removed and he or she becomes a lawful permanent resident. If not, the investor loses his or her conditional permanent residency and is not granted a visa.

## B.     The SAC's Factual Allegations

According to the SAC, whose allegations the court take as true for purposes of this motion, *see, e.g.*, *Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 707 F. Supp. 2d 774, 781 (N.D. Ill. 2010) (citing *Killingsworth v. HSBC Bank*, 507 F.3d 614, 618 (7th Cir. 2007)), Kameli is an immigration attorney who heads his own law firm. Beginning around 2009, the SEC alleges that Kameli began offering foreign nationals an opportunity to obtain EB-5 visas by investing in the creation and development of facilities providing memory care and/or assisted living services for senior citizens. Kameli initially planned four such facilities in Illinois: Aurora Memory Care, LLC d/b/a Bright Oaks of Aurora, LLC (the "Aurora Project"); Elgin Memory Care, LLC d/b/a Bright Oaks of Elgin, LLC (the "Elgin Project"); Golden Memory Care, Inc. d/b/a Bright Oaks of Fox Lake, Inc. (the "Golden Project"); and Silver Memory Care, Inc. d/b/a Bright Oaks of West Dundee, Inc. (the "Silver Project").[3] A separate fund was created to lend money to each Project: Aurora Assisted Living EB–5 Fund, LLC (the "Aurora Fund"); Elgin Assisted Living EB–5 Fund, LLC (the "Elgin Fund"); Golden Assisted Living EB–5 Fund, LLC (the "Golden Fund"); and Silver Assisted Living EB–5 Fund, LLC (the "Silver Fund"), respectively.[4] Each Fund used investors'

---

[3] The court refers to these Projects collectively as the "Illinois Projects."

[4] The court refers to these Funds collectively as the "Illinois Funds."

money to make a loan to its associated Project for the development and construction of its affiliated senior living facility.

Later, Kameli followed the same pattern in Florida, planning the development and construction of four senior living facilities in various locations. He created four Funds: First American Assisted Living EB–5 Fund, LLC (the "First American Fund"); Naples Memory Care EB–5 Fund, LLC (the "Naples Fund"); Ft. Myers EB–5 Fund, LLC (the "Ft. Myers Fund"); and Juniper Assisted Living EB–5 Fund, LLC (the "Juniper Fund").[5] Again, each Fund loaned money to its associated Project for the development of a senior living center: First American Assisted Living, Inc. (the "First American Project") for a facility to be located in Wildwood, Florida; Naples ALF, Inc. (the "Naples Project") for a facility to be located in Naples, Florida; Ft. Myers ALF, Inc. (the "Ft. Myers Project"), for a facility to be located in Ft. Myers, Florida; and Juniper ALF, Inc. (the "Juniper Project") for a facility to be located in Sun City, Florida.[6]

In addition to the Funds and Projects, Kameli created a number of other corporations to manage them. The Illinois Funds were managed by Chicagoland Foreign Investment Group ("CFIG"). The Florida Funds were managed by American Enterprise Pioneers ("AEP"), a CFIG subsidiary. In addition to management services, Kameli created several other corporations to provide development services to the various Projects. The development services were initially provided by CFIG. In 2013, however, Kameli created Bright Oaks Group, Inc. and Bright Oaks Development, Inc. (together, "Bright Oaks") to provide business and development services to the Projects. Nader Kameli ("Nader"), Kameli's brother, served as the CEO of CFIG and later, CEO of Bright Oaks.

---

[5] The court refers to these Funds collectively as the "Florida Funds."

[6] The court refers to these Projects collectively as the "Florida Projects."

The specific terms of the investments were set forth in Private Placement Memorandums ("PPMs"). Although the PPMs for each Fund differed in their details, the general terms of the investments were largely the same. Each individual submitted a Subscription Agreement along with a capital contribution of $500,000. Kameli also charged investors an administrative fee of between $35,000 and $75,000. Initially, investors' money was held in an escrow or investor holdings account pending approval of their I-526 Petitions. If denied, investors typically received their money back. If granted, the investor's money was released into the relevant Fund. Investors' money was pooled together and lent to the affiliated Project. Once the senior living facility became operational, the Project would begin repaying the loans from the Funds, allowing investors to recoup their principal plus interest. Loan interest was also to be used to pay CFIG and AEP for their management services, which meant that they would not begin receiving compensation until after the Projects had become operational. Most of all, creation of the senior living facilities would create the jobs necessary to fulfill the EB-5 Program's requirements.

In all, between 2009 and 2016, Kameli raised approximately $88.7 million in investment proceeds from at least 226 foreign investors. He also collected several million in administrative fees. According to the SEC, however, only one of the senior living facilities – the Aurora facility – is up and running (though several years behind schedule and at double the projected cost). The Commission alleges that the other Illinois Projects are behind schedule and have run out of money. Ground has yet to be broken on any of the Florida Projects. To date, most of the Illinois investors' I-526 Petitions have been granted. In the case of the Florida Funds, a number of First American Fund investors' I-526 Petitions have been granted. The petitions of investors in the

other Florida Funds have for the most part not been acted on. The SAC does not specifically state whether any of the I-829 Petitions have been granted.[7]

## C.     The SAC's Causes of Action

According to the SEC, defendants engaged in a range of illegal conduct in their handling of the investments. The details of the alleged misconduct are discussed more fully below. However, the SAC's central allegations are that defendants: (1) charged several of the Funds and Projects more than $4 million in undisclosed fees; (2) used approximately $16 million of investors' funds to engage in securities trading; (3) used the money of certain Silver Fund investors as collateral to establish a line of credit ("the Silver Line of Credit"), which defendants then used for their own benefit and the benefit of Funds and Projects other than the Silver Fund; and (4) made an undisclosed profit of roughly $1 million by acquiring parcels of land through a separate entity owned by Kameli, Platinum Real Estate and Property Investments, Inc. ("Platinum"), and selling them at a higher price to the Florida Projects.

The Commission alleges that defendants' actions violated both § 17(a) of the Securities Act and § 10(b) and Rule 10b-5 of the Exchange Act. The statutes are very similar. The main difference is "that § 10(b) and Rule 10b–5 apply to acts committed in connection with a purchase or sale of securities while § 17(a) applies to acts committed in connection with an offer or sale of securities." *S.E.C. v. Maio*, 51 F.3d 623, 631 (7th Cir. 1995). Section 17(a) and Rule 10b-5 both include three subsections. Section 17(a)(1) makes it unlawful "to employ any device, scheme, or artifice to defraud"; subsection (2) makes it unlawful to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order

---

[7] In their response brief, however, the SEC cites a case involving an investor in the Elgin Fund seeking to challenge the denial of his I-829 Petition. *See Doe v. Johnson*, No. 15-CV-01387, 2017 WL 1151036 (N.D. Ill. Mar. 28, 2017). The challenge was unsuccessful.

to make the statements made … not misleading"; and subsection (3) makes it unlawful "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a). Similarly, Rule 10b-5(a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud'; subsection (b) makes it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made … not misleading"; and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a)-(c).

The SEC alleges that defendants violated all three subsections of both § 17(a) and Rule 10b-5. They claim that defendants' actions constitute a scheme to defraud and fraudulent practices or courses of business under §§ 17(a)(1) and (a)(3) and under Rule 10b-5(a) and (c); and that, because defendants' actions were contrary to key representations in the PPMs, defendants have made misleading statements in violation of § 17(a)(2) and Rule 10b-5(b).

## D. Procedural History

The SEC's original complaint, filed in June 2017, consisted of three counts—one alleging violations of § 17(a), one alleging violations of § 10(b)/Rule 10b-5, and one alleging "control person" liability against Kameli under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The SEC also moved for a temporary restraining order and a preliminary injunction prohibiting defendants from further violations of the securities laws and further participation with the EB–5 Program. The court held a hearing on the motion over the course of several days and denied the motion. *See United States Sec. & Exch. Comm'n v. Kameli*, 276 F. Supp. 3d 852, 875 (N.D. Ill. 2017). After defendants moved to dismiss the complaint, the SEC filed an amended complaint (the "First Amended Complaint," "FAC"). Defendants moved to dismiss the FAC, asserting, among

other grounds, that the FAC failed to comply with Federal Rule of Civil Procedure 9(b). The court granted the motion. *See United States Sec. & Exch. Comm'n v. Kameli*, 373 F. Supp. 3d 1194, 1204 (N.D. Ill. 2019).

The Commission subsequently filed a second amended complaint ("SAC"). Defendants have again moved to dismiss, adducing no fewer than twenty separate grounds for dismissal. They assert that the SAC still falls short of Rule 9(b)'s pleading requirements. In addition, they assert that the SEC has failed to state a claim under Federal Rule of Civil Procedure 12(b)(6). The court discusses these in turn. First, however, it is necessary to address a number of preliminary issues.

## II. Preliminary Issues

### A.    Jurisdiction

Among their many other asserted bases for dismissal, defendants contend that the suit must be dismissed for lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Although not raised until the middle of defendants' opening brief, and although, as noted below, defendants' argument betrays some ambiguity regarding the extent to which it challenges the court's jurisdiction, the court must be vigilant regarding the existence of jurisdiction, and must address jurisdictional questions before considering issues on the merits. *See, e.g.*, *Cobbs v. Chiapete*, 770 F. App'x 282, 284 (7th Cir. 2019) ("Subject-matter jurisdiction is the first issue any federal court must address.").

Defendants contend that the court lacks jurisdiction over the suit because the investor funds used as collateral for the Silver Line of Credit do not constitute "securities" within the meaning of § 10(b) and § 17(a). As noted above, the SEC alleges that defendants collateralized a line of credit using the funds of Silver Fund investors. The SEC also alleges that defendants used

the Silver Line of Credit for expenses unrelated to the Silver Fund. According to the SEC, this constituted fraud against Silver Fund investors because defendants represented to investors that their funds would be used only for the Silver Fund's benefit. (As is discussed more fully below, *see* section IV.H.1, *infra*, defendants dispute that they made such representations). They also argue, however, that since the funds used to collateralize the line of credit were still in the holdings accounts, they did not constitute "securities" within the meaning of § 17(a) and § 10(b). Rather, citing language in the Silver Fund offering documents, defendants contend that the interests in the Funds became securities only after investors' I-526 Petition were approved and their assets were transferred to the Silver Fund. *See, e.*g., First Supplement to Silver Fund PPM, ECF No. 128-3 at 2 (defining Members of the Silver Fund as "each person who (i) executes such documents and instruments as the Manager requires, (ii) makes its Capital Contribution, and (iii) in the case of an Immigrant Investor, *has an I-526 Petition approved* by USCIS") (defendants' emphasis). Since § 17(a) and 10b-5 apply only to securities, defendants maintain that the court lacks subject-matter jurisdiction.

The parties discuss the definitional issue in some depth but largely ignore the jurisdictional aspect of the dispute. As it turns out, however, the jurisdictional issue can be resolved without addressing the meaning of "securities" under the antifraud statutes.[8] This is for

---

[8] There is also a question as to whether the definitional issue actually implicates the court's subject-matter jurisdiction. For the question of whether the transactions at issue involve "securities" also goes to the merits of the SEC's claims. True, there are many cases suggesting that the question of whether a transaction involves "securities" is indeed jurisdictional in nature. *See, e.g.*, *Emisco Indus., Inc. v. Pro's Inc.*, 543 F.2d 38, 41 (7th Cir. 1976) ("The transaction involved nothing more than a note used as a cash substitute in the purchase of property. Hence the note did not constitute 'a security' within the meaning of the 1934 Securities Act on which plaintiffs premised federal jurisdiction."); *La Salle Nat. Bank v. Arthur Andersen & Co.*, 531 F. Supp. 702, 707 (N.D. Ill. 1982) ("This court agrees with the defendant Arthur Andersen that the complaints do not properly allege the existence of a 'security' for purposes of showing federal jurisdiction and that they should therefore be dismissed."). However, these cases were decided

at least two reasons. First, defendants' argument implicates only the assets of Silver Fund investors. Thus, even if defendants were correct in regarding the definition of "securities," this would have no bearing on the SEC's claims involving other conduct and other Funds (e.g., defendants' alleged use of various Projects' assets to trade securities). Notably, while defendants conclude their argument by asserting that all of the SAC's counts must be dismissed for lack of subject-matter jurisdiction, *see* MTD 72 ("Plaintiff's claims fail for a lack of subject matter jurisdiction in accordance with Federal Rule of Civil Procedure 12. Therefore, counts one through fifteen must be dismissed with prejudice."), they assert elsewhere in the course of the argument that "the claims against Defendants that rest upon alleged wrongdoing *in regard to the Silver Line of Credit* must be dismissed for lack of subject matter jurisdiction," *id*. at 69 (emphasis added). In any case, the argument fails, regardless of what specific conclusion defendants believe may be entailed by it.

Second, defendants' argument fails even with respect to the claims premised on defendants' alleged wrongdoing in connection with the Silver Line of Credit. This is because, according to the SEC, defendants' alleged misconduct involving the Silver Line of Credit involved fraud not only against Silver Fund investors but against investors in other Funds as well. On the one hand, the SEC alleges that defendants misled Silver Fund investors by using the

---

prior to more recent Supreme Court cases that "have generally narrowed the issues that federal courts treat as affecting subject matter jurisdiction[. They] have directed courts to take a statute at its word when it speaks in terms of jurisdiction." *Frey v. E.P.A.*, 751 F.3d 461, 467 (7th Cir. 2014); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006) ("If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue. But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."). There is no need to wade into these waters for purposes of this motion because, as is discussed in what follows, defendants' challenge to the court's jurisdiction fails in any event.

Silver Line of Credit for improper purposes. However, defendants' use of the Silver Line of Credit is also implicated in misrepresentations to investors in other Funds. For example, the SAC alleges that in December 2013, Kameli and CFIG improperly used $141,000 from the Silver Line of Credit to pay for certain of the Elgin Project's expenses. SAC ¶ 217. According to the Commission, this constituted fraud not only against investors whose funds were used to collateralize the line of credit (because defendants led these investors to believe that the line of credit would be used solely for the benefit of the Silver Fund), but also against Elgin Fund investors (because, among other things, the Elgin Fund PPM led investors to believe that the Elgin Project would be funded solely by the assets of Elgin Fund investors). *Id.* ¶ 222. The SEC's allegations regarding defendants' misrepresentations vis-à-vis the Elgin Fund investors forms the basis for a claim under § 17(a) and § 10(b) irrespective of whether the assets used to collateralize the Silver Line of Credit can be deemed "securities" under the statutes.

For these reasons, defendants' definitional argument concerning the meaning of "securities" does not call into question the court's subject-matter jurisdiction over the suit.[9]

**B.** **Statute of Limitations**

A second preliminary issue raised by defendants (again, only in the middle of their opening brief) is their contention that the SEC's claims relating to the Golden, Elgin, and Aurora Funds are time-barred. It is well-settled that SEC enforcement actions seeking civil penalties are subject to 28 U.S.C. § 2462, the five-year statute of limitations period that generally applies to actions brought by the federal government. 28 U.S.C. § 2462 ("Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or

---

[9] Having resolved the jurisdictional issue on other grounds, it is unnecessary to address the merits of the parties' arguments on the definitional question.

forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."); *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1645 (2017) ("Disgorgement, as it is applied in SEC enforcement proceedings, operates as a penalty under § 2462. Accordingly, any claim for disgorgement in an SEC enforcement action must be commenced within five years of the date the claim accrued."). Because the Commission filed this suit on June 22, 2017, the limitations period began to run on June 22, 2012. Defendants argue that this bars the SEC's claims relating to the Golden, Elgin, and Aurora Funds because their PPMs were issued prior to June 22, 2012. Since the SEC's claims are based on alleged misrepresentations or omissions contained in the PPMs, defendants assert that the claims relating to these funds fall outside of the limitations period and are not actionable.

Mysteriously, the SEC has not responded to this argument. It seems unlikely that the Commission intended to concede the issue, however, because it is plainly incorrect. First, while the Golden, Elgin, and Aurora PPMs were issued prior to the limitations period, the SAC specifically alleges that defendants continued to use these offering documents until 2014. The SAC also specifically alleges that defendants' improper conduct did not begin, and hence the PPM's statements did not become false/misleading, until after June 22, 2012.[10] Thus, at least

---

[10] Specifically, with respect to the Golden Fund, the SAC alleges that defendants caused the Golden Project to make a $245,000 undisclosed payment to CFIG beginning in November 2012, SAC ¶ 157; engaged in securities trading with Golden Project funds from April 2013 to September 2015, *id*. ¶ 161; used $138,000 from the Silver Line of Credit to pay for various expenses of the Golden Project in December 2013, *id*. ¶ 170; and diverted Golden Project funds to Bright Oaks Development between June 2013 and June 2015, *id*. ¶ 175. With respect to the Elgin Fund, the SAC alleges that defendants made undisclosed payments from Elgin Project to Kameli and CFIG between 2010 and 2012, *id*. ¶ 210; used the Silver Line of Credit to pay for Elgin Project expenses in December 2013, *id*. ¶ 217; used an Elgin Fund investor's funds to pay CFIG credit card expenses in September 2014, *id*. ¶ 220; and used Elgin Project funds to trade in securities from April 2013 to April 2015, *id*. ¶ 225. With respect to the Aurora Fund, the SAC alleges that defendants made undisclosed payments from Aurora to CFIG in March 2011, September 2012, and February 2016, *id*. ¶ 251; used Silver Line of Credit funds to pay for

some of the conduct forming the basis for the SEC's claims involving these funds is alleged to have occurred within the limitations period.

To be sure, the SAC alleges that the Elgin and Aurora Funds made undisclosed payments to CFIG prior to June 2012. *See* SAC ¶¶ 210, 251. It is not clear why this should render the claims time-barred, however, because in each case, the alleged payments continued until October 2012 for the Elgin Fund, *id*. ¶ 210, and until February 2016 for the Aurora Fund, *id*. ¶ 251. (Neither party discusses whether the continuing-violation doctrine might be applicable here). Further, many of the SEC's claims relating to the Elgin and Aurora Funds are based on entirely different representations that became false/misleading based on separate conduct that is alleged to have occurred much later. *See, e.g*., *id*. ¶ 265 (alleging that, "[f]rom April 2013 to July 2013, Kameli and CFIG caused the Aurora Project to use money it borrowed from the Aurora Fund to trade in securities"); *id*. ¶ 225 (alleging that "[f]rom April 2013 to April 2015, Kameli and CFIG caused the Elgin Project to use money it borrowed from the Elgin Fund to trade in securities"). Finally, defendants' argument appears to address the timeliness of these claims only insofar as they are based on misrepresentations (i.e., those under Rule 10b-5(b) and § 17(a)(2)). The argument thus does not apply to the SEC's claims that are based on other conduct (i.e., claims involving the Elgin and Aurora Funds based on Rule 10b-5(a) and (c) and §§ 17(a)(1) and (3)). In short, even if the claims involving the Golden, Elgin, and Aurora Funds were time-barred as to some of defendants' alleged misconduct, the claims would not be time-barred *in toto*.

The parties separately dispute whether § 2462 applies to the SEC's request for injunctive relief, which seeks a permanent injunction "enjoining Defendants, their officers, agents, servants,

---

Aurora Project expenses from December 2013 through October 2014, *id*. ¶ 257; and engaged in securities trading with Aurora Project funds from April 2013 to July 2013, *id*. ¶ 265.

employees, attorneys and those persons in active concert or participation with Defendants who receive actual notice of the Order," from "engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object," in violation of § 10(b) and § 17(a). SAC 111. There is much disagreement among courts as to whether requests for injunctive relief are subject to § 2462's limitations period. *Compare Sec. & Exch. Comm'n v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019) (request for injunctive relief not subject to § 2462's five-year limitations period); *Sec. & Exch. Comm'n v. Graham*, 823 F.3d 1357, 1360 (11th Cir. 2016) (same); *United States v. Telluride Co.*, 146 F.3d 1241, 1248 (10th Cir. 1998), *with* S.*E.C. v. Bartek*, 484 F. App'x 949, 957 (5th Cir. 2012) ("Based on the severity and permanent nature of the sought-after remedies, the district court did not error [sic] in denying the SEC's request on grounds that the remedies are punitive, and are thus subject to § 2462's time limitations."); *Sec. & Exch. Comm'n v. Bio Def. Corp.*, No. CV 12-11669-DPW, 2019 WL 7578525, at *11 (D. Mass. Sept. 6, 2019).

Although the Seventh Circuit has not addressed the question, district courts in this circuit have generally held, in a range of different statutory contexts, that requests for injunctive relief are not subject to § 2462's limitations period. *See, e.g.*, *United States Sec. & Exch. Comm'n v. Battoo*, 158 F. Supp. 3d 676, 691 (N.D. Ill. 2016) ("In view of the distinction between, on the one hand, fines, penalties, and forfeitures, and on the other hand, equitable relief like injunctions and disgorgement, the Court concludes that § 2462 does not bar the SEC's claim for disgorgement and injunctive relief arising from pre-September 6, 2007 conduct."); *S.E.C. v. Ogle*, No. 99 C 609, 2000 WL 45260, at *3–4 (N.D. Ill. Jan. 11, 2000) ("Section 2462 does not apply to SEC civil enforcement actions seeking equitable relief because equitable remedies merely preserve the status quo; they do not constitute a punitive award. In fact, SEC actions

pursuing a public right and seeking equitable relief are not subject to any limitations period. Accordingly, the claims in support of equitable remedies are timely.") (citations omitted); *see also United States v. Murphy Oil USA, Inc.*, 143 F. Supp. 2d 1054, 1087 (W.D. Wis. 2001) ("Because nothing in the Clean Air Act itself or § 2642 precludes the government from seeking injunctive relief beyond the five year statute of limitations period, plaintiff's claims for injunctive relief for claims one, two and three are not barred by the statute of limitations even if § 2462 precludes it from recovering damages."); *United States v. U.S. Steel Corp.*, 966 F. Supp. 2d 801, 810 (N.D. Ind. 2013) ("Numerous courts have addressed this issue, and they have converged on a relatively simple analysis. Section 2462's limitations period does not apply to injunctive relief if the injunction is actually remedial—i.e., if it seeks to undo prior damage or protect the public from future harm. On the other hand, Section 2462 does bar injunctive relief if it is really just a facade for a penalty or a forfeiture—i.e., where the injunctive relief sought is punitive in nature.") (citations and quotation marks omitted).

In light of the foregoing, however, it is unnecessary to reach the issue here. For courts holding that requests for injunctive relief are not subject to § 2462 have concluded that such requests are not subject to *any* time limitation. *See, e.g.*, *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997) (concluding that request for equitable relief was not time-barred under § 2462 and citing the "well-established rule that an action on behalf of the United States in its governmental capacity ... is subject to no time limitation, in the absence of congressional enactment clearly imposing it'") (quoting *E.I. du Pont de Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)). Thus, having concluded that there is no time-bar to the claims relating to the Golden, Elgin, and Aurora Funds insofar as they seek civil penalties (and thus are plainly subject

to § 2462), it follows that the claims are also not time-barred insofar as they seek injunctive relief.[11]

## C.  Motion to Strike

A third and final preliminary issue is raised by the SEC's separate motion to strike defendants' motion to dismiss, or certain of the documents and exhibits cited within it. In each case, the exhibits in question are ultimately irrelevant to the court's analysis. Accordingly, the court denies the motion to strike as moot. However, because defendants rely on the exhibits to support a variety of different arguments, the basis for the court's determination is most usefully explained as these arguments arise in what follows.

## III.  Rule 9(b)

The court now turns to defendants' arguments for dismissal based on the SAC's purported pleading deficiencies. Securities fraud actions are subject to the heightened pleading requirements of Federal Rule of Civil Procedure Rule 9(b). *See, e.g.*, *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019); *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990).  Rule 9(b) "requires the plaintiff to state 'with particularity' any 'circumstances constituting fraud'. Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any

---

[11] Defendants additionally argue that the request for injunctive relief should be dismissed because it must be supported by a showing of actual risk of harm. They assert that many "individuals who are the officers, agents, servants, employees, and attorneys of Defendants are not accused of any wrongdoing in the SAC and have a relationship with Defendants that post-dates this matter. Reply Br. 20 (quotations marks and brackets omitted). This contention raises factual questions that are not properly decided at this stage. *See, e.g.*, *S.E.C. v. Gabelli*, 653 F.3d 49, 61 (2d Cir. 2011), rev'd on other grounds by 568 U.S. 442 (2013) ("[W]here, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry.").

newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). "[T]he precise level of particularity required under Rule 9(b) depends upon the facts of the case." *Camasta v. Jos. A. Bank Clothiers, Inc*., 761 F.3d 732, 737 (7th Cir. 2014). Thus, for example, where the scheme takes place over a long period of time, less specificity may be required. *See, e.g.*, *Onesti v. Thomson McKinnon Sec., Inc*., 619 F. Supp. 1262, 1265 (N.D. Ill. 1985) ("Rule 9(b)'s more stringent requirements must be read in conjunction with Rule 8, which requires a short and plain statement of the claim. The sufficiency of a pleading under these rules varies with the complexity of the transaction. When the transactions are numerous and take place over an extended period of time, less specificity is required.") (citations omitted).[12]

## A.    The Second Amended Complaint's Factual Allegations

In its opinion dismissing the FAC, the court indicated that the SEC had failed to comply with Rule 9(b) in several key respects. The central problem was that "the FAC's allegations cover[ed] eight projects with over 225 investors and span complex events that occurred between 2008 and 2016," and that, when taken as a whole, it did "not give notice of which of the many communications it mentions were allegedly fraudulent and which defendant is allegedly responsible for those communications." *Kameli*, 373 F. Supp. 3d at 1203. In concluding its discussion of the issue, the court explained that, while the SEC did not have to "plead the date, time, sender, recipient, and content of every securities transaction," the Commission was

---

[12] The SEC maintains that its complaint is not subject to the even more stringent pleading requirements of The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). As noted in ruling on defendants' motion to dismiss the FAC, while the Seventh Circuit has not addressed the question, most courts have concluded that the PSLRA's pleading requirements do not apply in SEC enforcement actions. *See Kameli*, 373 F. Supp. 3d at 1201 (citing *S.E.C. v. Steffes*, 805 F. Supp. 2d 601, 615–16 & n.12 (N.D. Ill. 2011)). Since defendants do not contend otherwise, the court applies the standard under Rule 9(b) (in concert with Rule 8(a)(2)).

required to "make clear exactly which of the eight years of communications form the basis of its fraud allegations and must differentiate among the defendants sufficiently to give each defendant fair notice of its alleged role." *Id*. at 1194.

The SAC has sufficiently remedied these defects. The complaint sets forth in substantial detail the allegations recounted above. It then devotes separate sections to the allegations relating to each Fund. Within each section, the SAC separately describes the particular ways in which the allegations support its claims under § 17(a) and Rule 10b-5. Each section also separately explains the ways in which defendants' conduct forms the basis for the claims under § 17(a)'s and Rule 10b-5's various subsections. Additionally, within each section for each Fund, the SAC separately identifies the different misrepresentations pertaining to each Fund. Specifically, the Commission alleges that the PPMs misleadingly represented to investors that: each Fund's sole business activity would be to invest in its associated Project; each Project would be funded by the EB-5 investor assets in its associated Fund; that CFIG and AEP would be compensated for their services by being paid a portion of the annual interest that each Project paid to its affiliated Fund once the senior living facility began receiving revenue; and that investments in the Funds would comply with the EB-5 Program's requirements.

In short, the SAC singles out the alleged misrepresentations; alleges where they were made (chiefly in the PPMs, but in some cases also in the Funds' Business Plans, Subscription Agreements, and Holdings Account Agreements); who was responsible for them (Kameli and either CFIG or AEP, depending on the Fund in question); and the time period during which the misrepresentations were made (based on the period during which defendants engaged in conduct contrary to the PPMs' representations).

18

The SAC has similarly rectified the deficiencies relating to the counts in which it sets forth its claims for relief. Whereas the FAC alleged only three counts – one for all § 10(b) claims, one for all § 17(a) claims, and one for control-person liability – the SAC asserts separate counts under § 10(b) and § 17(a) for each Fund. Hence, the SAC now consists of fifteen separate counts – separate § 10(b) and § 17(a) counts for each of the seven Funds, along with a control-person liability claim against Kameli alone under § 20(a) of Exchange Act. [13] Particularly in view of the size of the alleged scheme in both scale and duration, the court concludes that the SAC's allegations are sufficiently particular to comply with Rule 9(b).

Defendants argue that the SAC remains vague or ambiguous in several respects. For example, they claim that the SAC still leaves unclear whether their alleged misrepresentations are based on the PPMs or on other sources. The court sees no basis for confusion on this point. Although the SAC occasionally refers to other statements in recounting some of the case's background facts, it cites only statements in the PPMs (and in some cases other offering documents) when stating the basis for its claims under Rule 10b-5(b) and § 17(a)(2).

---

[13] Thus, Count I asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Silver Fund; and Count II asserts claims against Kameli and CFIG under § 17(a) in connection with the Silver Fund. Count III asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Golden Fund; and Count IV asserts claims against Kameli and CFIG under § 17(a) in connection with the Golden Fund. Count V asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Elgin Fund; and Count VI asserts claims against Kameli and CFIG under § 17(a) in connection with the Elgin Fund. Count VII asserts claims against Kameli and CFIG under Rule 10b-5 in connection with the Aurora Fund; and Count VIII asserts claims against Kameli and CFIG under § 17(a) in connection with the Aurora Fund. Count IX asserts claims under Rule 10b-5 against Kameli and AEP in connection with the First American Fund; Count X asserts claims against Kameli and AEP under § 17(a) in connection with the First American Fund. Count XI asserts claims under Rule 10b-5 against Kameli and AEP in connection with the Naples Fund; Count XII claims against Kameli and AEP under § 17(a) in connection with the Naples Fund. Count XIII asserts claims under Rule 10b-5 against Kameli and AEP in connection with the Ft. Myers Fund; Count XIV claims against Kameli and AEP under § 17(a) in connection with the Ft. Myers Fund. Lastly, Count XV asserts a claim under 20(a) of the Exchange Act for control-person liability against Kameli.

According to defendants, the SAC also leaves unclear who made the statements in question. Was it Kameli, CFIG, and AEP, or the Funds themselves? It is true that the SAC in some places says that the Funds issued PPMs. *See, e.*g., SAC ¶ 83 ("The Silver Fund issued a PPM dated July 2012."). However, the SAC specifically alleges for each Fund that, for purposes of Rule 10b-5(b), defendants are the "makers" of the statements in the PPMs. *See id*. ¶ 86 (Silver Fund); *id*. ¶ 146 (Golden Fund); *id*. ¶ 191 (Elgin Fund); *id*. ¶¶ 233, 242 (Aurora Fund); *id*. ¶ 273 (First American Fund); *id*. ¶ 307 (Naples Fund); *id*. ¶ 337 (Ft. Myers Fund). In addition, the SAC goes on to provide additional allegations to establish why the defendants should be deemed the "makers" of the statements. *See, e.g.*, SAC ¶ 86 ("Because Kameli and CFIG directed the preparation, and approved the distribution, of the Silver Fund July 2012 PPM, and because the Silver Fund July 2012 PPM attributed the statements therein to Kameli and CFIG, Kameli and CFIG are considered 'makers' of those statements for purposes of primary liability under the antifraud provisions of the federal securities laws."). Nor is it clear why allegations showing that the Funds were makers are necessarily inconsistent with the conclusion that defendants were makers. Defendants offer no reason why *both* groups cannot be deemed makers.

A third point of ambiguity, defendants maintain, has to do with Kameli's relationship with CFIG and AEP. Defendants say that the SAC ignores that Kameli is a legally distinct person from CFIG and AEP, and that the SAC "fails to put forth any factual allegations that justify the imposition of primary liability under Section 10(b), Rule 10b-5, and Section 17(a) aside from its conclusory claim that Kameli 'controlled' the operations." MTD 23-24. This appears to confuse the question of whether the SEC's allegations are sufficiently clear with the question of whether the allegations are legally sufficient. In dismissing the FAC, the court highlighted the SEC's failure to distinguish between Kameli and CFIG and AEP. There,

however, the problem was not whether or to what extent Kameli might be held liable for CFIG's

and AEP's actions; it was that the FAC's allegations failed to specify whether it was CFIG or

AEP that made the false statements with Kameli. *See Kameli*, 373 F. Supp. 3d at 1202 (citing

FAC's allegation that "*Kameli and CFIG or AEP* made materially false and/or misleading

statements about how the Projects affiliated with these Funds would obtain money for

development and construction.") (emphasis added). The SAC contains no such ambiguities.

## B.    Shotgun Pleading

Defendants raise a separate set of challenges to the way in which the SAC's causes of

action are pleaded. Specifically, defendants maintain that the SAC engages in so-called "shotgun

pleading" by failing to separate each of its claims for relief into a separate count.[14] Typically,

shotgun pleading involves incorporating in each count of a complaint all of the preceding

paragraphs and counts, "notwithstanding that many of the facts alleged [are] not material to the

claim, or cause of action, appearing in a count's heading.'" *CustomGuide v. CareerBuilder, LLC*,

813 F. Supp. 2d 990, 1001 (N.D. Ill. 2011) (quoting *Thompson v. RelationServe Media, Inc*., 610

F.3d 628, 650 n. 22 (11th Cir. 2010)). The problem with such pleadings is that they "make it

'virtually impossible to know which allegations of fact are intended to support which claim(s) for

relief.'" *Id*. quoting (*Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll*., 77 F.3d 364, 366

(11th Cir. 1996)).

First, defendants contend that the SAC's Rule 10b-5 counts must be dismissed because

the SEC asserts claims under all three of the Rule's subsections but fails to put them in separate

---

[14] Although defendants devote separate sections of the brief to advancing this argument with respect to the SAC's § 10(b) claims, its § 17(a) claims, and its § 20(a) control-person liability claim, their arguments are largely the same. To avoid redundancy, the following discussion focuses on defendants' arguments as to the § 10(b) claims. Separate discussion will be necessary only briefly with respect to the SAC's control-person claim.

counts. According to defendants, claims arising under Rule 10b-5(b) must be separated from those under Rule 10b-5(a) and (c) because the claims cannot be based on the same conduct. The court discusses in greater detail below the substantive issue of whether claims under Rule 10b-5(a) and (c) may be based on the same conduct used to assert claims under Rule 10b-5(b). *See* section IV.B, *infra*. Here, it suffices to note that, even assuming that defendants are correct on this point, it simply does not follow that the claims under Rule 10b-5's subsections cannot be *pleaded* in the same count. Defendants cite no authority for such a requirement. Nor is it uncommon for plaintiffs to allege violations of Rule 10b-5(a), (b), and (c) in a single count. *See, e.g.*, *Ledford v. Peeples*, 657 F.3d 1222, 1248 n.73 (11th Cir. 2011) (discussing Rule 10b–5(a) and Rule 10b-5(b) claims alleged in the same count); *OpenGate Capital Grp. LLC v. Thermo Fisher Sci. Inc.*, No. CV 13-1475-GMS, 2014 WL 3367675, at *15 (D. Del. July 8, 2014) (denying motion to dismiss claim insofar it alleged violation of Rule 10b–5(b) but granting the motion insofar as the claim alleged violation of Rule 10b–5(a) and (c)); *Sec. & Exch. Comm'n v. Small Bus. Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at *1 (N.D. Cal. Aug. 16, 2013) (discussing complaint in which violation of Rules 10b–5(a), 10b–5(b), and 10b–5(c) were alleged as a single cause of action).

The same is true of claims asserted under § 17(a)'s various subsections. *See, e.g.*, *S.E.C. v. ABS Manager, LLC*, No. 13CV319-GPC BGS, 2014 WL 2605476, at *5 (S.D. Cal. June 11, 2014) (discussing complaint in which cause of action alleged violations of sections 17(a)(1), 17(a)(2), and 17(a)(3)); *Sec. & Exch. Comm'n v. Small Bus. Capital Corp.*, No. 5:12-CV-3237 EJD, 2013 WL 4455850, at *3 (N.D. Cal. Aug. 16, 2013) (discussing complaint alleging violations of 17(a)(1), (a)(2), and (a)(3) in a single claim for relief); *JRA Architects & Project Managers, P.S.C. v. First Fin. Grp., Inc.*, No. CV 08-1285 (FAB/MEL), 2008 WL 11381412, at

*4 (D.P.R. Sept. 15, 2008), report and recommendation adopted, No. CV 08-1285 (FAB), 2009 WL 10688978 (D.P.R. Apr. 13, 2009) (fraud in violation of §§ 17(a)(1), 17(a)(2) and 17(a)(3) alleged in a single count of complaint); *see also Denny v. Carey*, 72 F.R.D. 574, 580–81 (E.D. Pa. 1976) ("The fact that plaintiff may assert violation of more than one section of the Securities Act of 1933 or the Securities Exchange Act of 1934 does not mean that there must be more than one cause of action with a separate count for each alleged violation.").

The reason Rule 10b-5 claims must be pleaded in separate counts, defendants say, is because the claims do not necessarily stand or fall together. They point out, for example, that the SEC might prevail on one of its Rule 10b-5(a) claims against one of the Funds but not its Rule 10b-5(b) claim against that Fund. If the claims are asserted in a single count, defendants argue, the court would be required either to dismiss both claims or allow both to stand, thereby either dismissing the valid Rule 10b-5(a) claim along with the defunct 10b-5(b) claim, or allowing the invalid Rule 10b-5(b) claim to proceed along with the valid 10b-5(a) claim.

That simply is not correct. It is perfectly possible for a court to permit a count or cause of action to proceed under one theory but not another. *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 587 (S.D.N.Y. 2016) (granting motion to dismiss Rule 10b-5(b) claim insofar as it relied on a duty to disclose uncharged wrongdoing but denying the motion insofar as Rule 10b-5(b) claim relied on statements about pending regulatory proceedings); *see also Stichting Pensioenfonds ABP v. Merck & Co.*, No. CIV.A. 05-5060 SRC, 2012 WL 3235783, at *17 (D.N.J. Aug. 1, 2012) (dismissing control-person claim as to some defendants but not others).

In addition to arguing that the SAC's Rule 10b-5(b) claims must be separated from the Rule 10b-5(a) and (c) claims, defendants go on to argue by essentially the same logic that the

23

SAC must also assert a separate count for each of its Rule 10b-5(b) claims against each of the Funds for each of the misrepresentations on which they are based. Thus, according to defendants, the SAC must assert its 10b-5(b) claim based on defendants' alleged misrepresentations to Silver Fund investors regarding the Fund's compliance with EB-5 regulations in a separate count from its 10b-5(b) claim based on defendants' alleged misrepresentations to Silver Fund investors regarding Kameli's and CFIG's compensation; and the SAC must devote still another separate count to its 10b-5(b) claim based on defendants' conflicts of interests; and so on for misrepresentation to the investors of each Fund.

Once again, however, defendants cite no case in which a court has announced such a requirement. Their sole citation is to *Frederiksen v. City of Lockport*, 384 F.3d 437, 438 (7th Cir. 2004), for the general proposition that Federal Rule of Civil Procedure 10(b) requires distinct claims to be separated into counts. But Federal Rule 10(b) specifically says that alleging separate counts is necessary only "[i]f doing so would promote clarity." Fed. R. Civ. P. 10(b). *See* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each claim founded on a separate transaction or occurrence--and each defense other than a denial--must be stated in a separate count or defense."). In this case, clarity would not be promoted – and might well be hindered – by requiring such a balkanization of the complaint. This conclusion becomes even more evident in light of defendants' separate argument that the SAC must allege separate counts for its claims under § 17(a), as well as separate control-person counts for each of the primary violations on which they are based. Clearly, this would produce an unduly long and complicated pleading.

Lastly, defendants contend that the control-person claim alleged in Count XV of the SAC must be dismissed because it incorporates all of the complaint's preceding paragraphs. Defendants point out that the preceding paragraphs allege violations of § 17(a) as well as of §

10(b). This is a problem, they say, because there can be no "control person" liability under §
20(a) of the Exchange Act for violations of § 17(a) of the Securities Act. But Count XV itself
specifically premises its assertion of liability only on the primary violations under § 10(b) and
excludes mention of § 17(a). SAC ¶ 423 ("Pursuant to Section 20(a) of the Exchange Act,
Kameli is liable as a control person for CFIG's and AEP's violations of Section 10(b) of the
Exchange Act and Rule l0b-5 thereunder.") (citations omitted). Hence, despite its incorporation
of previous paragraphs, Count XV adequately apprises defendants of the basis for its assertion of
control-person liability.

In short, the court concludes that the SAC meets Rule 9(b)'s pleading requirements.
Accordingly, defendants' motion to dismiss based on the SAC's alleged pleading deficiencies is
denied.

## IV.  Rule 12(b)(6)

The court now turns to defendants' arguments for dismissal pursuant to Rule 12(b)(6).
"Rule 12(b)(6) permits a motion to dismiss a complaint for failure to state a claim upon which
relief can be granted." *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). "To
properly state a claim, a plaintiff's complaint must contain allegations that 'plausibly suggest that
the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Id*. (quoting
*EEOC v. Concentra Health Servs., Inc*., 496 F.3d 773, 776 (7th Cir. 2007)).  "In ruling on a
motion to dismiss brought pursuant to Rule 12(b)(6), the court assumes all well-pleaded
allegations in the complaint to be true and draws all inferences in the light most favorable to the
plaintiff." *Plumbers & Pipefitters*, 707 F. Supp. 2d at 781.[15]

---

[15] The court confines itself to the SAC, even though the parties presented testimony and other
evidence in the course of the previous hearing on the Commission's motion for a preliminary
injunction. *See, e.g*., *Michigan v. U.S. Army Corps of Engineers*, 911 F. Supp. 739, 744 (N.D.

Defendants assert several different grounds for dismissal of the SAC's various claims. In large part, defendants' arguments assert that the SAC fails properly to allege a particular element necessary to state a claim under § 10(b) and § 17(a) of the Securities Act. As previously noted, the statutes are essentially the same, except that § 10(b) and Rule 10b–5 apply to acts committed "in connection with a purchase or sale of securities," while § 17(a) applies to acts committed "in connection with an offer or sale of securities." *Maio*, 51 F.3d at 631. While Rule 10b-5(b) and § 17(a)(2) impose liability for making misstatements and omissions, Rule 10b-5(a) and § 17(a)(1) impose liability for employing "any device, scheme, or artifice to defraud," and Rule 10b-5(c) and § 17(a) (3) impose liability for conduct that operates as a fraud or deceit "in connection with the purchase or sale of any security" and "in the offer or sale of any securities," respectively. A showing of scienter is required for claims under any of Rule 10b-5's subsections; a showing of scienter is necessary under § 17(a)(1) but not under §§ 17(a)(2) or (a)(3). *See, e.g.*, *S.E.C. v. Bauer*, 723 F.3d 758, 768 n.2 (7th Cir. 2013).

## A.    "Maker" Allegations for the SAC's Rule 10b-5(b) Counts

Defendants first seek dismissal of the SAC's claims under Rule 10b-5(b) on the ground that the Commission fails to allege that they are "makers" of the alleged misrepresentations.[16] As

---

Ill. 2012); *see also Advanced Micro Devices, Inc. v. Feldstein*, 951 F. Supp. 2d 212, 215 (D. Mass. 2013) ("A substantial quantity of extrinsic evidence has already been presented to the Court as part of Plaintiff's Application for Preliminary Injunction. However, under the Rule 12(b)(6) standard, the Court will rely only upon the facts contained in Plaintiff's Second Amended Complaint or incorporated therein by reference.").

[16] On this basis of this argument, defendants purport to seek dismissal of all of the SAC's § 10(b) counts. However, only Rule 10b-5(b) requires a showing that the defendant is the maker of misleading representations. Since the SAC's § 10(b) counts also assert claims under Rule 10b-5(a) and (c), defendants' argument on this point, even if correct, would not require dismissal of the § 10(b) counts in their entirety. And indeed, as discussed immediately below, defendants offer separate arguments for the SAC's claims under Rule 10b-5(a) and (c).

the Supreme Court has explained, "[f]or purposes of Rule 10b–5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *See, e.g.*, *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Here, the SAC specifically alleges that defendants are "makers" for purposes of Rule 10b-5(b) because they "directed the preparation, and approved the distribution" of the PPMs and that the PPMs attributed the statements they contained to Kameli and CFIG/AEP. *See* SAC ¶ 86 ("Because Kameli and CFIG directed the preparation, and approved the distribution, of the Silver Fund July 2012 PPM, and because the Silver Fund July 2012 PPM attributed the statements therein to Kameli and CFIG, Kameli and CFIG are considered 'makers' of those statements for purposes of primary liability under the antifraud provisions of the federal securities laws."); *id.* ¶ 146 (Golden Fund); *id.* ¶ 191 (Elgin Fund); *id.* ¶¶ 233, 242 (Aurora Fund); *id.* ¶ 273 (First American Fund); *id.* ¶ 307 (Naples Fund); *id.* ¶ 337 (Ft. Myers Fund).

Defendants object that these allegations are conclusory. In point of fact, however, the allegations are sufficiently supported by many of the SAC's other allegations. For example, the allegation that defendants directed the preparation and approved the distribution of the PPMs is supported by the SAC's general allegations that Kameli created CFIG and AEP, SAC ¶¶ 7, 52, as well as the Funds, *id.* ¶¶ 5-6, and that he "controlled all the operations of CFIG, AEP, the Funds, and the Projects," *id.* ¶ 8 ("Kameli controlled all the operations of CFIG, AEP, the Funds, and the Projects."). The SAC pleads additional facts to support the specific allegation that the PPMs attributed their statements to defendants. For example, with respect to the Elgin Fund, the SAC alleges that:

> (i) CFIG was the manager of the Fund; (ii) CFIG was responsible for all costs and
> expenses of the offering of interests in the Fund, including expenses related to the
> costs of preparing, reproducing, or printing the PPM; (iii) Kameli was a

27

> stakeholder in CFIG; (iv) Kameli was the Executive Director of CFIG; and (v) Kameli served as counsel to the Fund and CFIG in connection with the formation of the Fund and the offering of interests in the Fund.

SAC ¶ 190; *see also* SAC ¶ 201 (alleging similar facts regarding the Elgin 2011 PPM). The SAC includes similar allegations for each of the Funds. *See id.* ¶ 85 (Silver Fund); *id.* ¶¶ 145-46 (Golden Fund); *id.* ¶ 232 (Aurora Fund); *Id.* ¶ 272 (First American Fund); *Id.* ¶ 306 (Naples Fund); *id.* ¶ 336 (Ft. Myers Fund).

Defendants point to cases in which courts have held that serving in these roles – e.g., fund manager, principal, attorney – was not sufficient to impose maker liability under Rule 10b-5(b). Here, however, Kameli is alleged to have occupied all of these roles simultaneously -- in addition to creating, controlling, and operating the Funds. In any case, however, the question whether a defendant in fact exercised the requisite control over the content of the statement is "an inherently fact-bound inquiry." *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 427 (7th Cir. 2015). At this stage, the court concludes that, taking the SAC's allegations as true, and viewing them as a whole, the SEC has adequately alleged that defendants had "ultimate authority" over whether and how to communicate the PPMs' statements and content. The court therefore denies defendants' motion to dismiss insofar as it is based on the SAC's purported failure to plead "maker" liability.

## B.    Failure to Allege Knowing Dissemination or Scheme: Rule 10b-5(a) and 10b-5(c)

Next, defendants argue that all of the SAC's claims under Rule 10b-5(a) and (c) must be dismissed because they fail to allege that defendants "disseminated" the misleading statements in the PPMs. As noted previously, unlike Rule 10b-5(b), the text of Rules 10b-5(a) and (c) contain no specific reference to statements of any kind. Rule 10b–5(a) makes it unlawful to "employ any device, scheme, or artifice to defraud," and Rule 10b–5(c) makes it unlawful to "engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §§ 240.10b-5(a), (c). According to defendants, this means that the conduct used to support a claim under Rule 10b-5(b) – defendants' false/misleading statements/omissions – cannot also be used as the basis for claims under Rule 10b-5(a) and (c). As they put it, "[l]iability pursuant to Rule 10b-5(a) and Rule 10b-5(c) cannot be imposed by simply rechristening Rule 10b-5(b) claims as Rule 10b-5(a) and Rule 10b-5(c) claims." MTD 36.

Until recently, this position enjoyed considerable support among courts. *See, e.g.*, *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); *U.S. S.E.C. v. Benger*, 931 F. Supp. 2d 908, 913 (N.D. Ill. 2013); *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). It is no longer tenable, however, in light of the Supreme Court's decision in *Lorenzo v. Securities & Exchange Commission*, 139 S. Ct. 1094 (2019). The defendant in *Lorenzo* was an investment banker who sent an email at his boss's direction to prospective investors, knowing that the email contained false statements. The parties agreed that Lorenzo was not a "maker" for purposes of Rule 10b-5(b) because he was not responsible for the email's content. The question presented was whether Lorenzo could nonetheless be held liable under Rule 10b-5(a) and (c) given that the only conduct alleged in support of the claim was the misrepresentations. Lorenzo argued that "the only way to be liable for false statements is through those provisions that refer specifically to false statements" and that Rule 10b-5(a) and (c) apply "only when conduct other than misstatements is involved." *Id.* at 1101.

29

The Court rejected the notion "that each of these provisions should be read as governing different, mutually exclusive, spheres of conduct," observing that the "Court and the Commission have long recognized considerable overlap among the subsections of the Rule and related provisions of the securities laws." *Id*. at 1102. As the Court explained, "'[I]n declaring certain practices unlawful,' it was thought prudent 'to include both a general proscription against fraudulent and deceptive practices and, out of an abundance of caution, a specific proscription against nondisclosure' even though 'a specific proscription against nondisclosure' might in other circumstances be deemed 'surplusage.'" *Id*. (quoting *SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 198-99 (1963)). "'Each succeeding prohibition' was thus 'meant to cover additional kinds of illegalities—not to narrow the reach of the prior sections.'" *Id*. (quoting *United States v. Naftalin*, 441 U.S. 768, 774 (1979)). Under *Lorenzo*, therefore, claims under Rule 10b-5(a) and (c) may be based on misrepresentations and omissions.

Defendants read *Lorenzo* differently. They contend that asserting claims under Rule 10b-5(a) and (c) based only on misrepresentations generally remains verboten under *Lorenzo*. On their view, *Lorenzo* merely carves out an exception allowing such claims where the defendant is alleged to have *disseminated* the misrepresentation, rather than having made it. This interpretation is not plausible. Defendants arrive at their interpretation by seeking to square *Lorenzo* with prior cases holding that claims under Rule 10b-5(a) and (c) cannot be based on the same conduct as claims under Rule 10b-5(b). The court sees no basis for that assumption. Rather than positing a fine distinction between "making" statements and "disseminating" them, *Lorenzo* effectively abrogated the line of cases on which defendants rely and permits liability under Rule 10b-5(a) and (c) for both making and disseminating misleading statements – despite some resulting redundancy with Rule 10b-5(b). *See Sec. & Exch. Comm'n v. SeeThruEquity, LLC*, No.

18 CIV. 10374 (LLS), 2019 WL 1998027, at *5 (S.D.N.Y. Apr. 26, 2019) (*Lorenzo* foreclosed

defendants' argument that the "SEC inadequately alleges 'scheme' liability under Rule 10b-5(a)

and (c) … because it fails to allege a deceptive act that is distinct from misstatements.").

That said, however, the SAC actually alleges that defendants disseminated the

false/misleading statements. *See* SAC ¶ 51 ("Kameli directed employees of his law firm to

prepare the Funds' PPMs and the other offering documents attached to the PPMs, which

included, but were not limited to, Business Plans, Subscription Agreements, and Operating

Agreements. He approved the distribution of the PPMs and their attachments to prospective EB-

5 Program investors."); *see also* ¶ 84 (Silver); *id.* 114 (Golden); *id.* ¶¶ 189, 200 (Elgin); *id* ¶¶

231, 240 (Aurora); *id.* ¶ 271 (First American); *id.* ¶ 305 (Naples); *id.* ¶ 335 (Ft. Myers). Although

the SAC uses the word "distribution" rather than "dissemination," at least in this context, the

words are essentially interchangeable. Defendants again characterize these allegations as

"conclusory"; but they offer no basis or explanation for the characterization. To the contrary, the

SAC's general allegations regarding defendants' control over all aspects of the Funds' operations

provide sufficient support for the more specific allegations that defendants disseminated or

distributed the alleged false/misleading statements.

Indeed, defendants are also mistaken in claiming that the SAC fails to allege any

deceptive conduct apart from the misrepresentations forming the basis for the Rule 10b-5(b)

claims. As detailed above, the complaint alleges that Kameli, CFIG, and AEP commingled

funds; received undisclosed profit and compensation; and used funds for improper purposes such

as securities trading.

In sum, the court rejects defendants' contention that claims under Rule 10b-5(a) and (c)

cannot be predicated on the same conduct as that supporting claims under Rule 10b-5(b). Yet

even granting the contention, defendants' argument for dismissal fails because the SAC alleges

that defendants disseminated the PPMs' misleading statements, and also because the SAC

alleges conduct other than misrepresentations in support of its Rule 10b-5(a) and (c) claims.

## C.    Sellers

Defendants go on to assert a parallel argument for dismissal of the SAC's § 17(a) claims,

contending that the complaint fails to allege that defendants are "sellers" within the meaning of

the statute. By its plain terms, § 17(a) applies to "any person in the offer or sale of any

securities." 15 U.S.C. § 77q.  According to defendants, "[i]n order to be considered a 'seller' of

securities, one must pass title, or other interest in the security, to the buyer; or successfully solicit

the purchase, motivated at least in part by a desire to serve its own financial interest or those of

the securities owner. MTD at 39 (citing S.*E.C. v. JB Oxford Holdings, Inc*., No. CV 04-07084

PA VBKX, 2004 WL 6234910 (C.D. Cal. Nov. 9, 2004)). Defendants assert that the SAC

contains no such allegations. Instead, they claim, "a review of the offering documents of the

respective Funds … clearly show [sic] the purchase of securities from the funds themselves, and

not any of the Defendants." MTD at 39.

The court is not persuaded. To begin with, defendants' definition of "seller" is too

narrow. The Supreme Court has made clear that the statutory terms "in," "offer," and "sale" are

to be construed liberally. In *United States v. Naftalin*, 441 U.S. 768 (1979), for example, the

Court held that § 17(a) did not "require that the fraud occur in any particular phase of the selling

transaction," and that the terms are "expansive enough to encompass the entire selling process,

including the seller/agent transaction." *Id*. at 773; *see also S.E.C. v. Holschuh*, 694 F.2d 130, 142

(7th Cir. 1982) (rejecting the contention that "actual or first-hand contact with offerees or buyers

[is] a condition precedent to primary liability" under § 17(a)); *U.S. S.E.C. v. Czarnik*, No. 10

CIV. 745 PKC, 2010 WL 4860678, at *3 (S.D.N.Y. Nov. 29, 2010) ("[C]ontrary to the defendant's argument that section 17(a) requires that the defendant be an actual seller or offeror of securities for liability to attach, section 17(a) establishes broad anti-fraud prohibitions that are not limited to actual sellers of securities and can apply to persons who neither passed title nor solicited offers on behalf of securities issuers or sellers.") (quotation marks omitted). The SAC clearly alleges that defendants played a key role in the process of selling interests in the Funds.

In fact, the SAC satisfies even defendants' narrow definition according to which being a "seller" within the meaning of § 17(a) requires that a defendant "successfully solicit the purchase, motivated at least in part by a desire to serve its own financial interest or those of the securities owner. MTD at 39 (citing S.*E.C. v. JB Oxford Holdings, Inc*., No. CV 04-07084 PA VBKX, 2004 WL 6234910 (C.D. Cal. Nov. 9, 2004)). In many places, the SAC specifically alleges that defendants solicited investment in the Funds. *See* SAC ¶ 38 ("Defendants solicited and obtained investments in the CFIG and AEP Funds for an investment of $500,000 per investor, plus an administrative or service fee typically ranging from $35,000 to $75,000 for each investor."); *id*. ¶ 47 ("The CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States."); *id*. ¶ 49 ("Defendants solicited investors through similar, though not identical, offering documents for each Fund."); *id*. ¶ 12 ("This undisclosed practice would have been material to a reasonable investor in all of the Funds, both

at the time [Kameli] improperly diverted money from a Fund or Project … and when he solicited new investors for new Funds.").

As in so many other instances, defendants assert that these allegations are conclusory. Here, too, however, the SAC's allegations regarding defendants' solicitation of investments are supported by numerous other allegations. Among other things, the SAC alleges that the solicitation took place at various events, both in the U.S. and abroad, as well as via websites and internet videos, SAC ¶ 47; that the investments were offered in the PPMs, which defendants caused to be issued; and that investors sent their investment funds to Kameli, *id*. ¶ 44.

Lastly, defendants contend that any allegation that they were sellers of the investments is contradicted by other allegations in the SAC. Specifically, defendants point to allegations indicating that it was the Funds themselves that solicited investors. MTD 40. In one paragraph, for instance, the SAC alleges that "CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors." SAC ¶ 47.

As with defendants' argument vis-à-vis "maker" liability under Rule 10b-5(b), the Funds' alleged role as sellers is problematic only on the assumption that there can be only one seller for purposes of § 17(a). Defendants cite no authority and offer no argument for this proposition. In any case, when read along with the rest of the complaint, defendants are clearly alleged to have orchestrated the overall enterprise. As noted above, the SAC alleges that Kameli (along with CFIG and AEP) controlled the Funds. Indeed, the above-quoted paragraph on which defendants rely goes on by way of illustration to state that Kameli "has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in

34

the United States." SAC ¶ 47. In other words, the SAC indicates that, to the extent that the Funds are alleged to have engaged in selling, the activities were in large part carried out by Kameli.

Defendants argue that the paragraph's allegations do not expressly state that Kameli engaged in solicitation at these events. They suggest, for example, that Kameli may have attended the events in his role as an immigration attorney or for some purpose other than attracting EB-5 investors. MTD 41. However, that Kameli engaged in solicitation at these events can reasonably be inferred, and at this stage, the court is required to make all reasonable inferences in the Commission's favor. In any case, nothing turns on whether Kameli engaged in selling at these events. Even if he did not, the SAC's other allegations adequately plead that Kameli (and CFIG and AEP) are "sellers" for purposes of § 17(a).

## D.    Scienter

Defendants next contend that all of the SAC's claims under Rule 10b-5 and § 17(a)(1) must be dismissed because the complaint fails adequately to allege that defendants acted with scienter. For purposes of § 10(b) and § 17(a), "[s]cienter encompasses either a mental state embracing an intent to deceive, manipulate or defraud, or reckless acts that are not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *United States Sec. & Exch. Comm'n v. Ustian*, 229 F. Supp. 3d 739, 774 (N.D. Ill. 2017) (citations and quotation marks omitted). "In SEC enforcement actions, Rule 9(b) allows mental states to be alleged generally, yet there must still be some basis for believing the plaintiff could prove scienter." *Id.* (quotation marks and emphasis omitted). Generally speaking, scienter is a question of fact and is therefore usually best decided by the trier of fact. *See, e.g.*, *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d

954, 968 (N.D. Ill. 2011) ("First, and as a general matter, determinations as to a lack of scienter are typically—though not categorically—inappropriate at the summary judgment stage.").

The SAC sufficiently alleges that defendants acted with scienter. For one thing, the complaint specifically alleges that defendants acted knowingly/recklessly with respect to all of the SEC's 10b-5 and § 17(a)(1) claims and with respect all of the Funds. *See* SAC ¶¶ 117-118, 133, 137, 141-42 (Silver Fund); SAC ¶¶ 160, 166-67, 171, 174, 187 (Golden Fund); SAC ¶¶ 214, 218, 224, 228-29 (Elgin Fund); SAC ¶¶ 254, 258, 264, 268-69 (Aurora Fund); SAC ¶¶ 286, 290, 294, 303, (First American Fund); SAC ¶¶ 320, 324, 333 (Naples Fund); SAC ¶¶ 350, 356, 364 (Ft. Myers Fund); SAC ¶¶ 11, 32 (knowledge of EB-5 Programs' requirements).

These allegations draw support from the SAC as a whole. The Commission alleges that defendants were responsible for, and thus aware of, all of the representations made in all of the PPMs. The Commission also alleges that defendants were responsible for the diversion and commingling of funds and other conduct in light of which the PPMs' representations became misleading. For example, the SAC alleges that defendants were aware of the EB-5 Program's requirement that the full amount of an investor's capital be made available to the business most closely responsible for creating the employment on which his or her immigration petition is based; and that, after they began commingling and diverting investor funds, defendants were aware that the PPMs' statements that the investments complied with the Program's requirements were false/misleading. *See, e.*g., SAC ¶ 11 ("At the time he raised money from investors, Kameli knew, or was reckless in not knowing, that a well-known and established requirement of the EB-5 Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based. He knowingly or recklessly violated this requirement. He falsely

represented to investors that the Funds and Projects would comply with the EB-5 Program's requirements even though he knew, or was reckless in not knowing, that they did not."); *id.* ¶ 166 ("As Kameli and CFIG knew, or were reckless in not knowing, the Golden Project's securities trading … violated the [EB-5] Program's requirements because it prevented the full amount of a Golden Fund investor's contribution from being used for the job-creating Project (i.e., the Golden Project) most closely associated with their investment. In light of Kameli's and CFIG's use of Golden Fund and Project assets for securities trading, Kameli's and CFIG's statements in the Golden Fund July 2011 PPM that the Fund and Project would comply with the Program's requirements were false and/or misleading as of April 2013.").

The SAC's scienter allegations are further supported by allegations that, at least in some instances, Kameli was motivated by a desire to enrich himself. *See* Resp. Br. 30-31 (citing *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (stating that the "factual background adequate for an inference of fraudulent intent can be satisfied by alleging facts that show a defendant's motive to commit securities fraud")). For example, with respect to the Florida Project land transactions, the SAC alleges that Kameli listed the cost of the land as substantially more than he paid for it. *See, e.g.*, SAC ¶ 302 ("Additionally, as of September 2016, the First American Fund March 2013 Business Plan falsely and/or misleadingly stated that the First American Project's land costs would be $1 million, when in fact the actual land costs were $664,850, with the difference constituting an undisclosed approximate $335,000 profit to Kameli…. Such self-dealing would be material to a reasonable investor."); *see also* SAC ¶ 13 ("Not satisfied with the millions of dollars collected directly from investors – apparently for administrative, service, and/or legal fees paid to Kameli and his companies, partly for their purported compliance with the EB-5 Program's requirements – Kameli has diverted investor

funds from one Project to another and has spent a significant portion of investment proceeds for his own benefit, for the benefit of his brother, and for the benefit of companies he owns.").

According to defendants, the SAC's scienter allegations are deficient because they are unsupported by any reference to specific emails, phone calls, conversations, or testimony. But the SEC is not required to present evidence at this stage. *See, e.g.*, *Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860, 868 (N.D. Ill. 2010) ("Even under Rule 9(b), it is not necessary to plead evidence.") (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008)). Nor do the cases cited by defendants, *SEC v. Steffes*, 805 F. Supp. 2d 601 (N.D. Il. 2011), and *S.E.C. v. Scoppetoulo*, No. 10-20475-CIV, 2011 WL 294443 (S.D. Fla. Jan. 27, 2011), suggest otherwise. The cases are factually dissimilar because, among other things, both involved allegations of insider trading. Here, much of the conduct at issue is alleged to have been committed by Kameli alone, involving transactions between different entities that he owned and controlled. It should not be surprising, therefore, that the SAC does not cite communications between Kameli and other parties. In any case, the allegations identified above provide adequate support for the Commission's scienter allegations.

Defendants further argue that any inference of scienter is undercut by the fact that the PPMs are not alleged to have been deceptive at the time they were issued. Defendants point out that their alleged misconduct "occurred not days later, but rather and often years after the issuance of the PPMs." MTD 46. According to defendants, "[c]ourts have been hesitant to even inference [sic] scienter when there is a lack of proximity between the alleged misrepresentation or omission and the alleged contrary action." *Id.*

This argument is difficult to follow. At issue in the cases cited by defendants, *In re Verifone Sec. Litig.*, No. 5:13-CV-01038-EJD, 2016 WL 1213666 (N.D. Cal. Mar. 29, 2016), and

*In re Credit Acceptance Corp. Secs. Litig.*, 50 F. Supp. 2d 662 (E.D. Mich. 1999), was whether a defendant could be inferred to have acted with scienter at an earlier time based on subsequent events. In *In re Verifone*, for example, the plaintiffs claimed that one of the defendants had knowingly overstated his company's financial condition in a 2011 press release. *In re Verifone*, 2016 WL 1213666, at *8. To support their allegation that the defendant had knowingly misrepresented the company's financial condition, the plaintiffs cited the company's 2013 report of lower-than-expected revenue. *Id.* The court held that the lack of temporal proximity between the press release and subsequent report failed to support an inference of scienter. *Id.* at *9. Here, there is no allegation that the PPMs were false at the time they were issued and hence no issue of whether an inference of scienter can be made based on defendants' subsequent conduct. On the contrary, in this case the SEC alleges that it was defendants' own subsequent actions that actually gave rise to the false/misleading statements.

Defendants also challenge the SAC's allegation regarding Kameli's self-dealing. According to defendants, the SAC undermines any inference that Kameli acted self-interestedly. In defendants' characterization of the complaint, "it was not Defendants' nefarious actions that lead to the perilous financial situation of the projects"; instead, it was "due to Defendants allowing investors to redeem their investments." MTD 47. Defendants also say that, far from attempting to cover up their actions, the SAC itself acknowledges that Defendants periodically issued supplements to the PPMs to apprise investors of important developments and to ensure that they remained committed to investing in the respective Funds. *Id.* All of this, they contend, supports "a reasonable inference that Defendants were attempting to be as open as possible with the investors, disclose as much as possible, allow investors to recoup their investment, and lacked any intent to defraud." *Id.*

39

This reading of the SAC is difficult to square with its actual allegations. For one thing, while the SAC indicates that Kameli's handling of the redemptions worsened the Projects' financial condition, it does not allege that the redemptions were the *primary* reason for the Funds' economic difficulties. SAC ¶ 79 ("[W]hile Kameli has told investors at various points in time that they could withdraw from the Funds if they no longer wished to continue their investments, the Funds' poor financial condition has prevented Kameli from redeeming all Fund investors. Indeed, Kameli has declined some investors' redemption requests while allowing other investors to withdraw. Kameli's practice of allowing some, but not all, investors to withdraw their investments, even after they obtained their I-526 approvals from USCIS, has exacerbated the Funds' poor financial condition and harmed investors who remained invested in the funds.").

Nor does defendants' practice of updating and supplementing the PPMs undermine an inference of scienter. In fact, the SAC alleges that defendants deliberately omitted information from the supplements to deceive investors. In the case of the Silver and Golden Funds, for example, the Commission claims that the supplements failed to disclose the Silver and Golden Projects' relationship with Bright Oaks, and Nader Kameli's involvement with Bright Oaks. SAC ¶ 90 (none of the Silver Fund supplements disclosed that the Silver Project would receive money from any other Funds or Projects with which Kameli was involved); *id*. ¶ 130 ("In August 2013, Kameli and CFIG caused the Silver Fund to issue a First PPM Supplement, which asserted in pertinent part: 'Mr. Kameli is the principal of Bright Oaks Development, Inc. which may assist in the development and construction' of the Silver Project. However, this Silver Fund August 2013 First PPM Supplement omitted to state that Kameli had installed his brother as the President of Bright Oaks Development or that his brother had any involvement with the development of the Silver Project."); *id*. ¶ 150 (Golden Fund supplements never disclosed that

the Golden Project would obtain money from any other Funds or Projects with which Kameli was involved.); *id.* ¶ 184 (Golden Fund supplement informed investors of Golden Project's involvement with Bright Oaks Development, and Kameli's brother's involvement with Bright Oaks only in 2015, after they had stopped raising money).

In short, taking the SAC's allegations as true and drawing all reasonable inferences in the Commission's favor, the court concludes that the complaint adequately pleads scienter. The court therefore denies defendants' motion to dismiss the SAC's Rule 10b-5 and § 17(a)(1) for failing to allege scienter.[17]

## F.     Forward-Looking Statements

Defendants next contend that all of the SAC's counts must be dismissed because all of their alleged misrepresentations were forward-looking statements. They point out that a party cannot be held liable for forward-looking statements that turn out to be untrue, so long as they had a reasonable basis for making these statements at the time and they made the statements in good faith. *See, e.g.*, *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1333 (7th Cir. 1995) ("[A] projection can lead to liability under Rule 10b–5 only if it was not made in good faith or was

---

[17] Defendants separately argue that the SAC fails sufficiently to allege negligence for purposes of the claims under § 17(a)(2) and § 17(a)(3). However, having found that the SAC adequately alleges scienter, it follows *a fortiori* that the complaint sufficiently alleges the less onerous standard of negligence. *See, e.g.*, *Ustian*, 2019 WL 7486835, at *39 (holding that it was unnecessary to address sufficiency of evidence regarding negligence claims given questions of fact as to whether defendant acted with scienter); *United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 913 (S.D.N.Y. 2017) ("[B]ecause the Court finds that the SEC has properly plead the higher standard of scienter in connection with its misrepresentation claim, Uchimoto's motion to dismiss the Section 17(a)(2) claim for a failure to plead negligence is denied."); *S.E.C. v. Coplan*, No. 13-62127-CIV, 2014 WL 695393, at *4 (S.D. Fla. Feb. 24, 2014)("In light of these factual allegations, Coplan is deemed to have acted with scienter and, consequently, with the lower standard of negligence required for the Commission's claim under Sections 17(a)(2) and (3) of the Securities Act."). Accordingly, the court does not separately address defendants' argument that the SAC fails to plead negligence.

made without a reasonable basis."). Defendants' argument focuses specifically on their alleged representations regarding the Funds' compliance with the EB-5 Program's requirements. They claim that "the SAC is devoid of any well-plead [sic] factual allegations that allow one to even infer a lack of good faith or reasonable basis at the time the statements were made." MTD 57.

The court disagrees. Simply put, the PPMs' statements regarding EB-5 compliance cannot be regarded as "forward-looking." They were not predictions or forecasts about the Funds' status in the future; they were representing to investors that the Funds were in fact compliant with the EB-5 Program at the time that they were made (or at the very least, that defendants would not knowingly act in such a way as to make the Funds non-compliant with the Program). These representations, according to the SAC, became false or misleading once defendants' alleged misconduct began. Thus, by continuing to use the PPMs to attract investors, defendants made representations that were false at the time that they were made. *See, e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011) ("[C]ourts often describe forward-looking statements as statements whose accuracy can only be verified after they are made. The negative corollary to that proposition is that statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking statements.") (citations omitted); *see also Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 918 (N.D. Cal. 2012), on reconsideration in part (Jan. 10, 2013) ("The fact remains that a statement about a past or current fact can demonstrably be proven false. That is what distinguishes such facts from forward-looking predictions.").

Adopting a different tack, defendants argue that the SAC provides no basis for inferring that Kameli was aware of the Program's requirements or that the Funds were ever in violation of them. Indeed, they argue that, given USCIS's approval of many investors' I-526 Petitions, it was

reasonable for Kameli to have believed that the Funds were compliant with the Program's requirements. The SAC, however, specifically alleges that Kameli was aware of the Program's requirements. In particular, the Commission alleges that Kameli was aware of *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998), a decision by the Administrative Appeals Office of USCIS's predecessor agency, which mandated that the full amount of an investor's funds be made available to the business most closely responsible for creating the jobs on which his or her immigration petition is based. *See* SAC ¶ 32 ("As of the date on which Kameli began representing investor/clients and launched the Funds, he knew, or was reckless in not knowing, about the *Izummi* precedent decision and the EB-5 Program's requirement that the full amount of an investor's money must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based.").

Once again, defendants assert that the SAC's allegations are conclusory. But, as with the other allegations, those relating to Kameli's knowledge of the EB-5 Program are adequately fleshed-out. For example, the SAC alleges that Kameli held himself out as an expert in the Program, SAC ¶ 4 ("Kameli held himself out to investors as an expert in the EB-5 Program and told investors that his expertise would help investors obtain permanent U.S. residency through the Program."); and that he routinely spoke at events centering on the EB-5 Program, *id*. ¶ 47 ("The CFIG and AEP Funds have marketed their EB-5 limited partnership interests and solicited investors in a variety of ways – through public websites, internet videos, intermediaries who have promoted the investments, immigration attorneys with interested clients, and overseas meetings and seminars with prospective investors. Kameli has routinely attended events where he has spoken and met with prospective investors and investor representatives, including events in the United States.").

With respect specifically to Kameli's knowledge of the *Izummi* decision, the SAC alleges that Kameli and/or his firm cited the decision in filing investors' I-526 Petitions, *id*. ¶ 32 ("In fact, when Kameli and/or his law firm filed I-526 and I-829 Petitions with USCIS on behalf of Fund investors, they cited to the *Izummi* precedent decision in support of the Petitions, confirming that they knew the decision."), and in email communications, *id*. ¶ 33. Defendants object that these allegations leave unclear whether the acts were performed by Kameli or his firm, and they resist any notion that the firm's knowledge can be imputed to Kameli personally. But the fact that the SAC does not distinguish between Kameli and his firm on these points does not matter. The question is not whether the SAC makes sufficiently clear who made the statements for purposes of Rule 9(b); it is simply whether the complaint sufficiently alleges the element of scienter. With respect to the latter issue, it is not necessary to know whether Kameli personally made the statements; nor is it necessary to impute the firm's knowledge to Kameli himself. For even if Kameli was not personally involved in filing the petitions or composing the email in question, the fact that his firm was engaged in such matters makes it more plausible to infer that Kameli, too, was knowledgeable about them.

Yet it is not clear that defendants' position fares any better on the assumption that Kameli lacked knowledge of *Izummi*. As stated above, for purposes of § 10(b) and § 17(a)(1), scienter encompasses misleading statements made recklessly as well as knowingly. *Ustian*, 229 F. Supp. 3d at 774. The SAC alleges that if Kameli was not aware of *Izummi*, he acted recklessly. SAC ¶ 11 ("At the time he raised money from investors, Kameli knew, or was reckless in not knowing, that a well-known and established requirement of the EB-5 Program is that the full amount of an immigrant's investment must be made available to the business most closely responsible for creating the employment upon which the investor's immigration petition is based."). Likewise,

the court is unconvinced by defendants' argument that, given USCIS's approval of certain investors' I-526 Petitions, Kameli reasonably could have believed that the Funds were in compliance with EB-5 requirements. There is no indication that these approvals were anything more than routine or that they involved any actual scrutiny of the Funds and Projects.

None of the foregoing is to suggest that defendants ultimately will not be able to present evidence showing that Kameli did not know (and was not reckless in not knowing) of the EB-5 Program's requirements, or that he otherwise reasonably believed at all times that the Funds were in compliance with the requirements. At this juncture, however, the question is whether, taking the SAC's allegations as true, the complaint adequately alleges that, after he began diverting and commingling investor assets, Kameli lacked a good-faith basis for leading investors to believe that the Funds complied with the Program. The court concludes that it does.

## G.     The "Bespeaks Caution" Doctrine

In a similar vein, defendants claim that their alleged misrepresentations are not actionable because they are protected by the "bespeaks caution" doctrine. As the Seventh Circuit has explained, the "bespeaks caution doctrine provides that 'when forecasts, opinions, or projections in a disclosure statement are accompanied by meaningful warnings and cautionary language, the forward-looking statements may not be misleading.'" *Harden v. Raffensperger*, Hughes & Co., 65 F.3d 1392, 1404–05 (7th Cir. 1995) (quoting 3B Harold S. Bloomenthal, Securities and Federal Corporate Law § 8.26 [1] at 8–110 (1995)).

Here, defendants point to the following cautionary language included under the heading "Immigration Risks" in all of the PPMs:

> The Company makes no representation or warranty of any kind concerning whether an investment in the Company will meet the requirements of the Immigrant Investor Pilot Program or other U.S. immigration requirements. No assurances can be given that an investment in the Company will result in an

45

immigrant investor receiving an EB-5 Visa or conditional or permanent resident status in the U.S.

Investors in this Offering who have subscribed for Units with the intention of applying for U.S. conditional permanent residence through investment in the Company should be aware of certain risk factors relating to immigration to the U.S. and the Immigrant Investor Pilot Program and its administration. An immigrant investor who purchases Units with the intention of obtaining U.S. conditional permanent residence is encouraged, along with his or her advisors, to make his or her own independent review of the Immigrant Investor Pilot Program and the various immigration risk factors relating to the process in obtaining conditional and permanent residency status to determine if an investment in the Units is a suitable approach for such immigrant investor.

General Immigration Risks. Congress and/or USCIS may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to an immigrant investor or the Company. Immigrant investors who obtain conditional or permanent residence status must intend to make the U.S. his or her primary residence. Permanent residents who continue to live abroad risk revocation of their conditional or permanent residence status. The process of obtaining permanent resident status involves numerous factors or circumstances which are not within the control of the Company. These include an immigration investor's past history and quotas established by the U.S. Government limiting the number of immigrant visas available to qualified individuals seeking conditional or permanent resident status under the Immigrant Investor Pilot Program.

Golden Fund PPM 25, ECF 128-6; *see also* Silver Fund PPM 29-30; First American Fund PPM 30-31. According to defendants, this disclaimer put investors "on notice that none of the funds would necessarily adhere to the requirements of the EB-5 Program." MTD 60-61.

For at least two reasons, the bespeaks caution doctrine does not help defendants. First, the doctrine applies only to forward-looking statements. As already discussed, the SEC maintains that the statements were false at the time that they were made because at that point, the Funds had already run afoul of the EB-5 Program's requirements. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("The bespeaks caution doctrine does not serve if it is abused or gamed. Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *cf. In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp.

2d 487, 518 (S.D.N.Y. 2013) ("Moreover, Facebook's risk warnings are alleged to be more than mere opinions, they were misstatements of present fact, warning that something "may" occur when that event "had" already occurred, and not mere opinions of future possibilities.").

Second, the cautionary language cited by defendants does not address the specific risk relevant to the SEC's claims. On a natural reading, the above-quoted passages alert investors to the possibility that, for reasons beyond defendants' control, USCIS might determine that the Funds failed to meet the EB-5 requirements. *See* MTD 59 ("Whether a particular investor project adheres to the requirements of the EB-5 Program is a decision for the USCIS (an arm's length government agency who Defendants have no control over). Much in the same way a utility has no control over whether a government agency will or will not approve a permit for a power plant, and thus cannot be penalized when its prediction turns out to be inaccurate."). Here, the SAC alleges that defendants themselves are were responsible for the Funds' failure to comply with EB-5 requirements. The disclaimers on which defendants rely cannot reasonably be read as intending to caution investors that defendants might knowingly or recklessly operate the Funds in a way that violated the Program's requirements.

In short, just as defendants are not shielded from liability based on the purported forward-looking character of the PPMs' statements regarding EB-5 compliance, they likewise are not shielded by the PPMs' cautionary language regarding the EB-5 Program.

## G.    Control Person Liability

Defendants next contend that the SAC's claim for control-person liability against Kameli must be dismissed. The Seventh Circuit has set forth a two-pronged test for determining whether a person may be held liable as a control person under § 20(a) of the Exchange Act. *See, e.g.*, *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911 (7th Cir. 1994) (citing *Harrison*

*v. Dean Witter Reynolds Inc.*, 974 F.2d 873, 880–81 (7th Cir. 1992)); *Silverman v. Motorola, Inc.*, 772 F. Supp. 2d 923, 927 (N.D. Ill. 2011). "First, the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. The court has further stated that § 20(a) is to be viewed as remedial and therefore "construed liberally, and requiring only some indirect means of discipline or influence short of actual direction to hold a control person" liable." *Harrison*, 974 F.2d at 880–81 (quotation marks omitted).

Defendants argue that the control-person claim must be dismissed because it fails to allege that Kameli exercised sufficient control over CFIG and AEP. They insist that "[w]hether a defendant is a 'control person' subject to Section 20(a) liability is a factual question involving scrutiny of the defendant's participation in the day-to-day affairs of the primary violator and the defendant's power to control," MTD 62, and they claim that the SAC lacks such allegations.

This argument fails for several reasons. As an initial matter, defendants' proposed standard for determining control-person liability appears narrower than the one set forth in *Harrison*. In particular, there is nothing in *Harrison* to suggest that participation in day-to-day activities is determinative of the question. Even under defendants' standard, however, the SAC's allegations are sufficient. Although the complaint does not use the expression "day-to-day involvement," it nonetheless portrays Kameli as the prime mover behind all of the activities at issue in the suit and with CFIG and AEP in particular. He created and owns both corporations, SAC ¶ 7; he is CFIG's sole member, *id.* ¶ SAC 23; and he is AEP's President, *id.* ¶ 24. These allegations, along with the SAC's other allegations regarding Kameli's activities with the corporations, are easily sufficient to support an inference that Kameli possessed "some indirect

means of discipline or influence" over CFIG's and AEP's daily activities. *Harrison*, 974 F.2d at 880–81 (quotation marks omitted).

Against this, defendants argue that any inference that Kameli exercised day-to-day control over CFIG and AEP is contradicted by the fact that his brother, Nader Kameli, served as CFIG's Chief Operating Officer (COO). But the mere fact that Nader served in this role does not mean that he exercised exclusive day-to-day control over CFIG and AEP. The SAC implies that Nader was installed as a result of nepotism, rather than any experience he had with the work in question. *See, e.g.*, SAC ¶ 53 (asserting that, "[a]s of 2009, neither Kameli nor his brother had any experience or expertise in the development, construction, or management" of the projects Kameli was considering for EB-5 investments). Moreover, Nader's day-to-day involvement in the corporations' activities does not exclude Kameli's. More than one person can be held liable as a control person for a corporation's actions. *See, e.g.*, *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1088 (9th Cir. 2010) ("Ownership is one means of control, but it is not the only means, and multiple persons can exercise control simultaneously."); *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1030 (N.D. Ill. 2010) (declining to dismiss control-person claim asserted against two defendants); *In re Northfield Labs., Inc. Sec. Litig.*, No. 06 C 1493, 2008 WL 4372743, at *9 (N.D. Ill. Sept. 23, 2008) (declining to dismiss control-person claim asserted against two defendants).

In any event, as defendants themselves assert, the question of whether control-person liability may be imposed on an individual is a generally a factual one. *See, e.g.*, *Pension Tr. Fund for Operating Engineers v. DeVry Educ. Grp., Inc.*, No. 16 C 5198, 2018 WL 6714326, at *5 (N.D. Ill. Dec. 20, 2018) ("But whether an individual is a controlling person for purposes of § 20(a) is a fact-intensive issue that is not properly resolved at the pleading stage."); *In re Sears*,

*Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) ("Determination of whether an individual defendant is a " 'controlling person' under § 20(a) is a question of fact that cannot be determined at the pleading stage."). For purposes of this motion, the SEC has sufficiently alleged that Kameli "actually exercised general control over the operations" of CFIG and AEP, and that he "had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability." *Donohoe*, 30 F.3d at 911-12. Hence, defendants' motion to dismiss Count XV of the SAC is denied.

## H.    Particular Misrepresentations

Defendants' remaining arguments focus specifically on many of the central misrepresentations at the heart of the SEC's case: defendants' use of the Silver Line of Credit; their receipt of $4 million in fees from several of the Projects; their payments to Bright Oaks Development; defendants' use of investor funds to trade securities; and defendants' representations in connection with the acquisition of land for the Florida Projects. While differing in the details, defendants' arguments with respect to the various misrepresentations are structurally identical (and in some cases, repeated verbatim). For each alleged misrepresentation, defendants argue that their actions were consistent with all of the representations in the offering documents and that, consequently, there *was* no misrepresentation. In each case, they argue separately and more specifically that the Funds were at all times compliant with the EB-5 Program's requirements and that, consequently, they made no misrepresentations on that point.[18]

---

[18] The court notes that, with respect to these arguments, defendants have not replied to any of the arguments raised in the SEC's response brief. Typically, this results in the forfeiture of the point in question. *See, e.g.*, *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver."); *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008). Although the court has opted against the rigid application of this rule by simply holding that defendants have conceded *all* of the points at issue, further discussion of some of the issues would have been helpful. In their reply brief, defendants explain that they

Given the overlap between the issues and arguments, the court will avoid repetition by addressing previously-advanced arguments only where the court's prior discussion is not applicable *mutatis mutandis*.[19]

## 1.     Representations/Omissions Relating to the Silver Line of Credit

Defendants begin by challenging the Commission's allegation that they made misleading representations regarding the Silver Line of Credit—namely, that despite their representation to investors that the Silver Line of Credit would be used only for the investors' and the Fund's benefit, defendants in fact used the line of credit for the expenses of other Funds and Projects, and indeed even for their own personal expenses.

Defendants deny that they made any such representation restricting their use of the Silver Line of Credit. They point out that the funds used to secure the Silver Line of Credit belonged to investors who had specifically authorized defendants to do so. In addition, defendants cite section 11(d) of the Silver Fund Investor Holdings Account Agreement, which provides: "The Parties hereto consent to and agree that the Fund Manager [CFIG] has the right to use the funds held in the Investor Holdings Fund as collateral for the Fund Manager to secure a line of credit to be used for any expense the Fund Manager deems proper." Silver Fund Investor Holdings Account Agreement ¶ 11(d), ECF No. 128-1. According to defendants, this provision effectively

─────────────────────

decided not to reply to these arguments "[i]n an attempt to adhere to this Court's request that this current reply be within twenty-five pages." Reply Br. 27 n.2. In its minute entry addressing the briefing on the motion to dismiss, however, the court noted that defendants could request an expansion of the page limit if needed. *See* ECF No. 208.

[19] In addition, some of defendants' arguments are insufficiently developed. This is true, for example, of their assertion that the SAC fails to allege materiality with respect to the representations at issue. The SAC's allegations on these points are sufficient with respect to all of the misrepresentations at issue. Extended discussion of the issue of materiality is therefore unnecessary.

gave them carte blanche with respect to the funds in the holdings account. As a result, they contend, investors would have had no reason to believe that the Silver Line of Credit could be used only for the Silver Fund.

The SEC maintains that this reading of section (d) is too sweeping. According to the Commission, the provision must be read alongside other representations in the Holdings Account Agreement as well as representations in the Silver PPM. In particular, the SEC cites a provision of the Holdings Account Agreement stating: "Investor Holdings Agent shall establish an interest or non-interest bearing cash account to hold the Capital Contribution *for the benefit of Company and Investor* to be disbursed in accordance with this Agreement." Silver Fund Investor Holdings Account Agreement ¶ 4 (emphasis added). The Commission also points to the more general representations in the Silver Fund PPMs indicating that investor assets would be used (as required by the EB-5 Program) solely for the Silver Project.

At this stage, the court is not in a position to determine as a matter of law whether defendants misrepresented how the funds from the Silver Line of Credit would be used. "The test for whether a statement is materially misleading under Section 10(b) is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991)). "This is an objective inquiry, considering whether a reasonable investor would have received a false impression from the statement given the context and manner in which [the defendant] presented the statement." *United States Sec. & Exch. Comm'n v. Ustian*, No. 16 C 3885, 2019 WL 7486835, at *28 (N.D. Ill. Dec. 13, 2019) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)). Thus, as a general matter, "whether a public statement is misleading, or

whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." S.*E.C. v. Todd*, 642 F.3d 1207, 1220–21 (9th Cir. 2011). "'The issue is appropriately decided as a matter of law, however, when reasonable minds could not differ. In other words, if no reasonable investor could conclude public statements, taken together and in context, were misleading, then the issue is appropriately resolved as a matter of law.'" *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 897 (8th Cir. 2002) (quoting *Silver v. H&R Block, Inc.*, 105 F.3d 394, 396 (8th Cir. 1997)).  Given the tension between the different contractual provisions cited by the parties, and absent further information about the context in which the representations regarding the Silver Line of Credit were made, reasonable minds may differ as to how investors would have understood defendants' statements and what limits they would have believed defendants' use of the funds were subject to.

This conclusion holds notwithstanding the several additional arguments put forth by defendants. In support of their position, for example, defendants cite paragraph 8 of the Investor Holdings Account Agreement, which provides:

> The Investor Holdings Agent may hold the Capital Contribution deposited by the Investor in an interest-bearing account. Interest earned on such account shall first be used to pay the out-of-pocket expenses of the Investor Holdings Agent including, but not limited to, mailing costs and wire transfer fees incurred in connection with the transfer of the Capital Contribution not to exceed $500.00 per month.  Any remaining interest shall be paid to the Manager of Company in the Investor Holdings Agent's normal course at the end of the Investor Holdings Agent's regular interest payment and in compliance with U.S. laws and regulations.

Silver Fund Investor Holdings Account Agreement ¶ 8.

According to defendants, when read in conjunction with section 11, "it is clear that while the creation of the escrow account may have been for the benefit of the Silver Fund and investors, the ancillary uses of and earnings from the investors' funds were for the benefit of

CFIG." MTD 75. The court finds this interpretation highly strained. Section 8 says nothing about how the Silver Line of Credit would be used. It pertains only to the use of the interest earned on the escrowed funds. If anything, the provision's relatively strict rules regarding the minor issue of interest allocation tend to undermine defendants' contention that they had complete free rein when it came to the Silver Line of Credit.

Defendants also cite a 2013 USCIS Policy Memorandum, which states: "[a]n investor's money may be held in escrow until the investor has obtained conditional lawful permanent resident status if the immediate and irrevocable release of the escrowed funds is contingent only upon approval of the investor's Form I-526 and subsequent visa issuance and admission to the United States as a conditional permanent resident." United States Citizen and Immigration Services, Policy Memorandum: EB-5 Adjudications Policy at 6 (May 30, 2013) ("USCIS 2013 Memo").[20] As the Commission correctly points out, however, this document merely states that investor funds may be held in escrow. It does not say that the funds may be used for a line of credit, much less that the funds from such a line of credit could be used for purposes unrelated to the EB-5 investment.

---

[20] This document, and a second USCIS memorandum, United States Citizen and Immigration Services, *Talking Points from EB-5 Interactive Series: Expenses that are Includable (or Excludable) for Job Creation* (June 4, 2015) ("USCIS 2015 Memo"), are among those that the SEC has sought to strike. The Commission's basis for seeking to exclude these documents is not entirely clear. In its motion, the SEC states that although it has no reason to contest that the documents are indeed issued by USCIS, it "is impossible for the SEC or the Court to tell, at this stage, what the significance of these documents may be." Mot. to Strike 3. "At the motion to dismiss stage," the Commission says, "the Court should not take Defendants' word for it about the supposed significance of these documents." *Id*. What the Commission means by the "significance" of the documents is unclear. Ultimately, however, neither of the USCIS memos supports defendants' position. Accordingly, the SEC's motion to strike these documents is denied as moot.

Lastly, defendants separately argue that they had no duty to inform investors of how they spent funds from the Silver Line of Credit. They maintain that, "[g]enerally, there is no duty on the part of a company to provide investors with all material information." MTD 75. According to defendants, section 11(d) of the Holdings Account Agreement explicitly states that the Silver Line of Credit can be used for any expense CFIG deems proper, provided the investor authorized CFIG to do so. "What those expenses specifically are, although a reasonable investor may like to know, is not required to be disclosed by Kameli or CFIG." *Id.* at 76. But whether the investors authorized CFIG's use of the funds for the expenses in question is precisely what is at issue. In any case, the SAC identifies at least two sources of defendants' duty to disclose how they were to use the funds from the Silver Line of Credit. First, the Commission alleges in several places that, in virtue of his role as attorney for many investors, Kameli had a fiduciary duty to disclose the misuse of proceeds from the Silver Line of Credit. *See, e.g.*, SAC ¶¶ 67-69, 100, 114. In addition, the SAC alleges that "once Kameli and CFIG decided to speak on the issue of the Silver Line of Credit, they had an obligation to be both accurate and complete to avoid rendering their statements false or misleading." Resp. Br. 45. Defendants have offered no rejoinder on this point.

In short, because defendants have failed to show as a matter of law that they had unfettered authority with regard to the Silver Line of Credit, it is impossible to say as a matter of law that defendants' use of the line of credit entailed no misrepresentations. Accordingly, the court denies defendants' motion to dismiss the Commission's claims insofar as they are based on defendants' use of the Silver Line of Credit.

**2.      Representations/Omissions Regarding $4 million in Fees Paid to Defendants**

Next, defendants seek dismissal of the SEC's claims insofar as they are based on the allegation that defendants collected roughly $4 million in undisclosed fees from certain of the Projects. In particular, defendants challenge the SEC's assertion that defendants' receipt of these fees was contrary to the PPMs' statement that defendants' compensation would come entirely from loan interest and would not be paid until after the senior living centers began housing residents. Defendants also challenge the SEC's assertion that the payments violated EB-5 Program rules, thereby rendering false or misleading the PPMs' representation regarding EB-5 compliance.

With respect to the issue of compensation, defendants contend that the payments in question were for *development* services, whereas the PPMs' statements regarding compensation pertained only to *management* services. They argue that the compensation they received for development services was not subject to the conditions on compensation outlined in the PPMs for management services, and that their receipt of the $4 million in fees was not contrary to anything in the PPMs. Moreover, defendants cite a number of documents indicating that CFIG and AEP had indeed contracted with the Projects to provide development services. The amounts of these agreements largely match those on which the Commission's $4 million calculation is based.[21] As a result, they maintain, the payments in question were not undisclosed.

---

[21] These include several documents that the SEC has moved to strike, namely: the Elgin Development Services Agreement, ECF No. 128-9; the Golden Site Selection & Pre-Development Services Agreement, ECF No. 128-10; the Aurora Development Services Agreement, ECF No. 128-11; the Silver Business Development & Advisory Services Agreement, ECF No. 128-12; the First American Amended Business Development & Advisory Services Agreement, ECF No. 128-19; the Golden Development Services Agreement, ECF No. 128-29; and the Silver Development Services Agreement, ECF. 128-30. The Commission claims that the exhibits should be excluded because they were not attached to the complaint. For two reasons, however, the court need not rely on these documents for purposes of defendants' motion to dismiss. First, the information for which defendants cite these documents is also found in the Funds' Business Plans, which the Commission does not seek to exclude. Second, as will become

However, the Commission goes on to assert that the payments entailed misrepresentations about defendants' conflicts of interest. Specifically, the SEC says that defendants' conflict-of-interest disclosures focused on Kameli's role as counselor and manager, and that defendants never informed investors that Kameli, CFIG, or AEP intended to serve as developers for the Projects. "Even if the fees were disclosed," the Commission argues, "investors were not informed that those fees were going to Kameli, CFIG, or AEP." Resp. Br. 50. Further, the Commission asserts that "in some instances, Kameli was paying himself before the fees had been earned." *Id.*

In their opening brief, defendants give only glancing treatment to the adequacy of their conflict-of-interest disclosures. They assert that "the Funds' respective PPMs unequivocally state that CFIG, or CFIG's subsidiaries, would be reimbursed for services rendered and paid various fees as stipulated in the respective business plans' sources and uses"; that Kameli was a stakeholder in CFIG; that "the transactions entered into by Kameli, CFIG, and the projects will not be at arm's length, and that Kameli is the majority or sole equity holder in the Project." MTD 82. "Thus," defendants conclude, "investors … knew that such payments would be made to CFIG and could benefit Kameli." *Id.* at 82-83.

These passing remarks do not sufficiently address the adequacy of defendants' conflict-of-interest disclosures. Defendants cite no authority to suggest that these highly generalized disclosures were sufficient to inform investors of the conflicts of interest involved in the payments received for development services agreements. Defendants also leave unaddressed some of the SEC's specific allegations that in some cases Kameli paid himself for the

---

clear, the information in the documents is not responsive to the SEC's contention that, even if the payments themselves were disclosed, defendants' attendant conflicts of interest were not. Accordingly, as to these exhibits, the Commission's motion to strike is denied as moot.

development services before the fees had been earned. Thus, the court concludes that, insofar as the conflicts-of-interest disclosures are concerned, defendants have failed to show as a matter of law that their statements regarding the $ 4 million in fees were not misleading.

With respect to EB-5 compliance, defendants similarly attempt to show that their representations on the issue were not misleading because their use of investor funds was permissible under guidance provided by USCIS. Their argument is again based on their reading of the 2013 USCIS Memo. In particular, defendants cite the memo for the proposition that "in the regional center context, a commercial enterprise may create jobs indirectly through multiple investments in corporate affiliates or in unrelated entities," MTD 86 (citing 2013 USCIS Memo at 7); and that "in the regional center context, if the new commercial enterprise is not the job-creating entity, then the full amount of the capital must be first invested in the new commercial enterprise [defined by the USCIS as any for-profit activity formed for the ongoing conduct of lawful business] *and then* made available to the job-creating entity," *id.* (citing 2013 USCIS Memo at 16) (emphasis in original).

As interpreted by defendants, USCIS requires merely that investor funds go first to the new commercial enterprise (in this case, the Funds) and then to the job-creating entity (the Projects). Defendants maintain that once the job-creating entity receives the funds, it is free to dispose of them as it wishes. Here, they assert, investor funds always went first to the Funds, and only later were disbursed to the Projects. As a result, defendants maintain, the Projects paid the money to AEP and CFIG, who were free to do whatever they wanted with the money, including pay for development services. As they put it, "What CFIG or AEP did with its legitimately earned funds after the fact is their business alone and is not within the jurisdiction of Plaintiff." MTD at 87.

On its face, this contention is implausible. It has no limiting principle and would essentially permit investor funds to be used for *any* purpose—including patently fraudulent ones—so long as the funds followed the required path from the Funds to the Projects. To make a persuasive showing on this point, defendants would need to address such problems, and to discuss USCIS regulations in far greater depth than they have done here.

In sum, defendants have failed to demonstrate that, in light of their receipt of the $4 million in fees, the PPMs' representations regarding conflicts of interest and EB-5 compliance were not misleading. The court therefore denies defendants' motion to dismiss with respect to the SEC's claims regarding defendants' collection of $4 million in fees.

**3.      Representations/Omissions Regarding Bright Oaks Development**

The third misrepresentation alleged by the SEC stems from the allegation that, between June 2013 and June 2015, Kameli and CFIG caused the Golden and Silver Projects to pay Bright Oaks a total $745,000. SAC ¶¶ 119-20. Because defendants failed to disclose Nader Kameli's involvement with Bright Oaks during the time period in question, the SEC again alleges that defendants' conflict-of-interest disclosures were misleading.

Defendants initially argue that information about Bright Oaks could not have been disclosed to investors in the initial Golden and Silver PPMs because the documents were issued in 2011, and 2012, respectively, whereas Bright Oaks was not incorporated until 2013. This is beside the point, however, because the conduct on which the Commission's claim is based did not begin until 2013. Defendants assert that they informed investors of the relevant information regarding Bright Oaks in 2013. But the document they cite in support of the claim – an email memorandum sent by CFIG to Golden Fund investors and identified as a "Notice of Adjourned

Meeting"– fails to bear this out.[22] As the SEC notes, the letter at most shows only that Golden Fund investors were informed of Bright Oaks. It does nothing to show that Silver Fund investors were likewise informed. Moreover, the email merely discloses defendants' relationship with Bright Oaks. It says nothing about Nader Kameli's involvement with Bright Oaks.

For these reasons, the court declines to dismiss the SEC's claims insofar as they are based on the payments in question to Bright Oaks.

### 4.   Representations Regarding Securities Trading

Defendants next challenge the SEC's claims insofar as they are based on their use of investor funds to engage in securities training. As discussed above, the SEC alleges that, between April 2013 and September 2015, defendants caused the Illinois Projects to trade securities with money lent to them by their respective Funds. In some cases, the SEC further alleges that defendants used profits derived from the trading for purposes unrelated to the respective funds. According to the Commission, these actions violated the EB-5 Program's requirement that the full amount of an investor's money be made available to the business most closely responsible for creating the jobs upon which the investor's immigration petition is based. Thus, the Commission says, defendants misled investors by representing in the PPMs that the Funds would comply with the Program.

Defendants first argue that the Funds' operating agreements authorized their use of investor funds for securities trading. Specifically, paragraph 5.1 of the operating agreements provides:

---

[22] Chicagoland Foreign Investment Group, Update from Manager of Golden Assisted Living EB-5 Fund, LLC; Notice of Adjourned Meeting on August 21, 2013 (July 17, 2013), ECF No. 199-5. This is the last of the exhibits that SEC has moved to strike. Since the document is ultimately unhelpful to defendants, the court denies plaintiff's request that it be stricken.

> Subject to the terms of this Agreement and the terms of the Act, the Manager shall have the unrestricted power and exclusive authority to … carry on the activities of the Company and to do and to perform any and all things necessary for, incidental to, or connected with carrying on the activities of the [Fund].

Aurora Fund Operating Agreement, ECF No. 128-21; Elgin Fund Operating Agreement, ECF No. 128-22; Golden Fund Operating Agreement, ECF No. 128-23; Silver Fund Operating Agreement, ECF No. 128-24. Section 5.1 additionally states that "[a]ll operational decisions made by the Manager hereby have the express consent, approval, and affirmative vote of the Members." *Id*.

Defendants argue that this provision gave them the authority to trade securities with investor funds. For at least two reasons, the argument fails. First, it is on all fours with defendants' previous argument that, based on section 11(d) of the Holdings Account Agreement, they had unbridled authority to use the Silver Line of Credit as they wished. Here, as there, the Commission correctly argues that the provisions on which defendants rely must be viewed in context. *See, e.g.*, *Rombach*, 355 F.3d at 172 n.7. The question is whether, when taken along with defendants' other representations, investors would have regarded the operating agreement as giving defendants license to use their funds to engage in securities trading. As with section 11(d) of the Holdings Account Agreement, the court cannot agree with defendants that, as a matter of law, a reasonable investor would have understood the operating agreement in such a sweeping manner.

Second, even assuming that the operating agreements permitted defendants to engage in securities trading, that would not show that their representations regarding the EB-5 Program were not misleading. Whatever might have been permitted under the operating agreements, EB-5 rules still required defendants to use investors' money for the business most closely responsible

61

for creating the jobs upon which their immigration petition were based. It is unclear how using investor funds to trade securities would satisfy that requirement.

Defendants go on to repeat their argument, based on the USCIS 2013 Memo, that the *Izummi* decision requires only that investor money be distributed in the first instance to the new commercial enterprise (the Funds) and that whatever is done with the money once it goes through the job-creating entity (the Projects) is essentially irrelevant. The issue here, again, is whether EB-5 regulations are indeed indifferent to the way in which investor money is used once it is disbursed from the Funds to the Projects. Once more, the parties' briefing on this issue does not permit the court to address that issue in a meaningful way.

For these reasons, the court denies defendants' motion to dismiss the SEC's claims insofar as they are based on defendants' use of investor funds to trade securities.

## 5.    Statements Regarding Land Acquired for the Florida Projects

The final alleged misrepresentations challenged by defendants have to do with the transactions through which the land for the Florida Projects was acquired. As recounted earlier, the SEC alleges that Platinum Real Estate and Property Investments, Inc., a company owned by Kameli, purchased the land to be used for the Florida Projects at a price between approximately $665,000 and $750,000, and later sold the land to the Projects at a price of $1 million each. According to the SEC, this resulted in a combined profit to Kameli and Platinum of over $1 million. The Commission alleges that these transactions involved several misrepresentations: first, that the profit from the purchases represented a form of compensation for Kameli that was never disclosed to investors; second, that defendants failed adequately to inform investors regarding conflicts of interest; and third, that defendants misled investors about the cost of the

land by listing the price as $ 1 million rather than the substantially lesser amount Platinum actually paid for it.

Defendants do not address the SEC's contentions with respect to the issue of compensation. With respect to that issue, therefore, they have conceded the point. Defendants' arguments regarding the other alleged misrepresentations ultimately fail. As to the conflict-of-interest disclosures, defendants first dispute that they were required to disclose the matter at all. However, the Commission argues – and defendants fail to dispute – that the duty to disclose was based on Kameli's fiduciary relationship as attorney to several of the investors. Defendants go on to argue that the PPMs' disclosures were adequate, pointing to statements in the Florida PPMs. These are roughly the same as those of the Illinois Funds: they informed investors that Kameli owned both AEP and Platinum, and that defendants and that the Funds would not engage in arm's-length transactions. As in the case of the Illinois Funds' conflicts disclosures, however, the court is unable to say as a matter of law that the Florida Fund PPMs' disclosures were adequate. The issue turns on how reasonable investors might have understood these disclosures in light of defendants' other representations and other circumstances of this case. Because the parties have not addressed these matters in depth, the court cannot decide the issue at this juncture.

With respect to the issue of EB-5 compliance, defendants argue that they made no misrepresentations because they did not violate the Program's rules. Here, defendants rely entirely on second USCIS Policy Memorandum, issued in 2015, which states: "In terms of using funds from EB-5 investors to acquire real estate, *Matter of Izummi* requires that the full amount of money must be made available to the business(es) most closely responsible for creating the employment upon which the petition is based. For example, *a job-creating entity may propose to allocate some EB-5 funds to purchasing land* and other EB-5 funds to developing and operating

a business on the purchased land." MTD 109-10 (USCIS 2015 Memo at 4) (internal quotations omitted, defendants' emphasis). However, defendants provide no further explanation regarding how this sentence supports their conclusion. The quotation says merely that "some EB-5 funds" may be used to purchase land—a matter that does not appear to be in dispute. Defendants point to nothing further in the memo, and make no other argument, to suggest that land may be purchased and later sold at a higher price to turn a profit.

To be sure, the extent to which defendants may have profited from the sales is unclear. In their brief, they suggest that the "Land Costs" line item in the Funds' Business Plans includes costs and expenses beyond the parcel of land itself, so that the $1 million figure does not in fact represent a simple mark-up of the price. But they do not expand on the matter, and at any rate, this is a factual question that cannot be decided now. At this stage, the court is required to take the SAC's allegations, and all reasonable inferences therefrom, in the light most favorable to the Commission. Viewed in that light, defendants have failed to demonstrate that the land transactions for the Florida Projects comported with the EB-5 Program.

For these reasons, the court denies defendants' motion to dismiss the SAC's claims relating to the Florida Project land transactions.[23] Having considered and rejected defendants' other arguments under Rule 12(b)(6), as well as under Rule 9(b), defendants' motion to dismiss is denied.

---

[23] In addition to the payments to Bright Oaks, the SAC separately alleges that defendant violated the antifraud statutes by diverting funds from the Silver and Golden Funds through Bright Oaks to the Aurora Project. Defendants' arguments on this point overlap substantially with those already discussed. Specifically, they contend that the operating agreements and other documents gave them virtually unlimited authority regarding their handling of investor funds; and they argue that they complied with EB-5 rules because investor funds were always initially given to the Funds and were diverted and commingled only after the fact. Having considered these arguments already, the court will not address them separately here.

**Conclusion**

For the reasons discussed above, defendants' motion to dismiss [199] is denied and the

SEC's motion to strike [200] is denied as moot.


Date: <u>May 19, 2020</u>

                             Joan B. Gottschall
                     United States District Judge